No. 25-6268

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

STATE OF OREGON, et al.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the District of Oregon

————————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY
## PENDING APPEAL BY OCTOBER 10 AND AN IMMEDIATE
## ADMINISTRATIVE STAY BY OCTOBER 6

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

STATEMENT ......................................................................................................... 3

    A.    Legal Background ............................................................................ 3

    B.    Factual Background ......................................................................... 4

    C.    Prior Proceedings ......................................................................... 10

ARGUMENT ........................................................................................................ 11

I.    This Court has appellate jurisdiction. ................................................... 11

II.    The federal government is likely to prevail on the merits ................... 12

    A.    The President lawfully concluded that Section 12406's conditions are satisfied in Portland, and his judgment is conclusive. ............................. 13

    B.    Plaintiffs' remaining claims fail ..................................................... 21

II.    The other stay factors strongly favor the government ......................... 22

CONCLUSION ..................................................................................................... 24

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................. 11

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004) ................................................................. 12

*Bufkin v. Collins,*
    604 U.S. 369 (2025) ................................................................. 17

*Department of Education v. California,*
    145 S. Ct. 966 (2025) .............................................................. 11

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ..................................................................... 15

*East Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ................................................. 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................. 15

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.,*
    736 F.3d 1239 (9th Cir. 2013) ............................................... 23

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ................................................................. 21

*Luther v. Borden,*
    48 U.S. (7 How.) 1 (1849) ...................................................... 13

*Martin v. Mott,*
    25 U.S. (12 Wheat.) 19 (1827) ..................................... 2, 13, 14

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) .................... 2, 10, 11, 14, 15, 17, 18, 19, 22

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................. 11

*NRC v. Texas,*
    605 U.S. 665 (2025) ................................................................. 15

*Perpich v. Department of Def.*,
496 U.S. 334 (1990) ............................................................... 3

*Sterling v. Constantin*,
287 U.S. 378 (1932) ............................................................. 14

*Special Invs., Inc. v. Aero Air, Inc.*,
360 F.3d 989 (9th Cir. 2004) ............................................... 12

*United States v. Comstock*,
560 U.S. 126 (2010) ............................................................ 21

*United States v. Hatch*,
722 F.3d 1193 (10th Cir. 2013) ........................................... 21

**U.S. Constitution:**

Art. I, § 8, cl. 15 .......................................................... 3, 12, 21

Art. II, § 2, cl. 1 .................................................................. 4

**Federal Statutes:**

Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* ........................ 15

10 U.S.C. § 10101 ................................................................. 3

10 U.S.C. § 12406 ........................................ 1, 2, 4, 9, 10, 12-17, 19, 21, 22

10 U.S.C. § 12406(2) ........................................................... 16

10 U.S.C. § 12406(2)-(3) ...................................................... 12

**State Statutes:**

Or. Rev. Stat. § 396.160 ......................................................... 9

**Other Authorities:**

@realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.),
https://truthsocial.com/@realDonaldTrump/posts/115276694936263266 ........... 8

@realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.),
https://truthsocial.com/@realDonaldTrump/posts/115300118756896774
................................................................................... 9, 16

Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.................................................................... 4

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018) ............................................................................................ 17

iv

# INTRODUCTION

The district court has entered an extraordinary order countermanding the President's decision to call forth the National Guard to protect federal officers in Portland from violent attacks and to protect federal property from further damage. This Court should stay the order pending appeal, and should also grant an immediate administrative stay, as the Court has twice done recently for injunctions against the federalization and deployment of National Guard members in Los Angeles.

Under 10 U.S.C. § 12406, the President is authorized to federalize the National Guard when he "is unable with the regular forces to execute the laws of the United States" or "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." Both conditions apply in Portland. Over the past several months, agitators have assaulted federal officers with rocks, bricks, pepper spray, and incendiary devices and threatened federal personnel at their work. They have followed federal officers to their homes, doxed them online, and threatened to kill them on social media. They have also seriously damaged a federal building, breaking windows and security equipment and blockading the building's entrance. These violent actions, which local law-enforcement officials have been unwilling or unable to control, impede the ability of Immigration Customs and Enforcement (ICE) and other federal officials to enforce federal law and constitute a rebellion against federal authority. Although the violence has somewhat abated in the past month, that

is only because of an intensive deployment of federal police forces, which has become unsustainable.

In concluding that Section 12406's conditions were not satisfied, the district court impermissibly second-guessed the Commander in Chief's military judgments—something district courts lack the authority and competence to do. Nearly 200 years ago, the Supreme Court made clear that these judgment calls are for the President to make—not a Governor, and certainly not a federal court. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). At a minimum, as a stay panel of this Court explained, courts must "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom v. Trump*, 141 F.4th 1032, 1048 (9th Cir. 2025). And the President here had more than ample grounds to determine that regular forces were "unable" to sufficiently protect federal personnel and property and that the conditions in Portland at least rose to the level of a "danger" of rebellion. Where ongoing violence, threats of violence, and harassment aimed at interfering with the enforcement of federal immigration laws have stretched the regular forces beyond their capacity and left them unable to adequately enforce the laws, the President can call up the Guard in response to the most acute dangers and the most significant drain on federal enforcement resources.

The district court's order improperly impinges on the Commander in Chief's supervision of military operations, countermands a military directive to officers in the field, and endangers federal personnel and property. The balancing of harms thus

weighs strongly in favor of interim relief pending appeal so that the National Guard may protect federal personnel and property while this appeal is pending, and this Court should also grant an immediate administrative stay pending consideration of that request for relief. Defendants-appellants respectfully request an administrative stay no later than October 6, 2025, and a stay pending appeal no later than October 10, 2025.

Plaintiffs state that they oppose this motion and intend to file an immediate response.

## STATEMENT

### A.    Legal Background

**1.** The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15. Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation marks omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, become federal soldiers,

10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.**  Congress has granted the President authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406.  Section 12406 authorizes the President to call the National Guard into federal service if certain conditions are met. As relevant here, the second and third condition provide:

> Whenever . . . (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . suppress the rebellion, or execute those laws." *Id.*

**B.    Factual Background**

**1.**  Throughout the summer, ICE has seen a sharp and violent increase in protests and attempts to impede its duties of enforcing the Nation's immigration laws. *See* A83.  In Los Angeles, violent mobs attacked federal officers with concrete chunks, commercial-grade fireworks, and rocks and used dumpsters as battering rams to breach federal buildings.  Last week, a man opened fire on an ICE field office in Dallas, killing two detainees and injuring another.  Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.  The shooter's shell casings bore anti-ICE messages.  *Id.*

ICE's facility located in downtown Portland, known as the Lindquist Federal Building, has also experienced significant unrest targeting both the facility itself and those who work in it. A82.

Officers have feared for their safety. In one of the most significant incidents, agitators marched on the Portland ICE Office, lobbing rocks and sticks at federal personnel, and one protestor even wielded a firearm. A82-83. At the same time, they launched M80 fireworks and mortars at Federal Protective Services (FPS) officers. A82-83. To ensure their safety, FPS officers were forced to barricade themselves inside the ICE facility. A82-83. Those officers were able to escape only after special tactical units were deployed—making use of armored vehicles. A82-83. Several officers suffered injuries during this incident of mob violence. A82-83.

This incident is far from isolated. Officers have been bitten, kicked, shot with paintball guns, threatened with a machete and knife, and assaulted with potentially blinding lasers. A83; A66-67. Protestors have assembled a mock guillotine in front of the Portland ICE office and have directly threatened officers' lives. A71-72. Officers' personally identifiable information has been gathered and publicly released—a tactic call "doxing"—often with an accompanying death threat. A83 & n.1; A71. And it has become commonplace for officers to be followed after leaving work at the Portland ICE Office. A83. Indeed, officers are regularly trapped in their cars when entering and leaving federal property. A84. On multiple occasions, FPS had to use

pepper spray to disperse crowds, including at least one crowd that was holding a car hostage. A84.

Federal property is also under attack. Protestors repeatedly tried to burn down the Portland ICE Office, endangering federal property, personnel, and the public in general. A67-68. In one incident, a protester lit a flare and set fire to materials piled against the office. A67-68. The mob then piled on additional tinder, attempting to stoke the flames. A67-68. In another incident, protestors burned the American Flag on the ICE Office's driveway and lit an incendiary device next to that building's guard shack, again threatening to start a fire that would destroy federal property and endanger lives. A67-68. Separately, protestors have thrown rocks at the building and have damaged the main gate, proximity card readers, and security cameras in an attempt to breach the facility, causing significant security risks. A68-69; A83. Damage to the card readers has rendered access to the building significantly more difficult: now employees must call ahead to be individually admitted. A68-69. Protestors have also poured motor oil over the building entrance, creating both a fire risk and a direct threat to human safety. A73. As a result of damage and threats to the building, the Department of Homeland Security (DHS) was required to close the Portland ICE facility for more than three weeks, and even now that the facility has reopened, it must be boarded up to prevent further damage. A70.

FPS, which is charged with protecting the Linquist Building, is stretched to the point of collapse. The sustained violence and security risks have required FPS to

provide 24/7 protection for the building, a task it is simply not resourced to accomplish. A86. To date, 115 FPS officers have deployed to Portland in order to maintain this operational tempo. A86. DHS has been forced to reassign members of Homeland Security Investigations (HSI) Portland's Special Response Team (SRT) to support FPS, significantly impeding HSI's ability to accomplish the missions with which SRT is tasked. A76-77; A85. And while FPS has repeatedly attempted to contact the Portland Police Bureau (PPB) for assistance, the PPB has often failed to respond to calls for assistance, and even when they have responded, their response has been delayed. A84-85. These delays and failures to respond exacerbate tensions and leave FPS personnel and civilians in vulnerable positions. A84-85. In fact, instead of assisting in the protection of the Linquist Building, plaintiff City of Portland issued a Notice of Zoning Violation on September 18, 2025, requiring DHS to remove the protective boarding over its windows, exposing the building to further risk of damage and incursion. A78-79.

Plaintiffs' own declarations show the dire situation in Portland on the eve of the President's decision to federalize the Oregon National Guard. Throughout September 2025, ICE officials and property have been the subject of regular, often-violent protests. *See* A92-104. Large groups have gathered outside the ICE office, wielding sticks and harassing officers. *E.g.*, A95-97. Regularly, protesters interfere with cars seeking to enter or exit federal property, and within the last few weeks, several protesters have been arrested. *E.g.*, A95-97, A103-04. During one protest,

PPB concluded that it "would not be able to address [a] call" for assistance "with the resources [it] [had]." A104.

**2.** Based on the ongoing violence, harassment, and threats targeting the ICE facility in Portland, on September 26, DHS transmitted a memorandum to the Department of War (DoW) requesting "immediate and sustained assistance . . . in order to safeguard federal personnel, facilities, and operations in the State of Oregon." A52. The memorandum explained that "Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A52. Based on the need to "ensure the continued protection of federal facilities in Oregon[,]" DHS requested 200 DoW personnel to "direct[ly] support [] federal facility protection, access control, and crowd control measures." A52.

On the morning of September 27, the President cited the DHS request in directing the Secretary of War to coordinate the deployment of forces to Portland to protect ICE personnel and facilities. @realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266. Pursuant to that direction, the DoW first contacted the Oregon Adjutant General, who serves as Chief of Staff to the Governor of Oregon, Director of the Oregon Military Department, and Commander of the Oregon National Guard, to see if Oregon would assist in supplying National Guard members

in a non-federalized status.  *See* A47; Or. Rev. Stat. § 396.160.  The Oregon Adjutant General rejected that request, informing DoW that Oregon was unwilling to lend its voluntary support.  A48.

The President accordingly judged that the conditions in Portland satisfied the requirements of Section 12406 and federalized Oregon National Guard members. The President explained: "As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem."  @realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (Oct. 1 Truth).  "Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon."  *Id.*  "ANTIFA and Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law."  *Id.*

Those conclusions were consistent with assessments the President made earlier in the summer when federalizing National Guard members to temporarily protect ICE and other federal officials from the mob violence in Los Angeles.  Specifically, in a June 7 memorandum, the President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law and that "violent protests threaten the security of and significant damage to Federal immigration detention

facilities and other Federal property." A61. "To the extent that protests or acts of violence directly inhibit the execution of the laws," the President explained, "they constitute a form of rebellion against the authority of the Government of the United States." A61. In a published opinion, a unanimous panel of this court stayed a district court order enjoining that Los Angeles deployment, concluding that the President likely acted lawfully in invoking Section 12406. *See Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam).

**3.** On September 28, Secretary of War Pete Hegseth issued a memorandum to the Adjutant General and the Governor of Oregon mobilizing 200 members of the Oregon National Guard for sixty days. A48.

### C. Prior Proceedings

Plaintiffs, the State of Oregon and the City of Portland, filed suit alleging that the defendants violated 10 U.S.C. § 12406, the Posse Comitatus Act, the Administrative Procedure Act (APA), and the Constitution. A1-41. Plaintiffs sought a temporary restraining order, which the district court granted after full briefing and a hearing. A105-35. The court concluded that the federalization order violated Section 12406 and the Tenth Amendment and "enjoined" defendants from "implementing [their] September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service member to Portland." A136. The district court denied defendants' request to stay the injunction. A137.

## ARGUMENT

The federal government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

## I.   **This Court has appellate jurisdiction.**

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). "[W]here an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott v. Perez*, 585 U.S. 579, 594 (2018). Here, "several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction." *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). The court issued a comprehensive, 31-page order, "an adversary hearing has been held, and the court's basis for issuing the order is strongly challenged." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) (cleaned up). The order also threatens to inflict irreparable harm by exposing federal property and officials to a threat of violence and exposing lawful federal immigration enforcement efforts to interference and obstruction, thus warranting immediate review. *Abbott*, 585 U.S. at 594-95. For these reasons, a stay panel of this Court concluded that it had jurisdiction over the similar district court order enjoining the deployment of National Guard members in Los Angeles. *See Newsom v. Trump*, 141 F.4th 1032, 1043 (9th Cir. 2025).

In the alternative, this Court may exercise mandamus jurisdiction to review the district court's order. *See Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 993 (9th Cir. 2004). The order imposes irreparable harm by impinging on the ability of the President and the Secretary of War to use the National Guard to protect federal officials enforcing federal law, leaving the federal government with "no other adequate means to attain the relief." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (quotation marks omitted). And mandamus is "appropriate under the circumstances" because the district court has claimed authority to superintend the Executive Branch's control over the military. *Id.* at 381.

## II.    The federal government is likely to prevail on the merits.

The Constitution authorizes Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress empowered the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President judged that those conditions were satisfied in Portland, and there is no lawful basis for plaintiffs or the district court to override that judgment.

**A.** **The President lawfully concluded that Section 12406's conditions are satisfied in Portland, and his judgment is conclusive.**

**1.** Congress vested the decision whether to call up the National Guard in the President, not the courts, as the Supreme Court observed nearly 200 years ago in *Martin*, 25 U.S. (12 Wheat.) 19. There, President Madison activated the state militia into federal service pursuant to a 1795 law that provided that "whenever the United States shall be invaded, . . . it shall be lawful for the President of the United States to call forth such number of the militia . . . as he may judge necessary to repel such invasion." *Id.* at 29 (quotation omitted). A member of the New York militia challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service. *See id.* at 20-23.

The Supreme Court refused to entertain the militia member's contention that the President had misjudged the danger of an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President." *Id.* at 30. The Court emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union," as Commander in Chief, and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31. Once the President judged that such exigency existed, his judgment was "conclusive upon all other persons." *Id.* at 30. That includes the courts. *Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849).

Those same principles apply here. Plaintiffs seek to second-guess the President's judgment that attacks on federal personnel and property satisfied Section 12406's prerequisites for federalizing the National Guard in Portland. But as the Los Angeles stay decision explained, Section 12406 "is, in several material respects, the same as" the 1795 law at issue in *Martin*. *Newsom*, 141 F.4th at 1049. Section 12406 thus makes clear that Congress has granted "the authority to decide whether" its conditions are satisfied "exclusively to the President," whose decision must be treated as "conclusive." *Martin*, 25 U.S. (12 Wheat.) at 30.

Notwithstanding *Martin*, the panel that stayed the order enjoining the Los Angeles deployment concluded that some—albeit highly deferential—judicial review of the President's Section 12406 decision is available. *See Newsom*, 141 F.4th at 1046-50. The panel relied on *Sterling v. Constantin*, 287 U.S. 378 (1932), but that case underscores the conclusive nature of the President's judgments. *Sterling* involved a challenge to orders the Governor issued to the Texas National Guard after concluding that oil and gas producers were "in a state of insurrection." *Id.* at 387-88 (quotation omitted). The Court made clear that the Governor was "appropriately vested with the discretion to determine whether an exigency requiring military aid . . . has arisen" and that "[h]is decision to that effect [wa]s conclusive." *Sterling*, 287 U.S. at 399. The Court did not second-guess the Governor's judgment that an insurrection justified the deployment of the militia and evaluated only the measures taken by the militia once deployed. *See id.* at 401, 404.

14

**2.** Even if some judicial review is permitted, courts must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048. So long as that determination "reflects a colorable assessment of the facts and law within a range of honest judgment," courts must defer. *Id.* at 1051 (quotations omitted). That conclusion is consistent with general principles governing judicial review of presidential action. While plaintiffs challenging federal agency action ordinarily rely on the APA, 5 U.S.C. § 701 *et seq.*, the President is not an agency subject to the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Plaintiffs' only path to judicial review of the President's decision to invoke Section 12406, therefore, is a non-statutory ultra vires claim—a "Hail Mary pass" that "rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation omitted). The same is true of the DoW's implementation of that presidential directive. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make").

Plaintiffs cannot satisfy these demanding standards. In the weeks leading up to the federalization in Portland, ICE and FPS came "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A52. Outside of ICE's facility in downtown Portland, protestors attacked federal officers with rocks, bricks, pepper spray, and incendiary devices. *See* A66-67; A82-83. Protestors attempted to impede government vehicles as they entered or exited the

facility, throwing objects at the vehicles, blocking and surrounding them, and shouting threats at the occupants. A84; A68-69; A73. Individuals working inside the facility were followed home after work, and other federal personnel were doxed. A83; A68-69; A73-76. Protestors attempted on several occasions to burn down the facility and painted death threats on the facility's walls. A67-68; A71-72. Requests for assistance from local police resulted in no concrete actions or were ignored. A84-85; A78-79. As a result, DHS was forced to close the facility for three weeks and to reassign additional federal officers to support the protection of the facility and its occupants, significantly impeding its ability to perform its regular law enforcement functions. A70; A71; A76-77. These conditions amply support the President's judgment that he was "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3), and thus that federalization of a limited number of Guard members was warranted. *See* Oct. 1 Truth ("Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon.").

The President further explained why "protests or acts of violence" that "directly inhibit the execution of the laws . . . constitute a form of rebellion against the authority of the Government of the United States" (A61) or, at minimum, create a "danger of a rebellion," 10 U.S.C. § 12406(2). Contrary to the district court's conclusion, the term "rebellion" is not limited to an organized, armed, and open attempt to overthrow the entire government. [A129]. Congress enacted Section 12406's predecessor in response to the Whiskey Rebellion—a protest against a

16

specific tax, not an effort to overthrow the government as a whole. And dictionaries from the relevant time period, including those cited by the district court, define "rebellion" in a manner that encompasses deliberate resistance to the government's laws and authority. That broader conception of "rebellion" better reflects the historical context in which Section 12406 was enacted and the instances in which Presidents have federalized National Guard members since Section 12406 was enacted. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 9-12, 35-38 (2018). The fact that some on-the-ground conditions might both constitute a rebellion and render the President unable to enforce the federal laws does not create impermissible superfluity. *Contra* A128-30. "[S]ometimes the better overall reading of the statute contains some redundancy." *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (quotation omitted). The Whiskey Rebellion, undoubtedly rose to the level of a "rebellion" and also rendered the President "unable" to enforce the federal excise tax on whiskey.

**3.** In issuing its injunction, the district court substituted its own judgment for that of the President and failed to engage in the "highly deferential" review mandated by this Court's California stay decision. *See Newsom*, 141 F.4th at 1049. Put simply, the district court built its entire decision around a single premise: that "the protests were small and uneventful" when the President issued his federalization decision. A123; *see also* A123-30. But the district court itself identified several incidents in September, A123-24, and there is ample record evidence showing the violence was far

from "small" or "uneventful," providing more than a "colorable" basis to support the President's decision to federalize the Guard. *See Newsom*, 141 F.4th at 1049.

Plaintiffs' own evidence shows the dire situation in Portland on the eve of the President's decision to federalize the Oregon National Guard. Throughout September 2025, ICE officials and property were the subject of regular, often-violent protests. On Labor Day, for example, hundreds of protesters gathered outside ICE facilities and built a mock guillotine, requiring FPS officials to exert physical force to keep order and resulting in several arrests. A95-97. Multiple citizens called complaining about PPB's failure to control the mob, one calling PPB "useless." A94. Just a few days later, on September 6, a mob of 50 to 60 protesters gathered to harass federal personnel by flashing lights, swinging sticks, and blocking vehicles from accessing the building. A98-100. This violence lasted hours, yet nothing suggests that PPB rendered any assistance. *See* A98-100. Less than a week later, a group of protesters offloaded a car's worth of sticks and bats—potentially gearing up to engage in violence or at least "re[-]suppl[ying]" an already-armed mob. A101-02. On September 19, FPS was stretched beyond its means—unable to handle protesters threatening vehicles and at least one protester wielding a large stick or sword. A103-04. On the same day, federal officers had to respond to a bomb threat. A71. During one protest, PPB concluded that it "would not be able to address [a] call" for assistance "with the resources [it] [had]." A104.

18

This is far from "categorically different from the violent incidents" in California that justified the federalization of the California Guard, especially given the highly deferential standard of review. *Contra* A123-24. Both situations involved physical threats against federal personnel—like arming protesters (A101-04) and throwing rocks, sticks, and explosives at federal officers (*Newsom*, 141 F.4th at 1052). And both also involved attempts to damage federal property—like interfering with vehicles (A98-100) and destroying federal property (*Newsom*, 141 F.4th at 1052). While there were fewer agitators in Portland than in California, that just explains why the President federalized and deployed just 200 Guardsman in Portland, compared to 4,000 in California. It is not a basis for discrediting the President's colorable assessment of the facts. In short, the district court ignored evidence and minimized the seriousness of the problems in Portland during September.

The district court erred by focusing entirely on the situation in Portland in the handful of days preceding the President's federalization decision. *See* A123 (discounting events that occurred "at least two weeks" before federalization), A124 (same for an event that "occurred a week before" federalization). Nothing in Section 12406 suggests the President must consider only events that immediately precede his federalization decision, and reading in such a requirement was improper. Indeed, a recency requirement would make no sense—analysis of a threat necessarily encompasses consideration of how the situation on the ground has evolved over time. The President was well within his discretion to consider the months'-long unrest in

Portland, as well as the potential for continuing unrest over the foreseeable future, and both considerations support the President's federalization decision.

Although violence has somewhat abated in the recent month, that is only because of an intensive deployment of FPS forces. *Contra* A124-25. By relocating officers across the country and running 12-hour shifts seven days a week, FPS has done its best to cope with the mob violence in Portland—without any meaningful aid from local police. Contrary to the district court's suggestion, that Herculean effort is far from sustainable conduct by "regular forces." The President is not required to deploy nationwide federal law enforcement resources 24/7 to contain the situation in Portland; instead, he may lawfully determine that those forces are overstretched, that he is unable to execute the laws with those forces, and that federalization of Guard members is necessary to assist.

Events outside Portland—like a recent shooting at a Dallas ICE facility—are similarly relevant. *Contra* [A122]; [A125]. Those background facts might provide helpful insight into the potential dangers to federal personnel and property, the current dynamics in our country, historical patterns in mob violence, and lessons learned from prior events. Perhaps more importantly, federal law enforcement is a necessarily national endeavor. If resources must be shifted from one part of the country to another, or if a resource-intensive mission elsewhere is consuming resources, that informs whether the regular forces are able to enforce the laws. How and where to deploy those forces, or whether to reinforce them with the National

Guard, in response to violent resistance to federal law enforcement throughout the country is a judgment the Constitution and laws vest in the President.

Finally, the district court's suggestion that the President did not act in good faith is without factual support. A126. As explained, Portland faced significant protests on the eve of the President's federalization decision, and the President's social media posts are clear that only "necessary Troops" should be federalized—consistent with the limited federalization order at issue here. A126.

### B. Plaintiffs' remaining claims fail.

The federalization of the Guard does not violate the Tenth Amendment. The Supreme Court "long ago rejected the suggestion" that the federal government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). If a federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010). Here, the text of the Constitution makes clear that Congress may "provide for calling forth the Militia." U.S. Const. art. I, § 8, cl. 15. And Section 12406 rests on that express grant of authority, authorizing the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary." 10 U.S.C. § 12406. The district court treated plaintiffs' Tenth Amendment claim as derivative of their statutory claim,

A130-31, so the President's lawful invocation of Section 12406 defeats any Tenth Amendment claim. *Newsom*, 141 F.4th at 1054 n.5.[1]

## II.   The other stay factors strongly favor the government.

A unanimous panel of this Court already recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and that threats directed at federal personnel and property harm that interest. *Newsom*, 141 F.4th at 1054. The government also suffers irreparable harm when its federal immigration officials are prevented from safely and successfully enforcing the law. *See* A79-80. That some individuals have protested peacefully does not diminish the threat posed by the agitators who have attacked and threatened federal personnel and property. *See supra* pp. 4-8.

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief. Plaintiffs' argument that the deployment upsets the federal-state balance, "is, in essence, a merits argument," *Newsom*, 141 F.4th at 1055, which is wrong for the reasons explained. *See supra* pp. 13-22. The decision to call National Guard members into federal service necessarily renders those members temporarily unavailable to serve in state roles, but that is the result of the dual system

---

[1] The district court declined to address plaintiffs' remaining claims, but those claims fail for the reasons the federal government explained in district court.

of control created by the Constitution and Congress. And Governor Kotek was given the opportunity to maintain control of the Guard units, in any event.

Plaintiffs, moreover, can only speculate that emergencies and unrest might occur in Oregon while the Guard is deployed. Such speculation cannot establish that it is "likely," as opposed to merely "possib[le]," that plaintiffs will suffer irreparable harm absent interim relief. *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). And even if an emergency occurs, it is implausible to suggest that 200 otherwise-occupied Guard members will impair the State's ability to respond.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay pending consideration of the motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

*/s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*
*Sharon.swingle@usdoj.gov*

October 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,598 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ J. Kain Day
J. KAIN DAY

**ADDENDUM**

# TABLE OF CONTENTS

Complaint, Dkt. 1 (Sept. 28, 2025) ...................................................................... A1

Declaration of Major General Timothy L. Rieger, Dkt. 37 (Oct. 2, 2025) ............... A42

Declaration of Cammilla Wamsley, Dkt. 38 (Oct. 2, 2025) ......................................... A63

Declaration of Robert Cantu, Dkt. 40 (Oct. 2, 2025) ................................................. A81

Declaration of Brian Hughes, Dkt. 46 (Oct. 2, 2025) ................................................. A88

Ex. 1 to Declaration of Brian Hughes, Dkt. 46-1 (Oct. 2, 2025) ............................... A92

Ex. 2 to Declaration of Brian Hughes, Dkt. 46-2 (Oct. 2, 2025) ............................... A95

Ex. 5 to Declaration of Brian Hughes, Dkt. 46-5 (Oct. 2, 2025) ............................... A98

Ex. 11 to Declaration of Brian Hughes, Dkt. 46-11 (Oct. 2, 2025) ......................... A101

Ex. 19 to Declaration of Brian Hughes, Dkt. 46-19 (Oct. 2, 2025) ......................... A103

Opinion and Order Granting Motion For Temporary Restraining Order,
    Dkt. 56 (Oct. 4, 2025) ...................................................................................... A105

Temporary Restraining Order, Dkt. 56-1 ............................................................... A136

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND, | |
| Plaintiffs, | Case No. 3:25-cv-01756 |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

Page 1 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.  INTRODUCTION

1.      The "traditional and strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Our nation's founders recognized that military rule—particularly by a remote authority indifferent to local needs—was incompatible with liberty and democracy. Foundational principles of American law therefore limit the President's authority to involve the military in domestic affairs.

2.      Those principles stem first from the U.S. Constitution, which reserves the general police power for the states while establishing civilian control over the military. It also affords Congress, not the President, the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." Art. I, § 8, cl. 15–16. While Congress has delegated a portion of that power to the Executive, it carefully limited the President's authority to exert control over a state's National Guard—the modern term for the militia—to specific circumstances. And for over a century and a half, Congress has expressly forbidden federal military interference in civilian law enforcement.

3.      Defendants have trampled on these principles by federalizing members of the Oregon National Guard for deployment in Portland, Oregon, to participate in civilian law enforcement. On September 28, 2025, the Secretary of Defense (now referred to as the Secretary of War) issued a memorandum calling into federal service 200 members of the Oregon National Guard. This order effectuated a social media post by President Trump on September 27, 2025, which authorized the Secretary to employ "Troops" using "Full Force" in Portland. Citing nothing more than baseless, wildly hyperbolic pretext—the President says Portland is a "War ravaged" city "under siege" from "domestic terrorists"—Defendants have thus infringed on Oregon's sovereign power to manage its own law enforcement activity and National Guard

Page 2 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

resource. Far from promoting public safety, Defendants' provocative and arbitrary actions threaten to undermine public safety by inciting a public outcry.

4.    The facts cannot justify this overreach. While Defendants' actions appear focused on ongoing protests near an Immigration and Customs Enforcement facility in Portland, those protests have been small in recent weeks—typically involving less than thirty people—and the protesters' activities have not necessitated any arrests since mid-June. But Defendants' heavy-handed deployment of troops threatens to escalate tensions and stokes new unrest, meaning more of the Plaintiffs' law enforcement resources will be spent responding to the predictable consequences of Defendants' action.

5.    Defendants' deployment of troops to Oregon is patently unlawful. Because their stated basis for federalizing members of Oregon's National Guard is patently pretextual and baseless, Defendants cannot satisfy any of the three perquisites for involuntarily federalizing a state's National Guard under 10 U.S.C. § 12406. Defendants' purpose in federalizing those troops—to integrate them into federal law enforcement activities in Portland—also violates the Posse Comitatus Act.

6.    Additionally, Defendants' actions violate the Tenth Amendment's guarantee that the police power—including the authority to promote safety at protests and deter violent crime—resides with the states, not the federal government. And by singling out a particular disfavored jurisdiction for political retribution, these actions also eviscerate the constitutional principle that the states' sovereignty should be treated equally.

7.    For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

Page 3 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## II. JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a) and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are agencies of the United States and officers sued in their respective official

capacities. The State of Oregon is a resident of this district, and a substantial part of the events or

omissions giving rise to this Complaint occurred and continue to occur within the District of

Oregon.

## III. PARTIES

**A.      Plaintiffs**

10.      The State of Oregon is a sovereign state of the United States. Oregon is

represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

11.      Plaintiff City of Portland is a municipal corporation of the State of Oregon duly

organized and existing under the laws of the State of Oregon. The Portland Police Bureau (PPB)

is a bureau of the City of Portland. PPB is the largest law enforcement agency in Oregon and has

the primary responsibility for policing the City of Portland.

**B.      Defendants**

12.      Donald Trump is President of the United States. As such, he is the Commander-

in-Chief of the United States' armed forces, including those portions of the National Guard

lawfully under federal control. He is sued in his official capacity for declaratory relief only.

13.      Pete Hegseth is Secretary of Defense and the head of the U.S. Department of

Defense. He is sued in his official capacity.

Page 4 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

14.     The U.S. Department of Defense (DOD) is a department of the Executive Branch of the United States government responsible for coordinating and supervising the United States armed forces, including those portions of the National Guard lawfully under federal control. DOD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). On September 5, 2025, President Trump issued Executive Order 14,347, entitled "Restoring the United States Department of War," in which he stated that the Department of Defense "may be referred to as the Department of War" as a secondary title in certain contexts. 90 Fed. Reg. 43893, 43893 (Sept. 5, 2025).

15.     Kristi Noem is Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. She is sued in her official capacity.

16.     The U.S. Department of Homeland Security (DHS) is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). One component of DHS is U.S. Immigration and Customs Enforcement (ICE).

## IV. BACKGROUND

### A.     The Oregon National Guard is a State-Based Military Reserve Force

17.     The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15–16. This state-based militia that existed at the nation's founding was the forerunner of the modern National Guard.

18.     Today, the National Guard is a state-based military reserve force that consists of two overlapping but distinct organizations: the National Guard of the various States and the National Guard of the United States. Since 1933, anyone who enlists in a state's National Guard

Page 5 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

is simultaneously enlisted into the National Guard of the United States. And when a member of a state's National Guard is ordered into federal service, that member is relieved of his or her status in the state's National Guard for the duration of that federal service.

19.     Members of the National Guard may serve in one of three capacities: State Active Duty status, Title 32 status, and Title 10 status.

20.     First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. For example, when wildfires occur in Oregon, Governor Kotek frequently authorizes the Oregon National Guard to assist with firefighting efforts.

21.     Second, members of the National Guard may serve in a hybrid federal-state status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." The United States has traditionally recognized that National Guard members serving federal missions in Title 32 status must have the consent not only of their home state's governor but also the consent of any other governors concerned in the mission. Here, Oregon does not consent to the deployment of Oregon National Guard members pursuant to 32 U.S.C. § 502(f)(2)(A).

22.     Third, members of the National Guard may be "federalized" and called into federal service in what is known as "Title 10" status under Title 10 of the United States Code.

Page 6 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The President's authority under Title 10 is carefully limited to specific circumstances under 10 U.S.C. § 12406.

**B.      10 U.S.C. § 12406 Limits the Circumstances When a President Can Call a State's National Guard Members into Federal Service**

23.      Congress has granted the President authority over the states' respective National Guards, but it carefully limited that authority to specific circumstances. As relevant here, 10 U.S.C. § 12406 provides that:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

24.      Thus, the President's authority over a state's National Guard pursuant to § 12406 is limited to circumstances involving a foreign nation's "invasion," an outright "rebellion," or where the President has been "unable with regular forces" to execute Federal Law through ordinary means. And if one of those circumstances is present, the President "shall" issue any orders to a state's National Guard "through" that state's governor.

Page 7 -      COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**C.    The Posse Comitatus Act Prohibits the Deployment of Federalized National Guard Troops for the Purpose of Civilian Law Enforcement**

25.    The President's authority over a state's National Guard is subject to other constraints as well. The Posse Comitatus Act, 18 U.S.C. § 1385, prohibits anyone from deploying the U.S. military—including any National Guard members in federal service—for the purpose of civilian law enforcement within the United States. That prohibition applies "except in cases . . . expressly authorized by the Constitution or Act of Congress." *Id.*

26.    Notably, 10 U.S.C. § 12406 does not confer an exception to the Posse Comitatus Act because, while it authorizes the president to "call into federal service" a state's National Guard under certain circumstances, it does not authorize the president to domestically deploy the National Guard in pursuit of any particular purpose. This stands in contrast to other statutory provisions, like 10 U.S.C. § 252, which authorizes the President to not only "call into Federal service . . . the militia of any state" but also "*use* such of the armed forces" in specified law enforcement activities under certain circumstances (emphasis added).

27.    In light of these restrictions—together with Americans' "traditional insistence on limitations on military operations in peacetime," *Laird*, 408 U.S. at 15—it is unsurprising that until the last few months, no President had invoked § 12406 since President Nixon called up the National Guard to deliver mail during a Postal Service Strike over 50 years ago. *See* Exec. Order No. 11519, 35 Fed. Reg. 5003 (1970).

28.    The legal and normative constraints on presidential authority to federalize and deploy a state's National Guard are so well established that President Trump previously acknowledged them. Questioned in September 2020 about his commitment to restore law and order, the President said, "[w]e have laws. We have to go by the laws. We can't move in the National Guard. . . . Even in a Portland [Oregon] case, we can't call in the National Guard unless

Page 8 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

we're requested by a governor."[1] Instead, the president emphasized that communication and cooperation is key, because even "[i]f a governor or a mayor is a Democrat, like in Portland, we call them constantly."

**D.    The President Has Repeatedly Expressed Intentions to Use the Military for Routine Domestic Law Enforcement**

29.    Despite his prior statements, the President has shared his plans to deploy members of the National Guard to further his civilian law enforcement priorities.

30.    For example, asked in April 2024 whether his domestic immigration enforcement efforts would include using the U.S. military, President Trump said "It would."[2] The president continued that he would have "no problem using the military," which he understood to include "the National Guard," in order to further his domestic priorities and promote "law and order in our country."[3] Asked whether he would go so far as to override the Posse Comitatus Act, the President opined that the Act would not apply to immigration enforcement because in his view, "these [undocumented immigrants] aren't civilians. These are people that aren't legally in our country."[4]

---

[1] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

[2] *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET), https://time.com/6972022/donald-trump-transcript-2024-election/.

[3] *Id.*

[4] *Id.*

Page 9 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**A9**

31.     Similarly, on November 17, 2024, when a social media post predicted that President Trump "will declare a national emergency and will use military assets" to implement "a mass deportation program," the President responded: "TRUE!!!"[5]

**E.   Defendants Have Since Used the Military for Civilian Law Enforcement in Los Angeles and Washington, D.C.**

32.     Prior to President Trump ordering troops to Portland, federalized national guard and active-duty soldiers were first deployed in Los Angeles, California, and then Washington, D.C.

33.     Trump federalized the California National Guard on June 7, 2025, following a day of aggressive immigration enforcement activity in the Los Angeles metropolitan area. The authorization memorandum cited 10 U.S.C. § 12406 as legal authority, and claimed a factual basis of violence, disorder, and damage to federal property. *Newsom v Trump*, 141 F.4th 1032, 1041, 1051 (9th Cir., 2025).

34.     California filed suit claiming, among other things, that the federal action violated the Posse Comitatus Act. On September 2, 2025, the district court found that the Trump administration had "instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act." *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025).

35.     On August 11, 2025, the Trump administration's focus turned to Washington, D.C. At a press conference that day, President Trump announced the planned deployment of the

---

[5] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News(June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

D.C. National Guard into the district to "to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse."[6] He called it "Liberation Day in DC," and said, "we're gonna take our capital back."[7]

36.    The same day, Defendant Hegseth also announced that National Guard troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles. The Trump administration deployed national guard troops from D.C. and seven other states into Washington, D.C.[8]

37.    On September 4, 2025, the District of Columbia filed a lawsuit challenging that deployment on multiple grounds. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District." Complaint ¶¶ 129–30, *District of Columbia v. Trump*, No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1.

## F.    Portlanders Protest Against Portland ICE Facility

38.    On June 2, 2025, for the first time, federal authorities arrested an asylum-seeker at Immigration Court in Portland.[9]  This arrest catalyzed small public protests at Portland's ICE facility, located at 4310 S. Macadam Avenue.

---

[6] AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU

[7] *Id.*

[8] Brian Krans, *California Argues Trump's Use of Troops in LA Violated Federal Law*, KQED (Aug. 12, 2025 at 11:33 AM PT) https://www.kqed.org/news/12051797/california-argues-trumps-use-of-troops-in-l-a-violated-federal-law

[9] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html.

Page 11 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

39.     On June 6, 2025, protests began in Los Angeles following increased immigration enforcement activities in the city.[10] In the following days, small protests continued outside of Portland's ICE facility. At one point, protestors blocked an ICE driveway with a makeshift barricade.  Portland Police Bureau (PPB) officers cleared the barricade within minutes, citing safety concerns.[11] Protests in Portland continued, with PPB officers taking appropriate action, arresting those few ICE-facility protesters who engaged in criminal activity.[12]

40.     On June 15, 2025, Portland Mayor Keith Wilson, reacting to troop deployments in Los Angeles, stated that Portland does not need help from National Guard.[13] Subsequent events proved the Mayor correct.

41.     The small protests at the ICE facility became less energetic and required less law-enforcement involvement. Indeed, the last arrest PPB made at those protests was on June 19, 2025.[14] In the days since, PPB has monitored the near-nightly protests, none of which required

---

[10] *Id.*

[11] Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT), https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html.

[12] Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT), https://www.oregonlive.com/crime/2025/06/portland-police-arrest-10-at-ice-protest-as-nationwide-demonstrations-continue.html.

[13] Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT) https://www.oregonlive.com/politics/2025/09/how-protests-outside-portland-ice-unfolded-before-trumps-troop-announcement.html.

[14] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html. *But see* Sparling, *supra* note 13 (noting that federal authorities made arrests on July 4).

Page 12 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

police intervention to protect public safety or interdict criminal activity on the part of the protesters.

42. On July 8, 2025, as small ICE-facility protests continued, Tom Homan, the President's "Border Czar," pledged that immigration enforcement officers would be "tripling down" on enforcement in Portland.[15]

43. On July 19, 2025, protests continued with up to 60 people gathered at the ICE facility. A PPB officer described the group as "low energy and seated quietly."[16]

44. Sporadic protests continued over the subsequent weeks. On September 1, 2025, over 100 protestors marched to the ICE building. In response, federal officers deployed chemical gas and pepperballs at the crowd.[17]

## G. Local Law Enforcement Authorities Have Been and Remain Fully Equipped to Address the Protests

45. Portland Police Bureau is a sophisticated law-enforcement agency employing 812 full-time officers. Every officer receives basic crowd management training and specialized teams receive up to forty hours of annual crowd management training.

46. PPB's Central Precinct covers downtown Portland, where most public protests occur. As a result, Central Precinct officers have significant experience in protest management. Portland's ICE facility is located within PPB's Central Precinct, which employs 80 full-time officers who are the ideal frontline force for monitoring and responding to the small ongoing ICE-facility protests.

---

[15] Zarkhin & Shaikh, *supra* note 14.

[16] *Id.*

[17] *Id.*

Page 13 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

47.     PPB monitors social media and regularly communicates with protest organizers to develop internal risk assessments associated with public protests. Based on the needs associated with any protest, PPB can deploy additional personnel from other precincts, activate crowd management incident commanders, call in PPB's Rapid Reaction Team, bring in off-duty officers, or rely on an extensive network of other local, county, and state agencies.

48.     PPB has needed to activate such resources during select times in response to protests involving the ICE Facility in June and July of 2025. And in that single instance, on or around July 17, 2025, the Rapid Reaction Team was deployed in connection with ensuring public order during a planned march from a nearby park to the ICE-facility. In every case before and after July 17, 2025, baseline Central Precinct monitoring has been sufficient to maintain public safety at the ICE-facility protests.

**H.     In September 2025, the President Turned His Attention to Portland, Oregon**

49.     Aside from the incidents discussed above, the ICE-facility protests have generally been small and are frequently sedate. On any given weekend, the nightlife in Portland's entertainment district warrants greater PPB resources than have the small, nightly protests in front of the ICE facility a few blocks away.

50.     Nonetheless, on September 5, 2025, Fox News aired a report on Portland ICE protests that included misleading clips from Portland protests in 2020.[18]

51.     Shortly thereafter, President Trump appeared to reference events in the same misleading FoxNews report when speaking to the press. A reporter asked which city President Trump planned to send troops to next, and he said he was considering targeting Portland because of news coverage the night before. President Trump alleged that "paid terrorists" and "paid

_____

[18] *Id.*

Page 14 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agitators" were making the city unlivable, further stating "[a]nd when we go there, if we go to Portland, we're gonna wipe them out. They're going to be gone and they're going to be gone fast. They won't even stand the fight."[19]

52.     President Trump later designated Antifa a terrorist organization on September 19, 2025. Afterward, he described a plan to insert federal personnel in cities such as Chicago, Memphis, and Portland. He stated "Have you seen Portland at all? You take a look what's happening in Portland. It's uh I mean, this has been going on for years. It's just people out of control. Crazy. We're going to stop that very soon."[20]

53.     While answering questions from the press on September 25, 2025, the President baselessly insisted people had "just burned the place down."[21] He said Portland is "on my list of things that I want to do before, uh, we finish up with the cities because I think we're going to whip the cities into shape. . . ." The President declared his intention "to get out there" and "do a pretty big number of those people in Portland that are doing that."[22]

54.     On September 27, 2025, the President followed through on his threats, posting a message to his Truth Social account: "At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect

---

[19] The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

[20] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10 (YouTube, Sept. 19, 2025), https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[21] The Oregonian, *Trump Escalates Rhetoric Promising Federal Intervention in Portland, Citing "Anarchy"*, at 0:44 (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s.

[22] *Id.*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. Thank you for your attention to this matter!"[23]



> **Donald J. Trump** ✓ ✚
> @realDonaldTrump
>
> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!
>
> **12.8k** ReTruths  **53.1k** Likes                    9/27/25, 7:19 AM

55.     Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, requested that Oregon Governor Tina Kotek authorize mobilization of the Oregon National Guard in a non-federalized status based on a request from DHS. *See* Ex. 1. The memorandum threatened to direct mobilization of Oregon National Guard members under Title 10 of the U.S. Code if Governor Kotek did not agree within 12 hours to activate the National Guard. *Id.*

56.     DHS spokeswoman Tricia McLaughlin stated on September 27, 2025, that "President Trump and Secretary Noem are taking action to restore law and order following weeks of violent riots at ICE facilities, assaults on law enforcement, and the terrorist attack at our

---

[23] Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025 at 07:19 ET), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266

Page 16 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ICE facility in Dallas."[24] Specifics on how these concerns are related to Portland were not outlined.

57.    In a press conference on the same day, Governor Kotek stated that Oregon does not want military troops and that public safety will be handled by local law enforcement.[25]

58.    Nonetheless, on September 28, 2025, the Secretary of Defense issued a memorandum calling 200 members of the Oregon National Guard into federal service for a period of 60 days. *See* Ex. 2 at 1. That order was styled as "further implement[ation]" of a June 7, 2025 Presidential Memorandum, which vaguely cited "[n]umerous incidents of violence and disorder . . . in response to the enforcement of Federal law" that purportedly "constitute a form of rebellion against the authority of the United States." *Id.* at 2.

I.    **Defendants' Actions Represent the Latest Political Attack Against Democrat-led Jurisdictions that Refuse to Assist with Immigration Enforcement.**

59.    The federal government holds key powers and responsibilities over the subject of immigration and the status of non-citizens. Those are laid out in the Immigration and Naturalization Act.

60.    Components within DHS enforce those laws. Among them, Customs and Border Protection (CBP) is responsible for determining the admissibility of non-citizens and securing the country's borders. ICE has two primary subcomponents: Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI). ERO is tasked with civil immigration enforcement and removal, including housing detainees in facilities nationwide, for

---

[24] Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025), https://www.nytimes.com/2025/09/27/us/politics/trump-portland-troops.html.

[25] KATU News, *'We Do Not Need Help': Oregon Gov. Tina Kotek on Trump's Portland Announcement to Send Troops* (YouTube, Sept. 27, 2025), https://www.youtube.com/watch?v=aa_CImbyLW4.

Page 17 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration proceedings or removal from the United States. HSI conducts federal criminal investigations, in coordination with federal prosecutors and other criminal investigatory agencies.

61.     States and municipalities, by contrast, do not have this responsibility. States and municipalities instead protect the general public welfare. The Constitution vests the States with traditional police powers, which include the authority to make policy judgments and regulations for increasing the safety of all residents and focusing local police officers' limited time and resources on preventing and responding to crime.

62.     Under the Tenth Amendment to the United States Constitution, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X; *Slaughterhouse Cases*, 83 U.S. 36, 62 (1873) (describing the police power as extending "to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . within the State"). Among other meanings of this amendment is this:  the states—and not the federal government—wield the general police power.

63.     Public health and safety are among the more "conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). States "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quite of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

64.     In consideration of that responsibility, in 1987 Oregon passed the "Sanctuary Promise," the first law of its kind in the United States, which prohibits state and local government agencies from using their resources to assist with federal immigration enforcement.

Page 18 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*See* ORS 181A.820. Oregon's Sanctuary Promise has been updated several times since 1987. *See, e.g.*, H.B. 3265, 81st Legis. Assemb., Reg. Sess. (Or. 2021).

65.    The President has repeatedly attacked Democrat-led cities and states, including over immigration enforcement.[26]

66.    On June 23, 2020, he stated: "[A]ll of these problems, Seattle, Portland, Chicago, uh, you could go to Oakland, you could go to Baltimore. What do they have in common? They're run by liberal Democrats, just like Joe Biden."[27]

67.    While running for his current term, the President continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "the crime is so out of control in our country. I mean, you have cities – I will say this, the top 25, almost all are run by Democrats, and they have very similar policies. . . . But you can't walk across the street to get a loaf of bread. . . . You get shot. You get mugged. You get raped, you get whatever it may be. And you've seen it and I've seen it, and it's time for a change. We have to bring back our cities."[28]

68.    On inauguration day, 2025, President Trump signed Executive Order 14,159, "Protecting the American People Against Invasion," which once again sought to unlawfully

---

[26] *See* Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET), https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").

[27] David Brody, *EXCLUSIVE President Trump Ramps Up 2020 Message to Evangelicals, Says Biden Will Destroy Pro-Life Movement*, Christian Broad. Network (June 23, 2020), https://cbn.com/news/politics/exclusive-president-trump-ramps-2020-message-evangelicals-says-biden-will-destroy-pro.

[28] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET), https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/.

Page 19 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

defund "'sanctuary' jurisdictions" and directed the U.S. Department of Justice (DOJ) and DHS

to target jurisdictions like the Plaintiffs:

> Sec. 17. Sanctuary Jurisdictions. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

69.     On February 19, 2025, Trump signed Executive Order 14,218, "Ending Taxpayer

Subsidization of Open Borders," which sought to defund certain State programs based on new

immigration enforcement demands related to the provision of federal public benefits. 90 Fed.

Reg. 10581 (Feb. 19, 2025).

70.     A coalition of affected jurisdictions, including the City of Portland, promptly sued

to enjoin the January and February immigration-related executive orders. *City & Cnty. of San

Francisco v. Donald J. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Feb. 7, 2025). About a week

and a half before the court granted a preliminary injunction against those executive orders,

Trump again posted an attack on "sanctuary cities" claiming they "protect the Criminals:"[29]

---

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 10, 2025, at 06:53 ET), https://truthsocial.com/@realDonaldTrump/posts/114313927527638500.

Page 20 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



71.     On April 18, 2025, Stephen Miller, on behalf of the Trump administration, leveled the accusation that "Sanctuary cities shield criminal [undocumented immigrants] from removal." Miller opined that "these cities are engaged in systemic criminal violations and that they are engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of America."[30]

72.     On April 28, 2025, President Trump signed Executive Order 14287, titled "Protecting American Communities From Criminal Aliens." In it, he targeted "sanctuary jurisdictions" as well as "State and local officials" who allegedly "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws."  The order accused its targets of undertaking a "lawless insurrection against the supremacy of Federal law and the Federal Government's obligation to defend the territorial sovereignty of the United States." 90 Fed Reg 18761, 18761 (Apr. 28, 2025).

73.     The same executive order also expressed the administration's intention to defund grants or programs to states or municipalities with "sanctuary" laws that leave federal civil

---

[30] Roll Call Factbase Videos, *Press Briefing: Stephen Miller Speaks to Reporters Outside the White House – April 18, 2025*, at 10:17–36 (YouTube, May 12, 2025), https://www.youtube.com/watch?v=PyKrfqG51uI.

Page 21 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration enforcement entirely to the federal government, even though federal courts had held this unlawful during Trump's first term.

74.     In furtherance of his effort to coerce sanctuary jurisdictions with threats of defunding, the Trump administration, acting through various federal agencies, has asserted sweeping authority to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Oregon and other states to agree to cooperate with federal immigration enforcement activities as a condition to receiving billions of dollars in federal funding.

75.     For example, beginning in March 2025, DHS and its sub-agencies, including Federal Emergency Management Agency (FEMA), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless certain states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

76.     Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Oregon law allows, Oregon, with other states, prevailed in litigation challenging those coercive conditions. *Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *16 (D.R.I. Sept. 24, 2025) (granting summary judgment to the plaintiff states). Oregon and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dep't of Transportation*, No. 1:25-cv-00208-JJM-PAS (D.R.I. May 13, 2025), and the U.S. Department of Justice, *New Jersey v. U.S. Dep't of Just.*, No. 1:25-cv-00404-JJM-AEM (D.R.I. Aug. 18, 2025).

77.     In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary

Page 22 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**A22**

jurisdictions" around the country.[31] It accused them of "shamefully obstructing" the Trump administration's deportation plans and "shielding dangerous criminal aliens."[32]

78.    The Trump Administration later revised that list on August 5, 2025, shortening it to just 35 jurisdictions, stating that those jurisdictions were "[c]ities, states, or counties that have laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement (ICE)."[33]

79.    That list included the false accusation that the State of Oregon and the City of Portland (along with the listed others) "impede law enforcement and put American citizens at risk by design." It also stated the Department of Justice would "work closely with the Department of Homeland Security to eradicate these harmful policies around the country."[34]

80.    Collectively, these efforts sought to coerce sovereign states and their subdivisions and instrumentalities—including the Plaintiffs—to disavow their own laws and subjugate themselves to the political proclivities of the Trump administration. The August 5 publication

---

[31] Press Release, U.S. Dep't of Homeland Sec., DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

[32] Campbell Robertson, Halina Bennet & Jill Cowan, *A Federal List of Immigrant 'Sanctuaries' Nets Trump Allies and Foes Alike*, N.Y. Times (May 31, 2025), https://www.nytimes.com/2025/05/31/us/politics/sanctuary-cities-trump.html

[33] U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025), https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities.

[34] Press Release, U.S. Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

Page 23 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."[35]

81.  Also, during that time, President Trump directed federal agencies to focus immigration enforcement efforts in cities led by Democrats.[36]

82.  On August 13, 2025, Attorney General Bondi sent letters to officials in 32 of the 35 jurisdictions on the August 5 list, including Oregon Governor Tina Kotek and Portland Mayor Keith Wilson. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."[37]

83.  Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law," which was the letter's purpose. The letters did not include any specifics regarding any particular laws, nor did they reflect any recognition of prior court rulings holding the laws valid. The Bondi letter also demanded a response by August 19, 2025.[38]

---

[35] Id.

[36] Aamer Madhani, *Trump Directs ICE to Expand Deportations in Democratic-Run Cities, Undeterred by Protests*, AP News (June 15, 2025, at 7:51 PM PT), https://apnews.com/article/trump-ice-deportations-protests-65fa8d64ea12a78a0ee0ebeea008ee4d.

[37] Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders 15, 57 (Aug 13, 2025), https://www.justice.gov/ag/media/1411166/dl?inline (Letter from Pam Bondi, U.S. Att'y Gen., to Tina Kotek, Governor, State of Oregon; Letter from Pam Bondi, U.S. Att'y Gen., to Keith Wilson, Mayor, City of Portland).

[38] Id. at 16, 58.

Page 24 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

84.     On August 19, 2025, Governor Kotek responded to Bondi's letter. Kotek responded that "Oregon, its public officials and its law enforcement officers do not engage in conduct that thwarts federal immigration enforcement." Kotek further responded that, under Oregon's Sanctuary Promise, "Requests from federal agencies to local law enforcement agencies about immigration enforcement without a judicial order must be documented, reported and denied." Kotek further explained that "Oregon complies with federal law and it will continue to follow its own laws."[39]

85.     That same day, President Trump used the pretext of "crime" to threaten a plan to expand domestic troop deployment to other Democrat-led cities and states.[40]

## J.     Defendants' Actions Will Harm the State of Oregon by Interfering with the State's Sovereign Interest in Managing Its Own Law Enforcement Activities

86.     Defendants' unlawful federalization and deployment of Oregon National Guard members infringes on Oregon's sovereign interest in managing law enforcement within its borders, including the authority to manage protests and unrest. This power is reserved for the states under the Tenth Amendment. It also infringes upon the State's sovereign authority—and the Governor of Oregon's authority under Section 9 of the Constitution of Oregon—to manage the Oregon National Guard's resources according to the State's needs absent lawful federalization of the Guard's members.

---

[39] Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT), https://oregoncapitalchronicle.com/2025/08/19/i-respectfully-disagree-kotek-says-oregon-will-follow-sanctuary-law-despite-threats/.

[40] Mariah Welfel & Alexandra Hall, *Trump Says He'll Expand His Focus on Crimes to Other Democratic-Led Cities*, Nat'l Pub. Radio (Aug. 19, 2025, at 4:21 PM ET), https://www.npr.org/2025/08/19/nx-s1-5501329/trump-says-hell-expand-his-focus-on-crimes-to-other-democratic-led-cities.

Page 25 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

87.     Defendants' intended use of federalized National Guard troops to control protests in Oregon communities amounts to a usurpation of the role of domestic law enforcement. The State has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local law enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to the State's sovereign interest in managing its own law enforcement activities.

88.     Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities. State and local law enforcement agencies, including the Oregon State Police and the  Portland Police Bureau, have in place their own plans and protocols for maintaining safety and order in Oregon communities, and they are carrying out their lawful role accordingly. The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. Further, the needless presence of federalized troops will lead directly to escalated tensions and increased unrest, interfering with state and local law enforcement's ability to maintain order.

89.     Further, Defendants' deployment of troops threatens to increase civil unrest, requiring diversion of state law enforcement and state resources. Recent deployments of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to

Page 26 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom*, 2025 WL 2501619, at *7 (describing "Operation Excalibur," where federal troops were stationed in Humvees and tactical vehicles outside MacArthur Park in Los Angeles and blocked traffic along a stretch of Wilshire Boulevard while federal law enforcement officials marched across the park as a "show of presence"). As in those instances, Defendants' deployment of troops in Oregon communities will provoke and escalate protests and unrest and will require the State to divert its law enforcement personnel and resources to deal with unrest that the federal military presence has created.

## K.  Defendants' Actions Will Also Harm the State of Oregon and the City of Portland by Suppressing Business Activity

90.    Defendants' conduct threatens the economic well-being of the people of Oregon. In recent months, unlawful federal deployments and militarized raids in California and the District of Columbia have directly and rapidly chilled economic activity. The deployment of troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and farmers' markets shut down, as individuals were afraid to leave their homes due to militarized raids. Similarly, the deployment of National Guard troops in the District of Columbia depressed key industries, including tourism, restaurants, and hospitality services. Within a week after the deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average, with restaurant reservations showing an even steeper drop.[41] Defendants' military incursion into Oregon threatens similar immediate harms by depressing business activities, travel, and tourism in Oregon communities.

---

[41] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

Page 27 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

91.     Defendants' conduct also threatens financial harm to the government of Oregon in multiple ways. The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government. Deployment of troops in Oregon communities threatens similar harm to Oregon tax revenues.

**L.     Defendants' Actions Will Harm the State of Oregon by Diverting National Guard Personnel and Rendering Them Unable to Engage in Other Critical Work**

92.     Defendants' unlawful federalization and deployment of the Oregon National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

93.     Except for when it has been lawfully called into federal service, the Oregon National Guard answers to its Commander-in-Chief, the Governor of Oregon. The Governor calls members of the Guard into active duty to serve the needs of Oregon in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment. The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

94.     The Oregon National Guard's resources are limited. While the Guard has over 6,500 total members, only a fraction of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal service; engaged in the Guard's essential administrative functions; or in basic training. Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

Page 28 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

95.     Wildfire response is one of the most significant functions the Oregon National Guard performs in the State. In 2017, for example, roughly 1,090 members were mobilized to respond to wildfires. In 2020, roughly 998 were mobilized for fire response. On September 27, 2025—the same day that the President announced his intention to send troops into Portland—Governor Kotek invoked the Emergency Conflagration Act in response to a complex of wildfires burning on Southwest Oregon's Rogue River, which has grown to over 17,300 acres.[42] Because wildfires can begin unpredictably and spread rapidly, it is critical that all qualified personnel—including members of the Oregon National Guard—remain ready to respond to growing wildfires on short notice.

96.     The Oregon National Guard serves many other critical functions in the State. Historically, these functions have included, among other things, counter-drug-trafficking efforts; natural disaster response; and supporting the State's response to the Covid-19 pandemic.

97.     Given the Guard's limited resources, and the inherent uncertainty about what needs might arise, needlessly calling hundreds of the Guard's members into federal service for a months-long period places the State in jeopardy. All of the Guard members in federal service are unavailable to the State for emergency response efforts.

---

[42] Zach Urness, *Rogue River Moon Complex Wildfire Explodes, Doubles in Size as New Evacuation Orders Issued*, Statesman J. (Sept. 28, 2025 at 9:50 AM PT), https://www.statesmanjournal.com/story/news/2025/09/27/moon-complex-rogue-river-wildfire-explodes-new-evacuation-orders-issued/86391465007/.

Page 29 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## CAUSES OF ACTION

### COUNT I

### *Ultra Vires* Action – Violation of 10 U.S.C. § 12406
### (Against All Defendants)

98.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

99.     Under 10 U.S.C. § 12406, the President is permitted to federalize a state's National Guard only when (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States. Any such order "shall be issued through the governor[] . . . ." 10 U.S.C. § 12406.

100.     None of those factual circumstances are present in Oregon, and Defendants' assertions to the contrary are patently pretextual and lack any good-faith basis.

101.     Defendants have not identified any "invasion by a foreign nation."

102.     Nor is there any "rebellion or danger of a rebellion." The President's characterization of Portland as "war ravaged" community is pure fiction. The protests contained to a small area near Portland's ICE facility have been successfully managed by local law enforcement and do not in any way constitute a rebellion or danger of a rebellion. And the President's June 7, 2025 Memorandum, (Ex. 2 at 2–3), made no reference to the City of Portland or the protests near the City's ICE facility.

103.     Nor have Defendants cited even a *single instance* in which they were "unable . . . to execute the laws of the United States." For example, they have not identified an inability to detain or deport those who are unlawfully present in the United States due to protests in Portland.

Page 30 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

104.     All of these facts—together with the overwhelming evidence of the President's true intentions—reveal the obvious truth: that this action was motivated by his desire to normalize the use of military troops for ordinary domestic law enforcement activity while also punishing politically disfavored jurisdictions like Portland, Oregon.

105.     Because Defendants' invocation of the prerequisites for federalization in § 12406 was wholly pretextual, the Court should find Defendants' actions are ultra vires because they violate the statute's plain language.

## COUNT II

### *Ultra Vires* Action – Violation of the Posse Comitatus Act & 10 U.S.C. § 275
### (Against All Defendants)

106.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

107.     The Posse Comitatus Act forbids Defendants from employing the armed forces to engage in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

108.     This restriction is underscored by 10 U.S.C. § 275, which provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

109.     Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces—which includes the National Guard—for routine law enforcement such as protest

Page 31 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

management, the suppression of violent crime or property damage, and immigration enforcement.

110.    The Court need look no further than Defendants' own statements to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act. The President's statements dating back to his most recent campaign reveal his plans to incorporate military troops into civilian law enforcement activity. And Defendants' deployment of troops in Los Angeles and Washington, D.C. furthered that plan. Then on September 5, 2025, the President said he planned to deploy troops in Portland to "wipe out" what he described as "paid terrorists" and "paid agitators." And in his September 27, 2025 social media post, the President said he planned to use troops to "protect" Portland from "domestic" organization that will perpetrate crimes in the City.

111.    Defendants' actions in Los Angeles—where they were found to have violated the PCA—further support the conclusion that they plan to do the same thing in Portland.

112.    By willfully ignoring the PCA and 10 U.S.C. § 275, while also relying on a pretextual, baseless, and bad-faith invocation of 10 U.S.C. § 12406, Defendants are acting *ultra vires*.

113.    Therefore, Plaintiffs are entitled to a declaration that any action taken pursuant to the President's September 27 directive to is invalid, and an injunction prohibiting Defendants from implementing. Absent such relief, Plaintiffs will continue to be harmed by Defendants' illegal actions.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

A32

# COUNT III

## Violation of the Tenth Amendment of the U.S. Constitution
## (Against All Defendants)

### *Infringement on Oregon's Police Power*

114.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

115.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

116.    If Defendants federalize members of the Oregon National Guard under present circumstances, they would usurp the Governor of Oregon's role as Commander-in-Chief of the National Guard in Oregon and violates the State's sovereign role over local law enforcement, pursuant to its police powers.

117.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

118.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured

Page 33 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

119.    Deploying federalized military forces to respond to suppress violence and manage protests despite any evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the officers of the PPB, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

120.    Plaintiffs are entitled to a declaration that any action to federalize the Oregon National Guard is invalid, and an injunction prohibiting Defendants from implementing those directives.

### Unlawful Coercion and Retaliation

121.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Sebelius*, 567 U.S. at 536.

Page 34 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

122.     The Defendants' actions in calling up and deploying members of the Oregon National Guard are designed to punish Plaintiffs for refusing to accede to the Trump administration's political prerogatives, not least of which on Plaintiffs' so-called sanctuary laws.

123.     This violates the Tenth Amendment by seeking to coerce Oregon into abandoning its own statutory prerogatives and instead adopt the President's policy priorities.

### *Violation of Equality of State Sovereignty*

124.     "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a union of States, equal in power, dignity and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

125.     This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

126.     Defendants have trampled these principles by selecting certain politically disfavored jurisdictions—now including Portland, Oregon—for an involuntary deployment of military troops under federal control. "And despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [two] states" and the District of Columbia. *Id.* at 544.

127.     Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

circumstances," and must be limited to "area where immediate action" is truly necessary. *Id.* at 546.

128.    But Defendants' selection of Portland, Oregon for National Guard federalization and deployment was, at best, arbitrary, and at worst, a politically motivated retaliation for the Plaintiffs' adoption of policies that the President disfavors. After all, if Defendants' true aim were to protect jurisdictions that are "ravaged" and "under siege" by criminal activity, then they would have deployed the military to any of the many jurisdictions where violent crime rates are significantly higher.

**COUNT IV**

**Violation of the Administrative Procedure Act**

**Action That is in Excess of Statutory Authority, Arbitrary
and Capricious, and Contrary to Law**

**(Against Department of Defense, Secretary Hegseth,
Department of Homeland Security, and Secretary Noem)**

129.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

130.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

131.    The DOD and Secretary Hegseth's September 28, 2025, Memorandum, (Ex. 2 at 1), federalizing 200 members of the Oregon National Guard at the request of DHS and Secretary Noem constitute final agency action because they represent the "consummation" of the agency's

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

decision-making process and they represent action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

132.    For the reasons discussed above, the DOD and Secretary Hegseth have exceeded their statutory authority to federalize the Oregon National Guard under 10 U.S.C. § 12406. For the reasons also discussed above, that action is also arbitrary and capricious. And their direction in deploying the National Guard for law enforcement will violate the Posse Comitatus Act and 10 U.S.C. § 275 as well as the U.S. Constitution.

## COUNT V
### Violation of the Constitution Separation of Powers and the Militia and Take Care Clauses
### (Against All Defendants)

133.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

134.    The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

135.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637–38 (2024).

136.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

137.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

138.    The Militia Clauses expressly provide that "Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions. . . ." U.S. Const. art. I, § 8, cl. 15. They further provide that Congress has authority "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress. . . ." U.S. Const. art. I, § 8, cl. 16.

139.    In addition, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted). The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

Page 38 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

140.     Defendants have violated each of these constitutional doctrines by asserting authority over a state Militia that the Constitution and federal law expressly assign to the States and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275, which limit the participation of federal military forces in law enforcement.

141.     This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Plaintiffs are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

142.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care Clause, and impermissibly arrogate to the Executive power that is reserved to Congress or the states.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.     Declare that any order federalizing and deploying members of the Oregon National Guard is ultra vires and contrary to law;

b.     Hold unlawful and enjoin Defendants' federalization and deployment of members of the Oregon National Guard;

c.     Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth and the Department of Defense from calling Oregon National Guard members into federal service, deploying them in Oregon, or taking any other similar action in Oregon;

Page 39 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    d.      Award Plaintiffs' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

    e.      Award such additional relief as the interests of justice may require.

DATED September 28, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Scott Kennedy*
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

Page 40 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ROBERT TAYLOR  #044287
Portland City Attorney

*s/ Caroline Turco*
CAROLINE TURCO  #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*

Page 41 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

STATE OF OREGON, *et al.*

      Plaintiffs,

v.

TRUMP, *et al.*,

      Defendants.

No. 3:25-cv-1756-MHS

---

## <u>DECLARATION OF MAJOR GENERAL TIMOTHY L. RIEGER</u>

I, Major General Timothy L. Rieger, pursuant to 28 U.S.C. § 1746, hereby state and declare as follows:

**Relevant Personal History**

1.  This declaration is based on my personal knowledge as well as information made available to me during the performance of my official duties.

2.  This declaration is submitted in support of Defendants' opposition to Plaintiffs Motion for Temporary Restraining Order (TRO).

3.  I currently serve as the Acting Vice Chief of the National Guard Bureau. In this capacity, I assist the Chief of the National Guard Bureau in performing his duties as a member of the Joint Chiefs of Staff and principal advisor to the Secretary of War, Chairman of the Joint Chiefs of Staff, Secretary of the Army, and Secretary of the Air Force. I am also responsible for assisting the Chief of the National Guard Bureau to advise the Secretary of the Army, Secretary of the Air

1

**A42**

Force, the Chief of Staff of the Army, and the Chief of Staff of the Air Force on matters relating to the Federalized forces of the National Guard and its subcomponents, the Army National Guard of the United States, and the Air National Guard of the United States.

4.   In addition, I support the Chief of the National Guard Bureau in his assistance to the Secretary of War in facilitating and coordinating the use of National Guard personnel and resources. It is the mission of our agency, and thus part of my job, to coordinate with other Federal agencies, the Combatant Commands, and the Adjutants Generals of the 54 National Guards (the fifty States, three territories, and District of Columbia, hereinafter, "the States") pursuant to 10 U.S.C. § 10503.

5.   It is common practice for the Vice Chief of the National Guard Bureau to communicate directly with the Adjutant General of a State to coordinate National Guard activity, including where coordination with the Governor is necessary. As Acting Vice Chief, I often engage at this level with the State Adjutants General, who are representatives of the Governor in relation to National Guard activities. My office, including the Chief of Operations (J3), pursuant to DoD policy, coordinates State support of federal missions by engaging officials at the State's Joint Forces Headquarters, which is composed of the State's Adjutant General and other National Guard leadership, who in turn advise their Governor. *See* DoD Directive 5105.83. Based on my experience, communication directly between the Vice Chief of the National Guard Bureau and a State Adjutant General is standard and common practice when communicating important Department of War policies and direction, especially during emergencies.

6.   I previously served as Principal Deputy General Counsel for the National Guard Bureau, from April 2022 to October 2024. During that time, I gained extensive experience advising on the legal authorities under which the National Guards are mobilized and federalized—including,

2

**A43**

for example, in support of the Republican and Democratic National Conventions, the United

Nations General Assembly, the Southern Border missions, and responses to several natural

disasters. Prior to that, I served as the Assistant Adjutant General, California National Guard

from 2018 to 2022.

**National Guard Background**

7.    The National Guard Bureau is a federal agency under the Department of War that is the

"channel of communications on all matters pertaining to the National Guard, the Army National

Guard of the United States, and the Air National Guard of the United States between the

Department of the Army and Department of the Air Force" and the States in accordance with 10

U.S.C. § 10501(b) and DoD Directive 5105.77.

8.    The National Guard consists of "two overlapping, but legally distinct, organizations.

Congress, under its constitutional authority to 'raise and support armies' has created the National

Guard of the United States, a federal organization comprised of state national guard units and

their members." *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (quoting *Perpich v. U.S.

Dep't,*, 666 F. Supp. 1319, 1320 (D. Minn. 1987)). It is composed of both the State National

Guard, under the command of the States, and the National Guard of the United States, a federal

entity enmeshed in the federal chain of command.

9.    The National Guard wears two hats: "Since 1933 all persons who have enlisted in a State

National Guard unit have simultaneously enlisted in the National Guard of the United States. In

the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and

until ordered to active duty in the Army, they retain their status as members of a separate State

Guard unit." *Perpich*, 496 U.S. at 345. While ordered into federal service, "members of the

National Guard … lose their status as members of the state militia, "*id*. at 347, and become

3

**A44**

federal soldiers with the President as the Commander in Chief of those forces. *See* U.S. Const. art. II § 2, cl.

10. There are numerous authorities upon which National Guard Service members can mobilize. When under State command and control, National Guardsmen can mobilize in a purely State Active-Duty status or in a federally funded status under the command and control of the Governor pursuant to Title 32 of U.S. Code. When under Federal command and control, National Guardsmen will always be in a duty status under Title 10 of the U.S. Code.

11. It is my understanding that Title 10, section 12406 is a statue that authorizes the President of the United States to mobilize the militia for the enumerated purposes in the statute.

**Background**

12. On September 26, 2025, the Executive Secretary of the Department of Homeland Security sent the Department of War a request for assistance to protect federal facilities and personnel in Oregon. A copy is attached as Exhibit A. On September 27, 2025, noting the deterioration of conditions in Portland, President Donald J. Trump announced that he would authorize the mobilization of the National Guard to protect U.S. Immigration and Customs Enforcement (ICE) and other U.S. Government personnel and federal property in Oregon. On September 27th, President Trump posted on Truth social that he was directing Secretary of War "to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists." On October 1st, President Trump further explained on Truth Social that his September 27th decision was based on increasing violence and lawlessness in Portland as well as an inability of federal law enforcement to enforce the laws. In light of this, the Department of War took all necessary steps to communicate and facilitate the Oregon Governor's mobilization of the Oregon National Guard

**A45**

(ORNG) using federal funds to assist with curbing violence towards federal personnel and property, but the Governor ultimately declined.

13. The structure of the ORNG includes a Joint Forces Headquarters with the Adjutant General who represents the Governor in dealings with the National Guard Bureau on issues like federal mobilizations. The Governor is the Commander-in-Chief in State Active Duty or Title 32. The Adjutant General is the Commander of the ORNG and serves as the Chief of Staff to the Governor, and under the direction of the Governor, is charged with the supervision of all matters pertaining to the administration, discipline, mobilization, organization, and training of the ORNG and shall be the channel of official military correspondence with the Governor. Or. Rev. Stat. §§ 396.125, 396.145(2); 396.150(1); 396.160(1), (2), (6), (9), (12), (14).

**Deployment to Portland, Oregon**

14. On Friday, September 26, 2025, DHS Executive Secretary Andrew J. Whitaker transmitted a memorandum to Department of War Executive Secretary Colonel Anthony Fuscellaro with the following subject line: *Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Oregon)*, (Exh.A). The memorandum requested "immediate and sustained assistance from the Department of War in order to safeguard federal personnel, facilities, and operations in the State of Oregon," "including those directly supporting U.S. Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS)," which "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." Specifically, DHS requested on a reimbursable basis the deployment of "approximately 200 Department of War personnel, trained and equipped for mission security in complex urban environments" to "integrate with federal law enforcement operations, serving in direct support of federal facility

protection, access control, and crowd control measures."

15. At 8:31pm on Friday, September 26, I was notified of DHS's request for assistance and learned that the Secretary of War had authorized additional federal funding for mobilization of a portion of the ORNG under Title 32 status.

16. At 1:56pm on Saturday, September 27, I spoke with the Adjutant General, Brigadier General Alan Gronewold of the ORNG by phone. I advised him that DHS had sent the request for assistance and that the Secretary of War had authorized federal funding to mobilize 200 ORNG members under Title 32, U.S. Code. I explained that while the Department of War would be funding the mission, those National Guard members would remain under the Oregon Governor's command and control with federal funding, if this request was fulfilled in this status.

17. At 2:27pm on Saturday, September 27, I transmitted to the Adjutant General, via email, the memorandum titled, *Request for Oregon National Guard Federal Protection Mission*, addressed to him and signed by me, (a copy of which is attached as Exhibit B) along with a copy of DHS's request for assistance (Exh. A). The memorandum, informed the Adjutant General that the Secretary of War had "authorized additional federal funding for up to 200 members of the ORNG under Title 32 United States Code, Section 502(f), to perform the requested mission in a non-federalized status under the Governor's command and control through the Adjutant General." The memorandum further informed that given the immediate nature of DHS's request, if the ORNG members were not mobilized within 12 hours, the Secretary of War may direct the mobilization under Title 10, U.S. Code to perform the mission in a federalized status.

18. At 2:54pm on Saturday, September 27, in a reply to my 2:27pm email, the Adjutant General acknowledged receipt of my memorandum (Exh B).

19. At 6:44pm on Saturday, September 27, I spoke with the Adjutant General by phone

6

**A47**

again. During this call, he informed me that Governor Kotek was speaking with Secretary Noem

and President Trump regarding the Department of War request for assistance for the ORNG in

Title 32 status.

20. At 10:05pm on Saturday, September 27, I received another email from the Adjutant

General. He informed me that during a conversation earlier in the day, Governor Kotek had

expressed to the President that the ORNG mobilization was not necessary at this time and that

she rejected the offer of federal funding for Title 32 mobilization under her command and

control.

21. On Sunday, September 28, pursuant to the urgent request for assistance from DHS, the

Secretary of War issued a mobilization memorandum directing that "200 members of the ORNG

will be called into (Title 10) Federal service effective immediately for a period of 60 days." A

copy of the mobilization memorandum is attached as Exhibit C. The mobilization memorandum

relied on, and included as an attachment, the President's June 7 Memorandum authorizing the

mobilization of the National Guard to protect DHS and other U.S. Government personnel and

federal property. A copy of the June 7 Presidential memorandum is attached at Exhibit D.

22. To date, the approximately 200 ORNG Guardsmen federalized pursuant to Title 10 on

September 28th are being mobilized. No ORNG Guardsmen have begun performing their

protective mission at this time.

**Oregon National Guard When in Title 10 Status**

23. The 200 members of the ORNG federalized pursuant to Title 10 on September 28 are

under the command of U.S. Northern Command (USNORTHCOM), which is one of the

Department of War's eleven unified combatant commands. USNORTHCOM's missions include

providing command and control of homeland defense efforts and coordinating defense support of

**A48**

civil authorities. U.S. Army North (ARNORTH) supports USNORTHCOM in its missions. When federalized, members of a state national guard serve pursuant to Title 10 of the United States Code and come under the command of the President and the Secretary of War. In this case, the Secretary of War authorized USNORTHCOM and ARNORTH to assume command and control of the response to DHS's request for assistance, and USNORTHCOM has retained control over the activated portions of the ORNG since September 28.

24. This is not the first instance of the National Guard being utilized for the purpose of protecting federal personnel and property in Title 10 status. In June of 2025, the California National Guard was deployed for a similar purpose pursuant to the aforementioned June 7, 2025 memorandum (Exh. D). In my experience at the National Guard Bureau, as Acting Vice Chief and Principal Deputy General Counsel, I have become familiar with the procedures and policies of national guard mobilizations to respond to crises. I have also learned that it is imperative that the National Guard be prepared to deploy quickly and efficiently in such times to prevent the loss of life and destruction of property. In my experience, I have found that a delayed or insufficient response can worsen situations and hamper a proper and sufficient response. Therefore, in response to the mobilization orders requiring immediate action, and in close coordination with the Oregon Adjutant General, the ORNG has begun a swift and appropriate response to DHS's request for assistance. The parameters of the mission are delineated in DHS's request (Exh. A) and the Secretary of War's memorandum (Exh. C). I understand that the scope of this mission is to provide protective services in response to a request from DHS. The National Guard personnel activated would be limited in their functions to protecting federal property, personnel, and functions.

25. I declare under penalty of perjury that the foregoing is true and correct.

**A49**

Executed on this 02 day of October of 2025.

RIEGER.TIMOTHY.LE   Digitally signed by
E.1169002670        RIEGER.TIMOTHY.LEE.1169002670
                    Date: 2025.10.02 11:20:47 -04'00'

Major General Timothy L. Rieger, USA
Acting Vice Chief, National Guard Bureau

**A50**

EXHIBIT A

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



*Executive Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

September 26, 2025

MEMORANDUM FOR:   COL Anthony Fuscellaro
Executive Secretary
U.S. Department of Defense

FROM:   Andrew J. Whitaker
Executive Secretary
U.S. Department of Homeland Security

SUBJECT:   **Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Oregon)**

**Overview**

The Department of Homeland Security (DHS) requests immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon. Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations.

At the President's direction, DHS is seeking to put an end to the migrant invasion and these lawless riots. This further executes and follows the intent of past Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025). Additional requests may follow as the situation develops.

**DHS Overarching Goal**

DHS seeks DoW support to ensure the continued protection of federal facilities in Oregon that are experiencing sustained unrest, thereby reinforcing the safety of federal personnel, safeguarding public property, and enabling uninterrupted execution of federal law enforcement missions.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**A52**

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**Subject: Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Oregon)**
Page 2

### Specific Topics for Request

DHS requests deployment element of approximately 200 DoW personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures.

### End of Mission

DHS requests that DoW-authorized support capabilities remain in place through the cessation of unrest and unlawful protests in Oregon.

### Funding

DHS requests DoW provide support on a reimbursable basis.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**A53**

EXHIBIT B



**NATIONAL GUARD BUREAU**
111 SOUTH GEORGE MASON DRIVE
ARLINGTON VA 22204-1373

MEMORANDUM FOR: THE ADJUTANT GENERAL, OREGON NATIONAL GUARD

SUBJECT: Request for Oregon National Guard Federal Protection Mission

1. I am writing to inform you that the Department of War has received a request from the Department of Homeland Security (DHS) for immediate assistance to protect federal personnel, functions, and property in Oregon. In response, the Secretary of War has authorized additional federal funding for up to 200 members of the Oregon National Guard (ORNG) under Title 32 United States Code, Section 502(f), to perform this mission in a non-federalized status under your command and control.

2. I have enclosed DHS's request for protective measures while executing operations in Oregon. Due to the circumstances and immediate nature of this request, if ORNG forces are not mobilized in the next 12 hours, the Secretary of War may direct the mobilization of as many members of the ORNG as he may deem necessary under Title 10 United States Code.

3. The Department of War greatly appreciates your collaboration on this emergent situation. If your Governor agrees to a Title 32 mobilization of the ORNG, we will work with DHS to coordinate mission details with you. To be clear, we believe time is of the essence and failure to mobilize sufficient forces quickly to address the situation may risk lives and property damage. I respectfully request that you inform me immediately if your Governor is unable or unwilling to mobilize the ORNG under Title 32 to perform the necessary protective functions.

RIEGER.TIMOTHY. Digitally signed by
RIEGER.TIMOTHY.LEE.1169002670
LEE.1169002670 Date: 2025.09.27 14:21:14 -04'00'

Encl as.

Timothy L. Rieger
Major General, USA
Acting Vice Chief, National Guard Bureau

A55

EXHIBIT C



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

SEP 2 8 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, OREGON NATIONAL GUARD
THROUGH: THE GOVERNOR OF OREGON

SUBJECT: Calling Members of the Oregon National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members.

This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment(s):
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

**A57**

**THE WHITE HOUSE**

WASHINGTON

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws.  In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.  To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.

In light of these incidents and credible threats of continued violence, by the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations.  Further, I direct and delegate actions as necessary for the Secretary of Defense to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority.  The members and units of the National Guard called into Federal service shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense.  In addition, the Secretary of Defense may employ any other members

**A58**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.   The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.



EXHIBIT D

# THE WHITE HOUSE

WASHINGTON

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**A61**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.   The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### (Portland Division)

STATE OF OREGON and the CITY OF
PORTLAND,

    *Plaintiffs*

    *v.*

DONALD TRUMP, in his official capacity as
President of the United States; PETE
HEGSETH, in his official capacity as
Secretary of Defense; U.S. DEPARTMENT
OF DEFENSE; KRISTI NOEM, in her
official capacity as Secretary of Homeland
Security; and U.S. DEPARTMENT OF
HOMELAND SECURITY,

    *Defendants*

Case No. 3:25-cv-01756

Declaration of Field Office Director
Cammilla Wamsley

## DECLARATION OF CAMMILLA WAMSLEY

I, Cammilla Wamsley, hereby declare as follows:

1. I am employed by the United States Department of Homeland Security (DHS), U.S.
   Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations
   (ERO) as the Field Office Director (FOD) of ERO's Seattle Field Office, which includes
   the ERO Portland sub-office. I have held this position since July 27, 2025.

2. As the FOD for ERO Seattle, I direct and oversee ICE's enforcement of federal
   immigration laws in the states of Oregon, Washington, and Alaska.

3. The Seattle Field Office has approximately 115 officers covering three states across three
   time zones. In Oregon, ERO has three offices, including the Portland sub-office, with
   approximately 30 officers who are responsible for enforcing federal immigration law in a

**A63**

population of over four million people. Due to Oregon's sanctuary laws and policies, the

Seattle Field Office does not receive any cooperation from state and local law

enforcement agencies in Oregon enforcing federal immigration laws. *See, e.g.*, O.R.S. §

181A.820-829 and Portland Police Bureau Policy # PPB-0810.10, Bureau Contact with

Members of Immigrant Communities and Individuals with Diplomatic Immunity.[1]

4.  This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion

    for Temporary Restraining Order (TRO) and sets out the current conditions on the ground

    in the Portland Area of Responsibility (AOR) with respect to immigration enforcement

    operations and the security of ICE personnel and property. I have reviewed Plaintiffs'

    application for a TRO and supporting exhibits.

5.  The statements contained in this declaration are based upon my personal knowledge and

    information made available to me in the course of my official duties.

**<u>Background</u>**

6.  ICE is the largest investigative branch of DHS and is charged with enforcement of more

    than 400 federal statutes. The agency was created after the September 11, 2001, terrorist

    attacks, by combining components of the former Immigration and Naturalization Service

    and the former U.S. Customs Service, among other agencies, to more effectively enforce

    federal immigration and customs laws and to protect the United States against terrorist

    attacks. The mission of ICE is to protect the United States from the cross-border crime

    and illegal immigration that threaten national security and public safety. To carry out that

    mission, ICE focuses on enforcing immigration laws, preventing terrorism, and

---

1. Available at: https://www.portland.gov/policies/police-directives/arrest-detentions-court-0800/081010-bureau-contact-members-immigrant (last visited on Sept. 30, 2025).

combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7.  ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8.  The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Current Protests in Portland and Impact on ICE Operations**

9.  ERO Portland Office is located at 4310 South Macadam Avenue in downtown Portland, Oregon. Violent opportunists and protesters have targeted this site and the employees who work there since early June 2025.

10. Protesters at the ERO Portland Office have assaulted federal law enforcement officers with rocks, bricks, pepper spray and incendiary devices; some attacks have been serious enough for FPS to refer for prosecution on ICE's behalf. In just one example, on July 4, 2025, ICE officers observed several individuals defacing ICE property with graffiti. As an officer pursued one individual, that individual ran towards the officer and kicked him in the leg, causing the officer to trip. Another individual threw an incendiary device towards the officers, which then detonated near the officers. The U.S. Attorney's Office for the District of Oregon deemed these actions severe enough to seek the prosecution of four involved individuals. *See e.g.*, U.S. Attorney's Office District of Oregon Press Release, "Four Defendants Charged with Assaulting Federal Law Enforcement Officers, Other Offenses During Protests Near Local ICE Office (July 8, 2025)[2] (reporting that the U.S. Attorney's Office charged 22 defendants between June 13, 2025, and July 8, 2025, with offenses committed at the Portland ERO building including assaulting federal officers, arson, possession of a destructive device, and depredation of government property). Indeed, some of these could have resulted in serious, and perhaps permanent damage to officers. For example, in June 2025, a man geared with a gas mask and vest was arrested for pointing a powerful laser at federal officers outside an ICE facility in

---

[2] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses#:~:text=Since%20June%2013%2C%202025%2C%20the,and%20depredation%20of%20government%20property (last visited Oct. 1, 2025).

**A66**

Portland. *See* KGW8 News Report, "Man arrested outside Portland ICE facility, accused of pointing laser at federal officers" (June 19, 2025) (anti-ICE protester arrested outside the ERO Portland Office after attempting to shine a laser pointer in the eyes of officers in June 2025).[3]

11. Protesters have repeatedly tried to burn down the Portland ERO Office, risking the safety of the public at large and lives of both ICE personnel and any detainees who might have been held in the facility, in addition to property damage. For example, on June 11, 2025, federal officers observed a man ignite a flare and set fire to a range of materials that protesters compiled to barricade against a vehicle gate. Other individuals then added items to the pile of materials, growing the flames further. The Federal Bureau of Investigations, Federal Protection Service (FPS), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives investigated this incident, and the U.S. Attorney's Office for the District of Oregon is prosecuting these acts of violent destruction. *See* U.S. Attorney's Office, District of Oregon Press Release, "Four Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer, and Depredation of Federal Property During Protests Near Local ICE Office;"[4] Portland Police Bureau Press Release, "Protestors Place Flammable Material, Lit Flare Against ICE Building, Officers Arrest 3."[5] On June 24, 2025, protesters attempted to set a U.S. flag on fire in the driveway of the ERO Portland building, and later a protester attempted to light an incendiary device next to the building's guard shack. When FPS officers engaged with the protester, she

---

[3] Available at: https://www.kgw.com/article/news/local/protests/portland-ice-facility-protest-arrests/283-ee652223-8d7a-40f6-a2ec-0cc373caaad2 (last visited Oct. 1, 2025).
[4] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and (last visited on Oct. 1, 2025).
[5] Available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 1, 2025).

threatened them with knives. *See* U.S. Attorney's Office, District of Oregon Press

Release, "Three Defendants Charged with Assaulting Federal Law Enforcement Officers,

Other Offenses During Protests Near Local ICE Office."[6]

12. Protesters have also damaged property, including but not limited to, breaking the

windows of the office building and damaging the external security cameras with spray

paint and other tools. In one instance, protesters used physical force to push the stainless-

steel grid out of alignment from the building's vehicle entrance/exit gates (see photograph

below). The damaged gates compromised security because the gates required manual

locking with a chain and padlock each time a vehicle entry or exit was necessary. On

June 29, 2025, a card reader that permits foot and vehicle entry to the building was

rendered inoperable. *See* U.S. Attorney's Office, District of Oregon, Press Release, "Four

Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer,

and Depredation of Federal Property During Protests Near Local ICE Office."[7]

Ultimately, three card readers were broken in June 2025. Replacement of such technology

is expensive, and ERO is waiting for a secure box to house the card reader to be

manufactured. It is expected to arrive in mid-October. In the meantime, entering and

leaving the building are both more difficult, and the building and personnel are less safe.

With the card readers broken, personnel must call someone in the building ahead of time

to let them in and then wait. During this time, protesters take their photos, potentially to

use to publicly dox officers and their family members. Doxing of ICE employees occurs

when the employee's personally identifiable information is gathered and publicly released

---

[6] Available at: https://www.justice.gov/usao-or/pr/three-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses (last visited on Oct. 1, 2025).
[7] Available at:  https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and (last visited Oct. 1, 2025.).

for malicious purposes, such as public humiliation, stalking, identity theft, or targeting for harassment or physical violence. As a result, many personnel wear masks. These masks do not prevent protesters from following officers when they depart the facility, however. I am aware of multiple instances where ICE employees have had their identity and other personal information disseminated online for the sole purpose of doxing, harassing, and intimidating ICE employees and their families, including posting their home address. Specifically, on August 28, 2025, three individuals followed an ICE agent home while livestreaming their predatory pursuit of the agent, providing directions to the agent's home, and encouraging viewers to share the livestream and visit the agent at his home address. The U.S. Attorney's Office for the Central District of California has indicted all three individuals. *See* U.S. Attorney's Office, Central District of California Press Release "Federal Grand Jury Charges Three Women with Following ICE Agent Home from Work and Livestreaming His Home Address on Instagram" (Sept. 26, 2025) (where the Southern California defendants publicly disclosed on Instagram the victim's home address and told viewers, "Come on down.").[8]

---

[8]  Available at: https://www.justice.gov/usao-cdca/pr/federal-grand-jury-charges-three-women-following-ice-agent-home-work-and-livestreaming (last visited on Oct. 1, 2025).



13. As a result of the destruction caused by protesters, the ERO Portland Office was required to close for three weeks, from June 13, 2025, until July 7, 2025, forcing most Portland ICE officers to work out of an alternative temporary space. This significantly impeded operations. For example, non-detained aliens who had appointments at the ERO Portland facility had to be rescheduled for alternative locations and/or times, and when the facilities' windows were broken by vandals and/or violent protesters, ERO Portland officers had to process arrested illegal aliens at facilities in Washington State. While the facility is again currently operational, the windows on the building must remain boarded to prevent further damage to property or attempts at incursion and to provide security to those federal employees working inside.

Declaration of Field Office Director Cammilla Wamsley

14. The local HSI office advised they received a tip that someone planned to detonate an incendiary explosive device at the building on September 19, 2025. Although this attack did not take place, preparing for the possibility necessitated an increase in security inspections and otherwise diverted important agency resources.

15. HSI detailed three Special Response Team (SRT) certified Special Agents to ERO's SRT efforts in Portland in September 2025, and intends to continue to support as directed. HSI SRT Special Agents are trained, among other things, to engage with the public, serve high-risk warrants under hazardous conditions, arrest dangerous criminals, and assist other law enforcement agencies during critical incidents. Detailing HSI SRT Special Agents to Portland for these purposes diminishes HSI's operational capabilities nationwide due to personnel limitations.

16. Protesters at the ERO Portland Office building have spray painted direct threats against ICE officers on the building, as shown in the photograph below. On September 1, 2025, protesters even assembled a guillotine outside, presumably to intimidate personnel, while two protesters wielded riot shields. *See* Fox News Channel "Anti-ICE Portland rioters with guillotine clash with police in war-like scenes) (Sept. 2, 2025).[9]

---

[9] Available at: https://www.foxnews.com/us/anti-ice-portland-rioters-guillotine-clash-police-burn-flag-war-like-scenes (last visited Oct. 1, 2025).





Declaration of Field Office Director Cammilla Wamsley
10

17. Protesters at the Portland ERO Office building have also repeatedly attempted to impede law enforcement operations by blockading the vehicle entrance. On June 8, 2025, it was reported that protesters placed wood, rocks, and a traffic barrier, and again, on June 11, 2025, protesters set aflame stacked materials alongside the building and placed a pole against the main lobby entrance. Obstructions such as these, if continued, could have a serious effect on ICE's ability to carry out legitimate law enforcement activities and, in addition, are safety hazards if there was an immediate emergency to exit the building. *See, e.g.*, The Oregonian/Oregon Live "Portland police clear blockade of ICE office; chief says it was for safety not immigration enforcement" (June 10, 2025) (protesters barricaded vehicle entrance);[10] Portland Police Bureau News Release, "Protestors Place Flammable Material, Lit Flare Against ICE Building, Officer Arrest 3" (June 12, 2025) (protesters attempted to start a fire at the ERO Portland Office building after placing a pole against the door the facility).[11] It is my understanding the protesters have also poured a substance believed to be motor oil in the vehicle entrance. Motor oil is highly flammable and could be used to burn down the building or cause injury to the personnel using the vehicle entrance.

18. Protesters have attempted to identify both private and government vehicles used by ICE employees in Portland. In September 2025, ICE officers reported vehicles following them after leaving the Portland ERO Office. On September 9, 2025, multiple individuals were observed on four occasions shining high powered flashlights at vehicles departing the building in an apparent attempt to blind the drivers. In the second week of September

---

[10] Available at: https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html (last visited on Oct. 1, 2025).

[11] Available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 1, 2025).

2025, ICE personnel received multiple reports of drivers leaving the Portland building being temporarily blinded or disoriented after individuals shone high-powered lights at their vehicles. On September 12, 2025, protesters posted a photograph of an unmarked government vehicle used by ICE officers taken at the vehicle entrance of the ERO Portland Office to social media with a post that identified the vehicle by make, model and license plate number. The post alarmingly provided the address of the vehicle's location *after* it left the building and was parked at a separate location. It is further my understanding that, over the past several months, ICE officers in the Seattle AOR, particularly those employed in the Portland ERO Office, have been under surveillance and subjected to written, verbal, and physical threats due to their employment with ICE. Several Portland ICE officers have had their names, photographs and even home addresses posted publicly in multiple locations throughout their residential neighborhoods and the Portland metro area, along with threatening messages. Multiple Portland ICE officers have had unknown individuals appear at their residences in vehicles and on foot, peering into their private homes and recording the officers entering and leaving. A sample of one recent flyer containing violent threats and a Portland ICE officer's personal information, including residential address (redacted for safety reasons), can be seen below. ICE has seen a dramatic increase in assault against ICE personnel as these doxxing websites have revealed their identity and their families' identity to the public, exposing personnel and their families to known and suspected violent individuals. *See* DHS Press Release "Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement" (July 11, 2025). [12]

---

[12] Available at: https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last visited Oct. 1, 2025).



19. In addition, multiple social media users have threatened to murder Portland ICE officers, as depicted in the screenshot below (flyers depicting officers' images and personal addresses have been removed for officer safety) (captured on Sept. 9, 2025).



20. In response to these threats and violence by criminal agitators in Portland, ICE has

diverted its personnel and resources to assist the Federal Protection Service (FPS) in the

protection of the ERO Portland building, the people who work there, aliens, and the

public. As discussed above, this includes deploying ICE officers and agents from around

the country, including SRT personnel, to assist FPS in Portland beginning on or about

June 9, 2025. This diversion of personnel and resources to assist FPS erodes ICE's ability to enforce federal immigration laws in the State of Oregon and across the country.

21. National Guardsmen are especially needed now in Portland given the recent deadly acts of violence targeting ICE, its employees, and its detainees around the country in recent weeks. Notably, on September 24, 2025, in Dallas, Texas, a sniper fired shots indiscriminately at an ICE van and building wounding and killing detainees in custody. Shell casings found near the body of the shooter contained anti-ICE messages.



*See* DHS Press Release: "DHS Issues Statement on Targeted Attack on Dallas ICE Facility." [13]

22. Days later, crowds of protesters outside an ICE facility in Chicago chanted, "Arrest ICE, shoot ICE." One protester was found with firearm after arrest. *See* DHS Press Release:

---

[13] Available at: https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility (last visited on Oct. 1, 2025).

"Days After the Dallas Terrorist Attack on ICE, Rioters Gather Outside an ICE

Broadview, IL Facility and Chant "Arrest ICE, Shoot ICE," (noting that there has been a

1000% increase in assaults against ICE officers). [14]

23. As threats and violence against ICE becomes the norm – even in portions of the country

that are typically more friendly to ICE – it increases the likelihood that other rogue actors

will endanger the lives of ICE personnel and detainees. Cities like Portland, where

intimidation and violence are already daily tools, are ripe for violence.

24. Deployment of National Guardsmen to assist FPS will help protect ICE personnel and

ICE facility and allow ICE and its employees to enforce federal immigration laws in the

State of Oregon.

### Insufficient Response of Portland Officials

25. Portland authorities have expressed concern about offering any assistant to ICE that could

be viewed as supporting ICE's immigration law enforcement efforts.  Indeed, in June

2025, PPB Police Chief Bob Day spoke publicly about avoiding any actions that might

show 'perceived or actual support' for immigration agents after Portland officers cleared

a blockade of the ICE driveway to let an empty transport van pass.

26. Instead of helping ICE and FPS protect the ERO Portland building, and personnel from

arsonists, vandals, and stalkers, the City of Portland issued a Notice of Zoning Violation

on September 18, 2025, to the building for boarding up the windows without a Design

Review Approval. The notice requires removal of all the wood coverings on the windows

and doors within 30 days. Should these wood coverings be removed, violent protesters

---

[14]  Available at: https://www.dhs.gov/news/2025/09/26/days-after-dallas-terrorist-attack-ice-rioters-gather-outside-ice-broadview-il (last visited on Oct. 1, 2025).

will be able to damage the windows again, forcing another closure of the building to the public.

**National Guard Assistance Will Allow ICE To Enforce Federal Laws in Portland**

27. It is my understanding that, at this time, approximately 200 National Guardsmen will be deployed to the Portland area providing protection of federal personnel, property, and functions.

28. I expect the National Guard will protect federal immigration officials from interference in their lawful enforcement efforts and their presence at federal facilities in the Portland area.

29. The presence of the National Guard will enable ICE to continue to carry out its congressionally mandated duties in the Portland area. It is the additional manpower and resources provided by these guards – indeed, their mere presence – that will provide safety to local federal facilities and ensure the safety of those enforcing federal laws in Portland.

**Impact of Plaintiffs' Requested Relief**

30. If the Court grants Plaintiffs' temporary restraining order, ICE employees, detainees, the federal facilities, and the general public in the vicinity of the federal buildings will continue to be at serious risk of harm and ICE will have to continue to divert its limited personnel and resources to support FPS instead of enforcing federal laws in the State of Oregon.

Declaration of Field Office Director Cammilla Wamsley

A79

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

October 2, 2025



CAMMILLA
H WAMSLEY

Digitally signed by
CAMMILLA H
WAMSLEY
Date: 2025.10.02
10:34:56 -07'00'

Cammilla Wamsley
Field Office Director
Seattle Field Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and THE CITY OF PORTLAND<br><br>Plaintiffs<br><br><br>v.<br><br><br>DONALD TRUMP, *et al.*<br><br><br>Defendants. | Case No.: 3:25-cv-01756<br><br>**DECLARATION OF ROBERT CANTU** |

I, Robert Cantu, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. This declaration is submitted in support of Defendants' opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO).

3. I am the Deputy Director of the Federal Protective Service (FPS), Region 10, which encompasses Alaska, Washington State, Idaho, and Oregon. I have served in that position since September 9th, 2023. FPS is the law enforcement agency within the U.S. Department of Homeland Security (DHS) that protects the federal government facilities and persons therein in accordance with 40 U.S.C. § 1315.

4. FPS is a small agency with a total of 776 law enforcement officers. Of that number, only 497 are Inspectors, whose primary mission is to patrol and respond to law enforcement incidents at the federal buildings in their area of responsibility.

**A81**

While FPS can surge its Inspectors to respond to emergency situations, it is not resourced to provide a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or federal employees working in those facilities.

5.  Since June 2025, there have been ongoing protests of the Administration's immigration policies with many occurring at federal facilities in major urban centers, such as Los Angeles, San Francisco, Chicago, Dallas, Seattle, Denver, New York, Boston, Portland and Washington DC.  Many of these protests, at times, have turned violent, requiring FPS to use crowd control tactics to prevent the destruction of federal facilities or serious injury to federal employees and the public.

6.  FPS has had to deploy many of its officers to those cities to increase its presence at the facilities where the protests are occurring.   Even when the protests are peaceful, FPS needs to have an increased presence so that it can adequately respond to outbreaks of violence if they occur.  This has resulted in a reduction in the number of FPS Inspectors available in other areas of the country where FPS services are needed.  Indeed, all federal buildings continue to experience incidents requiring an FPS law enforcement response, and the continued deployment of FPS officers in response to the immigration protests stretches an already thin force beyond what is safe and effective.   While FPS officers are expected to respond to emergencies after hours and on weekends and holidays, they are not expected to work 12-hour shifts, seven days a week, which has become the norm.

7. In Portland, Oregon, there have been regular protests since June 2025 at the Immigration and Customs Enforcement (ICE) building, also known as the Lindquist Federal Building, located at 4310 South Macadam Avenue.  While many of the protests have been peaceful, there have been numerous occasions where groups of protestors have become extremely violent, threatening the building and federal law enforcement officers.

8. One of the most significant incidents occurred on June 14, 2025, when at approximately 4:30 p.m., protesters (including one who was carrying a firearm) began to advance up the driveway towards the main gate of the facility.  They were throwing rocks and sticks at the guard shack and launching M80 fireworks at FPS officers.  A mortar was thrown at the front entrance of the building, causing minor injuries to an officer.  Two separate fires broke out in front of the building which had to be extinguished by FPS officers.  FPS officers had to barricade themselves inside the building and protesters placed chains on the exterior doors.  At

Declaration of Robert Cantu
2

**A82**

approximately 5:59 p.m., protesters attempted to breach the front door and broke the front door glass. FPS officers were forced to deploy their long guns but did not use them. The protestors continued to throw mortars at the building. At approximately 6:12 p.m., the Border Patrol Tactical Unit (BORTAC) responded to the facility with an up-armored tactical vehicle. By approximately 6:24 p.m., FPS officers were able to leave the building and, along with ICE Special Response Team (SRT) and BORTAC, were able to push the protesters past the driveway and sidewalk, into the middle of the street. A number of FPS officers suffered minor injuries from rocks and fireworks. Three individuals were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

9. Since the June 14th incident, protesters have continued to accost both the building and federal officials as the officers execute their duties. For example, on June 29, 2025, at approximately 3:27 a.m., a protester tampered with an access card reader providing entry to the Lindquist Building. When FPS officers took the individual into custody after a foot pursuit, he resisted arrest by biting and kicking the officers.

10. Even more concerning is when protesters threaten officers with dangerous weapons. For example, on June 24, 2025, at approximately 11:09 p.m., after officers gave a warning to clear the driveway of the facility, one protestor shot officers with a paintball gun and another shined a laser in an officer's eyes, after the officers warned the individuals to clear the facility's driveway. That same night, a third protester was detained for assaulting an officer with a machete and knife. The officer deployed his taser and was able to recover the machete and knife before he was injured. All three protesters were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

11. FPS and ICE officers have also been the targets of doxing[1], and at the end of each shift, it is not uncommon for officers, who have been deployed to Portland from other locations to fill operational needs, to be tailed and followed back to their hotels. Those officers have reported that groups have protested at the hotels where they were staying, both on the Oregon and Washington State sides of the Portland metropolitan area.

---

[1] Doxing occurs when an individual's personally identifiable information is gathered and publicly released for malicious purposes, such as public humiliation, stalking, identity theft, or targeting for harassment or physical violence.

Declaration of Robert Cantu
3

**A83**

12. It is extremely common for protesters to attempt to impede government vehicles as they enter or exit the facility. Once the vehicles stop, the protesters surround the vehicle, shouting threats at the occupants. For example, on August 9, 2025, at approximately 1:00 a.m., a group of protesters became aggressive when an ICE vehicle was departing the facility and began striking the vehicle with their fists. FPS had to deploy pepperballs to push the protesters back away from the vehicle.

13. In addition, on September 29, 2025, at approximately 6:52 p.m., an FPS officer had to deploy his pepper spray fogger against a protester who refused to comply with multiple orders to depart federal property. The protester was part of a larger group standing in front of and to the right of the driveway. At approximately 10:26 p.m., FPS issued a warning for protesters to clear the driveway. At approximately 10:31 p.m., two FPS officers deployed their pepper spray foggers at protesters who were shining high-powered strobe lights in the faces of the FPS officers attempting to push the crowd back from the driveway. One of the FPS officers who had the strobe light directed at him experienced pain in his eyes and head and spotting of his vision.

14. The above examples are part of a larger coordinated effort to obstruct lawful federal enforcement actions based at the Lindquist Building. The facility is subject to nightly protests, which risk escalation at any moment. In addition, there are concerns that the protesters may be protecting domestic terrorist organizations that are seeking to prevent the deportation of criminal aliens within the State of Oregon. Because of these concerns and the volatility of the situation in Portland, FPS has been forced to drastically alter its operations in a manner which is currently unsustainable.

15. Normally, FPS would be able to rely on the Portland Police Bureau (PPB) to assist with large scale law enforcement operations related to federal facilities in Portland. FPS has been informed by PPB, however, that they will only respond to "life/safety" situations, but not anything immigration related. For example, on September 9, 2025, at approximately 12:21 a.m., a female counter-protester was surrounded by a group of twelve to thirteen individuals. The began to physically harasser her by taking her water bottles and shining a high-powered flashlight in her eyes. At approximately 1:08 a.m., FPS requested assistance from PPB. PPB dispatch responded that two units would respond but an estimated time of arrival (ETA) could not be provided. At approximately, 1:15 a.m., FPS called PPB

dispatch back to request an ETA. At approximately 1:27 a.m., a PPB Sergeant called in requesting a description of the situation and the counter-protester being harassed. At approximately 1:33 a.m., a PPB patrol car drove by the area but did not leave their vehicle or engage with the situation. At approximately 1:44 a.m., FPS called PPB dispatch again, emphasizing that the situation was not an immigration issue or related to federal property but rather a civilian in distress and that the counter-protester was surrounded and in danger. At approximately 1:46 a.m., FPS contacted PPB once again and PPB stated that they did not perceive the counter-protester to be in distress or at risk of bodily harm and would not intervene. The counter-protester continued to be harassed, spit on and threatened with physical harm. The counter-protester was permitted to come onto federal property for her safety. At approximately 2:27 a.m., FPS officers pushed the protestors off of federal property back away from the counter-protestor so that she could leave the federal property safely. The counter-protester fled the area southbound on Macadam Street with a group of protesters attempting to follow her. FPS believed that the counter-protester had enough of a head start to escape the area safely. At no point did PPB respond or assist FPS with the incident.

16. This situation has resulted in FPS having to rely almost exclusively on ICE SRT for assistance in preventing the violent protesters from attacking immigration officers and the ICE facility where they work. While having ICE SRT as an available resource is invaluable to FPS, their primary mission is to handle high-risk immigration enforcement operations. As such, their continued assistance to FPS will become a drain on those resources and is not a practical ongoing solution.

17. FPS officers have a broad range of responsibilities within their respective areas of responsibility. Not only do they respond to law enforcement calls, but they also conduct routine security inspections of the facilities and contract security guards working in the buildings. They are also responsible for conducting facility security assessments (FSAs), during which they identify security vulnerabilities for a building and make recommendations to the building's Facility Security Committee (FSC) how best to mitigate those risks. FPS is resourced to patrol and respond to law enforcement calls during the workday when the facilities it protects are open to employees and/or the public. While FPS officers will occasionally respond to emergencies after hours and on weekends and holidays, they do not typically have to do that repeatedly over an extended period.

18. The sustained violence associated with the protests in Portland has required FPS Region 10 to deploy officers from the other FPS Regions. To date, 115 FPS officers have had to deploy to Portland to maintain a 24/7 operational tempo. Removing these officers from their normal duty stations means that the buildings they are assigned to must rely on other FPS officers or the local police force to respond to law enforcement incidents. Moreover, the security related functions that the assigned officers normally perform end up being delayed.

19. FPS's efforts to contain the violence associated with the protests in Portland have placed an unreasonable strain on the FPS law enforcement community as well as on FPS's limited resources. To date, FPS has expended over two million dollars in overtime pay and expenses in response to the violent protests in Portland since June 5, 2025. Because those expenses were not anticipated, they were not factored into FPS's FY25 budget. FPS expects the costs to continue at the same rate or higher in FY26.

20. I understand that for these reasons DHS has requested, and the Department of War has agreed, to deploy members of the National Guard to assist FPS in the State of Oregon. Given FPS's urgent need for additional support in Portland, that assistance is vital. Because the National Guard has the personnel, resources and training to provide non-law enforcement support in an effective and efficient manner, they are the ideal partner for FPS to work with in protecting federal facilities, and FPS welcomes their assistance.

21. Having National Guard support will enable FPS to reduce the number of FPS Inspectors deployed to Portland and return them to their primary mission at their normal duty locations. The presence of the National Guard in Portland will also enable FPS to surge its forces to other cities as necessary to deal with ongoing and anticipated threats. Most importantly, it will enable FPS to perform its mission without having to request support from PPB.

22. It is my understanding that the National Guard members working with FPS will not engage in any law enforcement operations but will only provide FPS with direct support related to federal facility protection, access control and crowd control measures. The National Guard members supporting FPS will be instructed to call an FPS officer anytime a law enforcement response at a federal facility is necessary and to wait for the FPS officer to respond, to the extent practicable. FPS is very familiar with this type of arrangement, as it is similar to the relationship that FPS has with the contract security guards who do not have any law

enforcement authority but provide facility protection, access control and crowd control measures at the approximately 8,000 federal facilities that FPS protects daily.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 2, 2025, at Seattle, Washington

ROBERTO R CANTU    Digitally signed by ROBERTO R CANTU
Date: 2025.10.02 10:57:19 -07'00'

ROBERT CANTU

A87

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND,<br><br>    PLAINTIFFS,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>    DEFENDANTS. | Case No. 3:25-cv-01756-IM<br><br>**DECLARATION OF BRIAN HUGHES**<br><br>(In Support of Plaintiffs' Motion for Temporary Restraining Order) |

I, Brian Hughes, declare as follows:

1.    I make this declaration based on my personal knowledge.

2.    I am currently employed by the City of Portland as a Commander at Central

Precinct with the Portland Police Bureau.

3.    The ICE facility falls within the jurisdiction of Central Precinct. I have asked the

Page  1  –  DECLARATION OF BRIAN HUGHES

sergeants to continue monitoring the activity at the ICE facility daily and nightly. Sergeants have been instructed to call the on-duty ICE supervisor near the beginning of each shift to provide them with a C shift and E shift point of contact. A brief synopsis of what was observed is then emailed to me each evening and are maintained as a business record.

4.      Attached to this declaration as **Exhibit 1** is a true and correct copy of the Central monitoring email received for the evening operational period of September 1, 2025.[1]

5.      Attached to this declaration as **Exhibit 2** is a true and correct copy of the Central monitoring email received for the evening operational periods of September 2-4, 2025.

6.      Attached to this declaration as **Exhibit 3** is a true and correct copy of the Central monitoring email received for the evening operational period of September 3, 2025.

7.      Attached to this declaration as **Exhibit 4** is a true and correct copy of the Central monitoring email received for the evening operational period of September 5, 2025.

8.      Attached to this declaration as **Exhibit 5** is a true and correct copy of the Central monitoring email received for the evening operational period of September 6, 2025.

9.      Attached to this declaration as **Exhibit 6** is a true and correct copy of the Central monitoring email received for the evening operational period of September 7, 2025.

10.     Attached to this declaration as **Exhibit 7** is a true and correct copy of the Central monitoring email received for the evening operational period of September 8, 2025.

11.     Attached to this declaration as **Exhibit 8** is a true and correct copy of the Central monitoring email received for the evening operational period of September 9, 2025.

12.     Attached to this declaration as **Exhibit 9** is a true and correct copy of the Central monitoring email received for the evening operational period of September 10, 2025.

13.     Attached to this declaration as **Exhibit 10** is a true and correct copy of the Central monitoring email received for the evening operational period of September 11, 2025.

---

[1] Evening operational periods include any activity from that evening into the early morning hours of the next day.

Page 2 – DECLARATION OF BRIAN HUGHES

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

14.     Attached to this declaration as **Exhibit 11** is a true and correct copy of the Central monitoring email received for the evening operational period of September 12, 2025.

15.     Attached to this declaration as **Exhibit 12** is a true and correct copy of the Central monitoring email received for the evening operational period of September 13, 2025.

16.     Attached to this declaration as **Exhibit 13** is a true and correct copy of the Central monitoring email received for the evening operational period of September 14, 2025.

17.     Attached to this declaration as **Exhibit 14** is a true and correct copy of the Central monitoring email received for the evening operational period of September 15, 2025.

18.     Attached to this declaration as **Exhibit 15** is a true and correct copy of the Central monitoring email received for the evening operational period of September 16, 2025.

19.     Attached to this declaration as **Exhibit 16** is a true and correct copy of the Central monitoring email received for the evening operational period of September 17, 2025.

20.     Attached to this declaration as **Exhibit 17** is a true and correct copy of the Central monitoring email received for the evening operational period of September 18, 2025.

21.     Attached to this declaration as **Exhibit 18** is a true and correct copy of the Central monitoring email received for the evening operational period of September 19, 2025.

22.     Attached to this declaration as **Exhibit 19** is a true and correct copy of the Central monitoring email received for the evening operational period of September 19, 2025.

23.     Attached to this declaration as **Exhibit 20** is a true and correct copy of the Central monitoring email received for the evening operational period of September 20, 2025.

24.     Attached to this declaration as **Exhibit 21** is a true and correct copy of the Central monitoring email received for the evening operational period of September 20, 2025.

25.     Attached to this declaration as **Exhibit 22** is a true and correct copy of the Central monitoring email received for the evening operational period of September 22, 2025.

26.     Attached to this declaration as **Exhibit 23** is a true and correct copy of the Central monitoring email received for the evening operational period of September 23, 2025.

Page  3  –  DECLARATION OF BRIAN HUGHES

27.     Attached to this declaration as **Exhibit 24** is a true and correct copy of the Central monitoring email received for the evening operational period of September 24, 2025.

28.     Attached to this declaration as **Exhibit 25** is a true and correct copy of the Central monitoring email received for the evening operational period of September 25, 2025.

29.     Attached to this declaration as **Exhibit 26** is a true and correct copy of the Central monitoring email received for the evening operational period of September 26, 2025.

30.     Attached to this declaration as **Exhibit 27** is a true and correct copy of the Central monitoring email received for the evening operational period of September 27, 2025.

31.     Attached to this declaration as **Exhibit 28** is a true and correct copy of the Central monitoring email received for the evening operational period of September 27, 2025.

32.     Attached to this declaration as **Exhibit 29** is an index of the monitoring emails for September, 2025.

33.     I make this supplemental declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

EXECUTED in Portland, Oregon on October 2, 2025

_s/ Brian Hughes_____
Brian Hughes

Page  4  –  DECLARATION OF BRIAN HUGHES

# EXHIBIT 1

| | |
|---|---|
| **From:** | Maxey, Brent |
| **To:** | Hughes, Brian; Sheppard, Nathan |
| **Cc:** | Tackett, Todd; Ceaser, Madison |
| **Subject:** | Re: ICE Monitoring for 9/1 |
| **Date:** | Monday, September 1, 2025 10:47:52 PM |

Immediately after I sent the original email, FPS came out of the building and made a push and deployed gas. Per the livestream, it looked like they were clearing the front of the building to get some vehicles moved.

Lieutenant Brent Maxey #40930
Portland Police Bureau
Central Precinct – C Shift

---

**From:** Maxey, Brent
**Sent:** Monday, September 1, 2025 10:21 PM
**To:** Hughes, Brian <Brian.Hughes@police.portlandoregon.gov>; Sheppard, Nathan <Nathan.Sheppard@police.portlandoregon.gov>
**Cc:** Tackett, Todd <Todd.Tackett@police.portlandoregon.gov>; Ceaser, Madison <Madison.Ceaser@police.portlandoregon.gov>
**Subject:** ICE Monitoring for 9/1

Due to the holiday and the larger turnout at today's protest, I assumed responsibility for monitoring the activity around the ICE facility tonight. I contacted FPS Supervisor Will Turner and advised him of the event at Caruthers Park. Turner reported that FPS resources are being pulled back for other priorities in other parts of the country, and that they were down approximately ten of their tactical officers tonight.

At approximately 1730, the gathering at Caruthers Park was estimated at 125 people, about half of whom were dressed in black bloc. Many wore gas masks, though I did not observe shields or other direct-action equipment. The group remained in the park for about an hour for music and speeches before marching south on Moody Avenue to the ICE building. Once there, they coned off the eastbound lane of SW Bancroft, restricting access from Macadam Avenue. All other traffic flowed without issue. Protesters stood in the eastbound lane of Bancroft and on the sidewalk in front of the building with little to no energy. A few positioned themselves near the cones along Macadam, waving signs and flags at passing vehicles.

I spoke with Turner again, and he reiterated that he was not concerned about the group. He stated that his team would remain out of sight unless significant vandalism or life-safety issues occurred.

As the evening progressed, the crowd gradually dispersed. A larger-than-normal group of approximately 50 remained, though their activity level was low and there were no major issues.

Dispatch created an information call (24-239724) and added related calls throughout the night. The only call voiced was at 2140, when Wendy Sletten requested contact. Sergeant Buck spoke with her, and she expressed frustration over what she described as PPB's lack of response. She stated that the protesters were not there to demonstrate but to terrorize neighborhood residents, and that they constantly issue threats, which was the theme of the majority of calls.

As of 2200, about 40 individuals remained in the area, still with low energy and no significant problems observed.

---

**CAD/Call Log Summary**

- **17:48** – 60–70 protesters reported near ICE (per 9803).
- **18:43** – Estimated 125 protesters marching from Caruthers Park to ICE.
- **18:58** – Federal police dispatch reported protesters placing cones and blocking the street.
- **20:56** – Angry caller reported protesters "threatening them," though no specific threats were articulated; described a barbecue in the area.
- **21:01** – Caller at Gray's Landing Apts reported 12–13 protesters throwing bottles at the building.
- **21:06** – Caller reported protesters smashing a vehicle window and attempting to direct traffic.
- **21:08** – Caller reported protesters completely blocking traffic and threatening people trying to drive by; declined contact.
- **21:14** – Caller frustrated, stated PPB is "useless"; declined further contact.
- **21:34** – Caller reported barbecue and loud rap music.
- **21:40** – Caller (Wendy Sletten) from Gray's Landing expressed fear and frustration over lack of response; advised she may leave to stay with a friend.
- **21:52** – Caller reported people screaming and blocking S Moody at Lowell; declined contact.
- **22:03** – Caller (Joshua McCoy) reported approximately 12 protesters blocking Bancroft & Bond; optional contact provided.
- **22:08** – Sergeant spoke with Wendy Sletten again; she reiterated frustration, stating multiple incidents have occurred and she feels PPB is not responding.

Lieutenant Brent Maxey #40930
Portland Police Bureau
Central Precinct – C Shift

**A94**

# EXHIBIT 2

| | |
|---|---|
| **From:** | Edwards, John |
| **To:** | Maxey, Brent; Tackett, Todd; Sheppard, Nathan; Hughes, Brian |
| **Subject:** | Thursday night ICE update |
| **Date:** | Thursday, September 4, 2025 9:18:41 PM |

Will Turner is the OIC this week. I spoke to him a bit about the events the entire week since I was not here Monday and Wednesday.

Labor day they had over 200 protesters in front of the facility. They did several push outs and arrested a few. Most people left after the initial, but had around 100 - 150 loitering around all night. There was significant media coverage around the guillotine.

Tuesday was completely un eventful. No calls for service and around 20 of the usuals.

Wednesday, an unknown subject was flying a drone in front of the upper windows in violaion of the TFR. Agents figured out who the drone operator was, contacted and arrested. The susepect got violent and spit on agents. He was arrestd and booked.

Today, (Thursday) I counted 20 at the beginning of the shift and around 15 at 2030 hours.

Tuner told me they are seeing several older transients that are being cooersed into approaching the gate and causing a distraction or just told to rattel the gate. This was cooberated by watching the instigators escorting different subjects, mostly described as elder transients up to the gate. One one occasion, FPS took custody of an elderly man after he asked the agents if he could just come up to the gate and rattle it so the antifa instigators would leave him and others alone. He was escorted behind the gates and interviewed. He told agents he and several other transients are being coerced to act on their behalf to instigate agent response. The subject was given a cite and released.

Tracy Molina is a daily chronic problem. She is the subject in the flyer from Intel that was carrying what appeared to be a pink synthetic rifle with a Glock pistol that fits in the middle. For those that do not know her, she is a very aggressive 1234 with a military background. She has been arrested more times than one can count and has been excluded and arrested numerous times from city property. She likes to interupt city councel and business at city hall, etc. She can be very violent.

FPS had been looking for her for several weeks as she has made threats to ICE agents and has expended her three strikes at the facility. She was arrested and escorted in the building. She cut her arms in the holding cell and graffitied the wall with a lot of blood before being taken to the hospital. FPS executed a warrant on her apartment and later lodged at jail pending

Federal charges. She is on supervised pre trial release with a no contact at ICE restriction.

As of 2100 hours tonight, there have been no calls for service and no reportable activity at the facility.  There is an elderly Alaskan male (Daniel Cox) at the facility who has some severe medical issues with his legs (Infection/MRSA) that is a chronic.  He knows jail will not take him if arrested and is therefore empowered to stay and be a problem.

That is all I have for tonight.  Feel free to inquire if you have questions.

**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**

**A97**

# EXHIBIT 5

| From: | Edwards, John |
|---|---|
| To: | Maxey, Brent; Tackett, Todd; Sheppard, Nathan; Hughes, Brian |
| Cc: | Thurman, Justin |
| Subject: | Saturday Night ICE report |
| Date: | Sunday, September 7, 2025 12:45:09 AM |

Good Evening,

This was an extremely busy shift tonight for all three precincts. We started the shift in great shape with only -7. North and East were way worse off with -8 each.

I drove by ICE around 1600 hours, saw one person standing and one person passed out on the concrete wall in front of the building. I contacted OIC Tuner.

East had a horrible double homicide/suicide, a potential fatal/trauma crash and normal business. North had the missoin with all RRT resources.

Central started the shift with a 1234 subject who jumped off the Hawethorn Bridge after taking a header into an oncomming car.

North had a fatal crash on I5/Rosa Parks at around 2300 just as we were cleraring a tactical call. The IMT held all of C shift citywide over for two hours.

At around 2100, I received a call from OIC Turner letting us know there were over 50-60 very active protestors/black blockers/agitators at the gate who were very active. Lots of noise, flashing lights, some were swinging sticks. The crowd was very energized. I drove by just as FPS was pushing out in order to get some vehicles in. I noted well over 50 people in front of driveway as well as all four corners of S. Bancroft/Moody. The conditions were the same at 0030 hours after speaking with OIC Turner.

They have 26 agents on until 0100 and 7-8 overnight.

**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**

**A100**

# EXHIBIT 11

| | |
|---|---|
| **From:** | Edwards, John |
| **To:** | Ceaser, Madison; Tackett, Todd; Maxey, Brent; Sheppard, Nathan; Hughes, Brian; Lloyd, Bryan |
| **Subject:** | Friday Night Ice update |
| **Date:** | Saturday, September 13, 2025 1:01:21 AM |

No calls for service at or near ICE tonight.  I contacted OIC Wayne Mitchell, he saw a group of 8-10 loitering througout the evening. At around 1900 hours, a vehicle off loaded a large quantity of sticks and bats.  Unknown if they are gearing up for Sunday night or just to re supply.

He inquired about the camp being posted, however I have not heard back from Bernard on that yet.

Central was down 5 to start and lost two more to L5.  We had a significant UOF with four Officers and were on 1-2 most of the night with 71 calls holding at 0100.


**Sgt. John Edwards #32391**

**Portland Police Bureau**

**Central Precinct/C Shift (3pm-1am)**

**Cell- (971) 804-2161**

**Office (503) 823-0097**

**A102**

# EXHIBIT 19

**From:**    Edwards, John
**To:**    Maxey, Brent; Tackett, Todd; Sheppard, Nathan; Hughes, Brian
**Subject:**    Friday Night ICE update
**Date:**    Saturday, September 20, 2025 1:06:22 AM

Good evening/morning.

FPS Agents were busy tonight. There was a group of 50 at the facility. Due to short staffing, lots of calls and a major crime scene I was on the entire night, I did not drive by, however Sgt. Duarte did. Again, once a marked car drives through, the will flip off, scream and throw objects at the car and in most cases run towards the car as if they are going to charge the car.

FPS Will Turner called me throughout the night with info about black blockers assaulting people. We were on Pri 1-2 with 50-60 calls holding, however only got one call from someone reporting they were assaultded on Saturday.

I received video from FPS and a report about a journolist who was assaulted by a black blocker with a large sword or stick. VI is Rhein Amacher and suspect is Seth Sinclair. They are known to FPS as Seth is a nightly agitator that has been cited by FPS.

I set up a call (25-259060) for nights to att contact and make a report. The other call is (25-258940).

To be clear, even if these folks were still at ICE or nearby, we would not be able to address the call or make an arrest with the resources we have.


**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **OPINION AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

Dan Rayfield, Oregon Attorney General; Benjamin Gutman, Oregon Solicitor General; Dustin Buehler, Special Counsel; Scott Kennedy, Brian Simmonds Marshall, Thomas Castelli, Ian Van Loh, and Rachel Sowray, Senior Assistant Attorneys General; and Alexander C. Jones and Derek Olson, Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Attorneys for Plaintiff State of Oregon.

Robert Taylor, Portland City Attorney; Caroline Turco, Senior Deputy City Attorney; and Naomi Sheffield, Chief Deputy City Attorney, OFFICE OF THE PORTLAND CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Attorneys for Plaintiff City of Portland.

Brett A. Shumate, Assistant Attorney General; Eric J. Hamilton, Deputy Assistant Attorney General; Alexander K. Haas, Branch Director, Federal Programs Branch; Jean Lin, Special Litigation Counsel, Federal Programs Branch; Christopher D. Edelman, Senior Counsel; and Benjamin S. Kurland, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L Street, NW, Washington, DC 20005. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States.

On June 7, 2025, President Donald J. Trump issued a Memorandum broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406, without specifying a designated location or duration. This Memorandum authorized federalized troops to temporarily protect U.S. Immigration and Customs Enforcement ("ICE") and other federal employees "who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Declaration of Major General Timothy L. Rieger ("Rieger Decl."), Ex. D, ECF 37 at 20.

In the wake of this June 7, 2025 Memorandum, protests ensued at the ICE facility in Portland. From June 11th to June 25th, these protests included violent behavior and required an increased law enforcement presence by both the Portland Police Bureau ("PPB") and federal law enforcement agencies. After June 25, 2025, however, the protests were generally peaceful in nature with only sporadic incidents of violence and disruptive behavior. By late September, these protests typically involved twenty or fewer people.

On September 27, 2025, President Trump posted a message on his Truth Social account stating that he was directing Pete Hegseth, the Secretary of War, to provide troops to protect "War ravaged Portland" from "Antifa, and other domestic terrorists" and authorizing "Full Force, if necessary." Declaration of Assistant Attorney General Brian Marshall ("Marshall Decl."), Ex. 12, ECF 9-12 at 2. In response, on September 28th, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 of Oregon National Guard service members, over the objection of Oregon's Governor, Tina Kotek.

That same day, the State of Oregon and the City of Portland (collectively, "Plaintiffs") brought this lawsuit against President Trump, Secretary Hegseth, the Secretary of Homeland Security Kristi Noem, and the U.S. Departments of Defense and Homeland Security (collectively, "Defendants"). Plaintiffs allege that Defendants' actions are *ultra vires*[1] and therefore unlawful because they violate 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 175 by federalizing Oregon's National Guard. Plaintiffs also allege that Defendants' conduct violates the Tenth Amendment and the separation of powers doctrine by infringing on Oregon's state sovereignty and police powers. Finally, Plaintiffs assert that Secretary Hegseth's Memorandum violates the Administrative Procedure Act ("APA") because it is not in accordance with the law, is in excess of statutory jurisdiction, authority, or limitations, and is arbitrary and capricious.

Plaintiffs move for a temporary restraining order ("TRO") and stay of Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon

---

[1] *Ultra vires* actions allow courts to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023) (first citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992); then citing *Larson v. Domestic & Foreign Com. Corp.* 337 U.S. 682, 689–90 (1949)).

PAGE 3 – OPINION AND ORDER

National Guard service members to Portland. Defendants respond that this Court may not second guess the President's determination that conditions in Portland warranted a federal military response. Defendants also contend that their conduct did not violate the U.S. Constitution or any statutory provision or exceed their statutory authority.

This Court has considered the briefing and declarations submitted in this case, the submission of *amici*, and the presentation of the parties at the hearing on Plaintiffs' TRO on October 3, 2025. For the foregoing reasons, this Court finds that Plaintiffs have met their burden at this stage of the litigation and GRANTS Plaintiffs' motion for a temporary restraining order.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122–23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The first factor— likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary

injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

### A. The National Guard

Members of the National Guard must be "activated" to serve on a mission. Declaration of Lieutenant General Jeffrey S. Buchanan, (Retired) ("Buchanan Decl.") ECF 9-1 ¶ 11. First, they may serve in "State Active Duty" in the state where they are commissioned when the governor of the state or commonwealth activates their unit, and they are under the command of the governor. *Id.* ¶ 12. Second, they may be activated under Title 32 of the United States Code, where the governor asks the federal government to bring troops into active duty for a particular mission, and they are under the command of the governor, but the costs are borne by the federal government. *Id.* ¶ 13; *see also* 32 U.S.C. § 502(f)(2)(A). Finally, they may be activated under Title 10 of the United States Code, where they are considered federal military and under the command of the U.S. President, *i.e.*, the "federalized" National Guard. Buchanan Decl. ¶ 14; *see also* 10 U.S.C. § 12406. This is the activation that occurred here.

State Active Duty National Guard troops and those activated under Title 32 may engage in domestic law enforcement functions, subject to restrictions under state law. Buchanan Decl. ¶ 25. Federalized National Guard troops activated under Title 10 may not engage in domestic law enforcement activities, with some exceptions. *Id.* Members of the National Guard generally do not receive training to perform local law enforcement tasks, such as learning de-escalation techniques, the use of non-lethal force, or how to properly conduct criminal investigations. *Id.* ¶¶ 34–46.

A109

## B. Law Enforcement Resources in Portland

Plaintiffs present several witness declarations from local law enforcement officials detailing local and state law enforcement resources that stand ready to address unlawful conduct at protests in Portland. The primary local law enforcement agency in Portland is the Portland Police Bureau. PPB employs approximately 812 officers. Declaration of PPB Assistant Chief of Operations Craig Dobson ("Dobson Decl."), ECF 7 ¶ 7. All PPB officers are trained in crowd management and First Amendment law. *Id.* ¶ 8. Crowd Management Incident Commanders receive an additional 40 hours of crowd management training. *Id.* ¶ 11. PPB also has a Rapid Response Team of 50 officers that is specially trained in crowd management, intervention (removing someone from a protest), and "direct crowd control through approved maneuvers and tactics." *Id.* ¶ 13. The Rapid Response Team receives an initial 40 hours of crowd control training and then 10 hours of crowd control training per month, meeting the standards of the National Tactical Officers Association. *Id.* The Rapid Response Team works under a Crowd Management Incident Commander. *Id.* PPB also has specially trained Dialogue Officers who work with protest organizers, *id.* ¶ 12, and Mobile Field Forces, who can move from one precinct to another as the situation demands, *id.* ¶ 15.

Crowd Management Incident Commanders work outside of their everyday PPB roles and are activated in that role based on PPB's risk assessment of an event. *Id.* ¶ 11. These commanders are activated for large events, such as the April 2025 "No Kings" protest that drew approximately 40,000–50,000 participants. *Id.* ¶ 14. PPB also uses traffic control officers and can coordinate with other local and state resources and existing federal partners as needed. *Id.* ¶¶ 14, 17. PPB has mutual aid agreements with the Multnomah County Sheriff, the City of Gresham, the Port of Portland, Clark County, Washington, and the Oregon State Police. *Id.* ¶ 17. PPB also can call in off-duty officers if PPB anticipates risks will stretch the capacity of PPB's on-duty

workforce. *Id.* ¶ 16. If additional resources beyond all of these are critically needed, PPB may request that Oregon's Governor provide National Guard resources for a locally declared emergency. *Id.* ¶ 18.

The Multnomah County District Attorney took office in January 2025 with a strong commitment to prosecuting political violence and public criminal activity. Declaration of Multnomah County District Attorney Nathan Vasquez ("Vasquez Decl."), ECF 42 ¶ 5. The District Attorney's Office has a Strategic Prosecution Unit that works closely with the Crowd Management Incident Commander. *Id.* ¶ 6. Strategic Prosecution Unit District Attorneys are on call 24 hours per day. *Id.* ¶ 6. They meet weekly with PPB to assess public safety needs. *Id.* ¶ 8. When there is a demonstration that is anticipated to require a law enforcement presence, a DDA is assigned and a supervisory DDA participates in pre-event planning to try to prevent violent gatherings. *Id.* ¶¶ 6–7.

The Oregon State Police is a partner with PPB. It responds to requests from local law enforcement for assistance. Declaration of Oregon State Police Criminal Investigations Captain Cameron Bailey ("Bailey Decl."), ECF 8 ¶ 11. Although Portland has not requested the Oregon State Police's help with the current protests, the State Police stands ready to assist PPB should it so request. *Id.* ¶ 13. The Oregon State Police has approximately 700–800 sworn officers at any given time. *Id.* ¶ 5. The State Police trains every trooper on use of force, de-escalation, and crowd management. *Id.* ¶¶ 7, 9.

Existing federal law enforcement resources also protect federal facilities in Portland. *See, e.g.*, Dobson Decl. ¶ 25; Declaration of Deputy Director of the Federal Protective Service Robert Cantu ("Cantu Decl."), ECF 40 ¶¶ 17, 37 (describing federal law enforcement activities in Portland); Declaration of Seattle Enforcement and Removal Operations Field Officer Director

PAGE 7 – OPINION AND ORDER

Cammilla Wamsley ("Wamsley Decl."), ECF 38 ¶ 15 (describing federal law enforcement resources assisting in Portland). The federal government also has deployed additional federal law enforcement officers to Portland from around the country in response to protests when necessary. Cantu Decl., ECF 40 ¶ 18; Wamsley Decl., ECF 38 ¶ 20.

## C. Protests in Portland

ICE has a facility located at 4310 S. Macadam Avenue in Southwest Portland. Dobson Decl., ECF 7 ¶ 19. This facility encompasses approximately one block of the City of Portland. *See* Marshall Decl., Ex. 21, ECF 9-21 at 2. Following federal officials' arrests of asylum seekers in Portland's Immigration Court in June 2025, protests broke out around the ICE facility. These protests were small, generally involving fewer than 100 people, *see* Dobson Decl., ECF 7 ¶ 20, but were concentrated at the ICE facility and disruptive to the facility. The ICE facility is within PPB's Central Precinct. *Id.* ¶ 21. Unless a Crowd Management Incident Commander is activated, protests at the ICE facility are monitored by Central Precinct. *Id.*

Assistant Chief Dobson activated a Crowd Management Incident Commander for the ICE facility protests from June 11–25, 2025, who in turn activated a PPB Rapid Response Team, mostly in a monitoring capacity. *Id.* ¶ 22. The protests were mostly peaceful, but there were some individuals who engaged in unlawful conduct requiring PPB intervention. *Id.* PPB made 25 arrests from June 11–19, 2025. *Id.* After June 25, PPB transitioned monitoring over to Central Precinct because PPB determined that the protests were low risk. *Id.* ¶ 23. Since July 18, 2025, PPB has "carried out routine monitoring of the ICE-Facility protests without serious incident," and "the risks posed by nightly ICE-Facility protests have not merited anything more than standard, periodic monitoring like any other neighborhood in the City." *Id.* ¶ 24.

Defendants proffer three declarations in support of their opposition to the TRO from individuals who do not appear to be based in Oregon. These declarations detail some specific

PAGE 8 – OPINION AND ORDER

instances of violence and other unlawful conduct involving the ICE facility and protests from

this same period. On June 8, 2025, protestors attempted to block the vehicle entrance. Wamsley

Decl., ECF 38 ¶ 17. On June 11, protestors lit fires to barricade a vehicle gate. *Id.* ¶ 11. Four

offenders were arrested and are being prosecuted for arson, assaulting a federal officer, and

depredation of federal property. *Id.* On June 14, protestors threw rocks and sticks and M80

fireworks at Federal Protective Services ("FPS") officers. Cantu Decl., ECF 40 ¶ 8. The Border

Patrol Tactical Unit and the ICE Special Response Team responded, and the violent protest was

under control within approximately two hours of its start. *Id.* A few FPS officers suffered minor

injuries, and three protestors were arrested by federal officers and charged with assault on a

federal officer. *Id.*

On June 24, 2025, one protestor was detained for assaulting a federal officer with a

machete and knife—the officer deployed his taser and recovered the protestor's weapons without

getting injured. *Id.* ¶ 10. Another protester shot officers with a paintball gun, and a third shined a

laser in an officer's eyes. *Id.* All three were arrested by federal law enforcement and charged

with assault on a federal officer. *Id.* Another protester attempted to set a U.S. flag on fire in the

driveway. Wamsley Decl., ECF 38 ¶ 11. On June 29, a protestor tampered with the card reader at

the ICE facility and resisted arrest. Cantu Decl., ECF 40 ¶ 9. Ultimately, three card readers were

damaged in June 2025, as well as damage to gates and windows. Wamsley Decl., ECF 38 ¶ 12.

With the card readers broken, personnel must call someone ahead of time to let them in, causing

delays and inconvenience. *Id.* The ICE facility in Portland shut down from June 13, 2025, until

July 7, 2025, due to the property damage from protesters. *Id.* ¶ 13. As a result of the closure,

most Portland ICE officers had to work out of separate temporary space. *Id.*

On August 20, 2025, PPB activated a Crowd Management Incident Commander from 4:00 p.m. to 7:30 p.m., having assessed potential risk of increased protest activity that did not end up occurring. Supplemental Declaration of Craig Dobson ("Dobson Supp. Decl."), ECF 21 ¶ 3. Otherwise, from July 18th to September 27th, Central Precinct police officers handled the ICE protests with routine monitoring. Dobson Decl., ECF 7 ¶¶ 24, 25. The protests generally were limited to fewer than 30 people and were "largely sedate." *Id.* ¶ 25. If the protests were to increase or threaten public safety, PPB could call on additional available resources. *Id.* ¶ 26. But the protests have been such a minor issue, that the normal nightlife in downtown Portland has required more police resources than the ICE facility. *Id.*

Federal law enforcement encountered some instances of unlawful conduct in the two months leading up to the federal deployment. On August 9, 2025, protesters attempted to block an ICE vehicle and federal officers had to use pepper spray so the vehicle could depart. Cantu Decl., ECF 40 ¶ 12. On September 1, protestors assembled a "guillotine," and two protestors had riot shields. Wamsley Decl., ECF 38 ¶ 16. That night, PPB checked in twice with FPS Supervisor Will Turner and was told despite FPS being "down ten tactical officers" who were sent to other parts of the country, he was "not concerned" about the protestors. Declaration of Central Precinct Commander Brian Hughes ("Hughes Decl."), Ex. 1, ECF 46-1 at 2. At one point, however, federal officers had to come out and deploy tear gas to clear the area for a vehicle to exit. *Id.* According to PPB dispatch logs, on that occasion Federal officers arrested "a few" people. Hughes Decl., Ex. 2, ECF 46-2 at 2.

On September 9, 2025, four protestors shined high-powered flashlights in the eyes of drivers leaving the ICE facility. Wamsley Decl., ECF 38 ¶ 18. ICE received additional reports of drivers leaving the building that week having flashlights shone in their eyes. *Id.* PPB, however,

did not receive any requests for assistance from federal officers during the next 17 days of September. Additionally, PPB's independent monitoring of the protests and regular communications with FPS during this time show protests generally averaging less than 20 persons, with a few nights having around 50 persons. *See generally* Hughes Decl., Ex. 3, ECF 46-3 to Ex. 16, ECF 46-16. Sometimes the protests had "higher energy," and sometimes they had skirmishes between protestors, but they rarely had any issues with federal officers or federal property. *Id.*

On September 18, 2025, the protests increased in size to around 150 people, but there were no issues with federal property or personnel and FPS did not request assistance. *Id.*, Ex. 17, ECF 46-17 at 2. On September 19, federal law enforcement employed munitions to break up a crowd and reported to PPB assaults on protestors and one journalist by a known "agitator." *Id.*, Ex. 18, ECF 46-18 at 2 to Ex. 19, ECF 46-19 at 2. There was no reported activity, however, against federal property or personnel.

From Monday, September 22, 2025, through Friday, September 26, 2025, in the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. *Id.*, Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. PPB reported no incidents of disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. *Id.*, Ex. 25, ECF 46-25 at 2.

In support of their opposition to the TRO, Defendants include in their supporting declarations that federal law enforcement officers are concerned that protests "risk escalation at any moment," Cantu Decl., ECF 40 ¶ 14, and that ICE employees are being "doxed" and having their personal information posted online. Wamsley Decl., ECF 38 ¶ 12. Several Portland ICE officers have had flyers with their names, photographs, and home addresses posted publicly. *Id.*

PAGE 11 – OPINION AND ORDER

¶ 18. And on September 12, 2025, a photograph of an unmarked ICE vehicle in Portland was posted online with its make, model, license plate, and location after it left the ICE facility. *Id.* ¶ 18.

Defendants also express concern about danger in Portland because of incidents that have occurred elsewhere in the country. *Id.* ¶ 21. Most concerning is the sniper shooting in Dallas, Texas, targeting an ICE van, and the protest that followed in Chicago when a protestor was found with a firearm. *Id.* ¶¶ 21–22.

## D. Defendants' Actions Relating to Federalization of National Guard

On June 6 and 7, 2025, violent protests broke out in Los Angeles at ICE facilities and elsewhere. *See Newsom v. Trump* (*Newsom I*), 786 F. Supp. 3d 1235, 1242–43 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025). On June 7, 2025, President Trump issued a Memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406. Rieger Decl., Ex. D, ECF 37 at 20–21. The June 7, 2025 Presidential Memo recited that "incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Rieger Decl., Ex. D, ECF 37 at 20. The June 7, 2025 Presidential Memo also stated that the protests "threaten the security" of ICE detention centers and other federal property. *Id.* The June 7, 2025 Presidential Memo concluded that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

The June 7, 2025 Presidential Memo authorized the federalized troops to "temporarily protect ICE and other United States Government personnel who are performing Federal

**A116**

functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on *current threat assessments* and planned operations." *Id.* (emphasis added). The number of National Guard troops was to be no fewer than 2,000 and the duration of the deployment under the June 7, 2025 Presidential Memo was 60 days or at the discretion of the Defense Secretary. The June 7, 2025 Presidential Memo did not refer to any specific location.

In response to the June 7, 2025 Presidential Memorandum, that same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members. *Newsom I*, 786 F. Supp. 3d at 1244. Two days later he federalized another 2,000 California National Guard members and deployed the National Guard along with approximately 700 active duty Marines. *Id.* at 1244–45. The first of these troops arrived to Los Angeles on June 8, 2025. *Id.* at 1245. Governor Gavin Newsom and the State of California sued President Trump and other defendants, obtaining a TRO under § 12406, which was stayed by the Ninth Circuit. *See Newsom v. Trump* (*Newsom II*), 141 F.4th 1032 (9th Cir. 2025).

On September 19, 2025, President Trump explained that the administration was going to "get rid of" the "problems" in cities, including Chicago, Memphis, and Portland. Marshall Decl., ECF 9 ¶ 25. He described that in Portland people were "out of control" and "crazy." *Id.*

On September 25, 2025, the President again described Portland, exclaiming that "nobody's ever seen anything like it" with activity happening "every night," with people that "just burn the place down." Marshall Decl., ECF 9 ¶ 26. President Trump commented on "professional agitators" in Portland who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings," with Portland

having activity "every night . . . for years." *Id.* He promised to do a "pretty big number" on the "people in Portland that are doing that." *Id.*

On September 27, 2025, President Trump posted a message on Truth Social, stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

*See* Marshall Decl., Ex. 12, ECF 9-12 at 2. Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, asked Governor Kotek, via Oregon National Guard Adjutant General Alan R. Gronewald, to immediately mobilize 200 National Guard members "to protect federal personnel, functions, and property in Oregon." Rieger Decl., Ex. B, ECF 37 at 14. Major General Rieger threatened federalization of the Oregon National Guard if Governor Kotek refused. Rieger Decl., Ex. B, ECF 37 at 14.

Governor Kotek spoke with President Trump and explained that there was no insurrection or threat to public safety in Oregon. *See* Marshall Decl., Ex. 14, ECF 9-14 at 2–3. She declined to voluntarily activate Oregon's National Guard. *Id.* Oregon's Attorney General emphasized that local law enforcement has "the capacity to manage public safety without federal interference" and that sending "200 National Guard troops to guard a single building is not normal." *Id.*; *see also id.*, Ex. 15, ECF 9-15 at 2–3.

On September 28, 2025, Secretary Hegseth issued his memorandum, authorizing the federalization of 200 Oregon National guard members. Rieger Decl., Ex. C, ECF 37 at 16. He cited and attached the June 7, 2025 Presidential Memo. *Id.* at 17–18. He explained that his memorandum "further implements the President's direction" from the June 7, 2025 Presidential Memo. *Id.* He then directed the federalization and deployment of 200 Oregon National Guard

service members for 60 days. *Id.* Those members will be "under the command and control of the Commander, U.S. Northern Command." *Id.* Plaintiffs filed this lawsuit later that day, and their motion for a TRO on September 29, 2025.

On October 1, 2025, President Trump posted on Truth Social:

> As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 1, 2025 at 10:36 AM), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (emphasis in original); *see also* Rieger Decl., ECF 37 ¶ 12 (stating that the President "further explained" his September 27, 2025, decision to federalize troops in his October 1 Truth Social post). According to Defendants, "National Guard personnel activated would be limited in their functions to protecting federal property, personnel, and functions." Rieger Decl., ECF 37 ¶ 24.; *see also* Cantu Decl., ECF 40 ¶ 22 (same).

## DISCUSSION

Plaintiffs bring claims alleging that Defendants' actions violate (1) the statutory authority granted the President in 10 U.S.C. § 12406, (2) Oregon's sovereign rights as protected in the Tenth Amendment, (3) the Posse Comitatus Act, (4) the Administrative Procedures Act, and (5) the separation of powers, as well as the Militia and Take Care Clauses of the U.S.

PAGE 15 – OPINION AND ORDER

Constitution. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest tip in their favor. Defendants respond that President Trump determined that the situation in Portland met the statutory criteria under Section 12406, and under the deference this Court must give that determination, Plaintiffs' fail to show a likelihood of success on that claim. And absent a showing that Defendants' conduct violated Section 12406, Defendants argue that Plaintiffs cannot show that they are likely to succeed on their remaining claims.

For the reasons discussed below, this Court finds that Plaintiffs are likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 and was *ultra vires*. In addition, because Section 12406 defines the scope of Congress's constitutional delegation to the President to federalize the National Guard, Plaintiffs are likely to succeed on their claim that the President exceeded his constitutional authority and violated the Tenth Amendment. Because this Court finds that Plaintiffs are likely to succeed on these two claims, this Court declines to reach Plaintiffs' arguments regarding their likelihood of success on their remaining claims. Plaintiffs also have adequately shown irreparable harm and that the balance of equities and public interest weigh in their favor. This Court therefore grants Plaintiffs' motion for a temporary restraining order.

## A. Likelihood of Success on the Merits

### 1. Section 12406 Claim

#### a. Statutory Framework

Under the Militia Clause of U.S. Constitution, Congress has the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress first delegated authority to the President to call forth the militia in extraordinary, limited circumstances in the Militia Act of 1792. *See* Ch.

28, § 1, 1 Stat. 264–65. Congress affirmed this power in the Militia Act of 1795, which "was a precursor to the Militia Act of 1903." *Newsom II*, 141 F.4th at 1047. The Militia Act of 1903 created the modern framework of the National Guard, *see* Ch. 196, § 25, 32 Stat. 775 (1903), and this statute was the "precursor to [10 U.S.C.] § 12406." *Newsom II*, 141 F.4th at 1047.

Under 10 U.S.C. § 12406, the President may federalize National Guard service members if:

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

After making this determination, the President may federalize National Guard troops "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia." *Id.*

In *Newsom II*, the Ninth Circuit held that 10 U.S.C. § 12406 does not "preclude[] judicial review of the President's determination that a statutory precondition exists." 141 F.4th at 1047.[2] However, a reviewing court must give "a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048. A court "review[s] the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range

---

[2] Defendants argue that the President's determination under 10 U.S.C. § 12406 is unreviewable, but they acknowledge that the Ninth Circuit has held that this determination is reviewable. Resp., ECF 35 at 18–19.

of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). At the same time, the Executive's "exercise of his authority to maintain peace" must be "*conceived in good faith*, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis in original) (quoting *Sterling*, 278 U.S. at 399–400).

### b. Whether the President is Unable with the Regular Forces to Execute the Laws of the United States

Defendants first argue that the President "had a colorable basis for invoking § 12406(3)," *id.* at 1052, because he was "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3); *see* Resp., ECF 35 at 20–22. Although Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States," "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Newsom* II, 141 F.4th at 1051.

As a threshold matter, this Court must determine to what extent the President can rely on violence that occurred months prior to his September 27, 2025 federalization directive and that had subsided by September. Under *Newsom II*, and as a matter of logic, this Court assesses whether the President invoked Section 12406(3) based on "a colorable assessment of the facts" as they existed *at the time* he federalized the National Guard. *Newsom II*, 141 F.4th at 1051. In *Newsom II*, the Ninth Circuit evaluated the "protesters' interference with the ability of federal officers to execute the laws, *leading up to* the President's federalization of the National Guard on June 7." *Id.* at 1052 (emphasis added). And the Ninth Circuit specifically cited events from "the day before" the June 7, 2025 federalization order to conclude that "the President had a colorable basis for invoking § 12406(3)." *Id.* Likewise, this Court will focus on "the ability of federal

PAGE 18 – OPINION AND ORDER

officers to execute the laws[] leading up to the President's federalization of the National Guard"
on September 28, 2025. *Id.*

In this case, and unlike in *Newsom II*, Plaintiffs provide substantial evidence that the
protests at the Portland ICE facility were not significantly violent or disruptive in the days—or
even weeks—leading up to the President's directive on September 27, 2025. The record evidence
establishes that while disruption outside the Portland ICE facility peaked in June of 2025, federal
and local law enforcement officers were able to "quell[] . . . the disorder." *Newsom II*, 141 F.4th
at 1051 (quoting *Sterling*, 278 U.S. at 399–400). As of September 27, 2025, it had been months
since there was any sustained level of violent or disruptive protest activity in Portland. During
this time frame, there were sporadic events requiring either PPB monitoring or federal law
enforcement intervention, but overall, the protests were small and uneventful.

Defendants' declarants describe only four incidents of protesters clashing with federal
officers in the month of September preceding the federalization order—on September 1st, 9th,
12th, and without further specification, the second week of September. Wamsley Decl., ECF 38
¶¶ 16, 18; Cantu Decl., ECF 40 ¶ 15. The first involved protesters setting up a makeshift
guillotine to intimidate federal officials; the second involved four people shining overpowered
flashlights in the eyes of drivers; the third involved someone posting a photograph of an
unmarked ICE vehicle online; and the last involved additional drivers having flashlights shone in
their eyes. Cantu Decl., ECF 40 ¶ 15; Wamsley Decl., ECF 38 ¶¶ 16–18. These incidents are
inexcusable, but they are nowhere near the type of incidents that cannot be handled by regular
law enforcement forces. They also occurred at least two weeks before President Trump issued
his directive. More broadly, these incidents are categorically different from the violent incidents
as described in *Newsom II* that took place in Los Angeles when the President federalized the

A123

California National Guard on June 7, 2025. *See* 141 F.4th at 1052 ("[P]rotesters threw objects at ICE vehicles trying to complete a law enforcement operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building.").

Plaintiffs provide all the PPB call logs in the month of September, which show that PPB worked in close coordination with FPS supervisors and regularly checked the status of the ICE facility. As detailed above, they also show that the protest activity in September generally did not involve violence against federal property or personnel. At the hearing, Defendants highlighted a September 19 entry relating to FPS reporting an assault by a known agitator against other protestors and a journalist. Hughes Decl., Ex. 19, ECF 46-19. This isolated assault, which did not target federal personnel, and which occurred a week before the federalization order, along with the other isolated September incidents, do not approach the level of disruption to federal functions in Los Angeles that *Newsom II* described as occurring "the day before" President Trump's June 7, 2025 federalization of the California National Guard. 141 F.4th at 1052. Neither outside the Portland ICE facility nor elsewhere in the City of Portland was there unlawful activity akin to what was occurring in Los Angeles leading up to June 7, 2025. *See id.* at 1041 (describing the riotous activity).

Defendants also argue that strained FPS resources suffice to show that the President had a colorable basis to invoke Section 12406(3). Resp., ECF 35 at 20–21. But they demonstrate just the opposite, that federal law enforcement officers, unaided by any military forces, were capable of not only "quelling" the violence in June but also "preventi[ng]" it through September. *Newsom II*, 141 F.4th at 1051 (quoting *Sterling*, 287 at 399–400). The Deputy Director of the

Federal Protective Service Region that encompasses Oregon noted that to date, FPS has deployed 115 officers from other FPS Regions to Portland. Cantu Decl., ECF 40 ¶ 18. This deployment of additional federal law enforcement officers reduced the level of disorder between June and September to the point that in the immediate days leading up to the federalization order, around twenty or fewer protesters gathered outside the ICE Facility and "FPS indicated no issues or criminal reports." Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. On September 26, the eve of the President's directive, law enforcement "observed approximately 8–15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity." Hughes Decl., Ex. 26, ECF 46-26. It is clear that "the regular forces," i.e. FPS and additional federal law enforcement, *were able* to execute the laws of the United States.

Defendants' argument that this diversion of federal law enforcement officers from out-of-state demonstrates that "the regular forces" were unable to execute the laws is not persuasive. Defendants' proposed test for Section 12406(3) would allow the President to call in the National Guard whenever one law enforcement office receives support from another office, which is a routine aspect of law enforcement activity. If the President could equate diversion of federal resources with his inability to execute federal law, then the President could send military troops virtually anywhere at any time.

In support of their opposition, Defendants also rely on occurrences of violence elsewhere in the country and the risk that peaceful protests in Portland might escalate into violence "at any moment." Resp., ECF 35 at 13. But violence in a different state and the mere potential for future escalation do not provide a colorable basis to invoke Section 12406(3). To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the President to federalize one state's National Guard based on events in a different

A125

state or mere speculation about future events. In other words, violence *elsewhere* cannot support

troop deployments *here*, and concern about hypothetical *future* conduct does not demonstrate a

*present* inability to execute the laws using nonmilitary federal law enforcement.

Finally, the President's own statements regarding the deployment of federalized National

Guardsmen further support that his determination was not "*conceived in good faith*" or "in the

face of the emergency and directly related to the quelling of the disorder or the prevention of its

continuance." *Newsom II*, 141 F.4th at 1051 (emphasis in original) (quoting *Sterling*, 287 U.S. at

399–400). Despite the "minimal activity" outside the Portland ICE facility in the days preceding

September 27, 2025, Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26, President Trump

directed Secretary Hegseth "to provide all necessary Troops to protect War ravaged Portland,

and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists."

Marshall Decl., Ex. 12, ECF 9-12. Two days before that directive, the President claimed that

Portland has "professional agitators" who are "paid a lot of money by rich people," "anarchists,"

and "crazy people" who try to "burn down buildings, including federal buildings." *See* Marshall

Decl., ECF 9 ¶ 26. Whatever the factual basis the President may have for these allegations,

nothing in the record suggests that anything of this sort was occurring "every night" outside the

Portland ICE building or in the City of Portland in the days or weeks leading up to his September

27 directive. *Id.*

In sum, the President is certainly entitled "a great level of deference," *Newsom II*, 141

F.4th at 1048, in his determination that he "is unable with the regular forces to execute the laws

of the United States." 10 U.S.C. § 12406(3). But "a great level of deference" is not equivalent to

ignoring the facts on the ground. As the Ninth Circuit articulated, courts must "review the

President's determination to ensure that it reflects a colorable assessment of the facts and law

within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling*, 278 U.S. at 399). Here, this

Court concludes that the President did not have a "colorable basis" to invoke § 12406(3) to

federalize the National Guard because the situation on the ground belied an inability of federal

law enforcement officers to execute federal law. *Id.* at 1051–52. The President's determination

was simply untethered to the facts.

### c.  Whether there is a Rebellion or Danger of Rebellion

Defendants also argue that the September 28, 2025 federalization order is authorized

under subsection two, which permits federalization of the National Guard in response to "a

rebellion or danger of a rebellion against the authority of the Government of the United States."

10 U.S.C. § 12406(2). In the June 7, 2025 Presidential Memo, President Trump stated that, "[t]o

the extent that protests or acts of violence directly inhibit the execution of the laws, they

constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20.

The parties disagree about the meaning of the word rebellion in the statute.

"Interpretation of a word or phrase depends upon reading the whole statutory text, considering

the purpose and context of the statute, and consulting any precedents and authorities that inform

the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Additionally, courts must

interpret words in statutes "consistent with their 'ordinary meaning . . . at the time Congress

enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting

*Perrin v. United States*, 444 U.S. 37, 42 (1979)).

The Ninth Circuit did not reach the government's rebellion arguments in *Newsom II*.

*See* 141 F.4th at 1051. In *Newsom I*, however, the district court performed a detailed statutory

interpretation of § 12406(2) that this Court finds instructive. 786 F. Supp. 3d at 1251. There, the

court surveyed four dictionaries from the late 1800s and early 1900s—when Congress passed the

first predecessor statute to § 12406, the Militia Act of 1903. *See id.* at 1252. From that survey,

PAGE 23 – OPINION AND ORDER

the court identified several shared characteristics of a rebellion, as Congress would have

understood the term in 1903:

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue."

*Id.* at 1253 (emphasis omitted).

The court also considered three of the same definitions that the parties here proffer from

the current edition of *Black's Law Dictionary*:

> 1. Open, organized, and armed resistance to an established
> government or ruler; esp., an organized attempt to change the
> government or leader of a country, [usually] through violence.
>
> 2. Open resistance or opposition to an authority or tradition.
>
> 3. Hist. Disobedience of a legal command or summons.

*Id.* at 1252 (quoting *Rebellion*, *Black's Law Dictionary* (12th ed. 2024)).

Plaintiffs advocate for the first definition, whereas Defendants advocate for the second

and third definitions. *See* Resp., ECF 35 at 22–23. As a threshold matter, the second and third

definitions that Defendants proffer fail to meet any of the shared characteristics of early 1900s

definitions of "rebellion"—that the rebellion be (1) violent and armed; (2) organized; (3) open

and avowed; and "against the government as a whole—often with an aim of overthrowing the

government." *See Newsom I*, 786 F. Supp. 3d at 1253.

Even overlooking that problem, however, Defendants' definition of rebellion also

contravenes the greater statutory context of § 12406. *See Dolan*, 546 U.S. at 486. In *Newsom II*,

the Ninth Circuit defined the statutory phrase "unable with the regular forces to execute the laws

of the United States" in subsection (3) by reference to "[t]he statutory context." *See* 141 F.4th

at 1051. To do so, it compared the phrase to subsections (1) and (2). *Id.* "Subsections one and

**A128**

two of the statute describe unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* Defendants' broad proffered definitions of rebellion fall far short of an unusual and extreme exigency.

Therefore, this Court reaches the same conclusion as the district court in *Newsom I* that the following "key characteristics" provide the boundaries for what constitutes a "rebellion":

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue.

*Newsom I*, 786 F. Supp. 3d at 1253 (emphasis omitted). Here, the protests in Portland were not "a rebellion" and did not pose a "danger of a rebellion," especially in the days leading up to the federalization. As discussed above, Defendants presented evidence of sporadic violence against federal officers and property damage to a federal building. Defendants have not, however, proffered any evidence demonstrating that those episodes of violence were part of an organized attempt to overthrow the government as a whole, and therefore, Defendants have failed to show that the President had a colorable basis to conclude that Section 12406(2) was satisfied.

Defendants nevertheless argue that the President was authorized under Section 12406(2) to quell "violent resistance to lawful enforcement of federal immigration law occurring in Portland." Resp., ECF 35 at 22. Indeed, the President also stated that "protests or acts of violence [that] directly inhibit execution of the laws[] constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20. These conceptions of rebellion improperly conflate the statutory preconditions in Sections 12406(2) and (3). As discussed above, subsection (3) only authorizes the President to federalize the National Guard if he is "unable with the regular forces to execute the laws of the United States." If subsection (2) ("rebellion") was satisfied whenever "protests or acts of violence directly inhibit execution of the laws," subsection (3) (requiring inability to enforce

PAGE 25 – OPINION AND ORDER

federal law) would be superfluous. "If we were to adopt the federal government's reading of
subsection [two], it would swallow subsection[ ] [three]." *See Newsom II*, 141 F.4th at 1051; *see
also Fischer v. United States*, 603 U.S. 480, 490 (2024) ("Congress would not go to the trouble
of spelling out [a list of terms] if a neighboring term swallowed it up . . . .").

### 1.  Tenth Amendment

Defendants' *ultra vires* federalization of Oregon's National Guard troops also violates the
Tenth Amendment. "No matter the context, the President's authority to act necessarily 'stem[s]
either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S.
593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).
The Tenth Amendment reserves to the States all rights and powers "not delegated to the United
States by the Constitution." U.S. Const. amend. X. In turn, action that "exceeds the National
Government's enumerated powers undermines the sovereign interests of the States." *Bond v.
United States*, 564 U.S. 211, 225 (2011).

The Constitution grants Congress the power to "provide for calling forth the Militia to
execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I,
§ 8, cl. 15. "Congress has delegated portions of that power to the President" in 10 U.S.C.
§ 12406. *Newsom II*, 141 F.4th at 1055; *see Youngstown*, 343 U.S. at 636–38 (Jackson, J.,
concurring). Here, because the President is acting outside that delegation, he is "'tak[ing]
measures incompatible with the expressed . . . will of Congress' reflected in that statute."
*Newsom II*, 141 F.4th at 1045–46 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J.,
concurring)). "But the Constitution authorizes Congress, not the President, to determine when
(and how) the militia can be called into actual service of the United States." *Newsom II*, 141
F.4th at 1045. Therefore, the President lacks constitutional authority to federalize the National

Guard once he exceeds the constitutional authority that Congress granted him, such as in Section 12406.[3]

Because the President is federalizing the Oregon National Guard absent constitutional authority, his actions undermine the sovereign interest of Oregon as protected by the Tenth Amendment. Oregon has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause. And as discussed above, Defendants have acted outside the scope of this constitutional authority conferred by Congress. Put another way, Defendants "interfere[d] with the constitutional balance of power between the federal and state governments" by federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 9.

## B. Irreparable Harm

Having demonstrated a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Irreparable harm is that "for which there is no adequate legal remedy." *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). If a plaintiff is likely to succeed on a constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

---

[3] In arguing that Defendants did not violate the Posse Comitatus Act, Defendants assert that under the Take Care Clause, "the President has inherent Article II authority to use troops for the protection of federal property and federal function." Resp., ECF 35 at 25. But the President's inherent authority under the Take Care Clause does not support the conclusion that he has inherent authority to federalize the state National Guard to accomplish this purpose. *See Newsom II*, 141 F.4th at 1045 ("[T]he Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States.").

First, Oregon has demonstrated a likelihood that it will suffer a constitutional injury due to Defendants' violation of the state's Tenth Amendment right to control its National Guard. This encroachment on Oregon's police power leaves an indelible mark on Oregon's "sovereignty under the Constitution," *see Shelby County v. Holder*, 570 U.S. 529, 544 (2013), which cannot be remedied by a "legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068. Because Oregon is likely to succeed on its Tenth Amendment claim, it will also likely suffer irreparable harm in the absence of a temporary restraining order.

Second, Plaintiffs claim "ongoing and concrete" harms to their "law enforcement and public safety interests" due to the diversion of state resources. Motion, ECF 6 at 38 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Federalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies. *See id.* Further, state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization. Dobson Decl., ECF 7 ¶ 30 ("Scaling resources to address protests based on the federal deployment may mean that PPB is less able to respond to regular public safety calls for service.").

Defendants respond that the deployment, federalizing only 200 of a total 6,500 Oregon National Guard members, does not substantially impair Oregon's use of the overall force. Resp., ECF 35 at 35–37. However, the 200 members constitute 60% of Oregon National Guardsmen "who are trained to quickly respond to emergencies, including national disasters." Declaration of Brigadier General Alan R. Gronewold, ECF 34 ¶ 3.

Defendants also argue that these harms from diversion are "so conclusory" as to render them "utterly meaningless." Resp., ECF at 37. But the increased need for state and local law

enforcement reflects reality. On the night the September 28, 2025, National Guard federalization order was announced, the size of the protests increased substantially, ballooning to around 200 people, with a second protest at a different location including "a few hundred." Schoening Decl., Ex. B, ECF 12-1 at 1. Moreover, this Court notes that in Los Angeles, the National Guard mobilizations inflamed protests, spawned unrest at new locations, and required additional resources from the California Highway Patrol. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 11. Likewise, the deployment of federal law enforcement officers to Portland in 2020 "reignited" protests and riots that had "largely self-extinguished." Declaration of Caroline Turco, ECF 13 ¶ 3.

## C. Balancing the Equities and Public Interest

Lastly, the balance of the equities and the public interest, *see E. Bay Sanctuary Covenant*, 993 F.3d at 668, also weigh in favor of granting Plaintiffs' TRO. The public has a profound interest in "prevent[ing] irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). Put simply, the issues at stake in this case are important, and the consequences of this Court's decision are far-reaching. As soon as the federalized National Guard deploys to Portland, the state of Oregon will suffer an injury to its sovereignty. Conversely, if the TRO issues, federal law enforcement may continue "to protect federal personnel, functions, and property in Oregon." ECF 1-1 at 2. In addition, both state and federal law enforcement officers may continue to arrest protestors who violate the law. The impact on Defendants, if any, is therefore *de minimis*.[4]

---

[4] Defendants claim that they have a "significant" and "uncontested interest in the protection of federal agents and property and the faithful execution of the law." *Newsom II*, 141

Furthermore, this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs. "That tradition has deep roots in our history and found early expression, for example, in . . . the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* James Madison, Address to the Constitutional Convention (1787), reprinted in 1 Records of the Federal Convention of 1787, at 465 (Max Farrand ed., 1911) ("A standing military force, with an overgrown Executive will not long be safe companions to liberty. The means of defence [against] foreign danger, have been always the instruments of tyranny at home."). This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation.

---

F.4th at 1054–55. But the record demonstrates that the threats to that interest in Portland do not warrant the extraordinary measure of bringing in the military. Rather, based on the current record, it is clear that any threats to federal agents and property are readily remedied—as they have been—by federal civilian law enforcement, with the support of State and local law enforcement. Therefore, this interest cannot overcome the countervailing balance of equities and public interest that weigh in favor of Plaintiffs.

PAGE 30 – OPINION AND ORDER

## CONCLUSION

For the above reasons, this Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and temporarily enjoins Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland. The TRO expires in fourteen days on October 18, 2025, and the parties are ORDERED to comply with the attached TRO. The Defendants' request to stay or administratively stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 31 – OPINION AND ORDER

**A135**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

The Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and

ORDERS as follows:

1.      Defendants are temporarily enjoined from implementing Defendants' September

28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard

service members to Portland.

2.      This Temporary Restraining Order expires by its own terms on October 18, 2025,

at 11:59 p.m.

PAGE 1 – TEMPORARY RESTRAINING ORDER

**A136**

3.      Plaintiffs are ORDERED to post a nominal bond of $100 within 48 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.      Defendants' Request to Stay or Administratively Stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

5.      The Court Clerk will contact the parties to schedule a telephone hearing on October 17, 2025, to address whether this Temporary Restraining Order should be extended for another 14 days.

6.      Any motion for a Preliminary Injunction shall be filed no later than October 17, 2025; Defendants' opposition shall be due no later than October 23, 2025, and Plaintiffs' reply shall be due on October 27, 2025.

7.      A combined hearing on the preliminary injunction motion and a trial on the merits under Rule 65(a)(2) is set for October 29, 2025, before the Honorable Judge Karin J. Immergut, in Courtroom 13A, beginning at 9:00 a.m.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge


PAGE 2 – TEMPORARY RESTRAINING ORDER

**A137**