No. 25-6268

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

STATE OF OREGON and the CITY OF PORTLAND,

Plaintiffs-Appellees,

v.

DONALD TRUMP, in his official capacity as President of the United States; et al,

Defendants-Appellants.

_____

OPPOSITION TO MOTION FOR ADMINISTRATIVE STAY AND STAY
PENDING APPEAL
_____

Appeal from the United States District Court
for the District of Oregon
_____

DENIS M. VANNIER  #044406
Senior Deputy City Attorney
Office of City Attorney
 1221 SW 4th Ave., Ste. 430
 Portland, Oregon 97204
 Telephone:  (503) 823-4047
 denis.vannier@portlandoregon.gov

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General
DUSTIN E. BUEHLER  #152024
Special Counsel
JONA J. MAUKONEN  # 043540
Assistant Attorney-In-Charge
Civil Appeals
PEENESH SHAH  #112131
Assistant Attorney General
STACY M. CHAFFIN  #205782
Assistant Attorney General
 1162 Court St.
 Salem, Oregon 97301
 Telephone:  (503) 378-4402
 stacy.chaffin@doj.oregon.gov

Attorney for Appellee
City of Portland

Attorneys for Appellee
State of Oregon

_____

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................1

JURISDICTION ...............................................................................3

STATEMENT OF FACTS ...............................................................4

    A.    The Portland ICE facility was the target of a series of
relatively small and progressively less disruptive protests.............4

    B.    In early September 2025, President Trump began publicly
stating his desire—based expressly on outdated
information—to increase the federal response to the Portland
protests. ..........................................................................................5

    C.    Following a social media post from President Trump in late
September 2025, Secretary Hegseth ordered the mobilization
of the Oregon National Guard...........................................................8

ARGUMENT......................................................................................9

    I.    Defendants are not likely to succeed on the merits........................11

        A.    Defendants' actions are *ultra vires* and exceeded the
President's authority under 10 U.S.C. § 12406. .................. 11

            1.    President Trump did not make any 10 U.S.C. §
12406 determinations regarding the current,
factual circumstances in Portland............................. 12

                a.    The inapplicable and outdated June 7
memorandum does not reflect a
presidential determination about the
current circumstances in Portland.................. 13

                b.    The President's descriptions of Portland
as "War ravaged" and "under siege" are
neither factually accurate nor reflect
honest judgment and are entitled to no
deference. ....................................................... 14

            2.    Even giving deference to the president's

statements, none of the predicates in § 12406 exists. ............................................................................ 17

      B.    Deploying federalized troops violates the Tenth Amendment. ......................................................... 20

  II.    The equitable factors do not support issuance of a stay pending appeal. .............................................................21

CONCLUSION ....................................................................................27

## TABLE OF AUTHORITIES

### Cases Cited

*Abbott v. Perez*,
  585 U.S. 579 (2018) .................................................................25

*Bennett v. Medtronic, Inc.*,
  285 F.3d 801 (9th Cir. 2002) ......................................................3

*Dep't of Commerce v. New York*,
  588 U.S. 752, 139 S. Ct. 2551 (2019) ............................... 14, 15

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ......................................................3

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) ................................................23

*Laird v. Tatum*,
  408 U.S. 1 (1973) ....................................................................26

*Maryland v. King*,
  567 U.S. 1301 (2012) ...............................................................23

*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) ........ 3, 8, 12, 14, 15, 17, 18, 19, 20, 22, 23

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................... 9, 11, 21

*Ohio v. Env't Prot. Agency*,
  603 U.S. 279 (2024) .................................................................25

*Sebelius v. Cloer*,
  569 U.S. 369 (2013) .................................................................17

*Shelby County v. Holder*,
    570 U.S. 529 (2013) .................................................................................23

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ........................................................................ 12, 19

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020)..............................................................24

*Tennessee v. Dept. of Educ.*,
    104 F.4th 577 (6th Cir. 2024)..................................................................23

*United States v. Morrison*,
    529 U.S. 598 (2000) ................................................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...............................................................................11

## Constitutional and Statutory Provisions

10 U.S.C. § 12406.......................... 2, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 26

10 U.S.C. § 12406(1)............................................................................17

10 U.S.C. § 12406(2)............................................................................17

10 U.S.C. § 12406(3)............................................................................18

28 U.S.C. § 1292(a)(1)............................................................................3

U.S. Const., Amend. I.............................................................................18

U.S. Const., Amend. X ................................................................. 2, 20, 21

U.S. Const., Art. I, § 8, cl. 15-16........................................................12

U.S. Const., Art. I, § 9, cl. 2 ...............................................................17

## Other Authorities

Fed. R. Civ. P. 65(b) ...............................................................................3

*Rebellion*, Black's Law Dictionary (12th ed. 2024)...........................................17

The Examination of Doctor Benjamin Franklin,
    Before an August Assembly, Relating to the Repeal of the Stamp-Act
    (Feb. 13, 1766), *available at* https://tinyurl.com/577emuzh....................24

iii

*The Oregonian,*
>*"It Is Like Living in Hell": Trump Discusses Portland as He Considers*
>*Sending the National Guard* (YouTube, Sept. 5, 2025),
>https://www.youtube.com/watch?v=6tP9QqDmu74) ................................ 6

*The Oregonian,*
>*Trump Escalates Rhetoric Promising Federal Intervention in Portland,*
>*Citing "Anarchy,"* (YouTube, Sept. 25, 2025),
>https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s ...................... 6

## OPPOSITION TO MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING APPEAL

_____

## INTRODUCTION

As part of a nationwide campaign to assimilate the military into civilian law enforcement, defendants are deploying the military to Portland, Oregon. Last week, President Trump described Portland as "War ravaged" and "under siege from attack by Antifa, and other domestic terrorists" and—via social media—called on Defense Secretary Hegseth to employ "Troops" using "Full Force" in Portland. The next day, Secretary Hegseth called 200 Oregon National Guard soldiers into federal service. In doing so, he relied on an outdated and unrelated June 7, 2025, Presidential Memorandum that authorized the federalization of the National Guard in response to Immigration and Customs Enforcement (ICE) protests in Los Angeles.

Although the Oregon National Guard soldiers have been federalized, they are not yet on the streets of Portland. Judge Immergut's order maintains that status quo. This court should deny defendants' request for an administrative stay to maintain the status quo and prevent unlawfully federalized soldiers from engaging the public and patrolling Portland streets.

Defendants' actions infringe on Oregon's sovereign power to manage its own law enforcement activity and its own National Guard and cause economic

and other harms to the city of Portland. What is worse, they do so based entirely on inaccurate information. President Trump did not make any 10 U.S.C. § 12406 determinations regarding the current, factual circumstances in Portland. As the district court found, the real facts do not remotely justify this overreach. Defendants federalized the National Guard in response to ongoing protests near an ICE facility in Portland, but in the month before federalization, the protests were generally small, sedate, typically fewer than thirty people, and could be managed, to the extent necessary, by existing law enforcement resources. Because the stated basis for federalizing members of the Oregon National Guard is untethered to the actual facts, defendants cannot satisfy any of the prerequisites for involuntarily federalizing the state's National Guard under 10 U.S.C. § 12406. Additionally, defendants' actions violate the Tenth Amendment's guarantee that the police power resides with the states, not the federal government.

The Court should deny the request for an administrative stay and deny the motion for a stay pending appeal. In the event the Court grants an administrative stay, plaintiffs request that briefing on the stay motion be expedited.

3

## JURISDICTION

This court should dismiss this appeal and decline to consider defendants'
stay motion because it lacks jurisdiction over the appeal of a TRO. *See E. Bay
Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) ("Ordinarily,
a TRO is not an appealable order."). Only if a TRO "'possesses the qualities of
a preliminary injunction,' is it reviewable under 28 U.S.C. § 1292(a)(1)."
*Newsom v. Trump*, 141 F.4th 1032, 1043 (9th Cir. 2025) (citation omitted). In
assessing whether a TRO is best construed as an appealable preliminary
injunction, this court evaluates whether "an adversary hearing has been held,
and [whether] the court's basis for issuing the order [was] strongly challenged."
*E. Bay*, 932 F.3d at 762 (quoting *Bennett v. Medtronic, Inc*., 285 F.3d 801, 804
(9th Cir. 2002)). "Further, a key distinction between a 'true' TRO and an
appealable preliminary injunction is that a TRO may issue without notice and
remains in effect for only 14 days (or longer if the district court finds 'good
cause' to extend it)." *Id*. at 762 (quoting Fed. R. Civ. P. 65(b)).

Here, the TRO does not possess the qualities of a preliminary injunction
and is not appealable. Crucially, while the district court issued the TRO after
an adversarial hearing, the district court ordered that the TRO would expire in
14 days on October 18, 2025. Dkt 56. That 14-day expiration distinguishes this
case from *Newsom*, where this court determined it had jurisdiction.

4

## STATEMENT OF FACTS

**A.    The Portland ICE facility was the target of a series of relatively small and progressively less disruptive protests.**

Protests began outside the ICE facility, located in the South Waterfront neighborhood of Portland, on June 2, 2025, after ICE officials arrested an asylum seeker at Portland's immigration court.  Order 8; Dkt 9-21; Dkt 7 ¶ 19; Dkt 7 ¶ 20.  The district court found that "protests were mostly peaceful, but there were some individuals who engaged in unlawful conduct requiring [Portland Police Bureau] PPB intervention."  Order 8; Dkt 7 ¶ 20.

The PPB occasionally intervened to protect public safety or address violations of law, but the need to do so has been limited.  Order 8; Dkt 7 ¶¶ 22-23.  Between June 11 and June 19, PPB made 25 arrests at the ICE facility protests in connection with nightly monitoring.  *Id.*  In August, no arrests were necessary despite continued nightly monitoring.  *Id.*; Dkt 7 ¶ 23 (discussing "decreasing risk posed by the ICE-Facility protests" after June 25, except on specific July dates when PPB increased its monitoring presence).

Defendants' own evidence confirms that "many of the protests have been peaceful," despite some instances of violence and threats primarily before August.  Dkt 40 ¶ 7.  Instances of criminal activity occurred primarily in June and July 2025.  Dkt 40 ¶¶ 8-10 (referencing incidents from June 14, 24, and 29); Dkt 38 ¶¶ 10-13, 17 (referencing incidents almost exclusively in June and

July).  The cited evidence identifies only a single potentially unlawful incident in August 2025, in which protesters impeded a government vehicle's travel. Dkt 40 ¶ 12 (referencing incident from August 9).[1]

The district court found that from July 18th to September 27th, "[t]he protests generally were limited to fewer than 30 people and were 'largely sedate.'"  Order 10; Dkt 7 ⁋ 25.  Although PPB has agreements in place to call for assistance from other law enforcement agencies including the Oregon State Police, such additional resources have been unnecessary.  Order 10; Dkt 7 ⁋ 26; Dkt 8 at 3.  "[T]he protests have been such a minor issue, that the normal nightlife in downtown Portland has required more police resources than the ICE facility."  *Id.*

## B.  In early September 2025, President Trump began publicly stating his desire—based expressly on outdated information—to increase the federal response to the Portland protests.

Weeks after the Portland ICE protests had settled into small, peaceful assemblies, President Trump began targeting Portland for a military response. On September 5, 2025, when asked where he planned to send federal troops next, President Trump responded that he was considering targeting Portland.

---

[1]     Those declarations cite an incident from August 28, but those events took place in California, not Portland.  Dkt 38 ¶ 12 (discussing incident from August 28).

6

Dkt 9-23 (*The Oregonian, "It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74). During the interview, the President referenced the "destruction of the city" and said: "[Portland] was not on my list, but *when I watched television last night*, this has been going on." *Id*. (emphasis added). The previous night, Fox News aired a report on the ICE facility protests that mixed outdated clips from Portland's 2020 protests with footage from the 2025 ICE facility protests. Dkt 9-17 at 10. The President incorrectly represented that protesters were "throwing smoke bombs into stores" and likened Portland to "living in hell." *Id.* The President promised that "when we go there * * * we're going to wipe them out." *Id.*

On September 25, 2025, President Trump baselessly claimed: "Nobody's ever seen anything like [what is happening in Portland]. They just burn the place down." Dkt 9-25 (*The Oregonian, Trump Escalates Rhetoric Promising Federal Intervention in Portland, Citing "Anarchy,"* (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s). President Trump again inaccurately claimed that protesters were "trying to burn down buildings, federal buildings," and "it's every night, and they've done it for years." *Id.*

7

The district court found that "nothing in the record suggests that anything of [that] sort was occurring 'every night' outside the Portland ICE building or in the City of Portland in the days or weeks leading up to this September 27 directive." Order 22; Dkt 9 ⁋ 26. The protests at the ICE facility in the month of September were generally calm, sedate, and peaceful. Dkt 46-26. From Monday, September 22, 2025, through Friday, September 26, 2025, the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. Order 11; Dkt 46-22; 46-24; 46-25. PPB reported no incidents or disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. Order 11. "On September 26, the eve of the President's directive, law enforcement 'observed approximately 9-15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity." Order 21; Dkt 26; Dkt 46-26. The district court found that "federal law enforcement officers, unaided by any military forces, were capable of not only quelling the violence in June but also preventi[ng] it through September." Order 20 (internal quotations omitted).

8

**C.    Following a social media post from President Trump in late September 2025, Secretary Hegseth ordered the mobilization of the Oregon National Guard.**

Soon after expressing those inaccurate beliefs, President Trump on September 27 described Portland as "War ravaged" and "under siege from attack by Antifa, and other domestic terrorists" and "direct[ed]" his "Secretary of War" Pete Hegseth—via social media—to employ "Troops" using "Full Force" in Portland:



Donald J. Trump 🔵 ➕
@realDonaldTrump

At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

**12.8k** ReTruths  **53.1k** Likes                    9/27/25, 7:19 AM

Dkt 9-12.

In response, on September 28, 2025, Secretary Hegseth issued a memorandum calling 200 members of the Oregon National Guard into federal service for 60 days.  Dkt 1-2 at 2.  The Hegseth memorandum purported to be "further implement[ation]" of a June 7, 2025, Presidential Memorandum.  *Id.* at 2.  But that June 7, 2025, Presidential Memorandum was issued "in response" to escalating ICE protests in Los Angeles.  *Newsom*, 141 F.4th at 1041.  In that memo, President Trump determined that "[t]o the extent that protests or acts of

violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Dkt 1-2 at 3. For that reason, President Trump "call[ed] into Federal service members and units of the National Guard under 10 U.S.C. 12406[.]" *Id.* The June 7 memorandum did not reference, relate to, or mention Portland.

## ARGUMENT

A party seeking a stay pending appeal must show that it is likely to succeed on the merits of its appeal, that it will be irreparably injured absent a stay, and that the balance of the equities and the public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Defendants cannot satisfy those requirements. The district court properly granted an order temporarily restraining defendants' order to federalize 200 Oregon National Guard members and deploy them on the streets of Portland.

Here, the President did not make any § 12406 determinations specifically relating to Portland. The nearly four-month-old Presidential memorandum authorizing the federalization of the National Guard in response to events in California is not applicable to Secretary Hegseth's order to federalize members of the Oregon National Guard; it does not reference Portland, and even if it did, its conclusions are stale and do not reflect the current circumstances in Portland. To the extent that this court concludes that the President's social media post

constitutes § 12406 determinations—which it should not—those determinations carry no weight because they are based on inaccurate information and assumptions.  Even if this court generally affords the President's determinations substantial deference, the social media post does not reflect a colorable assessment of the facts and law within a range of honest judgment.  They are simply inaccurate.  Thus, defendants cannot make a strong showing of likelihood of success.

All the equitable factors weigh against a stay pending appeal. Defendants will not be harmed by temporarily restoring the Oregon National Guard to state control and restoring the status quo from before their unlawful actions.  Civilian law enforcement at the local, state, and federal level is already available in great numbers to preserve order and enforce the laws, as they have during similar periods of civil protest for decades.

Considered individually, defendants' legal arguments are meritless. Considered in the aggregate, they are terrifying.  As the district court aptly noted:  "Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation."  Order 30.  Defendants' interpretation of § 12406 would empower the President to commandeer a state's National Guard whenever members of the public merely opposed his authority or presented administrative difficulties

for civil law-enforcement officials. That unchecked power could be deployed in any context, by any future president—not just where civilians are protesting immigration enforcement. Collectively, defendants' arguments would sideline the Judiciary, ignore Congress's limitations, and trample over the States' sovereign interest in their own militias. The district court correctly rejected those arguments.

## I.    Defendants are not likely to succeed on the merits.

### A.    Defendants' actions are *ultra vires* and exceeded the President's authority under 10 U.S.C. § 12406.

Defendants cannot make a "strong showing" of likelihood of success. *Nken*, 556 U.S. at 434. The President exceeded the authority Congress gave him in 10 U.S.C. § 12406—the sole statute invoked to federalize members of the Oregon National Guard. *See generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment) (the President's "power is at its lowest ebb" when he takes actions incompatible with the express terms of a statute). Here, defendants failed to satisfy any of the three predicate conditions in 10 U.S.C. § 12406, rendering their actions *ultra vires*.

1. **President Trump did not make any 10 U.S.C. § 12406 determinations regarding the current, factual circumstances in Portland.**

The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15-16. 10 U.S.C. § 12406 authorizes the federalization of the state National Guard consistent with the Constitution's first Militia Clause and imposes important limitations on the President's authority:

Whenever—

   (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

   (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

   (3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

The President's decision to invoke § 12406 is subject to judicial review. *Newsom*, 141 F.4th at 1050-51. That review is to ensure, at the very least, that the President's § 12406 determinations "reflect[] a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)). In *Newsom*, the Court

concluded that its "review of the President's determinations" as it relates to §
12406 "is especially deferential." 141 F.4th at 1047.

But here, the President never made the determination required by §
12406 based on a current assessment of Portland. Rather, the federalization
appears to be based on two documents, neither of which is sufficient. First,
Secretary Hegseth relied on a June presidential determination in response to the
situation in California, not Oregon. That does not reflect a presidential
determination relevant to the federalization at issue here. Second, defendants
rely on a social media post by the President—but even if that could demonstrate
the President's decision, it does not reflect § 12406's standards.

### a. The inapplicable and outdated June 7 memorandum does not reflect a presidential determination about the current circumstances in Portland.

When ordering the Oregon National Guard into federal service on
September 28, 2025, Secretary Hegseth asserted that the order "further
implements" the June 7 Presidential Memorandum used to mobilize the
California National Guard, which Secretary Hegseth attached to his
memorandum. Dkt 37 at 16-18. Major General Reiger confirmed that the
"mobilization memorandum *relied on* * * * the President's June 7
Memorandum authorizing the mobilization of the National Guard to protect
DHS and other U.S. Government personnel and federal property." Dkt 37 at 7

(emphasis added). But the June 7 memorandum was issued "in response to" escalating ICE protests in Los Angeles. *Newsom*, 141 F.4th at 104. That memorandum contains no specific reference to or determinations regarding the circumstances in Portland. Dkt 37 at 17. Even if it did, those determination are stale and reflect circumstances as of June 7—not on September 28, almost four months later.

        **b.**    **The President's descriptions of Portland as "War ravaged" and "under siege" are neither factually accurate nor reflect honest judgment and are entitled to no deference.**

In the event this court concludes that President Trump's social media statements constitute § 12406 determinations, those determinations are inadequate and should be afforded no deference because they are neither factually accurate nor reflect "honest judgment." *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 781, 139 S. Ct. 2551 (2019) (recognizing an exception to the usual deference applicable "[o]n a strong showing of bad faith or improper behavior" that will "justify extra-record discovery" (internal quotation marks omitted)); *cf. also id.* at 784 (applying that exception when "the evidence tells a story that does not match the explanation").

The President's hyperbolic assertions that Portland is "War ravaged" and "under siege" have no basis in fact. That description of Portland is patently false and inconsistent with the reports of law enforcement who are present at

and actively monitoring the ICE facility protests. Dkt 46-29. In September, the protests at the ICE facility were generally calm, sedate, and peaceful. Dkt 46-26. In the five days before the President's social media post, there were between seven to twenty people at the ICE facility and no significant activity. Dkt 46-23; 46-24; 46-25; 46-26. On September 26, the day before the President's social media post, there were 8-15 people at the ICE facility who were sitting in lawn chairs or walking around. Dkt 46-26. The energy was "low," and there was "minimal activity." Dkt 36-26. Because President Trump decided to federalize the Oregon National Guard based on inaccurate information, his determinations should not be afforded any deference. This Court "cannot ignore the disconnect between the decision made and the explanation given." *Dep't of Commerce*, 588 U.S. at 785; *Id.* at 784 (refusing to accord otherwise applicable deference to a decision where the "rationale—the sole stated reason—seems to have been contrived"). Even under deferential standards of review, courts are "not required to exhibit a naiveté from which ordinary citizens are free" *Id.* at 785 (internal quotation marks omitted).

The President cannot "federalize the National Guard based on no evidence whatsoever[.]" *Newsom*, 141 F.4th at 1050. The decision to federalize the National Guard must be made in response to a specific rebellion, invasion, or circumstance where Federal law cannot be executed. The

16

alternative would permit the President to indefinitely authorize the deployment of National Guard troops anywhere in the country, for virtually any reason, without any specific or particularized determination of a present or immediate need. That is inconsistent with Congress's narrow delegation in 10 U.S.C. § 12406. Because President Trump did not make any § 12406 determinations relating to the current circumstances in Portland, defendants cannot succeed on the merits.

And contrary to defendants' assertion, the President's social media post did not qualify as legally sufficient § 12406 determinations. The President did not identify any circumstance in § 12406 as a ground for federalizing the National Guard. The President did not identify the "numbers" of Oregon National Guard that "he considers necessary to repel the invasion, suppress the rebellion, or execute those laws" as required by § 12406. Instead, the President unlawfully delegated that power to Secretary Hegseth and ordered him "to provide all *necessary* troops." Dkt 9-12 (emphasis added). Because the President never made the required determinations, the decision to federalize was *ultra vires*.

For those reasons, this Court should not afford the President's § 12406 determinations—should they exist—any deference.

### 2. Even giving deference to the president's statements, none of the predicates in § 12406 exists.

Defendants concede that the events in Portland do not constitute an invasion or "danger of invasion." 10 U.S.C. § 12406(1). They instead assert that the predicates in subsection (2) and (3) are satisfied. Statutory terms must be "interpreted in accordance with their ordinary meaning," *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), and defendants' expansive reading of subsection (2) and (3) cannot be squared with the ordinary meaning of the words Congress enacted.

"*Rebellion or danger of a rebellion.*" The district court correctly found that the record did not support "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2); Order 25. The ordinary meaning of "rebellion"—today and when Congress enacted the Militia Act of 1903—is "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024); *see id.* ("Cf. civil war"). That is why the term "rebellion" is often used alongside the term "invasion," as in § 12406. *See, e.g.,* U.S. Const. art. I, § 9, cl. 2 (specifying that the writ of habeas corpus "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"); *Newsom*, 141 F.4th at 1051 (both invasions and

rebellions "threaten the normal operations of civil government"). "Rebellion" is not a synonym for protests, civil unrest, or even riots.

The facts here do not rise to the level of a "rebellion" or "danger of a rebellion." The protests at the ICE facility are protected First Amendment activity accompanied by sporadic, isolated episodes of criminal activity that were appropriately addressed by local authorities. In the month before Secretary Hegseth federalized the Oregon National Guard, the protests at the ICE facility were generally calm, sedate, and peaceful. Dkt 46-26. Nothing in the record demonstrates that at the time the Oregon National Guard soldiers were federalized the protests at the ICE facility constituted a rebellion or danger of a rebellion.

*"Unable with the regular forces to execute the laws."* The protests at the ICE facility have not rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). *See Newsom*, 141 F.4th at 1051 ("minimal interference with the execution of laws is, by itself, [not] enough to justify invoking § 12406No evidence supports the President's hyperbolic assessment of Portland as a "War ravaged" community "under siege," and defendants' purported justification for invoking § 12406 does not represent a "colorable" assessment of the facts within the "range of honest judgment." *Newsom*, 141 F.4th at 1051.

19

The facts here mark a stark contrast with those that led this Court to stay a temporary restraining order in *Newsom*, where evidence showed that, at the time the California National Guard soldiers were federalized, protesters were throwing objects at ICE vehicles trying to complete law enforcement operations, "'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building." 141 F.4th at 1052. "[S]ome protesters threw objects, including Molotov cocktails, and vandalized property." *Id.* As the district court found, "[n]either outside the Portland ICE facility nor elsewhere in the City of Portland was there unlawful activity akin to what was occurring in Los Angelese leading up to June 7, 2025." Order 20. Congress never intended that relatively small, contained, and largely sedate protests would justify military intervention.

Defendants attempt to bolster their claims with descriptions of the protests that occurred months before Secretary Hegseth federalized the Oregon National Guard. But the § 12406 determination must be "in the face of the emergency and directly related to the quelling of the disorder[.]" *Newsom*, 141 F.4th at 1051 (citing *Sterling*, 287 U.S. at 399-400). Thus, the circumstances necessary to justify federalization must be close in time to federalization and

localized to the area of concern. The ICE facility shooting in Dallas is deplorable, but a horrific tragedy 2,000 miles away cannot justify federalizing the National Guard in Portland. To decide otherwise provides the President unlimited power to reference any act of violence, in any state, committed at any time as justification for militarizing the cities of this Nation. That cannot be.

Defendants fail to identify any laws that could not be executed or that were even impacted by the protests. Instead, defendants rely on their need to reallocate internal resources to respond to the protests as justification to federalize the National Guard. But defendants' staffing issues are not sufficient to send the military to the streets of Portland. Order 21. In fact, the night before the President's September 27 social media post, the Regional Director for FPS reported that additional FPS officers who had "surged" to Portland had "already left Portland" to return to "their respective offices." Dkt 46-26.

Because no evidence supports the President's hyperbolic assessment of Portland as a "War ravaged" community "under siege," that justification for invoking § 12406 does not represent a "colorable" assessment of the facts. *Newsom*, 141 F.4th at 1051.

### B. Deploying federalized troops violates the Tenth Amendment.

As the district court concluded, because the President is acting outside the power delegated to him by Congress in 10 U.S.C. § 12406, Defendants'

*ultra vires* federalization of the Oregon National Guard troops also violates the Tenth Amendment. Order 26-27. The Tenth Amendment reserves to the States all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. The deployment of federal troops in Portland over the objection of state and local officials for the ostensible purpose of fighting crime intrudes on Oregon's sovereign police power and interferes with the constitutional balance of power between the federal and state governments in violation of the Tenth Amendment. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). Accordingly, Defendants will not prevail on Plaintiffs' Tenth Amendment Claim.

## II. The equitable factors do not support issuance of a stay pending appeal.

In addition to the merits, the Court considers: "whether the applicant will be irreparably injured absent a stay"; "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and "where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). The last two factors "merge when the Government is the opposing party." *Id.* at 435. Here, all factors weigh in favor of denying the stay pending appeal.

Defendants generally have an "interest in the protection of federal agents and property and the faithful execution of the law." *Newsom*, 141 F.4th at 1054. But, as the district court found, "any threats to federal agents and property are readily remedied—as they have been—by federal civilian law enforcement, with the support of State and local law enforcement." Order 30. And unlike in California, the record overwhelmingly demonstrates that the Portland protests in the month prior to federalization were generally small, sedate, and peaceful. When criminal activity did occur, PPB swiftly and effectively responded, and PPB—and their state and local partners—are ready and capable of responding to any issues that may arise in the future. Defendants have not demonstrated that any agents were injured in the month prior to federalization, that any recent property damage had occurred, or that they have been unable to execute the law. Moreover, at the time of the filing of this opposition, Oregon National Guard members have been federalized, but they are not currently patrolling the streets of Portland. Defendants will not be irreparably harmed by maintaining the status quo, which—despite an initial increase in agitation—have generally remained calm and non-violent. Dkt 46-29. The district court found that any harm to defendants was *de minimis*, Order 29, and this factor weighs in favor of denying the stay.

In contrast, as the district court recognized, the State, the City, and the public will be significantly harmed if the federalization of members of the Oregon National Guard over the objection of the Governor continues. Order 27-29. First, Oregon is already enduring a substantial sovereign injury from the uncalled-for deployment of federal troops to engage in domestic law enforcement, which is a usurpation of the police power the Constitution reserves to the States. This encroachment on Oregon's police power leaves an indelible mark on Oregon's "sovereignty under the Constitution," *see Shelby County v. Holder*, 570 U.S. 529, 544 (2013), which cannot be remedied by a legal remedy, such as award of damages. *See Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, Circuit Justice); *Tennessee v. Dept. of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024); *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001); *Newsom*, 141 F.4th at 1055 (recognizing that "significant interests of Plaintiffs are implicated here").

Second, the "ongoing and concrete harm[s]" to Oregon's and Portland's "law enforcement and public safety interests" are irreparable. *Maryland,* 567 U.S. at 1303. Those harms include the diversion of Oregon National Guard members from their state responsibilities, impairing the State's ability to call upon the Guard to protect itself and its citizens or to respond to a natural disaster or other emergency. Defendants argue that federalizing only 200

Oregon National Guard members is not a large enough number to irreparably harm the City or the State. But defendants ignore that the 200 National Guard members being federalized amount to *sixty percent* of the Oregon National Guard Response Force—the components of the National Guard who are trained to quickly respond to emergencies, including natural disasters. Dkt 34 at 2.

Regardless, depriving the State of *any* number of troops through unlawful federalization is an irreparable injury to the State's sovereign interests. The unlawful deployment of 200 troops is more than enough to escalate and complicate state and local law enforcement efforts and inflame tensions. *See* Dkt 41-1 (Brief for State of California and Governor Newsom as Amicus Curiae); *cf.* The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the Repeal of the Stamp-Act (Feb. 13, 1766) ("Suppose a military force sent into America * * * . They will not find a rebellion; they may indeed make one."), *available at* https://tinyurl.com/577emuzh.

The district court specifically found that "state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization." Order 28; Dkt 7 ⁋ 9-10, 30; *cf. Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable harm because government officials "will lose the discretion * * * to allocate scarce resources among different county operations necessary to fight the pandemic");

*Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (the "inability [of the state] to enforce its duly enacted plans clearly inflicts irreparable harm on the State"). Defendants' actions are already causing financial injury to the City. The day after the President announced he was sending in troops, the PPB incurred over $50,000 in overtime responding to the increased protests the announcement spurred, and it incurred over $40,000 more over the next two days. Dkt 33 at 2-4. The district court found that the actual deployment of troops in Portland will provoke further, larger protests, forcing the City to incur more expenses and divert more law enforcement resources. Order; 29; Dkt 7 at 9-10; Dkt 12-1 at 1. The interests here weigh heavily in favor of denying the stay and maintaining the status quo.

The deployment of military troops threatens irreparable economic and financial harms to Oregon, Portland, and their residents. Military deployment threatens to chill economic activity, harming the economic well-being of Oregon and Portland residents and decreasing State and City tax revenues. *See* Dkts. 29-31. Those financial harms are irreparable because the United States has sovereign immunity. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that non-revocable costs traced to federal action are sufficient to show irreparable harm). The district court reasonably determined that an order

temporarily returning control of the Oregon National Guard to the Governor was necessary to protect the State from further harm.

Finally, the broader public interest supports the district court's order. The "traditional and strong resistance of Americans to any military intrusion into civilian affairs * * * has deep roots in our history" and our Constitution. *Laird v. Tatum*, 408 U.S. 1, 15 (1973). As discussed above, defendants have exceeded the scope of their statutory authority, and they are acting contrary to the constitutional federal-state balance. Defendants' nearly limitless conception of § 12406 would give the President discretion to repeat this experiment in response to other ordinary, nonviolent acts of civil disobedience across our Nation. The public interest is served by a judicial order preserving the rule of law in the face of unprecedent and unlawful Executive action that threatens grave and irreparable damage to our State and the Nation.

///

///

///

///

///

///

///

## CONCLUSION

The administrative stay and the motion for a stay pending appeal should

be denied.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General

/s/  Denis M. Vannier
_____
DENIS M. VANNIER  #044406
Senior Deputy City Attorney
denis.vannier@portlandoregon.gov

Attorney for Appellee
City of Portland

/s/  Stacy M. Chaffin
_____
STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov
DUSTIN E. BUEHLER  #152024
Special Counsel
JONA J. MAUKONEN  # 043540
Assistant Attorney-In-Charge
Civil Appeals
PEENESH SHAH  #112131
Assistant Attorney General

Attorneys for Appellee
State of Oregon

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and

32(a)(5)-(6) and Local Rules 27-1(d) and 32-3, I certify that the Opposition to

Motion for Administrative Stay and Stay Pending Appeal is proportionately

spaced, has a typeface of 14 points or more and contains 5,595 words.

DATED:  October 5, 2025

/s/  Stacy M. Chaffin
STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov

Attorney for Plaintiff-Appellee
State of Oregon

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2025, I directed the Opposition to Motion for Administrative Stay and Stay Pending Appeal to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stacy M. Chaffin
STACY M. CHAFFIN #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov

Attorney for Plaintiff-Appellee
State of Oregon