**No. 25-6268**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

STATE OF OREGON, et al.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,
*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Oregon

———————————

## REPLY IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................. 3

I.     This Court has appellate jurisdiction. .......................................... 3

II.    The federal government is likely to prevail on the merits ..................... 4

III.   The remaining factors support a stay .............................................. 10

CONCLUSION ............................................................................................ 12

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Department of Education v. California,*
    145 S. Ct. 966 (2025) ................................................................ 3-4

*Martin v. Mott,*
    25 U.S. (12 Wheat.) 19 (1827) ............................................ 4, 8

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) .............................. 1, 4, 7, 9, 10

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................ 7

**Federal Statutes:**

3 U.S.C. § 301 ....................................................................... 9

10 U.S.C. § 12406 ........................................................... 2, 5-10

**Other Authorities:**

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus*
*Act and Related Matters: The Use of the Military to Execute Civilian*
*Law* (2018) .......................................................................... 10

## INTRODUCTION

The federal defendants set out in their stay motion the conditions that led the President to determine that Oregon National Guard troops should be federalized and mobilized to Portland to help protect federal personnel and property. Echoing the district court, plaintiffs fail to address, or even acknowledge, the evidence defendants detailed in their Motion—much of which came from plaintiffs' own filings. *See* Mot.4-8 (detailing facts). This evidence shows continuing, often-violent unrest on the eve of the President's federalization decision, and it amply justifies that decision. Neither plaintiffs nor the district court can second-guess the President's determination.

To summarize, over several months, agitators conducted coordinated and violent attacks in an effort to prevent the enforcement of federal immigration law. The Portland U.S. Immigration and Customs Enforcement (ICE) Office was damaged, and federal officers were assaulted, threatened, doxed, and routinely trapped in their cars when entering and leaving the facility. Portland police were largely unresponsive, and federal officials were able to contain the violence only by reassigning a large contingent of Federal Protective Service officers and other federal officers for round-the-clock protection—an intensive deployment that cannot be sustained indefinitely. That reassignment diverts ICE officers from enforcing the immigration laws and ties down the government's limited protective resources, preventing them from being deployed elsewhere to help protect federal personnel and

property from similar violent opposition to federal law enforcement occurring in other urban areas. Particularly after targeted violence aimed at ICE operations elsewhere in the country, including the shootings at an ICE field office in Dallas, the President was justified in concluding that the conditions in Portland posed a sufficient impediment to the execution of federal laws and danger of a rebellion to warrant federalizing a relatively small contingent of National Guard members. That determination, if judicially reviewable, was surely within the "range of honest judgment" that the conditions in 10 U.S.C. § 12406 were satisfied. *Newsom v. Trump*, 141 F.4th 1032, 1048 (9th Cir. 2025). The district court overstepped its role in concluding otherwise and enjoining the President from calling up the National Guard to protect federal personnel and property in Portland from further violence.

Plaintiffs and the district court nevertheless reason that the President lacked authority to act except in response to extreme and uncontrolled violence localized to Portland and imminently preceding federalization. Such a standard would make little sense and would disable the President from considering the state of federal defensive resources after months of targeted violence, the need for additional protection for ICE operations elsewhere in the country, and the threat of intensified violence in Portland. Congress did not impose these limits on the President's authority to federalize the Guard; nor did it authorize the federal courts to second-guess the President's judgment about when and where to call up the Guard to reinforce the

2

regular forces in response to sustained and widespread violent resistance to federal law enforcement.

Plaintiffs also contend that the President did not make the requisite determination that federalization was necessary—an argument the district court declined to accept—but that is at odds with the actions and statements of the President and the Secretary of War, which are entitled to a presumption of lawfulness. There is no statutory requirement that the President's determination must be made in a written decision cataloguing its factual basis. The federal defendants acted lawfully in federalizing and deploying Oregon National Guard members to assist federal officers in Portland.

Finally, the balancing of harms favors a stay of the district court's injunction, which improperly overrides the President's military judgment and endangers federal personnel and property.

## ARGUMENT

### I.     This Court has appellate jurisdiction.

Plaintiffs do not contest the key facts that establish this Court's jurisdiction. The district court entered a fully reasoned 31-page decision, after extensive briefing and argument. *See* A105-135. Moreover, as detailed in the defendants' stay motion, defendants strongly challenge the basis for the district court's injunction—which is unlawful and will inflict irreparable injury if allowed to stand. In short, the district court's order has all the hallmarks of an injunction. *See Department of Education v.*

*California*, 604 U.S. 650, 651 (2025). The fact that the order expires automatically on October 18 does not suggest otherwise. *Contra* Opp.3. The Supreme Court has itself construed an order as a preliminary injunction despite that order's pending expiration. *See Department of Education*, 604 U.S. at 651.

## II.    The federal government is likely to prevail on the merits.

**A.** The Constitution and Congress have vested in the President the decision to call up the National Guard to protect federal personnel and federal property. As the Supreme Court held two hundred years ago, "the authority to decide whether [an] exigency has arisen[]" justifying the federalization of the militia "belongs exclusively to the President." *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827). Once the President judges that such an exigency existed, his judgment is "conclusive upon all other persons." *Id.* That holding governs here and precludes plaintiffs' and the district court's efforts to second-guess the President's judgment that the conditions in Portland warranted federalization of Guard members to protect federal personnel and property from violence designed to thwart enforcement of federal immigration laws.

Even if some judicial review of the President's federalization decision is available, plaintiffs acknowledge that review must be "especially deferential." Opp.13 (quoting *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025) (per curiam)). The only question is whether the President's decision reflects "a colorable assessment of the facts and law within a 'range of honest judgment.'" Opp.12 (quoting *Newsom*, 141 F.4th at 1051).

The President's decision to invoke Section 12406 to federalize National Guard members in Portland is amply supported by facts in the record, as the federal government explained. *E.g.*, Mot.5-8. For months, federal personnel and property have been under attack. Protesters have lobbed incendiary devices at federal officers (A82-83); armed themselves with guns, bats, and a machete (A66-67, A82-83); released officers' personal information online, while threatening those officers' lives (A83 & n.1); and attempted to burn down the Portland ICE facility on multiple occasions (A67-68). Damage to federal property required a weeks-long closure of the Portland ICE office, and even now that the facility has reopened, it must be boarded up to prevent further damage. A70. This threat to life and property persisted through the President's decision to federalize the Oregon National Guard on September 27, including multiple incidents of violence in September. *See* A92-104. And efforts to quell the violence have stretched federal police services beyond their means, even after the relocation of Department of Homeland Security (DHS) officers from elsewhere in the country, *see* A86, and local law enforcement has provided little to no assistance, A84-85. This record is more than sufficient to provide a "colorable" basis for the President's Section 12406 determination.

Plaintiffs (Opp.4-5) and the district court (A123-124) attempt to minimize this evidence, entirely ignoring the regular violence that persisted throughout September, A92-104. This is especially telling because plaintiffs' own evidence establishes that pattern of unrest. *See* Mot.18. During September, protesters erected a mock

guillotine (A95-97), distributed weapons (A101-02), and called in a bomb threat (A71). That is hardly the "calm, sedate, and peaceful" protests plaintiffs describe. Opp.7.

Plaintiffs compare these conditions to the conditions that preceded the National Guard deployment in Los Angeles, arguing that the violence in Los Angeles was more severe and widespread. Opp.19. But the President and the Secretary accounted for the different conditions in the two cities. That is why 4,000 California National Guardsmen were federalized and deployed in Los Angeles, while only 200 National Guardsmen were federalized in Portland. And the situation in Los Angeles does not mark the outer bound of the President's authority under Section 12406. Sustained violence, threats of violence, and harassment directed at federal officers attempting to enforce our immigration laws can impede execution of the laws and constitute a rebellion against federal authority even if it occurs on a smaller scale.

Plaintiffs also repeat the district court's error in focusing myopically on the days immediately preceding the President's determination and the localized conditions in Portland. Opp.15; Opp.19-20. The President need not—and should not—blind himself to the larger context in assessing whether on-the-ground conditions require the engagement of military resources. He is entitled to take into consideration both a longer-term pattern of events, the significant diversion of federal resources that temporarily led to a reduced level of conflict in Portland, the dire need for additional federal resources elsewhere given the targeted attacks in Dallas, Chicago, and other urban areas, and the changed risk calculus as a result.

6

This continuing drain on federal resources was far from a mere "administrative difficult[y]," as plaintiffs contend.  Opp.10.  To even begin to manage the mob violence in Portland, DHS was forced to relocate officers from across the country, and those officers then had to work 12-hour shifts seven days a week.  A82.  In contending that these heroic efforts preclude the President from invoking Section 12406, plaintiffs repeat the reasoning that this Court's stay panel rejected: that the statute cannot apply as long as any amount of federal law enforcement can continue, even if it requires dedicating every DHS officer in the country to a single location.  As the stay panel explained, "Section 12406 does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States . . . nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible."  *Newsom v. Trump*, 141 F.4th 1032, 1051 (9th Cir. 2025) (per curiam).  The determination that the regular forces are unable to execute the law necessarily requires a judgment about whether to divert limited resources away from other locations and activities.  The President, who is looking at the totality of circumstances and not just narrowly focused on one location, is appropriately charged with making that determination.  *Cf. United States v. Texas*, 599 U.S. 670, 680 (2023) (explaining that the Executive Branch "must balance many factors" when evaluating "inevitable resource constraints and regularly changing public-safety and public-welfare needs" and that this "complicated balancing process in turn leaves courts without meaningful standards for assessing those policies").

Plaintiffs similarly fail to manufacture procedural defects in the President's judgment, Opp.13-15, and even the district court did not reach such a conclusion. As the President explained, he decided to federalize the National Guard in Portland after receiving the DHS request describing the "coordinated assault by violent groups intent on obstructing lawful federal enforcement actions," A52, and determining that federal officers were unable to enforce the laws. *See* Mot.8-9. And just recently, the President reiterated, in a memorandum related to federalization of the Illinois National Guard, that he "directed the Secretary of War to mobilize the National Guard due to ongoing violence and interference with Federal law enforcement in Oregon." SA4.[1] Plaintiffs criticize the September announcements of the President's decision as "legally insufficient." Opp.16. But nothing in Section 12406 requires the President to contemporaneously issue a formal statement explaining his invocation of the statute. To the contrary, it is settled that "[w]hen the President exercises an authority confided to him by law, the presumption [is] that it is exercised in pursuance of law." *Martin*, 25 U.S. (12 Wheat.) at 32-33. "It is not necessary to aver, that the act which he may rightfully do, was so done." *Id.* at 33. Nor does the statute require that the President enumerate the factual circumstances that support his decision. *Contra* Opp.15-16. The President's memorandum federalizing the California National Guard did not list the evidence supporting his decision, and this Court's stay panel

---

[1] Citations are to the supplemental addendum attached to this reply.

nonetheless concluded that he likely acted lawfully in invoking Section 12406 based on the record evidence submitted by the parties. *See Newsom*, 141 F.4th at 1052.[2]

The federal government also explained why the President's judgments about Portland were consistent with the conclusions in the June 7 memorandum, which was the basis for the California deployment. *See* Mot.9-10. That memorandum described how "incidents of violence and disorder" had recently occurred and "threaten[ed] to continue" in response to federal officials' enforcement of federal law. A61. The President further explained that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." A61. That same logic formed the basis for the President's later determination that—after months of sustained violence and stretching DHS officers to the point of breaking—the conditions in Portland justified federalizing the National Guard. *See supra* pp. 5-7.

Finally, plaintiffs attempt to bolster their arguments with the same cramped interpretation of Section 12406's language that the district court adopted. Opp.17-18. As already explained, however, the federal government's interpretation of Section 12406's terms better reflects both ordinary meaning and the instances in which Presidents have federalized National Guard members before and after Section 12406

---

[2] Section 12406 similarly lacks any requirement that the President personally decide the appropriate number of troops to federalize, *contra* Opp.16, and the district court did not find any error in the President's delegation of that determination. *See* 3 U.S.C. § 301

was enacted.  Mot.17 (citing Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 9-12, 35-38 (2018)).

**B.**  The federalization order is also consistent with the Tenth Amendment. Plaintiffs acknowledge that their Tenth Amendment claim is derivative of their statutory claim, Opp.20-21; it accordingly fails for the same reasons.  *See supra* pp. 4-10.

## III.  The remaining factors support a stay.

As previously explained, the equitable factors tilt strongly in the federal government's favor.  Mot.22-23.  The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law," *Newsom*, 141 F.4th at 1054, and protesters in Portland have significantly threatened that interest, *see* Mot.4-8; A79-80.

Plaintiffs attempt to minimize this harm, repeating their characterization of the Portland protests as "generally small, sedate, and peaceful."  Opp.22.  But this is nothing more than a rehashing of plaintiffs' argument on the merits, which fails for the same reasons expressed above.  *See supra* pp. 4-10.  Plaintiffs' blinkered view of the situation in Portland, ignoring the regular and often-violent protests in September and in the preceding months, does not render the federal government's harm any less significant.

Nor can plaintiffs credibly assert that the Portland Police Bureau (PPB) is capable of "swiftly and effectively" responding to mob violence. *See* Opp.22. Their own evidence proves the opposite: PPB lacks "enough available forces" to protect the ICE office from just "50-60 protesters." SA2-3. Worse still, PPB has instructed its officers not to render aid to ICE—at least in certain circumstances. SA3 (cars entering/exiting). PPB cannot, or will not, take any action to mitigate the government's irreparable harm.

On the other side of the ledger, plaintiffs' attempt at showing their own harm falls flat. Issues of state sovereignty are not implicated by the federal government's enforcement of federal law—much less by the deployment of National Guard troops to ensure those laws are faithfully executed. *Contra* Opp.23. And the plaintiffs' reliance on the ongoing ability of its police force to respond to protests ignores the fact that, even after the President's federalization decision, the PPB was both unable and unwilling to protect federal officers and property. SA1-3.

In the end, plaintiffs constantly refer to the need to "maintain[] the status quo" by upholding the district court's injunction. *E.g.*, Opp.1. What this ignores, however, is that the status quo includes significant, often-violent protests that threaten federal officers and property—without a local police force willing or able to help. That is the very irreparable harm that justified federalization of the National Guard, and it likewise justifies a stay pending appeal.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay pending consideration of the motion.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

*/s/ J. Kain Day*
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*
  *Sharon.swingle@usdoj.gov*

October 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) and Local Rules 27-1(d) and 32-3 because it contains 2,663 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ J. Kain Day*
J. KAIN DAY

**SUPPLEMENTAL ADDENDUM**

# TABLE OF CONTENTS

Ex. 28 to Declaration of Brian Hughes, Dkt. 46-28 (Oct. 2, 2025)...........................SA1

President Donald J. Trump, Department of War Security for the Protection of
Federal Personnel and Property in Illinois (Oct. 4, 2025)...............................SA4

# EXHIBIT 28

| | |
|---|---|
| **From:** | Braun, Andrew |
| **To:** | Lloyd, Bryan |
| **Cc:** | Dobson, Craig; Hughes, Brian; Sheppard, Nathan; Ceaser, Madison |
| **Subject:** | ICE Monitoring overnight 9/27-28 |
| **Date:** | Sunday, September 28, 2025 6:06:50 AM |

25-267118

9/28 at 0020 hours

Victims:  Oliva Lopez, Andy 6/24/96

Moore, Maya 11/3/97

Ralph, Christopher 10/6/70

McFarland, Pyper 9/13/66


Suspects:  Unidentified


Summary: FPS reported a 20 vs. 1 fight was occurring just east of the ICE building on Bancroft St. As officers responded to the area, the 4 victims called in. Moore and Oliva were observing the protest as Moore livestreamed with her phone. When the protesters burned an American flag, Moore and Oliva expressed their displeasure to the crowd. A verbal argument escalated and crowd members started pushing Moore. Oliva intervened to protect her, and crowd members assaulted and pepper sprayed him. Ralph and McFarland are area residents and were walking by the protest to see what was going on. They witnessed Oliva being assaulted. Ralph attempted to intervene and was also assaulted. McFarland was surrounded by protesters and felt she was being intimidated and unable to leave. All 4 were eventually able to leave the area; a protester broke the driver's window of Oliva and Moore's car as the drove away.


Ralph had minor injuries and declined medical. Oliva was bleeding heavily from his face, was evaluated by AMR, and declined transport. Oliva and Moore were able to give descriptions of 3 suspects, but did not have video or photos. FPS did not capture the assault on their cameras.


There were 50-60 protesters outside of ICE at the time. Most of them were blocking the facility's driveway in anticipation of the shift change. Many were dressed in bloc, with helmets, masks, and other PPE. We did not have enough available officers to form a MFF due to other ongoing priority calls (including a robbery with a firearm and assaults around the entertainment district). The described suspects were not visible when we drove by the fringe of the crowd.


Additionally, FPS requested PPB's assistance with facilitating getting their vehicles out of the facility for shift change. They had the resources to clear their driveway, but were concerned

**SA2**

about protesters shining bright lights at them as they drove out. Regional Director Eric Johnson claimed that the Chief and/or AC Dobson told him 2 weeks ago that PPB could position marked cars at Macadam/Bancroft to deter the crowd during shift changes. I was not sure if that action would conflict with previous direction to not assist with facilitating the movement of vehicles in and out of the facility; regardless, we did not have the resources to safely accomplish that task for a crowd of this size and demeanor.

We received no further calls after shift change. Priority call load did not afford an opportunity for us to monitor the area later in the night.

Sergeant Andrew Braun

#56961

Portland Police Bureau

1111 SW 2nd Ave. Portland, OR 97204

Central E Shift UMT

971-337-4539

SA3

**THE WHITE HOUSE**

WASHINGTON

October 4, 2025

MEMORANDUM FOR THE SECRETARY OF WAR
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of War Security for the Protection
                of Federal Personnel and Property in Illinois


The situation in the State of Illinois, particularly in and
around the city of Chicago, cannot continue.  Federal facilities
in Illinois, including those directly supporting Immigration and
Customs Enforcement (ICE) and the Federal Protective Services
(FPS), have come under coordinated assault by violent groups
intent on obstructing Federal law enforcement activities.  These
groups have sought to impede the deportation and removal of
criminal aliens through violent demonstrations, intimidation,
and sabotage of Federal operations.  These violent activities
appear to be increasing, and the situation in the State of
Illinois, particularly in and around the city of Chicago, cannot
continue.

These activities are not occurring in isolation.  Instead, these
activities are similar to other ongoing efforts in multiple
States and cities around the country to disrupt the faithful
enforcement of Federal law.  On June 7, 2025, I determined that
similar activities warranted the mobilization of the National
Guard.  Likewise, at the end of September, I directed the
Secretary of War to mobilize the National Guard due to ongoing
violence and interference with Federal law enforcement in
Oregon.

In those prior directives and in this instance, I have
determined that these incidents, as well as the credible threat
of continued violence, impede the execution of the laws of the
United States.  I have further determined that the regular
forces of the United States are not sufficient to ensure the
laws of the United States are faithfully executed, including
in Chicago.

**SA4**

2

In light of both past incidents in Chicago and the credible threat of future incidents, and in light of my determinations, by the authority vested in me as President by the Constitution and the laws of the United States of America, including 10 U.S.C. 12406, I hereby call into Federal service at least 300 members of the Illinois National Guard, until the Governor of Illinois consents to a federally-funded mobilization, under Title 32 of the United States Code, of the Illinois National Guard under State control. The members of the Illinois National Guard called into Federal service shall protect ICE, FPS, and other United States Government personnel who are executing Federal law in the State of Illinois, and Federal property in the State of Illinois. They shall do so at any locations at which violent demonstrations prevent the execution of Federal law or are likely to prevent the execution of Federal law based on current threat assessments and planned operations. The duration of such Federal service shall be 60 days or at the discretion of the Secretary of War. Further, I direct and delegate actions as necessary for the Secretary of War to coordinate with the Governor of the State of Illinois and the Chief of the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the Illinois National Guard under this authority.

To carry out this mission, the deployed National Guard personnel may perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois. Following the deployment of any National Guard personnel to any location in Illinois, the Secretary of War shall consult with the Attorney General and the Secretary of Homeland Security prior to withdrawing the personnel from such location. The Secretary of War and the Secretary of Homeland Security may delegate to subordinate officials of their respective Departments any of the authorities conferred upon them by this memorandum.

**SA5**