No. 25-6268

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

STATE OF OREGON and the CITY OF PORTLAND,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, et al., in their official capacities,

*Defendants-Appellants*

_____

**BRIEF OF THE STATES OF IOWA, MONTANA, OKLAHOMA, SOUTH CAROLINA AND 16 ADDITIONAL STATES AS** *AMICI CURIAE* **IN SUPPORT OF DEFENDANTS-APPELLANTS' MOTION FOR STAY PENDING APPEAL**

_____

Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 2

INTEREST OF *AMICI CURIAE* ........................................................................ 3

ARGUMENT ............................................................................................................ 4

    I.    Violent Rioters in Portland Are Harming Federal Officers and Property and Impacting the Federal Government's Ability to Carry Out Federal Laws. ....................................................................... 4

    II.    President Trump Certainly Had a "Colorable Basis" For Federalizing the National Guard to Protect Federal Agents and Property from Violent Rioters in Portland. ...................... 8

    III.    The Harms Incurred If Violent and Destructive Protests and Riots Are Allowed to Continue in Portland are Borne by All States. ................................................................................................. 10

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

Cases

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................. 11, 12
*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d. 1211 (D.C. Cir. 1981) ......................................................................... 15
*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ........................................................................... 11
*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) .................................................................. 8, 9, 10
*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................................................... 11

Statutes

10 U.S.C. § 12406(3) ........................................................................................... 8, 9

## INTEREST OF *AMICI CURIAE*

For the past four years, illegal open-border immigration policies flooded the country with illegal aliens, including criminals convicted of crimes in their home country, violent international gang members, and suspected ISIS terrorists. Much of that was done in violation of federal immigration law through the assertion of executive nonenforcement prerogatives. Now, President Trump is executing Congress's dictates and enforcing federal immigration laws—which includes valiant efforts by federal law enforcement to identify and deport alien criminals. Against that backdrop of law enforcement, activists began to gather in cities across the United States, including Portland. But rather than protest peacefully, some of those protests became violent, threatening federal officers, harming federal property, and certainly impeding enforcement of federal law. President Trump's deployment of a small number of National Guard members to defend against this lawlessness is responsible, constitutional, and authorized by statute.

*Amici Curiae* are Iowa, Montana, Oklahoma, South Carolina, and 16 additional States with  which submit this brief in support of Defendants. The District Court's order below comes at an immense cost

to the States. The undersigned States recognize the important roles and balance played in the National Guard system by both the states and federal government. But the District Court and Plaintiffs fail to respect that balance here.

## ARGUMENT

**I. Violent Rioters in Portland Are Harming Federal Officers and Property and Impacting the Federal Government's Ability to Carry Out Federal Laws.**

Recently, violence against federal immigration officials has increased. "The men and women of ICE put their lives on the line to protect and defend the lives of American citizens," ICE Assistant Secretary Tricia McLaughlin recently said in a statement. Audrey Conklin, *California sheriff says Newsom 'encouraged' LA riots as ICE arrests violent illegal aliens*, Fox News (Jun. 10, 2025), https://tinyurl.com/y942z342. McLaughlin also noted that some "politicians … are contributing to the surge in assaults of our ICE officers through their repeated vilification and demonization of ICE," referencing comparisons made "to the modern-day Nazi gestapo" and to "glorifying rioters." *Id.* Indeed, there are real-world consequences to Portland's poor

treatment of federal immigration officials and inaction to address violence against them.

In June 2025, the regular demonstrations that had been occurring at Portland's ICE building since President Trump took office began to escalate. Michael Wiley, et al., *Police declare riot at Portland ICE facility, multiple arrests made*, OPB (updated June 15, 2025), https://tinyurl.com/y7xc44m7. "At one point, protesters attempted to force their way into the facility, eventually breaking through a glass door with a pole-like object." *Id.* Protestors have started fires. *Timeline of protests, arrests at ICE facility since June*, MSN (Oct. 1, 2025), https://tinyurl.com/ytd5dcu5. Protestors have barricaded the driveway to the ICE facility, Michael Wiley & Conrad Wilson, *Portland police square off with protesters overnight as ICE demonstrations intensify*, OPB (June 13, 2025, at 7:07 am), https://tinyurl.com/ys8xhc3p, with Portland PD declaring they would not help clear the driveway. Conrad Wilson & Troy Brynelson, *Federal officers, protesters clash in small demonstration near Portland ICE facility*, OPB (June 11, 2025, at 7:00 am), https://tinyurl.com/457443s3. In early July, the Department of Justice

noted that "for weeks, individuals have repeatedly targeted the [ICE] building and federal law enforcement officers with threatening statements, discharging pepper spray, and throwing rocks, trash, and bricks," and noted that since June 13, 2025, twenty-two defendants had been charged "with offenses committed at the ICE building including assaulting federal officers, arson, possession of a destructive device, and depredation of government property." *Four Defendants Charged with Assaulting Federal Law Enforcement Officers, Other Offenses During Protests Near Local ICE Office*, US Attorney's Office District of Oregon (July 8, 2025), https://tinyurl.com/4njn3swy.

But it did not end there. Since that time, protestors have continued their presence at the ICE building, with neighboring residents calling it a "war zone" and "terrifying." Joseph Trevino, *Inside the Antifa siege on 'war zone' Portland and the resistance to the National Guard cleaning it up*, N.Y. Post (Oct. 1, 2025, at 6:02 pm), https://tinyurl.com/2auy54zn. One Portland resident who lives near the ICE building told reporters that "'[e]very night, there's tons of protesters basically being vagrants on the street. … They are making noise constantly, even when nobody from ICE

is outside.'" Ariel Zilber, *Protesters clash with ICE agents as Trump deploys federal troops to 'war-ravaged' Portland*, N.Y. Post (Sept. 28, 2025, at 12:05 pm), https://tinyurl.com/mwb4pszs. Photos from a September 1, 2025, clash show ICE agents responding with shields to the protestors outside the facility. Alexandria Koch, *Portland mayor condemns federal intervention, claims videos of anti-ICE riots were from years ago*, N.Y. Post (Sept. 28, 2025, at 3:58 am), https://tinyurl.com/4jjfs6np. Defendants' Declaration from Field Office Director Cammilla Wamsley affirms these types of activities and much more. *See* Doc. 38.

Despite the continued violence occurring at the ICE facility, Portland Mayor Keith Wilson has continuously decried any federal help, stating that "the number of necessary troops is zero, in Portland and any other American city," Jeff Thompson, *'Portland is doing just fine': Oregon governor rejects Trump's plan to send troops to the city*, KLCC (Sept. 27, 2025, at 7:24 pm), https://tinyurl.com/52kehvdx, and that the National Guard members would be there "without precedent or purpose." Zilber, *supra*, https://tinyurl.com/52kehvdx. Governor Tina Kotek said she told

the President "in very plain language" that "there is no insurrection or threat to public safety that necessitates military intervention in Portland or any other city in our state," and that "[l]ocal law enforcement has this under control." Josh Gerstein & Kyle Cheney, *Oregon sues to block Trump from deploying state's National Guard in Portland*, Politico (Sept. 28, 2025, at 7:36 pm), https://tinyurl.com/yjrmnhxf. Yet the facts say otherwise. Given the prevalence of violence aimed at federal law enforcement, in Portland and around the country, it is unsurprising that the President deployed National Guard resources to protect them from obstructions in their attempts to execute federal laws.

**II.    President Trump Certainly Had a "Colorable Basis" For Federalizing the National Guard to Protect Federal Agents and Property from Violent Rioters in Portland.**

Federal law explains that "[w]henever … the President is unable with the regular forces to execute the laws of the United States … the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to … execute those laws." 10 U.S.C. § 12406(3). In *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025), the Ninth Circuit held that the

President indeed had "a colorable basis for invoking" Section 12406(3) to federalize the National Guard in Los Angeles. The Court used "a highly deferential standard of review" to determine if there was a "colorable assessment of the facts and law within a 'range of honest judgment'" to warrant such a decision. *Id.* at 1051-52. In determining that the President's actions were authorized, the Court referenced that the defendants had presented evidence "of protesters' interference with the ability of federal officers to execute the laws," noting violence against federal officers, including throwing objects, ramming gates, and vandalizing property. *Id.* at 1052. The Court also noted that defendants' declarations there showed how "those activities significantly impeded the ability of federal officers to execute the laws." *Id.*

Under the same analysis, there is no doubt that the President's decision to send National Guard members to Portland reflects a similar "colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051. There has been a continuous and growing threat outside of the ICE building in Portland. Field Office Director Wamsley's Declaration confirms the threat to federal officers and facilities, *see*

*generally* Doc. 38, even noting that the facilities were forced to close for three weeks after violence and destruction intensified in June, Doc. 38 ¶ 13. And the President's order to send 200 National Guard members, contrasted with the thousands deployed in California in *Newsom*, shows that there was a measured response here. That is not to say that the President could not have federalized more members, but this response certainly shows that it was a reasoned decision based on the facts as known at the time. The President's response here was certainly "within a 'range of honest judgment.'" *Newsom*, 141 F.4th at 1051.

### III. The Harms Incurred if Violent and Destructive Protests and Riots Are Allowed to Continue in Portland are Borne by All States.

The President's decision to federalize the National Guard to protect federal officers and property in Portland has effects beyond the borders of Oregon; states and cities across the U.S. benefited from this decision.

States are already impacted with the immense costs of illegal immigration. States have been required to bear numerous financial costs as a result of illegal immigration including costs related to incarceration and supervisions of criminal illegal aliens, the cost of criminal recidivism,

and public education and healthcare costs. *See United States v. Texas*, 599 U.S. 670, 716–17 (2023) (Alito, J., dissenting). These expenses have collectively cost the states billions. *See California v. United States*, 104 F.3d 1086, 1090 (9th Cir. 1997). These costs are particularly acute where the Supreme Court has left the States with little recourse to address immigration-related harms outside of federal enforcement. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (holding that a state generally may not enact a law that addresses the subject of alien registration because Congress has "occupied the field."); *see also United States v. Texas*, 599 U.S. 670, 674 (2023) (holding that states are precluded from suing to ensure that the federal government is enforcing immigration laws). As the Supreme Court stated, "[t]he problems posed to the State[s] by illegal immigration must not be underestimated." *Arizona*, 567 U.S. at 389. The President therefore must have full discretion to allocate federal resources—including federalized National Guard—so that limited federal immigration enforcement resources are not diverted to Oregon. Otherwise, states will continue to bear the costs of non-enforcement of federal immigration laws.

States are at risk of even more costs if violent protests are implicitly endorsed in Oregon. Antifa-aligned groups seek to undermine the federal government as it works to redress this significant problem by causing damage to federal property, harming federal agents, and in some cases, damaging the city in which the riot is located—causing significant damage to the state and its citizens. For example, the costs of the anti-ICE riots in Los Angeles are estimated to have cost taxpayers $30 million. Chris Nesi, *House Judiciary Committee opens probe into taxpayer-funded group's potential ties to LA anti-ICE riots*, N.Y. Post (June 24, 2025, at 12:34 pm), https://tinyurl.com/4bbjx9ar.

Indeed, many reports suggest that much of the violence and destruction caused by these riots can be traced to a few organizations funding the riots, *see id.,* or individuals moving between the States encouraging this type of behavior, *see Wiley, et al., supra*, https://tinyurl.com/y7xc44m7.[1]

---

[1] Indeed, this type of interstate movement has occurred before. Take for example the riots that occurred in 2020. Destruction due to rioting

The pervasiveness of these coordinated attacks cannot be underestimated. They have resulted in the President declaring Antifa a domestic terrorist organization due to its explicit "calls for the overthrow of the United States Government, law enforcement authorities, and our system of law." Designating Antifa as a Domestic Terrorist Organization, 90 Fed Reg. 46317, 46317 (Sept. 22, 2025). To accomplish its goals, Antifa organizes and executes a campaign to "obstruct enforcement of Federal laws through armed standoffs with law enforcement, organized riots, violent assaults on Immigration and Customs Enforcement [ICE] and other law enforcement officers, and routine doxing of and other threats against political figures and activists." *Id*.

---

occurred in at least 20 States, Jennifer A. Kingson, *Exclusive: $1 billion-plus riot damage is most expensive in insurance history and rioters*, AXIOS (Sept. 16, 2020), https://tinyurl.com/f4xwsjhs, and some rioters moved between jurisdictions. After rioting occurred in Minnesota in 2020, arrest records showed that out of 18 people arrested in St. Paul, 6 were not from Minnesota, and out of 109 people arrested in Minneapolis, 16 were from another state. Trevor Hughes, *Protests in Minneapolis turned violent: Officials first blamed outsiders, but that's not what arrests show*, USA Today (updated June 4, 2020, at 3:39 pm), https://tinyurl.com/bdzax9mm

Accordingly, aggression toward ICE is not a problem unique to Oregon. ICE faces significant threats nationwide. Take for example the tragic shooting at a Dallas ICE field office in September 2025, where a sniper opened fire and killed three people. "This vile attack was motivated by hatred for ICE[.]" *DHS Issues Statement on Targeted Attack on Dallas ICE Facility*, DHS (Sept. 24, 2025), https://tinyurl.com/fzdeaz59. The shell casings that were found contained "anti-ICE messages on them," and handwritten notes by the shooter indicating he "hoped his actions would give ICE agents real terror of being gunned down[.]" *Id.*; Holly Yan & Priscilla Alvarez, *A 2nd detainee — a father of 4 — dies after a gunman opened fire at an ICE office in Dallas*, CNN (Sept. 30, 2025), https://tinyurl.com/52tn5sky.

Because this type of aggression toward ICE—targeting a specific facility and preventing agents from being able to safely fulfill their duties—has already necessitated the need for National Guard federalization in two States, it is imperative that the unrest be dissolved quickly to deter similar rioting in the other states.

Accordingly, the President's action of federalizing the National Guard furthers the public interest because it allows ICE agents to continue to perform their statutory duties of identifying, apprehending, and removing illegal aliens, which is an essential way to protect the States from the harms caused by illegal immigration. *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) ("[T]he public interest in enforcement of the immigration laws is significant." (collecting cases)). And it protects states from the costs incurred by violent protests and riots. Further, allowing the federal government to repel this type of behavior at its outset sets a precedent discouraging similar behavior in other States.

## CONCLUSION

The Court should grant Defendants' Motion for Stay.

DATED October 8, 2025   BRENNA BIRD

Attorney General of Iowa


*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319

(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

### ADDITIONAL ATTORNEYS GENERAL IN SUPPORT

Austin Knudsen
Attorney General of Montana

Gentner Drummond
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Steve Marshall
Attorney General of Alabama

Tim Griffin
Attorney General of Arkansas

James Uthmeier
Attorney General of Florida

Chris Carr
Attorney General of Georgia

Raúl R. Labrador
Attorney General of Idaho

Theodore E. Rokita
Attorney General of Indiana

Kris Kobach
Attorney General of Kansas

Rusell M. Coleman
Attorney General of Kentucky

Liz Murrill
Attorney General of Louisiana

Lynn Fitch
Attorney General of Mississippi

Catherine Hanaway
Attorney General of Missouri

Michael T. Hilgers
Attorney General of Nebraska

Dave Yost
Attorney General of Ohio

Marty Jackley
Attorney General of South Dakota

Ken Paxton
Attorney General of Texas

John B. McCuskey
Attorney General of West
Virginia