

DAN RAYFIELD
Attorney General

BENJAMIN GUTMAN
Interim Deputy Attorney General

## DEPARTMENT OF JUSTICE
APPELLATE DIVISION

October 16, 2025

**VIA E-FILING THROUGH CM/ECF ONLY**

Molly C. Dwyer, Clerk of Court
Ninth Circuit Court of Appeals
The James R. Browning Courthouse
95 7th Street
San Francisco, CA 94102

      Re:    *Oregon, et al. v. Trump, et al.*, 25-6268
                **FRAP 28(j) new and pertinent authority**

Dear Ms. Dwyer,

I represent the State of Oregon in the above-captioned matter argued on October 9, 2025. I submit this letter pursuant to Fed. R. App. P. 28(j) to inform the Court of new and pertinent legal authority. Today, the United States Court of Appeals for the Seventh Circuit issued an opinion in *Illinois et al. v. Trump et al.*, 25-2798, which relates to the President's federalization of members of the Illinois National Guard.

On October 4, 2025, the President invoked his authority under 10 U.S.C. § 12406 to federalize and deploy members of the Illinois National Guard. The State of Illinois and the City of Chicago promptly sued, and the district court granted plaintiffs' request for a temporary restraining order, enjoining the administration from federalizing and deploying the National Guard within Illinois. The administration moved the Seventh Circuit to stay the district court's order pending appeal.

The Seventh Circuit concluded that the district court's factual findings were not clearly erroneous, and that the facts did not justify the President's actions in Illinois, even giving substantial deference to his assertions. The Court also concluded:

Clerk of the Court
October 16, 2025
Page 2

> the critical analysis of a "rebellion" centers on the nature of the resistance to government authority. Political opposition is not rebellion. A protest does not become a rebellion merely because the protestors advocate for myriad legal or policy changes, are well organized, call for significant changes to the structure of the U.S. government, use civil disobedience as a form of protest, or exercise their Second Amendment right to carry firearms as the law currently allows. Nor does a protest become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in protest.

Order at 11. The Seventh Circuit denied the administration's motion for a stay pending appeal but continued its stay of the portion of the order enjoining federalization of the Guard.

    Very truly yours,

    /s/ Stacy M. Chaffin

    Stacy M. Chaffin
    Assistant Attorney General
    stacy.chaffin@doj.oregon.gov

SC3:kw5/1002074537

In the

# United States Court of Appeals

For the Seventh Circuit

No. 25-2798

STATE OF ILLINOIS and
the CITY OF CHICAGO,

                                           *Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, et al.,

                                           *Defendants-Appellants*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:25-cv-12174 — **April M. Perry**, *Judge*.

DECIDED OCTOBER 16, 2025

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges*.

PER CURIAM. On October 4, 2025, President Donald Trump invoked his authority under 10 U.S.C. § 12406 to federalize and deploy members of the National Guard within Illinois, over the objection of the state's Governor. He asserted that deploying the Guard in the state was necessary to quell violent assaults against federal immigration agents and property. The State of Illinois and the City of Chicago promptly sued

President Trump and members of his administration, arguing that none of the statutory predicates for federalizing the Guard under § 12406 had been met, and that the federalization also violated the Tenth Amendment and the Posse Comitatus Act, 18 U.S.C. § 1385.

The district court granted plaintiffs' request for a temporary restraining order, enjoining the administration from federalizing and deploying the Guard within Illinois. In the district court's view of the factual record, neither of the predicate conditions for federalization proffered by the administration was present in Illinois: There was insufficient evidence of rebellion or a danger of a rebellion, 10 U.S.C. § 12406(2), nor was there sufficient evidence that the President was unable with the regular forces to execute the laws of the United States, *see id.* § 12406(3). The administration immediately appealed and moved for a stay of the order pending appeal.

Because we conclude that the district court's factual findings at this preliminary stage were not clearly erroneous, and that the facts do not justify the President's actions in Illinois under § 12406, even giving substantial deference to his assertions, we deny the administration's motion for a stay pending appeal except to the extent we continue our stay of the portion of the order enjoining the federalization of the Guard.

# I

## A

We draw our account from the district court's factual findings in its opinion granting the temporary restraining order. On September 8, 2025, the Trump administration announced "Operation Midway Blitz"—an escalation of the administration's enforcement of the immigration laws in Illinois. Federal

law enforcement officers increased their presence in the Chicagoland area.

U.S. Immigration and Customs Enforcement (ICE) processes immigrant detainees at a facility in Broadview, Illinois, a village about twelve miles west of downtown Chicago. For the past nineteen years, protestors have engaged in small demonstrations outside the Broadview facility, including a weekly prayer vigil. But the protests grew in size and regularity following the commencement of Operation Midway Blitz. On some occasions, protestors have stood or sat down in the driveway leading to the Broadview facility, and ICE has physically removed those people. The number of protestors on a typical day is fewer than 50. According to Broadview Police, the crowd has never exceeded 200, though the administration suggests it may once have reached around 300. Since September 13, Broadview Police and the Illinois State Police (ISP) have set up surveillance cameras to record and monitor activity in the area.

On September 26, approximately 100 to 150 protestors gathered outside the Broadview facility, and ICE deployed pepper spray and tear gas. The Broadview Police Department requested assistance from Illinois's law enforcement mutual aid network, and state police and other local police departments sent six cars. The activity near the facility closed a nearby road for roughly five hours, but Illinois law enforcement was able to contain the scene. That same day, the Department of Homeland Security (DHS) requested from the Department of Defense 100 troops to protect ICE facilities in Illinois with "immediate and sustained assistance" because of a "coordinated assault" by unnamed "violent groups …

actively aligned with designated domestic terror organizations."

Operation Midway Blitz soon intensified. On September 27, Gregory Bovino of Customs and Border Protection (CBP) and other federal agents came to the Broadview Police station and said that there would be increased deployment of chemical arms, and that it was "going to be a shitshow." The same day, a federal officer requested that Illinois voluntarily send Illinois National Guard troops to protect federal personnel and property; the state declined.

In turn, Illinois law enforcement stepped up its efforts in Broadview. On October 2, the ISP created a "Unified Command" of state and local law enforcement and emergency response organizations to coordinate public safety measures at the DHS facility. On October 3, the ISP established designated protest areas. When some protestors attempted to approach federal personnel and property, state and local law enforcement maintained control, making five to seven arrests, and federal agents detained 12 people.

On October 4, a few dozen protestors demonstrated at the facility. State and local law enforcement quickly responded and controlled the scene. DHS did not have to intervene.

Also on October 4, the President invoked his authority to federalize the National Guard. He issued a memorandum stating that the "situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue. Federal facilities in Illinois, including those directly supporting [ICE] and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities… I have determined that

these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States. I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." The memo authorized the federalization of Illinois National Guard members under 10 U.S.C. § 12406 to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois."

Illinois state officials opposed the deployment of the National Guard. The same day, the National Guard Bureau notified the Adjutant General of the Illinois National Guard that the President had authorized the mobilization of at least 300 members of the Illinois National Guard and directed that Illinois mobilize the Guard under 32 U.S.C. § 502(f) within 2 hours, or the Secretary of Defense would do so under Title 10. The Adjutant General responded that Illinois Governor Pritzker would not call the National Guard into Title 32 status and objected to the federalization of the National Guard.

Secretary of Defense Pete Hegseth then called Illinois National Guard members into federal service under 10 U.S.C. § 12406. In a memo to the Adjutant General, the Secretary stated that he was invoking § 12406 to federalize Guard troops to "protect [ICE], [FPS], and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations."

The next day, Secretary Hegseth explained to the Adjutant General that the President was invoking § 12406 to federalize up to 400 National Guard troops from Texas and to deploy them in Illinois and Oregon because "violent incidents, as well as the credible threats of continued violence, are impeding the execution of the laws of the United States." There were also a few dozen protestors at the ICE facility in Broadview that day, but state and local law enforcement maintained control, and DHS did not need to intervene. That night, a leader at ICE's Broadview facility lauded, in an internal email, the effectiveness of state and local law enforcement's Unified Command.

Despite President Trump's federalization of Guard troops as necessary to enforce federal immigration law, DHS and ICE have touted the success of Operation Midway Blitz. In an October 3 press release, DHS stated that ICE and CBP have effected more than 1,000 immigration arrests since the start of the Operation. In a September 26 DHS press release, the Department declared that protests had not slowed ICE down, and, in fact, ICE has significantly increased its deportation and arrest numbers year over year.

**B**

On October 6, 2025, plaintiffs—the State of Illinois and the City of Chicago—filed this lawsuit, arguing that the Trump administration's orders federalizing National Guard troops in Illinois under 10 U.S.C. § 12406 were unlawful. 10 U.S.C. § 12406 provides:

    Whenever—

        (1) the United States, or any of the Commonwealths or possessions, is invaded

> or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

Plaintiffs argued that there is no rebellion or danger of rebellion in Illinois, nor is the President unable with the regular forces to execute the laws of the United States. They further contended that the federalization orders violate the Posse Comitatus Act, 18 U.S.C. § 1385, and the Tenth Amendment. Plaintiffs sought emergency injunctive relief preventing the Trump administration from federalizing and deploying National Guard troops in Illinois.

After holding a hearing and assessing the preliminary record, the court granted in part plaintiffs' request for a temporary restraining order and enjoined the federalization and deployment of the National Guard for 14 days. The court withheld judgment on a preliminary injunction and did not extend its order to non–National Guard military forces or the President himself. The district court recognized the substantial deference due a President's assessment of whether § 12406(2)

or (3)'s factual predicates are satisfied, but it concluded nonetheless that, under its factual findings, the statutory requirements were not met. Where the declarations of the administration conflicted with the declarations of state and local law enforcement concerning conditions on the ground, the court made a credibility determination in plaintiffs' favor. In particular, the court found that all three of the federal government's declarations from those with firsthand knowledge were unreliable to the extent they omitted material information or were undermined by independent, objective evidence.

The Trump administration promptly appealed. It also moved for a stay pending appeal and for an emergency administrative stay. We granted the motion for an administrative stay in part, allowing the Guard members in Illinois to remain under federal control but blocking their deployment while we considered the motion for a stay.

## II

Before we reach the merits of the administration's motion, we must assure ourselves that we have jurisdiction to review the district court's temporary restraining order. Generally, a temporary restraining order is not appealable under 28 U.S.C. § 1292(a)(1). *See Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006). The Supreme Court has explained, however, that when a temporary restraining order "carries many of the hallmarks of a preliminary injunction," it should be construed as an appealable injunction. *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam); *see Abbott v. Perez*, 585 U.S. 579, 594 (2018). Among these hallmarks are the issuance of an order after an "adversary hearing" and a "strong[] challenge[]" to the court's basis for issuing an order. *Sampson v. Murray*, 415 U.S. 61, 87 (1974).

No. 25-2798                                                                 9

We conclude that the order is appealable. The district court issued a thorough, 51-page written opinion after holding an adversary hearing and receiving extensive factual submissions and briefing, and the administration has strongly challenged virtually every basis for the district court's order. We are therefore satisfied that sufficient hallmarks of a preliminary injunction are present here such that we can review the order under § 1292(a)(1).

### III

"In deciding whether to stay an injunction pending appeal, we apply a standard that parallels the preliminary injunction standard but also keeps in mind the district court's exercise of equitable discretion." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). Thus, a party seeking a stay must show (1) a likelihood of success on the merits, and (2) a threat of irreparable harm absent a stay. *Id.* If the moving party makes such a showing, this court must consider (3) "the balance of harms, primarily in terms of the balance of risks of irreparable harm in case of a judicial error," as well as (4) the public interest. *Id.*; *see Nken v. Holder*, 556 U.S. 418, 434 (2009). Generally, in reviewing an injunction, we take a fresh look at the legal issues but review the district court's factual findings for clear error. *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020).

The administration argues that the President's federalization of the Guard under § 12406 is not judicially reviewable at all. Alternatively, it contends that the factual predicates of § 12406(2) and (3) are satisfied in light of the deference due the President's decision to federalize the Guard. We conclude, at this preliminary stage and given the district court's factual

findings, that the federal government does not appear likely to succeed on either argument.

### A

The administration principally asserts that the President's discretion to call up the National Guard simply is not judicially reviewable. This argument relies heavily on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). President Madison had invoked a precursor to § 12406 to mobilize the New York militia during the War of 1812, which President Madison deemed an invasion. Jacob Mott refused to report for duty and was court-martialed and fined. Martin (a Marshal) seized his property to pay the fine and Mott sued Martin, contesting President Madison's determination that there was an invasion permitting the federalization of the militia. The Court concluded that the determination whether an actual or imminent invasion had arisen was not "an open question, upon which every officer … may decide for himself" but "belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 29–30. The administration argues that those principles govern here, and that where, as here, a statute "commits [a] decision to the discretion of the President," the President's exercise of that discretion is not subject to judicial review. *Dalton v. Specter*, 511 U.S. 462, 474 (1994).

We do not think the holding of *Martin* can extend so far. The Court's broad language must be understood in its context. The Nation was then at war with the most powerful empire on earth. That empire had actually invaded the United States and was sacking its capital city in August 1814. The Court in *Martin* expressed incredulity at the prospect that every officer under the President's command could make his own determination whether an imminent threat of invasion

existed and could refuse to obey the President's orders or be subject to civil liability if he enforced what was later deemed an invalid order. 25 U.S. at 29–30. Here, by contrast, the question is whether courts, not subordinate militiamen, may review the President's determination under § 12406, primarily as to whether political protests have become violent to the extent that they constitute a rebellion or that the administration is "unable" to execute federal law with the "regular forces" available to it.

As the Ninth Circuit aptly noted, unlike in *Dalton*, "the statute here enumerates three predicate conditions for the President's decision to call forth the National Guard." *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025). Nothing in the text of § 12406 makes the President the sole judge of whether these preconditions exist. It follows that the President's decision to federalize and deploy the National Guard under the statute is reviewable. *See id.*

At this preliminary stage, then, we conclude the federal government is unlikely to prevail on its argument that *Martin* or *Dalton* foreclose all judicial review of the President's decision to federalize the National Guard under § 12406.

**B**

Though we reject the administration's assertion that § 12406 instills the President with unreviewable discretion, we nevertheless agree with the Ninth Circuit that the President should be granted "a great level of deference" on the question of whether one of the statutory predicates exists. *Newsom*, 141 F.4th at 1048. As the Supreme Court has recognized, "when it comes to collecting evidence and drawing factual inferences" in the domain of national security and foreign

relations, "'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)); *cf. Sterling v. Constantin*, 287 U.S. 378, 399–400 (1932) (holding that governor was allowed a "permitted range of honest judgment" in exercising discretion to call up state military forces while acting in "good faith," but finding military deployment was in fact not justified and could not be "conclusively supported by mere executive fiat"). Precisely how deferential the standard should be is a question we do not endeavor to resolve at this early stage.

Even giving great deference to the administration's determinations, the district court's contrary factual findings—which, at this expedited phase of the case, are necessarily preliminary and tentative—are not clearly erroneous. The submitted evidence consists almost entirely of two sets of competing declarations describing the events in Broadview. The district court provided substantial and specific reasons for crediting the plaintiffs' declarations over the administration's, and the record includes ample support for that decision. Given the record support, the findings are not clearly erroneous. *See United States v. Nichols*, 847 F.3d 851, 857 (7th Cir. 2017) (explaining that "where the district court's factual findings are supported by the record, we will not disturb them" under clear-error review).

Where neither the President nor the district court is entitled to deference is on the meaning of the statute—what constitutes a "rebellion," and what it means to be "unable with the regular forces to execute the laws." 10 U.S.C. § 12406. These determinations are matters of statutory interpretation,

No. 25-2798                                                    13

a function that is "precisely the business of the judiciary." *Seggerman Farms, Inc. v. Comm'r*, 308 F.3d 803, 806 (7th Cir. 2002); *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Our interpretation of the statute is de novo even on a motion for a stay. *See Tully*, 977 F.3d at 612.

At this stage, we cannot say the administration is likely to succeed in demonstrating that the President lawfully federalized the Guard under either § 12406(2) or § 12406(3).[†]

We start with § 12406(2) and the meaning of "rebellion or danger of a rebellion." The parties rely on the same dictionaries, from the late nineteenth and early twentieth centuries, with the administration arguing that "rebellion" should be read to mean "deliberate resistance to the government's laws and authority." Plaintiffs instead urge us to define rebellion more narrowly—as the district court did—as a violent, armed, organized, open and avowed resistance that is "against the government as a whole—often with the aim of overthrowing the government—rather than in opposition to a single law or issue." *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1252–53 (N.D. Cal.), *stayed pending appeal on other grounds*, 141 F.4th 1032 (9th Cir. 2025) (citing *Rebellion*, *Black's Law Dictionary* (1st ed. 1891); *Rebellion*, *American Dictionary of the English Language* (1900); *Rebellion*, *The Cyclopedic Dictionary of Law*

---

[†] We acknowledge that President Trump has made many statements suggesting that the Guard should fight crime in Chicago generally, but the federal government confines its argument to the use of subsections (2) and (3) of § 12406 based on an inability to execute immigration laws, as opposed to general criminal laws. At this preliminary stage, and given the press of time, we therefore limit our analysis to those arguments for federalizing and deploying the Guard.

(1901); and *Rebellion*, *Webster's International Dictionary of the English Language* (1903)).

Although we substantially agree with the definition of rebellion set forth by the district court in *Newsom*, we emphasize that the critical analysis of a "rebellion" centers on the nature of the resistance to governmental authority. Political opposition is not rebellion. A protest does not become a rebellion merely because the protestors advocate for myriad legal or policy changes, are well organized, call for significant changes to the structure of the U.S. government, use civil disobedience as a form of protest, or exercise their Second Amendment right to carry firearms as the law currently allows. Nor does a protest become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest. Such conduct exceeds the scope of the First Amendment, of course, and law enforcement has apprehended the perpetrators accordingly. But because rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion.

Applying our tentative understanding of "rebellion" to the district court's factual findings, and even after affording great deference to the President's evaluation of the circumstances, we see insufficient evidence of a rebellion or danger of rebellion in Illinois. The spirited, sustained, and occasionally violent actions of demonstrators in protest of the federal government's immigration policies and actions, without more, does not give rise to a danger of rebellion against the government's authority. The administration thus has not demonstrated that it is likely to succeed on this issue.

We turn next to the meaning of § 12406(3)—"unable with the regular forces to execute the laws of the United States." The administration exhorts us to accept the Ninth Circuit's reading of this subsection. In *Newsom*, the Ninth Circuit interpreted "unable" to mean that the federal government was "significantly impeded," and "regular forces" to mean "federal officers." 141 F.4th at 1052. The district court in this case, by contrast, concluded that the definition of "unable" is "not having sufficient power or ability; being incapable." And it determined that "regular forces" means the soldiers and officers serving in the regular armed forces.

We need not fully resolve these thorny and complex issues of statutory interpretation now, because we conclude that the administration has not met its burden under either standard. Even applying great deference to the administration's view of the facts, under the facts as found by the district court, there is insufficient evidence that protest activity in Illinois has significantly impeded the ability of federal officers to execute federal immigration laws. Federal facilities, including the processing facility in Broadview, have remained open despite regular demonstrations against the administration's immigration policies. And though federal officers have encountered sporadic disruptions, they have been quickly contained by local, state, and federal authorities. At the same time, immigration arrests and deportations have proceeded apace in Illinois over the past year, and the administration has been proclaiming the success of its current efforts to enforce immigration laws in the Chicago area. The administration accordingly is also unlikely to succeed on this argument.

Both sides seem to agree that the Tenth Amendment question rises and falls with the statutory claim. The Tenth

Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. These reserved powers include "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S. 598, 617–18 (2000). Because there are constitutionally recognized grounds for the federalization of the National Guard, *see* U.S. Const., art. I, § 8, cl. 15, the success of the Tenth Amendment claim is tied to the success of plaintiffs' claim that the President's invocation of § 12406 was unlawful. And because, in our preliminary assessment, the federal government does not appear likely to succeed on its argument that it satisfied § 12406, it does not appear likely to succeed in showing the Tenth Amendment permits the deployment of the Guard.

## C

Having concluded that the administration has not shown a likelihood of success on the merits at this early stage, we evaluate the remaining stay factors, which we conclude also weigh against a stay of the district court's order with respect to deployment. We recognize, as the Ninth Circuit did, that the federal government has a strong interest in the protection of its agents and property. *Newsom*, 141 F.4th at 1054. But given the district court's well-supported view of the record, the federal government has been able to protect federal property and personnel without the National Guard's help. By contrast, the administration's likely violation of Illinois's Tenth Amendment rights by deploying Guard troops in the state over the state's objection "constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th

No. 25-2798 17

Cir. 1978). And the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant. The balance of harms thus weighs in plaintiffs' favor regarding the deployment of the Guard.

On the other hand, we conclude that the harm to plaintiffs of permitting Guard troops to remain temporarily under federal control, without deploying, as this case further progresses appears to be relatively minimal. (We acknowledge, however, that circumstances might arise that could increase plaintiffs' potential harm, including if Illinois needs its Guard members who have been commandeered by the federal government to assist with state matters.) Lastly, as the district court properly determined, the public has a significant interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods, except when absolutely necessary and justified by law.

**IV**

We reiterate that, because of the procedural posture of this appeal, our conclusions are preliminary and based on our review of the limited record before the district court. The issues presented are necessarily fact bound, and it is possible that events could transpire that satisfy one of § 12406's factual predicates. But even with the benefit of considerable deference to its judgments, the administration has not shown that is true today.

Because we conclude that the factors weigh against a stay of the deployment order pending appeal, IT IS ORDERED that the motion to stay pending appeal is GRANTED in part

18          No. 25-2798

and DENIED in part. We continue to STAY the district court's October 9, 2025, order only to the extent it enjoined the federalization of the National Guard within the state. The administration remains barred from deploying the National Guard of the United States within Illinois.