**Case No. 25-6268**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF OREGON, et al.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,
*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Oregon,*
*Case No. 3:25-cv-01756-IM • The Honorable Karin J. Immergut, District Judge*

## BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE* IN SUPPORT OF REHEARING EN BANC

Julia Spiegel
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

Darin Sands
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Suite 204
Portland, OR 97209
Telephone: (503) 734-2480

Carey R. Dunne
Kevin Trowel
Zack Goldberg
Martha Reiser
FREE AND FAIR
LITIGATION GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

Joseph T. Baio
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013
Telephone: (914) 523-2255

*Counsel for Amici Curiae*
*Bipartisan Former Governors*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................1

INTERESTS OF AMICI CURIAE ..........................................................5

ARGUMENT ..............................................................................7

  I.   Federalism is enshrined in the Constitution and entrusts the states—not the federal government—with general police powers. ...........................................................7

  II.  The National Guard plays a critical role in assisting governors in protecting the public. ...............................................9

  III. Only in the most exceptional circumstances has the National Guard been federalized or active-duty forces deployed in a state absent consultation with state authorities. .....................12

  IV. The Administration's interpretation of 10 U.S.C. § 12406 conflicts with this history and tradition of federal-state coordination. ................................................................14

  V.  The Administration's interpretation of 10 U.S.C. § 12406 threatens public safety. .................................................15

  VI. The courts play a critical role in protecting this balance of state-federal authority. ...........................................17

CONCLUSION ...........................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alden v. Maine*,
527 U.S. 706 (1999) ...........................................................................11

*Bond v. United States*,
572 U.S. 844 (2014) ...........................................................................2, 8

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ...........................................................................17

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ................................................................. 1, 8, 14

*Laird v. Tatum*,
408 U.S. 1 (1972) ...............................................................................18

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ............................................................17

*New York v. United States*,
505 U.S. 144 (1992) ................................................................. 1, 7, 17

*Oregon v. Trump*,
No. 3:25-cv-1756-IM, 2025 WL 2817646 (D. Or. Oct. 4, 2025) ........19

*Perpich v. Dep't of Def.*,
496 U.S. 334 (1990) ..........................................................................9, 14

*Printz v. United States*,
521 U.S. 898 (1997) ................................................................. 1, 7, 8

*Stark v. Wickard*,
321 U.S. 288 (1944) ...........................................................................17

*Trump v. Hawaii*,
585 U.S. 667 (2018) ...........................................................................18

*United States v. Lopez*,
514 U.S. 549 (1995) ...........................................................................8

*United States v. Morrison*,
529 U.S. 598 (2000) ...........................................................................8

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) ........................................................14

*Webster v. Doe*,
    486 U.S. 592 (1988) ........................................................18

**U.S. Constitutional Provisions:**

U.S. Const. amend. X................................................................7

**Statutes & Court Rules:**

8 U.S.C. § 1182(f) ...................................................................18

10 U.S.C. § 12301(b) ..............................................................19

10 U.S.C. § 12406..........................................................*passim*

Fed. R. App. P. 40(b)(2)(D).......................................................3

Md. Code Ann., State Gov't § 3-303(a)......................................9

Mont. Code Ann. § 10-3-305(1) .................................................9

N.Y. Mil. L. § 3 ........................................................................9

**Other Authorities:**

About the Guard | How We Began, National Guard Bureau .....................9

Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is
    Different From Its Deployment There in 1992*, Time Magazine
    (June 9, 2025) ........................................................12

Bill Chappell, *What Happened When Lyndon Johnson Federalized the
    National Guard,* NPR (June 9, 2025)................................13

The Federalist No. 51 (Alexander Hamilton) ...........................8

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their
    Mission in L.A.*, N.Y. Times (July 16, 2025) .......................16

Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil
    Authorities (Oct. 29, 2018).............................................11

Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*, National
    Guard Bureau (Sept. 13, 2021).........................................10

(5 of 25), Page 5 of 25          Case: 25-6268, 10/22/2025, DktEntry: 66.1, Page 5 of 25

Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989 (2020)..................................................................16

Tech. Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former Guard Chief Reflects on the Guard's "Finest Hour"*, National Guard Bureau (Aug. 29, 2013) ..........................................................................10

Elaine S. Povich, *Same Mission, Different Pay for National Guard*, Stateline (June 18, 2020) ..............................................................10

Paul J. Scheips, *The Role of Federal Military Force in Domestic Disorders, 1945–1992*, Army Hist. Series, CMH Pub. 30-20-1 (2012)...............13

Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents Called in the National Guard to Quell Domestic Unrest?*, Wash. Post (June 9, 2025) ..........................................................................12

U.S. Department of Defense, *Profile of the Military Community: 2023 Demographics* (Dec. 16, 2024) ............................................................9

U.S. Department of the Army, Civil Support Operations, Field Manual 3-28 (2010)........................................................9, 11, 15

## INTRODUCTION

Our constitutional order depends on the dispersion and careful balance of authority among the federal government and the states. The contours of that balance were established at the Founding and are embodied in the United States Constitution. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997). "In the tension between federal and state power lies the promise of liberty." *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991).

Amici curiae are acutely familiar with the tension between federal and state power that is at the core of our constitutional democracy. As a bipartisan group of former governors who collectively governed states—both large and small—through natural disasters, episodes of civil unrest, and public health emergencies, amici have substantial experience exercising command over their states' National Guard while managing the sensitive and often complex interplay between state and federal authority in times of heightened need or domestic crisis.

To be sure, the maintenance of this delicate balance has presented challenges throughout our nation's history. Where such challenges have arisen, federal courts have intervened to protect it. *See New York v. United States*, 505 U.S. 144, 155

1

(1992) ("At least as far back as *Martin v. Hunter's Lessee*, . . . the Court has resolved questions of 'great importance and delicacy' in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States."). Those interventions reflect the essential premise that, "[i]n our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). The broad reservoir of authority retained by the states includes what the courts have called "'police power.' The Federal Government, by contrast, has no such authority and can exercise only the powers granted to it" by the Constitution. *Id.* (internal quotations and citations omitted).

Throughout our history, and notwithstanding our nation's political, social, and geographic diversity, the federal government has rarely and only under the most extraordinary circumstances imposed military authority on the citizens of a state against the wishes of the state's executive. The structure of our federalist system, and the language of the relevant statutory provisions at issue in this case, impose legal constraints on the president's authority to take such extreme measures. Indeed, over the course of our nearly 250-year history, the president has attempted such military imposition only a handful of times, and only in times of significant exigency. Our political structure also incentivizes the federal and state governments to work together cooperatively to address issues of local and national

importance, including but not limited to civil unrest. Historically, state and federal authorities have negotiated—in public and in private—the balance of their respective authorities, and never until recent months, to amici's knowledge, have those negotiations resulted in the unilateral deployment of federal troops to address the kind of modest public protests occurring Portland.

Accordingly, this case presents issues of "exceptional importance" concerning our nation's federalist structure, the preservation of state sovereignty, the domestic use of military force for civilian law enforcement, and the judiciary's historic role in checking federal overreach. Fed. R. App. P. 40(b)(2)(D). In amici's experience, local law enforcement agencies are best equipped to respond to local protests, including those in which a minority of protestors have broken the law, while safeguarding the constitutional rights of others who wish to—and do—exercise those rights peacefully. If anything, the hasty federalization of the National Guard without consultation and cooperation from state authorities likely exacerbated tensions in Portland and thereby increased the risk to civilians and law enforcement officers alike.

Indeed, the upending of the normal federal-state balance has predictably created a range of practical harms. Not only was the decision to deploy federal forces undertaken without cooperation; the deployment itself is taking place without adequate coordination to ensure that local law enforcement and federal

forces are working safely and effectively together. History teaches that there is significant potential for confusion and error under these circumstances. In addition, National Guard members have now been pulled away from their regular state duties, which include responding to actual emergencies and natural disasters. Governors rely on Guard forces to perform such life-saving tasks on a daily basis; this diversion of state resources creates a real risk to the health and safety of Oregonians.

The decision to federalize and deploy the National Guard to Portland over the objection of Oregon's governor stands in stark contrast to our nation's history and tradition of federal-state cooperation. The Court need not identify the outer limit of the president's authority to federalize and deploy the National Guard under Title 10, United States Code, Section 12406 (or other provisions) to conclude that the present deployment of military resources, based on an assertion of nearly unfettered federal authority, is unlawful. The president's assertion of authority to deploy military troops on domestic soil based on his unreviewable discretion, and without the cooperation and coordination of state authorities, threatens to upset the delicate balance of state and federal power that underlies our constitutional order.

For these reasons, amici respectfully submit that the Court grant rehearing en banc.

## INTERESTS OF AMICI CURIAE

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and civilian commanders of their respective National Guards.[1]  In that role, they exercised the police powers reserved to the states to ensure the public's health, safety, and welfare—often in coordination with federal authorities across party lines.  They bring firsthand experience activating the National Guard in response to natural disasters, public health emergencies, and civil unrest.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Appellees' request for relief in this exceptionally important case.  As described herein, federal authorities' decision to federalize the National Guard without consultation with Oregon's governor disturbs the constitutional balance of state and federal authority, weakens state executives' authority to maintain intrastate law and order, deprives states of vital emergency response tools, and breaks with a long tradition of cooperation between the federal government and the states on issues of public safety.  The former governor amici in support of this brief are:

---

[1] No party or party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparation or submission of this brief.  All parties consented to the filing of this amicus brief.

- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019.

- Steve Bullock, Governor of Montana from 2013 to 2021.

- Arne Carlson, Governor of Minnesota from 1991 to 1999.

- Mark Dayton, Governor of Minnesota from 2011 to 2019.

- Jim Doyle, Governor of Wisconsin from 2003 to 2011.

- Parris Glendening, Governor of Maryland from 1995 to 2003.

- Jennifer Granholm, Governor of Michigan from 2003 to 2011.

- Bill Graves, Governor of Kansas from 1995 to 2003.

- Christine Gregoire, Governor of Washington from 2005 to 2013.

- Jay Inslee, Governor of Washington from 2013 to 2025.

- Tony Knowles, Governor of Alaska from 1994 to 2002.

- Gary Locke, Governor of Washington from 1997 to 2005.

- Terry McAuliffe, Governor of Virginia from 2014 to 2018.

- Janet Napolitano, Governor of Arizona from 2003 to 2009.

- Martin O'Malley, Governor of Maryland from 2007 to 2015.

- Deval Patrick, Governor of Massachusetts from 2007 to 2015.

- Marc Racicot, Governor of Montana from 1993 to 2001.

- Bill Ritter Jr., Governor of Colorado from 2007 to 2011.

- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.

- Steve Sisolak, Governor of Nevada from 2019 to 2023.

- Eliot Spitzer, Governor of New York from 2007 to 2008.

- Ted Strickland, Governor of Ohio from 2007 to 2011.

- Tom Vilsack, Governor of Iowa from 1999 to 2007.

- Bill Weld, Governor of Massachusetts from 1991 to 1997.

- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.

- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

## ARGUMENT

### I.    Federalism is enshrined in the Constitution and entrusts the states—not the federal government—with general police powers.

"It is incontestible that the Constitution established a system of 'dual sovereignty,'" in which the states "retained 'a residuary and inviolable sovereignty.'" *Printz*, 521 U.S. at 918–19 (quoting The Federalist No. 39 (James Madison)).  This division of authority is evidenced throughout the Constitution, which grants Congress only "discrete, enumerated" powers.  *Printz*, 521 U.S. at 919.  The Tenth Amendment makes that division explicit by reserving all other powers "to the States respectively, or to the people."  *Id.* at 919 (quoting U.S. Const. amend. X); *see also New York*, 505 U.S. at 156 ("[I]f a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.").

7

This federalist structure safeguards liberty.  "[A] healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front."  *Gregory*, 501 U.S. at 458; *see also* The Federalist No. 51 (Alexander Hamilton) ("a double security arises to the rights of the people") (quoted in *Printz*, 521 U.S. at 922).

Within this framework, states retain broad "police powers" to protect public health and safety—authority the federal government lacks.  *See Bond*, 572 U.S. at 854 (noting that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power,'" but the "Federal Government, by contrast, has no such authority"); *United States v. Lopez*, 514 U.S. 549, 584–85 (1995) (Thomas, J., concurring) ("The Federal Government has nothing approaching a police power.").  Although the federal government may override this authority with a clear directive from Congress, the presumption remains that states—not the federal government—bear primary responsibility for maintaining civil order within their borders.  *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

## II.    The National Guard plays a critical role in assisting governors in protecting the public.

State National Guard units have safeguarded our communities since before the nation's founding.[2]  In the early 20th century, the National Guard was transformed and professionalized through various acts of Congress.  *See generally Perpich v. Dep't of Def.*, 496 U.S. 334, 342–44 (1990).  Today, the Army and Air National Guards comprise some 430,000 members across all states and territories.[3]

Over this long history, the National Guard has played a critical role in ensuring public safety under the leadership of governors, in their capacities as commanders-in-chief, and in coordination with federal authorities.[4]  For example,

---

[2] About the Guard | How We Began, National Guard Bureau, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ (last visited October 22, 2025).

[3] *See* U.S. Department of Defense, *Profile of the Military Community: 2023 Demographics* 86 (Dec. 16, 2024), https://www.militaryonesource.mil/data-research-and-statistics/military-community-demographics/; *see also* U.S. Department of the Army, Civil Support Operations, Field Manual 3-28 at 1–6 (2010) ("Army Field Manual") ("Each state, each territory, and the District of Columbia have National Guard forces, for a total of 54 state and territorial Army National Guard elements.").

[4] *See, e.g.*, N.Y. Mil. L. § 3 ("The governor of the state shall be the commander-in-chief of the militia of the state."); Md. Code Ann., State Gov't § 3-303(a) ("The Governor is the commander-in-chief of the land and naval militia of the State, except for any part of the militia that is in the active military service of the United States."); Mont. Code Ann. § 10-3-305(1) ("During an incident and during a state of emergency or disaster, the governor is commander-in-chief of the militia and of all other forces available for incident, emergency, or disaster duty."); *see also* Army Field Manual at viii ("The governor of each respective state has overall command

National Guard members were deployed in response to the September 11 terrorist attacks, including Governor Glendening's Maryland Air National Guardsmen who quickly joined first responders on the ground at the Pentagon.[5]  In 2005, more than 50,000 National Guard troops—including units deployed by amici Governors Vilsack, Sebelius, Gregoire, Granholm, and Doyle—responded to the Hurricane Katrina disaster in Florida, Louisiana, and Mississippi, following emergency declarations by the governors of those affected states.[6]  And in 2020, more than 84,000 National Guard troops were deployed domestically to assist with civil unrest and the COVID-19 pandemic, again, under the direction of governors.[7]

In amici's experience, state officials calling upon state resources are best equipped to lead the response to all but the most extraordinary disasters and emergencies.  State and local leaders, directing local resources, are best positioned

---

responsibility for the National Guard in that state and is their Commander in Chief.").

[5] *See* Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*, National Guard Bureau (Sept. 13, 2021), https://www.nationalguard.mil/News/Article-View/Article/2772083/maryland-national-guard-remembers-911/.

[6] *See* Tech. Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former Guard Chief Reflects on the Guard's "Finest Hour"*, National Guard Bureau (August 29, 2013), https://www.nationalguard.mil/News/Article-View/Article/574826/hurricane-katrina-eight-years-later-former-guard-chief-reflects-on-the-guards-f/.

[7] Elaine S. Povich, *Same Mission, Different Pay for National Guard*, Stateline (June 18, 2020), https://stateline.org/2020/06/18/same-mission-different-pay-for-national-guard/.

to know where and what kind of help is needed in an emergency, and how to most efficiently provide it to the affected population. Military guidance reflects this consensus: incidents should be "managed at the lowest level possible,"[8] and "[t]he primary responsibility for responding to domestic disasters and emergencies . . . rests with the lowest level of government able to manage the response."[9] In amici's collective experience, incidents requiring a federal military response are nearly unprecedented—state and federal officials have worked together in good faith to avoid the use of federal forces in situations normally handled by state and local law enforcement.

Indeed, in amici's experience, such cooperation is essential, and successful federal-state partnership arises from a deeper principle that underlies the very structure of our system of government: states retain not only sovereign authority but also "the dignity and essential attributes inhering in that status." *Alden v. Maine*, 527 U.S. 706, 714 (1999). Successful emergency response depends on respect for state sovereignty, communication, and shared accountability—principles historically embraced by both state and federal officials.

---

[8] Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil Authorities at II-11 (Oct. 29, 2018) ("Joint Chiefs Publication").

[9] Army Field Manual at 3-2.

**III.    Only in the most exceptional circumstances has the National Guard been federalized or active-duty forces deployed in a state absent consultation with state authorities.**

Presidents have historically recognized the importance of consulting with state officials before federalizing National Guard units—a reflection of the states' primary responsibility for maintaining civil order.  In rare cases, that consultation has led past administrations and governors, working together, to federalize Guard forces.  In 1992, for example, President George H.W. Bush responded to a request from California Governor Pete Wilson and Los Angeles Mayor Tom Bradley by federalizing the California National Guard and deploying active-duty troops during the Los Angeles riots.[10]  In other instances, federal consultation with state authorities has led the president to reach the opposite conclusion, such as in 2006 when Louisiana Governor Kathleen Blanco retained control over the Guard and opposed federalization in response to Hurricane Katrina.[11]

Federalization without gubernatorial consent has occurred only in exceptional circumstances where, for example, governors openly defied federal

---

[10] Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992*, Time Magazine (June 9, 2025), https://time.com/7292493/trump-national-guard-la-1992-riots/.

[11] Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents Called in the National Guard to Quell Domestic Unrest?*, Wash. Post (June 9, 2025), https://www.washingtonpost.com/history/2025/06/09/national-guard-president-deployments/.

law.  For instance, in 1957, President Eisenhower federalized the Arkansas
National Guard and deployed active-duty troops only after Arkansas Governor
Orval Faubus openly refused to comply with a federal court order to integrate
Little Rock Central High School.[12]  Similarly, in 1965, President Johnson
federalized Alabama's Guard, but only after Governor George Wallace refused to
follow a court order requiring that state officials protect civil rights marchers in
Selma.[13]  In neither instance, it should be noted, did the president rely on 10 U.S.C.
§ 12406 to federalize the state's National Guard.

      Oregon presents no such exceptional circumstances. Oregon's governor and
state authorities have not defied any federal law and instead have actively worked
to maintain order at the modest protests in Portland, while also allowing protestors
to safely exercise their free speech rights.  Yet unlike past presidents who sought
consultation with state officials, President Trump federalized Oregon's Guard
without consent or coordination with Oregon's governor.  That decision breaks

---

[12] Bill Chappell, *What Happened When Lyndon Johnson Federalized the National Guard,* NPR (June 9, 2025), https://www.npr.org/2025/06/09/nx-s1-5428352/johnson-national-guard-history-eisenhower-alabama-civil-rights-trump-newsom.

[13] Paul J. Scheips, *The Role of Federal Military Force in Domestic Disorders, 1945–1992*, Army Hist. Series, CMH Pub. 30-20-1, at 162–63 (2012), https://www.govinfo.gov/content/pkg/GOVPUB-D114-PURL-gpo82975/pdf/GOVPUB-D114-PURL-gpo82975.pdf.

sharply with longstanding constitutional practice and undermines the spirit of cooperative federalism.

## IV.  The administration's interpretation of 10 U.S.C. § 12406 conflicts with this history and tradition of federal-state coordination.

The administration's reading of 10 U.S.C. § 12406 departs from the long tradition of federal-state cooperation in managing the National Guard.  The Guard's dual-control structure reflects core federalist principles.  *See Perpich*, 496 U.S. at 345 (explaining dual-role structure of National Guard).  That structure depends on good-faith collaboration—especially during domestic deployments.

To understand Section 12406 as authorizing the president to override a governor's judgment in the absence of the most extraordinary circumstances is to distort the constitutional balance among the federal government and the states.  It is implausible that Congress intended to grant the president sweeping authority to federalize the Guard without geographic or temporal limits even when a state is maintaining order through civilian means.  *See, e.g.*, *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787 (2000) (noting "the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute") (internal quotations omitted); *Gregory*, 501 U.S. at 461 ("[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not

14

readily interfere.").  Section 12406 provides *conditional* authority—triggered only by rebellion, invasion, or the inability to enforce federal law using regular forces—that limits federalization through a fact-based inquiry, and it instructs that federal authorities work with, rather than around, "the governors of the States."  *See* 10 U.S.C. § 12406.

The administration's expansive view of Section 12406 carries dangerous consequences.  In amici's view, it poses a serious and unprecedented threat to the constitutional balance, raising exceptionally important questions about unchecked federal military intervention on domestic soil.

## V.    The administration's interpretation of 10 U.S.C. § 12406 threatens public safety.

The administration's understanding of Section 12406 not only undermines state sovereignty but also deprives governors of a critical public safety tool.  If federalization of the National Guard is unreviewable, a president motivated by ill will or competing policy priorities could divert Guard resources away from critical state needs, including natural disasters or public health crises.

Uncoordinated deployments of federalized Guard members—often untrained in civilian law enforcement—exacerbate confusion on the ground, strain resources, and undermine public confidence in both state and federal law enforcement.  Poorly planned call-ups also reduce troop morale and readiness.  *See* Army Field Manual at B-2 ("The pace of work in a disaster response and other incidents is

15

demanding. Leaders monitor their Soldiers to avoid physical exhaustion. Rotating personnel between more demanding tasks and less demanding tasks mitigates the accumulation of fatigue. Leaders need to establish and enforce viable sleep plans.").[14]

In short, when the federal government federalizes and deploys the National Guard in a state without consent and coordination with state executives, it risks creating precisely the kind of constitutional tension and practical harms that the dual-role structure of the Guard was designed to prevent. *See* Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989, 996 (2020) (asserting that separation of the professional military and the state-federal militia system was intended to "limit federal military power and to provide checks against the use of illegitimate force by private parties, state actors, and federal officials"). The Guard exists to serve as a flexible, state-controlled force that may augment federal capacity *in coordination with*—not *in defiance of*—state and local leadership. Disregarding that balance threatens constitutional norms and impairs emergency response nationwide.

---

[14] Interviews with Guard members recently deployed in Los Angeles without consultation with California's governor indicate "low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come." Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

**VI.   The courts play a critical role in protecting this balance of federal-state authority.**

The president claims unreviewable authority under 10 U.S.C. § 12406 to federalize the Oregon National Guard.  That assertion conflicts with the Constitution, the judiciary's role in upholding our federalist structure, and long-standing principles of state sovereignty.  Judicial review is especially critical where one sovereign encroaches on another's authority to police modest, domestic unrest.

 "It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), including "determining the limits of statutory grants of authority."  *Stark v. Wickard*, 321 U.S. 288, 310 (1944).  Courts routinely resolve questions "of great importance and delicacy in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States."  *New York*, 505 U.S. at 155 (internal quotation omitted).

Federal courts also interpret statutes with sensitivity to state sovereignty. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (warning against broad readings of federal statutes that intrude into areas traditionally regulated by the states). Section 12406 contains no language suggesting that Congress committed to the president the unfettered discretion to displace state authority over the Guard without any judicial oversight.  Rather, the statute provides conditional authority tied to defined emergencies—rebellion, invasion, or inability to execute federal law

17

with regular forces—and contains no grant of unchecked discretion.  *See Laird v. Tatum*, 408 U.S. 1, 15–16 (1972) ("Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury.").  Nothing in Section 12406 purports to grant the president unreviewable authority to deploy the Guard anywhere, anytime, based on whatever facts that the president, in his sole discretion, deems sufficient, and without consultation with the state's chief executive.  Yet that is precisely the type of unchecked power the president seeks to establish here.

When Congress intends to grant the president (or others) unreviewable decision-making authority, it does so with unmistakable language.  In *Trump v. Hawaii*, for example, the Court held that 8 U.S.C. § 1182(f) "exudes deference to the President in every clause" and "entrusts to the President the decisions whether and when" to exercise the authority granted by the statute.  585 U.S. 667, 684 (2018).  The Court reached a similar conclusion in *Webster v. Doe*, where the statute under review "exude[d] deference to the Director, and . . . foreclose[d] the application of any meaningful judicial standard of review."  486 U.S. 592, 600 (1988).

Section 12406 contains no such sweeping language.  And unlike in the immigration or foreign policy context—where executive power is at its apex—the

18

Constitution contemplates a shared structure of authority over state militias. *See,*
*e.g.*, 10 U.S.C. § 12301(b) (requiring gubernatorial consent to activate National
Guard in certain circumstances). It is precisely where presidential authority is non-
plenary and constrained by statutory predicates that judicial oversight becomes
necessary to enforce constitutional and statutory boundaries. Ultimately, whatever
deference the president may be owed under Section 12406, it does not permit him
to "ignor[e] the facts on the ground" or make a determination "untethered" from
reality. *Oregon v. Trump*, No. 3:25-cv-1756-IM, 2025 WL 2817646, at *11 (D. Or.
Oct. 4, 2025).

This Court need not define the outer limits of presidential authority to
conclude that the action here—federalizing Oregon's Guard without clear statutory
justification or state consent—is subject to review and incompatible with federalist
principles.

## CONCLUSION

For the reasons set forth above, amici curiae respectfully request that the
Court grant rehearing en banc.

DATED: October 22, 2025

Julia Spiegel
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Darin Sands
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Suite 204
Portland, OR 97209

/s/ Carey R. Dunne
Carey R. Dunne
  *Counsel of Record*
Kevin Trowel
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

Joseph T. Baio
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013


*Counsel for Bipartisan Former Governors*