No. 25-6268

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF OREGON, et al.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon

## DEFENDANTS-APPELLANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO OCTOBER 20, 2025 ORDER

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-7203*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT ....................................................................................................6

    A.    Legal Background ..............................................................6

    B.    Factual Background ...........................................................8

    C.    Prior Proceedings...........................................................14

ARGUMENT ..................................................................................................19

CONCLUSION ...............................................................................................38

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Atonio v. Wards Cove Packing Co.*,
   810 F.2d 1477 (9th Cir. 1987) ........................................................ 19

*Bufkin v. Collins*,
   604 U.S. 369 (2025) .................................................................... 25

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ....................................................................... 23

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .................................................................... 23

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ........................................................ 37

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) .................................................................... 32

*Illinois v. Trump*, ---- F.4th ---,
   No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025) ........................... 35

*Luther v. Borden*,
   48 U.S. (7 How.) 1 (1849) ............................................................. 21

*Martin v. Mott*,
   25 U.S. (12 Wheat.) 19 (1827) ............................................... 4, 20, 21

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) ................................ 3, 14, 15, 17, 18, 21, 23, 28, 31, 33

*NRC v. Texas*,
   605 U.S. 665 (2025) .................................................................... 23

*Oregon v. Trump*, --- F.4th ----,
   No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) .... 4, 15, 16, 17, 18, 19, 26, 26-27, 28, 29, 30, 35, 38

*Perpich v. Department of Def.*,
   496 U.S. 334 (1990) .................................................................. 6, 7

*Sterling v. Constantin*,
   287 U.S. 378 (1932).................................................................. 21, 22

*United States v. Comstock*,
    560 U.S. 126 (2010) ......................................................................... 32

*United States v. Hatch*,
    722 F.3d 1193 (10th Cir. 2013) ...................................................... 32

## U.S. Constitution:

U.S. Const. art. I, § 8, cl. 15 ........................................................ 6, 20, 33

U.S. Const. art. II, § 2, cl. 1 ................................................................ 7

## Statutes:

Administrative Procedure Act (APA),
    5 U.S.C. § 701 *et seq.* .................................................................. 23

10 U.S.C. § 10101 ............................................................................... 6

10 U.S.C. § 10106 ............................................................................... 7

10 U.S.C. § 12406 ..................................................................... 1, 7, 14, 33

10 U.S.C. § 12406(2) ......................................................................... 25

10 U.S.C. § 12406(2)-(3) ................................................................... 20

10 U.S.C. § 12406(3) ..................................................................... 14, 24

Or. Rev. Stat. § 396.160 ................................................................... 12

## Rules:

Fed. R. App. P. 40(a) ....................................................................... 19

Fed. R. App. P. 40(b)(2)(A) ............................................................. 35

Fed. R. App. P. 40(b)(2)(B) ............................................................. 34

**Other Authorities:**

DHS, *Bounties Originating from Mexico Offered to Shoot ICE and CBP Officers in Chicago* (Oct. 14, 2025), https://perma.cc/CMX2-J9DC ..................................................................... 32

DHS, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://perma.cc/SC58-XM25 ................................................ 8

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018) .......................................................................... 7, 25

@realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.), https://truthsocial.com/@realDonaldTrump/posts/ 115276694936263266 .................................................................................... 12

@realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.), https://truthsocial.com/@realDonaldTrump/posts/ 115300118756896774 ............................................................................... 13, 24

## INTRODUCTION

This case is a challenge by Oregon and the City of Portland to the President's lawful order federalizing a very small percentage of the Oregon National Guard to protect federal personnel and property in Portland. Under 10 U.S.C. § 12406, the President may federalize the Guard when he "is unable with the regular forces to execute the laws of the United States" or "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." Both conditions apply in Portland. For more than four months, the Immigration and Customs Enforcement (ICE) and Removal Operations field office in Portland has been targeted by violence and threatened violence. Agitators have assaulted federal officers with rocks, bricks, pepper spray, and incendiary devices. They have damaged federal property, including by breaking office windows, security cameras, and card readers permitting entry to the building. They have spray-painted violent threats, and blockaded the building's vehicle entrance. They have trapped officers in their cars, and followed their vehicles when they leave. And they have threatened federal officers at the facility (including erecting a guillotine outside), menaced officers at their homes, doxed them online, and threatened to kill them on social media.

In response to this unrest, local authorities have been unhelpful and at times hostile. Last month, after the field office's windows were boarded up to prevent property damage and protect personnel, the City of Portland demanded the boards' removal with a Notice of Zoning Violation. Portland's police department has also been

largely unresponsive to the continuing and often violent unrest. Portland's Police Chief has spoken about the need to avoid any actions that might even be "perceived" as supportive of immigration agents. And the record is replete with evidence—including emails from Portland Police officials reporting that no officers are available—of the Portland Police failing to provide assistance when federal officials have requested it.

As a result of these circumstances, ICE was forced to close the Portland field office for three weeks. Federal officials were able to contain the violence only by reassigning a large contingent of Federal Protective Service (FPS) officers and other federal officers for round-the-clock protection—an intensive deployment that cannot be sustained indefinitely. That reassignment diverts ICE officers from enforcing the immigration laws as well as ties down the government's limited protective resources, preventing them from being deployed elsewhere to help protect federal personnel and property from similar violent opposition to law enforcement occurring in other areas.

On September 26, the Department of Homeland Security (DHS) accordingly sought "immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon," "including those directly supporting [ICE] and" FPS, which "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." The President agreed to grant the request. DoW asked Oregon Governor Tina Kotek to mobilize 200 members of the Oregon National Guard under Title 32 of the U.S. Code. In that scenario, the Guardsmen would have been federally funded but

under the command and control of Governor Kotek. But Governor Kotek refused. The Secretary of War thus directed the mobilization in a federalized Title 10 status. The deployment is highly limited, encompassing only about 200 Guardsmen. And the Guardsmen are limited to protection of federal personnel and property.

In a recent similar case involving mob violence in Los Angeles, the President federalized several thousand Guardsmen to provide protection in that area. A district court in the Northern District of California enjoined the Los Angeles deployment but this Court stayed the injunction, holding that the Executive Branch was likely to succeed in its argument "that the President lawfully exercised his statutory authority under § 12406(3), which authorizes federalization of the National Guard when 'the President is unable with the regular forces to execute the laws of the United States.'" *Newsom v. Trump*, 141 F.4th 1032, 1040 (9th Cir. 2025) (per curiam). The *Newsom* panel held that federal courts must "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists," *id.* at 1048, and limit review of the determination to assessing whether "it reflects a colorable assessment of the facts and law," *id.* at 1051. The Court accordingly stayed the injunction against that federalization and deployment—which was approximately twenty times larger than the federalization and deployment here, while also including several hundred Marines.

The district court in this case nonetheless issued an order countermanding the President's decision to call forth the National Guard to protect federal officers in Portland from violent attacks and to protect federal property from further damage. A

3

panel of this Court granted a stay pending appeal. *See Oregon v. Trump*, --- F.4th ----, No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) (per curiam).

The panel correctly granted a stay and its decision does not warrant further review. The extensive violence and threats of violence in Portland, which local law-enforcement officials have been unwilling or unable to control, impede the ability of ICE and other federal officials to enforce federal law and constitute a rebellion against federal authority. Although the violence has somewhat abated in the past month, that is largely because of an intensive deployment of federal protective and other forces, which has become unsustainable.

In concluding that Section 12406's conditions were not satisfied, the district court committed numerous errors. Initially, the court impermissibly second-guessed the Commander in Chief's military judgments—something district courts lack the authority and competence to do. Nearly 200 years ago, the Supreme Court made clear that these judgment calls are for the President to make—not a Governor, and certainly not a federal court. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). In any event, the President here had ample and certainly "colorable" grounds to determine that regular forces were "unable" to sufficiently protect federal personnel and property and that the conditions in Portland at least rose to the level of a "danger" of rebellion. In concluding otherwise, the district court wrongly downplayed the regular, often violent protests, and it arbitrarily refused to consider events in Portland that had occurred just a few weeks earlier. And as to rebellion or "danger" of a rebellion, the district court adopted an

implausibly narrow definition of that term—limited to violence directed at the overthrow of the government as a whole, among other requirements—that is contrary to the context in which Section 12406 was enacted and that would exclude (among other historical examples) the Whiskey Rebellion.

Even putting all this aside, en banc review of the panel's decision is not warranted. It is an interlocutory stay decision that largely applies the legal standard enunciated in *Newsom* and will not bind the merits panel. The dispute between the majority and dissent was almost entirely fact-bound. And en banc review is particularly unwarranted because the government has sought a stay from the Supreme Court of a different injunction preventing deployment of federalized Guardsmen in Illinois, and briefing on that stay application concluded yesterday.

Nor do the facts warrant the extraordinary step of taking a stay decision en banc. Plaintiffs provided no evidence of irreparable harm warranting an injunction. Oregon's claims are fundamentally statutory, not constitutional, and there is no meaningful injury to its sovereignty. The Guard will only be protecting federal property and personnel, and certainly will not be usurping any state prerogative. The district court also accepted Oregon's argument that diversion of federalized Guardsmen from their state responsibilities irreparably harmed the State, but this contention, in addition to being entirely conclusory, is implausible given that the federalization involves approximately three percent of the Oregon National Guard, for a limited period. Finally, although the district court contended that the State would be irreparably harmed in the form of

protests directed at the Guard's presence, the court's predictions are unfounded and belied by the recent experience in Los Angeles. In any event, this sort of "rioters' veto" cannot be a basis to enjoin the President's lawful exercise of his constitutional and statutory authority to protect federal personnel and property. And even if Oregon's claimed injuries were assumed to be sufficient irreparable harm to warrant an injunction—and they are not—it would not follow that the en banc court's intervention is warranted even to prevent this limited deployment while the appeal is briefed and decided on an expedited basis. The Court should decline to disturb the panel's stay decision and allow the appeal to proceed in the ordinary course.

## STATEMENT

### A.    Legal Background

**1.** The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101.

6

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345. Once ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *id.* at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.** Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here.

Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 8 (2018) (CRS Report). Today, in its entirety, Section 12406 provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

### B. Factual Background

**1.** Throughout the summer, ICE has seen a sharp and violent increase in protests and attempts to impede its duties of enforcing the Nation's immigration laws. *See* A83.[1]

In early June, violent mobs in Los Angeles surrounded and damaged facilities used by DHS for immigration enforcement and attacked federal officers with rocks, commercial-grade fireworks, concrete chunks, and other makeshift weapons, trapping one federal officer in her vehicle and shattering the wrist of another. In Los Angeles, violent mobs attacked federal officers with concrete chunks, commercial-grade fireworks, and rocks and used dumpsters as battering rams to breach federal buildings. Last month, a man opened fire on an ICE field office in Dallas, killing two detainees and injuring another. DHS, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://perma.cc/SC58-XM25. The shooter's shell casings bore anti-ICE messages. *Id.*

ICE's facility located in downtown Portland, known as the Lindquist Federal Building, has also experienced significant unrest targeting both the facility itself and those who work in it. A82.

---

[1] Citations to "A" are to the addendum accompanying the federal government's stay motion.

Officers have feared for their safety. In one of the most significant incidents, agitators marched on the Portland ICE Office, lobbing rocks and sticks at federal personnel, and one protestor even wielded a firearm. A82-83. At the same time, they launched M80 fireworks and mortars at FPS officers. A82-83. To ensure their safety, FPS officers were forced to barricade themselves inside the ICE facility. A82-83. Those officers were able to escape only after special tactical units were deployed, making use of armored vehicles. A82-83. Several officers suffered injuries during this incident of mob violence. A82-83.

This incident is far from isolated. Officers have been bitten, kicked, shot with paintball guns, threatened with a machete and knife, and assaulted with potentially blinding lasers. A83; A66-67. Protestors have assembled a mock guillotine in front of the Portland ICE office and have directly threatened officers' lives. A71-72. Officers' personally identifiable information has been gathered and publicly released—a tactic called "doxing"—often with an accompanying death threat. A83 & n.1. And it has become commonplace for officers to be followed after leaving work at the Portland ICE Office. A83. Officers are also regularly trapped in their cars when entering and leaving federal property. A84. On multiple occasions, FPS has had to use pepper spray to disperse crowds, including at least one crowd that was holding a car hostage. A84.

Federal property is also under attack. Protestors repeatedly tried to burn down the Portland ICE Office, endangering federal property, personnel, and the general public. A67-68. In one incident, a protester lit a flare and set fire to materials piled

against the office. A67-68. The mob then piled on additional tinder, attempting to stoke the flames. A67-68. In another incident, protestors burned the American flag on the ICE Office's driveway and lit an incendiary device next to that building's guard shack, again threatening to start a fire that would destroy federal property and endanger lives. A67-68. Separately, protestors have thrown rocks at the building and have damaged the main gate, proximity card readers, and security cameras in an attempt to breach the facility, causing significant security risks. A68-69; A82-83.

Damage to the card readers has rendered access to the building significantly more difficult: employees must now call ahead to be individually admitted. A68-69. Protestors have also poured motor oil over the building entrance, creating both a fire risk and a direct threat to human safety. A73. As a result of damage and threats to the building, DHS was required to close the Portland ICE facility for more than three weeks, and even now that the facility has reopened, it must be boarded up to prevent further damage. A70.

FPS, which is charged with protecting the Lindquist Building, is stretched to the point of collapse. The sustained violence and security risks have required FPS to provide 24/7 protection for the building, a task it is simply not resourced to accomplish. A86. To date, 115 FPS officers have deployed to Portland in order to maintain this operational tempo. A86. DHS has been forced to reassign members of Homeland Security Investigations (HSI) Portland's Special Response Team (SRT) to support FPS,

significantly impeding HSI's ability to accomplish the missions with which SRT is tasked. A76-77; A85.

And while FPS has repeatedly attempted to contact the Portland Police Bureau (PPB) for assistance, the PPB has often failed to respond to calls for assistance, and even when they have responded, their response has been delayed. A84-85.

These delays and failures to respond exacerbate tensions and leave FPS personnel and civilians in vulnerable positions. A84-85. In fact, instead of assisting in the protection of the Lindquist Building, plaintiff City of Portland issued a Notice of Zoning Violation on September 18, 2025, requiring DHS to remove the protective boarding over its windows, exposing the building to further risk of damage and incursion. A78-79.

Plaintiffs' own declarations and accompanying exhibits show the critical situation in Portland on the eve of the President's decision to federalize the Oregon National Guard. Throughout September 2025, ICE officials and property have been the subject of regular, often-violent protests. *See* A92-104. Regularly, protesters interfere with cars seeking to enter or exit federal property, and within the last few weeks, several protesters have been arrested. *E.g.*, A95-97; A103-04. During one protest, PPB concluded that it "would not be able to address [a] call" for assistance "with the resources [it] [had]." A104.

**2.** Based on the ongoing violence, harassment, and threats targeting the ICE facility in Portland, on September 26, DHS transmitted a memorandum to DoW

requesting "immediate and sustained assistance . . . in order to safeguard federal personnel, facilities, and operations in the State of Oregon." A52. The memorandum explained that "Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A52. Based on the need to "ensure the continued protection of federal facilities in Oregon," DHS requested 200 DoW personnel to "direct[ly] support . . . federal facility protection, access control, and crowd control measures." A52-53.

On the morning of September 27, the President cited the DHS request in directing the Secretary of War to coordinate the deployment of forces to Portland to protect ICE personnel and facilities. @realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266. Pursuant to that direction, DoW first contacted the Oregon Adjutant General, who serves as Chief of Staff to the Governor of Oregon, Director of the Oregon Military Department, and Commander of the Oregon National Guard, to see if Oregon would assist in supplying National Guard members in a non-federalized status. *See* A47; Or. Rev. Stat. § 396.160. The Oregon Adjutant General rejected that request, informing DoW that Oregon was unwilling to lend its voluntary support. A48.

The President accordingly judged that the conditions in Portland satisfied the requirements of Section 12406 and federalized Oregon National Guard members. The

President explained: "As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem." @realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (Oct. 1 Truth). "Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon." *Id.* "ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law." *Id.*; *see also* Stay Reply Supplemental Addendum at 4 (President reiterating, in a memorandum related to federalization of the Illinois National Guard, that he "directed the Secretary of War to mobilize the National Guard due to ongoing violence and interference with Federal law enforcement in Oregon").

**3.** Those conclusions were consistent with assessments the President made earlier in the summer when federalizing National Guard members to temporarily protect ICE and other federal officials from the mob violence in Los Angeles. Specifically, in a June 7 memorandum, the President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law and that "violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." A61. "To the extent that protests or acts of violence directly inhibit the execution of the laws," the President explained,

13

"they constitute a form of rebellion against the authority of the Government of the United States." A61.

In a published opinion, a unanimous panel of this Court stayed a district court order enjoining that Los Angeles deployment, concluding that the President likely acted lawfully in invoking Section 12406. *See Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam). The panel there concluded that the President "had a colorable basis for invoking § 12406(3)," *id.* at 1052, which authorizes the President to call forth the National Guard when he is "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3).

**4.** On September 28, Secretary of War Pete Hegseth issued a memorandum to the Adjutant General and the Governor of Oregon mobilizing 200 members of the Oregon National Guard for sixty days. A48.

### C. Prior Proceedings

Plaintiffs, the State of Oregon and the City of Portland, filed suit alleging that defendants violated 10 U.S.C. § 12406, the Posse Comitatus Act, the Administrative Procedure Act (APA), and the Constitution. A1-41. Plaintiffs sought a temporary restraining order, which the district court granted after full briefing and a hearing. A105-35. The court concluded that the federalization order violates Section 12406 and the Tenth Amendment and "enjoined" defendants from "implementing [their] September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." A136. The district court denied

14

defendants' request to stay the injunction. A137. On October 15, the district court extended the effective period of the order by 14 days, to November 1. Dist. Ct. Dkt. No. 85

On October 20, following briefing and oral argument, the panel granted a stay pending appeal. The panel concluded that it had appellate jurisdiction, holding that the putative temporary restraining order—entered following adversarial briefing and a hearing, strongly contested, and since extended—"has the practical effect of a preliminary injunction." *Oregon v. Trump*, No. 25-6268, --- F.4th ----, 2025 WL 2951371, at *2 (9th Cir. Oct. 20, 2025) (per curiam) (discussing *Newsom*, 141 F.4th at 1044).

The per curiam opinion, joined by Judges Nelson and Bade, read *Newsom* as precluding the federal government's argument that the President's federalization decision is not subject to judicial review at all. 2025 WL 2951371, at *8. But like the Court in *Newsom*, the panel held that Defendants were likely to prevail on the merits. In a painstakingly thorough opinion, the majority carefully reviewed the record—including violence and threats of violence at and near the Portland field office from June to September, as well as the responses from federal and local officials—and concluded that, under the deferential standard set forth in *Newsom*, Defendants are likely to prevail in their argument that the President lawfully exercised his discretion under Section 12406(3). *Id.* at *2-7, *10-13.

Among other things, the per curiam opinion reasoned that the district court erred in applying the "highly deferential standard" set out in *Newsom* for determining whether

the President's judgment "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" 2025 WL 2951371, at *9 (quotation omitted). Specifically, the district court erred in "discount[ing] the violent and disruptive events that occurred in June, July, and August, including the resulting closure of the ICE facility for over three weeks in June and July," while focusing "on only a few events in September." *Id.* at *10. Contrary to that isolated focus, "the President is entitled, and indeed, duty-bound, to evaluate the entire context of events leading up a decision to invoke § 12406," which includes these recent past events. *Id.* at *11.

The majority next held that the district court "erred by placing too much weight on statements the President made on social media"; those statements did not alter the conclusion that the facts on the ground provide "a colorable basis to support the statutory requirements." 2025 WL 2951371, at *11. And the panel held that the district court wrongly concluded that the surge of officers to Portland from around the country to respond to months of violence established that the regular forces could execute the laws. *Id.* at *11-12. To the contrary, the record established that these deployments were irregular and unsustainable. *Id.*

As to the Tenth Amendment claim, the panel noted that this claim is derivative of their statutory claim (as noted below, the dissent agreed with this point). "[W]hen the President federalizes the National Guard absent an authorization by Congress acting under its militia clause power, he necessarily violates the Tenth Amendment." 2025 WL 2951371, at *13. But since "Defendants are likely to establish that the President lawfully

16

federalized the National Guard as Congress authorized in § 12406(3)[,] . . . Defendants are also likely to succeed on Plaintiffs' Tenth Amendment claim." *Id.*

Weighing the remaining stay factors, the panel concluded that "'[b]oth irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property and the faithful execution of law.'" 2025 WL 2951371, at *14 (alteration in original) (quoting *Newsom*, 141 F.4th at 1054). "Here, like *Newsom*, the undisputed facts show that protesters damaged a federal building, leading to its closure for over three weeks, attempted to burn the building down, placed chains on the doors, attempted to breach the front door of the building and broke the front glass door, threw objects at the building, including rocks, sticks, and a mortar, and launched M80 fireworks at federal officers, assaulted federal officers, shined lasers at officers' eyes, and doxed federal officers." *Id.*

The panel further rejected Plaintiffs' argument that Defendants will not be irreparably harmed absent a stay, noting that "the record establishes that the continued deployment of FPS officers to Portland is unsustainable, and state and local law enforcement have been unable or unwilling to assist the government's efforts to protect federal personnel and property at the ICE facility." 2025 WL 2951371, at *14 (citation omitted). And like the Court in *Newsom*, the panel stated that Plaintiffs have significant interests but that their arguments were ultimately merits arguments that the Court rejected. *Id.* at *14 (discussing *Newsom*, 141 F.4th at 1055).

Judge Nelson issued a concurring opinion. In his view, Supreme Court precedent precludes review of the President's Section 12406 determination. 2025 WL 2951371, at *15 (Nelson, J., concurring). Judge Nelson further suggested that Plaintiffs may lack standing and that, in any event, "the President's determination under § 12406(3) and § 12406(2) are bolstered by the history and tradition of the early Militia Acts." *Id.* Judge Nelson also stressed that the President's response to the events in Portland was measured and proportionate—federalizing 200 Guardsmen (as noted above, roughly five percent of the Los Angeles deployment *Newsom* concluded was likely lawful). *Id.* at *21-22. Although the precise number of troops to deploy is left to the President's discretion, "[t]he federalization and deployment of just 200 National Guardsmen for 60 days is well within a deferential proportional response to support good faith." *Id.* at *22.

Judge Graber dissented. Like the district court, Judge Graber believed that only the incidents in the days immediately preceding the President's Section 12406 determination were relevant. 2025 WL 2951371, at *25-26 (Graber, J., dissenting). Judge Graber further contended that if events in June and July were considered—"the more serious protests in June and the resulting closure of the ICE building for more than three weeks, from June 13 to July 7"—those events at that time "likely" did not give rise to an inability to execute the laws. *Id.* at *27. Judge Graber characterized the significant surge in personnel that the Government's declarants had explained was

unsustainable as "staffing difficulties" that could not support a "colorable" determination that the statutory conditions were met. *Id.* at \*27-28.[2]

## ARGUMENT

Rehearing en banc is "extraordinary," *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc) (quotation omitted), and "not favored," Fed. R. App. P. 40(a). Rehearing of an interlocutory stay decision is even more unusual. The criteria governing rehearing are plainly not satisfied here: the panel's grant of a stay was correct and in any event does not conflict with a decision of other courts in any respect warranting further review. And an interlocutory decision simply preserving the President's control over the armed forces and temporarily allowing a deployment of just 200 Guardsmen solely for the protection of federal personnel and property hardly presents a question of exceptional importance—let alone a question of such exceptional importance that it warrants the highly irregular step of rehearing en banc a stay decision.

**A.1.** The panel correctly concluded that the President likely did not exceed his authority in deploying the National Guard to protect federal property and personnel. The Constitution authorizes Congress to "provide for calling forth the Militia to execute

---

[2] The per curiam opinion and Judge Graber also disagreed on whether relief was warranted given that the district court entered a second putative temporary restraining order that Defendants have not appealed. The per curiam opinion's assessment of this question is correct, but because this dispute does not even plausibly meet the standards for en banc review, we do not discuss it further here. Consistent with a scheduling order issued by the district court prior to the panel's stay ruling, the federal defendants moved to dissolve the second temporary restraining order on October 20. Dist. Ct. Dkt. No. 97.

the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress empowered the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President judged that those conditions were satisfied in Portland, and there is no lawful basis for plaintiffs or the district court to override that judgment.

As a threshold matter, the President's determination is not reviewable. The Supreme Court long ago established that the President's exercise of the authority vested in him by Congress to call up the militia is committed to his exclusive discretion by law. In *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), a member of the militia of New York challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. *See id.* at 20-23 (statement of the case). President Madison had called the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (quotation omitted) (opinion of the Court). The Supreme Court refused to entertain the contention that the President

20

had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30; *accord Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right," and observing that extending the judicial power so far would be "a guarantee of anarchy"). Like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" the statutory prerequisites are satisfied "exclusively to the President." *Martin*, 25 U.S. (12 Wheat.) at 30.

This Court concluded otherwise in *Newsom*, holding that federal courts may "review the President's determination" that the statutory preconditions for federalizing the National Guard under Section 12406 are satisfied, but that any such review must be "highly deferential." 141 F.4th at 1051-1052. According to *Newsom*, a court may "at least review" whether the President's judgment "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling* v. *Constantin*, 287 U.S. 378, 399 (1932)).

*Newsom* was mistaken on this point. *Martin* forecloses such review. *Newsom* apparently viewed *Martin* as having been qualified by this Court's later decision in *Sterling v. Constantin*. *See* 141 F.4th at 1050-51. But *Sterling* only confirms that the President's judgment is not reviewable. There, a federal court had enjoined a state agency from implementing orders to limit oil production during a boom; the Governor of Texas had

21

declared martial law in parts of the State during the litigation and had responded to the injunction by ordering the state militia to shut down oil wells operating in violation of production limits; and the federal court then enjoined the Governor's orders. *See* 287 U.S. at 387-91, 396-97. The Supreme Court upheld the lower court's determination that the Governor's orders establishing production controls were reviewable and were unconstitutional. *Id.* at 398, 404.

In doing so, however, the Court in *Sterling* emphasized that when "the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen," the executive's "decision to that effect is conclusive." 287 U.S. at 399. And the Court attributed that proposition to *Martin*, which it cited and quoted approvingly. *See id.* The exercise of judicial review in *Sterling* itself did not violate that principle, the Court explained, because the case concerned the lawfulness of the Governor's production controls—not the Governor's antecedent decision to call up the militia in the face of what the Governor found to be an insurrection in the State. *See id.* at 401-02 ("Fundamentally, the question here is not of the power of the Governor to proclaim that a state of insurrection, or tumult, or riot, or breach of the peace exists, and that it is necessary to call military force to the aid of the civil power. . . .The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil.").

**2.** Even if some judicial review is permitted, courts must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048. So long as that determination "reflects a colorable assessment of the facts and law within a range of honest judgment," courts must defer. *Id.* at 1051 (quotation omitted). That conclusion is consistent with general principles governing judicial review of presidential action. Although plaintiffs challenging federal agency action ordinarily rely on the APA, 5 U.S.C. § 701 *et seq.*, the President is not an agency subject to the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Plaintiffs' only path to judicial review of the President's decision to invoke Section 12406, therefore, is a non-statutory ultra vires claim—a "Hail Mary pass" that "rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation omitted). The same is true of DoW's implementation of that presidential directive. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make"). In short, even if the President's determination is reviewable, Plaintiffs' challenge to that determination must meet the extremely stringent standard for *ultra vires* review, which requires showing not merely that the President "has arguably reached a conclusion which does not comport with the law" but rather that the President "has taken action entirely in excess of [his] delegated powers and contrary to a specific prohibition." *NRC*, 605 U.S. at 681 (emphasis and quotation omitted).

The President had an ample—and certainly "colorable"—basis for his determination that the statutory conditions were satisfied. In the weeks leading up to the federalization in Portland, ICE and FPS came "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A52. Outside of ICE's facility in downtown Portland, protestors attacked federal officers with rocks, bricks, pepper spray, and incendiary devices. *See* A66-67; A82-83. Protestors attempted to impede government vehicles as they entered or exited the facility, throwing objects at the vehicles, blocking and surrounding them, and shouting threats at the occupants. A84; A73. Individuals working inside the facility were followed home after work, and other federal personnel were doxed. A83; A68-69; A73-76. Protestors attempted on several occasions to burn down the facility and painted death threats on the facility's walls. A67-68; A71-72. Requests for assistance from local police resulted in no concrete actions or were ignored. A84-85; A78-79. As a result, DHS was forced to close the facility for three weeks and to reassign additional federal officers to support the protection of the facility and its occupants, significantly impeding its ability to perform its regular law enforcement functions. A70; A71; A76-77. These conditions plainly support the President's judgment that he was "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3), and thus that federalization of a limited number of Guard members was warranted. *See* Oct. 1 Truth ("Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon.").

The President further explained why "protests or acts of violence" that "directly inhibit the execution of the laws . . . constitute a form of rebellion against the authority of the Government of the United States" (A61) or, at minimum, create a "danger of a rebellion," 10 U.S.C. § 12406(2). Contrary to the district court's conclusion, the term "rebellion" is not limited to an organized, armed, and open attempt to overthrow the entire government. A129. Congress enacted Section 12406's predecessor in response to the Whiskey Rebellion—a protest against a specific tax, not an effort to overthrow the government as a whole. And dictionaries from the relevant time period, including those cited by the district court, define "rebellion" in a manner that encompasses deliberate resistance to the government's laws and authority. That broader conception of "rebellion" better reflects the historical context in which Section 12406 was enacted and the instances in which Presidents have federalized National Guard members since Section 12406 was enacted. *See* CRS Report 9-12, 35-38. The fact that some on-the-ground conditions might both constitute a rebellion and render the President unable to enforce the federal laws does not create impermissible superfluity. *Contra* A128-30. "[S]ometimes the better overall reading of the statute contains some redundancy." *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (quotation omitted). The Whiskey Rebellion, undoubtedly rose to the level of a "rebellion" and also rendered the President "unable" to enforce the federal excise tax on whiskey.

**3.** For the reasons identified by the panel, in issuing its injunction, the district court substituted its own judgment for that of the President and failed to engage in the highly deferential review mandated by this Court's decision in *Newsom*.

**i.** Initially, as the panel majority noted, the district court erred by focusing entirely on the situation in Portland in the handful of days preceding the President's federalization decision. *See* A123 (discounting events that occurred "at least two weeks" before federalization); A124 (same for an event that "occurred a week before" federalization). The district court declined to give any weight at all to the serious violence and disruption "in June, July, and August, including the resulting closure of the ICE facility for over three weeks in June and July." 2025 WL 2951371, at *10. Nothing in Section 12406 suggests the President must consider only events that immediately precede his federalization decision, and reading in such a requirement was improper.

In addition, incidents of violence and unrest in June, July, and August are hardly distant events—it is simply untenable to hold that these still-quite-recent occurrences are categorically irrelevant such that the President's consideration of them does not reflect even a *colorable* assessment of the facts. But more specific to Portland, violence has abated somewhat only because of an intensive deployment of FPS forces for 24/7 coverage—a deployment Defendants' declarants explained in detail was unsustainable. *See supra* pp. 10-11. Thus, respectfully, even if the dissent were correct to frame the issue as whether the President colorably determined that he was unable with the regular forces to execute the laws "at the time when he invokes the statute," 2025 WL 2951371,

at *28 (Graber, J., dissenting), it was entirely reasonable for the President to consider these previous events in determining that the limited Guard deployment was necessary in light of the extraordinary measures needed to address that prior violence *and* the impracticality of maintaining those measures indefinitely. And as a practical matter, it would be perverse to effectively fault the President for waiting to authorize the Guard's deployment until late September when additional options had been pursued and reasonably determined to be unsustainable, rather than deploying the Guard immediately in June or July.

**ii.** But even artificially confining the analysis to events in September in Portland, the district court's decision was wrong and the panel majority correctly stayed that decision. The district court built its entire decision around a single premise: that "the protests were small and uneventful" when the President issued his federalization decision. A123; *see also* A123-30. But the district court itself identified several incidents of threats and violence in September, A123-24, and there is ample record evidence showing the violence was far from "small" or "uneventful," providing more than a "colorable" basis to support the President's decision to federalize the Guard. Throughout September 2025, ICE officials and property were the subject of regular, often-violent protests. On Labor Day, for example, hundreds of protesters gathered outside ICE facilities and built a mock guillotine, requiring FPS officials to exert physical force to keep order and resulting in several arrests. A95-97. Just a few days later, on September 6, a mob of 50 to 60 protesters gathered to harass federal personnel

27

by flashing lights, swinging sticks, and blocking vehicles from accessing the building. A98-100. This violence lasted hours, yet nothing suggests that PPB rendered any assistance. *See* A98-100. Less than a week later, a group of protesters offloaded a car's worth of sticks and bats—potentially gearing up to engage in violence or at least "re[-]suppl[ying]" an already-armed mob. A101-02. On September 19, FPS was stretched beyond its means—unable to handle protesters threatening vehicles and at least one protester wielding a large stick or sword. A103-04. On the same day, federal officers had to respond to a bomb threat. A71.

    **iii.** Both the district court and panel dissent emphasized supposed differences between the situation in Los Angeles and Portland. A123-24; *Oregon v. Trump*, 2025 WL 2951371, at *27 (Graber, J., dissenting). But any fact-bound differences do not call into question the reasonableness of the response here, especially under the exceedingly deferential standard of review set forth in *Newsom*. For one, the differences should not be exaggerated. Both situations involved physical threats against federal personnel—like arming protesters (A101-02) and throwing rocks, sticks, and explosives at federal officers (*Newsom*, 141 F.4th at 1052). And both also involved attempts to damage federal property—like interfering with vehicles (A98-100) and destroying federal property (*Newsom*, 141 F.4th at 1052). But in addition, while there were fewer agitators in Portland than in California, that explains why the President federalized and deployed just 200 Guardsman in Portland, compared to 4,000 in California. *Cf. Oregon v. Trump*, 2025 WL 2951371, at *21-22 (Nelson, J., concurring).

**iv.** Contrary to the district court and panel dissent, the reasonableness of the President's determination is underscored by the failure of the PPB to provide effective assistance. "[I]n June 2025, PPB Police Chief Bob Day spoke publicly about avoiding any actions that might show 'perceived or actual support' for immigration agents" after PPB officers cleared a blockade of the ICE driveway to let an empty transport van pass. A78. And in several emails in September shortly before the federalization order at issue, PPB officers state that no officers were available to respond to disturbances at the ICE facility. *See Oregon v. Trump*, 2025 WL 2951371, at *6. On Labor Day, multiple citizens called complaining about PPB's failure to control the mob, one calling PPB "useless." A94. And during another protest, PPB concluded that it "would not be able to address [a] call" for assistance "with the resources [it] ha[d]." A104.

**v.** Finally, the panel correctly noted that the district court failed to give sufficient deference to the President's determination that the "surge deployment of FPS officers and HSI SRT officers from around the country to respond to the months of violence at the ICE Facility," *Oregon v. Trump*, 2025 WL 2951371, at *11—far from establishing that the regular forces could execute the laws—was unsustainable and supported the President's determination that Guard assistance was necessary.

By any measure, the steps taken to control the violence and unrest in Portland in June and July were unusual. DHS deployed 115 FPS officers to Portland. *Id.* And even with that surge, FPS agents have routinely had to work 12-hour shifts seven days a week. *Id.* at *12.

29

Respectfully, the dissent's flyspecking of the agency's declarations on these points goes well beyond the highly deferential review set forth in *Newsom* and in any event does not undermine the reasonableness of the President's determination. The dissent, for example, faulted the agency for not "describing how many officers worked [12-hour shifts], whether they worked those hours while deployed in Portland, how often they worked such strenuous hours, and so forth." 2025 WL 2951371, at *29 n.5 (Graber, J., dissenting). But the relevant declaration states that "12-hour shifts, seven days a week . . . has become the norm." A82.

And while the dissent faulted Defendants for not providing additional information on when each of the additional FPS personnel arrived in Portland and how many FPS personnel outside their normal duty stations were in Portland at any given time, 2025 WL 2951371, at *29 (Graber, J., dissenting), it is undisputed that nearly a quarter of the agency's entire FPS capacity had to be redirected over a relatively short period to a single location in one medium-sized American city due to the unrest there. And Defendants' declarants explained in detail why these conditions were unsustainable, including that FPS "is not resourced to provide a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or federal employees working in those facilities," A82 "FPS's efforts to contain the violence associated with the protests in Portland have placed an unreasonable strain on the FPS law enforcement community as well as on FPS's limited resources," A86, and "continued deployment of

30

FPS officers in response to the immigration protests stretches an already thin force beyond what is safe and effective," A82.

**vi.** Finally, the district court and panel dissent are incorrect in contending that the Government did not explain how this overstretch and other difficulties caused by the violence and unrest were causing an inability to execute the laws. As a threshold matter, *Newsom* does not require such an explanation. To be sure, *Newsom* held that there must be more than some "minimal interference." 141 F.4th at 1051. But the Court in *Newsom* did not require the President to provide particular examples of federal law enforcement that was precluded. Rather, the Court relied upon the violence itself, and deferred to the President's judgment that "those activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052. The panel properly followed the same course in allowing the much smaller deployment here to go forward. It is simply common sense that federal agents would be able to engage in greater enforcement of the immigration laws if they were not operating under the threat of assaults and obstruction, and that they are currently bearing unacceptable risks to their safety while doing their jobs.

And in any event, Defendants provided such an explanation here. In addition to their detailed explanation of why the status quo placed unsustainable demands on FPS, Defendants' ICE declarant explained that the agency has had to detail three SRTs to Portland, A71, and has had to deploy "ICE officers and agents from around the country, including SRT personnel, to assist FPS in Portland beginning on or about June

9," which "erodes ICE's ability to enforce federal immigration laws in the State of Oregon and across the country," A76-77. Even if the President's determination is reviewable, this is more than sufficient under any plausible standard.[3]

**4.** As the panel concluded, the federalization of the Guard does not violate the Tenth Amendment. The Supreme Court "long ago rejected the suggestion" that the federal government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). If a federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010). Here, the text of the Constitution

---

[3] Though the panel majority did not reach this issue, the reasonableness of the President' decision is further underscored by events outside Portland. The events in Portland are not occurring in a vacuum. We have already discussed the events in Los Angeles prompting deployment of the National Guard in that area. In addition, two days before DHS requested assistance in Portland, a man shot at an ICE field office in Dallas, killing two detainees and injuring one other. *See supra* p. 8. And just this past week, DHS reported that "Mexican criminals, in coordination with domestic extremist groups[,] have placed targeted bounties" on DHS personnel in Chicago, with tiered bounties up to $50,000 for kidnapping, assaulting, and assassinating federal law enforcement officers and senior officials. DHS, *Bounties Originating from Mexico Offered to Shoot ICE and CBP Officers in Chicago* (Oct. 14, 2025), https://perma.cc/CMX2-J9DC. It is unnecessary to rely on these events here because local conditions in Portland amply justify the President's determination. But the President is in any event plainly entitled to consider this nationwide pattern of violent resistance to immigration enforcement in determining that National Guard assistance in other hot spots is warranted—both to protect federal officials and property to allow federal officials to fully execute the laws, and to guard against the danger of rebellion.

makes clear that Congress may "provide for calling forth the Militia." U.S. Const. art. I, § 8, cl. 15. And Section 12406 rests on that express grant of authority, authorizing the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary." 10 U.S.C. § 12406. The district court treated plaintiffs' Tenth Amendment claim as derivative of their statutory claim, A130-31, as did the panel majority, 2025 WL 2951371, at *13, and Judge Graber "agree[d] with the parties that, for the purpose of the present motion, no meaningful difference exists between the statutory claim and the constitutional claim," *id.* at *23 n.1 (Graber, J., dissenting). So the President's lawful invocation of Section 12406 defeats any Tenth Amendment claim. *Newsom*, 141 F.4th at 1054 n.5.[4]

**5.** The remaining stay factors favor the Government. Indeed, even as to the much larger deployment in the Los Angeles area, *Newsom* held that "[b]oth irreparable harm and the public interest weigh in favor of Defendants." 141 F.4th 1054. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and that threats directed at federal personnel and property harm that interest. *Id.* The government also suffers irreparable harm when its federal immigration officials are prevented from safely and successfully enforcing the law. *See* A79-80. That some individuals have protested peacefully does not diminish

---

[4] The district court declined to address plaintiffs' remaining claims, but those claims fail for the reasons the federal government explained in district court.

the threat posed by the agitators who have attacked and threatened federal personnel and property.

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief. We address Plaintiffs' allegations of irreparable harm below in explaining why en banc review is unwarranted.

**B.1.**    Even putting aside that the panel decision is correct, that decision is a poor candidate for en banc review. En banc review of an interlocutory stay decision is extremely unusual. And this is not the rare stay decision that warrants such a drastic step. The panel's decision creates no meaningful new law. Judge Graber did not appear to dispute that the panel had appellate jurisdiction to review the putative temporary restraining order and, like the per curiam opinion, Judge Graber identified the opinion in *Newsom* as setting forth the applicable legal standard. Although Defendants understand and appreciate that Judge Graber strongly disagreed with the majority's analysis, the main disagreement between the two opinions was largely whether the facts here warranted a stay under *Newsom*'s deferential standard (as well as the extent to which the President could reasonably rely on events occurring in June-August as opposed to in September). *See supra* pp. 18-19. That is just not the stuff of en banc review.

**2.** Nor do any of the other traditional criteria for en banc review apply here. The panel's grant of a stay does not conflict with any decision from the Supreme Court. *See* Fed. R. App. P. 40(b)(2)(B). If anything, as previously discussed, Supreme Court precedent dictates that the President's determination is not reviewable. The panel's

decision also does not conflict with *Newsom* or any other decision from this Court. *See* Fed. R. App. P. 40(b)(2)(A).

Nor is there any Circuit conflict that warrants en banc review here. To be sure, the Seventh Circuit recently granted in part and denied in part a motion for a stay pending appeal of a putative temporary restraining order enjoining the President's invocation of Section 12406 in Chicago, Illinois. *Illinois v. Trump*, ---- F.4th ---, No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025) (per curiam). The panel in this case considered the Seventh Circuit's decision in *Illinois* and found it distinguishable on its facts. *Oregon v. Trump*, 2025 WL 2951371, at *13 n.15. The district court in the *Illinois* case largely refused to consider Defendants' declarations explaining the dangerous conditions in Chicago, because it found them "unreliable" based on a purported "credibility determination" specific to that case to which the Seventh Circuit then deferred. *Illinois v. Trump*, 2025 WL 2937065, at *3. That determination was flatly wrong, but there is no such issue in this case.

In any event, the *Illinois* decision only further underscores that further review of the panel decision by an en banc court is not warranted. The United States has sought a stay pending appeal of the injunction in *Illinois* from the Supreme Court. *See Trump v. Illinois*, No. 25A443 (U.S.). As of yesterday, that motion is fully briefed. The Court should await guidance from the Supreme Court and allow the merits panel to decide the preliminary injunction appeal expeditiously based on the record and any intervening

guidance from the Supreme Court—not take the highly unorthodox step of immediately taking en banc a fact-bound interlocutory decision.

**3.** Finally, the panel opinion does not resolve a question of exceptional importance, at least on these facts. Relatedly, Plaintiffs' attempted showing of irreparable harm was, under any fair analysis, meager, and certainly does not warrant the drastic step of taking an interlocutory stay decision en banc.

In the district court, Plaintiffs primarily insisted that the federalization and deployment inflicted a sovereign injury on Oregon. But the Guard will only be protecting federal property and personnel—not engaging in law enforcement—and they will certainly not be exercising any police powers customarily *performed by the State*. The district court nonetheless held that Plaintiffs will likely "suffer a constitutional injury due to Defendants' violation of the state's Tenth Amendment right to control its National Guard." A132. But as all three judges on the stay panel recognized, the Tenth Amendment analysis here is entirely derivative of the question whether Section 12406 authorizes the federalization and deployment. Plaintiffs' claim is therefore fundamentally statutory, not constitutional, and alleged violations of a federal statute do not give rise to any presumption of irreparable harm. Nor can Plaintiffs logically complain about any alleged injury from the federalization order itself since Governor Kotek could have chosen to command and control the requested 200 Guardsmen, but she declined. *See supra* p. 12.

36

Plaintiffs also complained that the federalization required diversion of Oregon National Guard members from state responsibilities, but the federalization involves approximately three percent of the Oregon National Guard, for a limited period. Oregon provided no example of present or reasonably likely future needs that this small and time-limited federalization will prevent the state government from addressing. Plaintiffs thus can only speculate that emergencies and unrest might occur in Oregon while the Guard is deployed. Such speculation cannot establish that it is "likely," as opposed to merely "possib[le]," that plaintiffs will suffer irreparable harm absent interim relief. *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249-50 (9th Cir. 2013) (quotation omitted). And even if an emergency occurs, it is implausible to suggest that 200 otherwise-occupied Guard members will meaningfully impair the State's ability to respond.

Finally, the district court found irreparable harm based on claims that the Guard's presence will purportedly lead to increased protests, supposedly requiring additional state resources. A132. First of all, reliance on any such "harm" is improper because the argument is not based on anything the Guard will do, but on the theory that people the Guard does not control will protest the Guard's presence. A heckler's veto is unacceptable even when directed to constrain private activity; it certainly is not a valid basis for enjoining the President's acts in protection of federal officials and property. In any event, the court's prediction of how violent rioters will react to the presence of organized, lawful, armed force is implausible. Similar predictions by

37

California officials were proven wrong in practice. Indeed, California recently sought to vacate the stay of the district court's injunction of the Los Angeles federalization and deployment and deployment, in part by arguing that "the California Highway Patrol has not seen any large-scale, protest-related activities in the area since June 19." *See* No. 25-3727, ECF No. 126.1, at 11 (9th Cir. Oct. 7, 2025).

Plaintiffs thus failed to demonstrate irreparable harm warranting an injunction in the first place. Indeed, as Judge Nelson cogently explained, there is a substantial question whether they even have Article III standing for at least some of their claims and asserted injuries. *See* 2025 WL 2951371, at *17-18 (Nelson, J., concurring).

That said, the relevant question with respect to alleged irreparable harm to Plaintiffs is not whether the district court correctly found that Plaintiffs would suffer irreparable harm absent an injunction. Rather, the question is whether the facts here are so stark that they warrant the extraordinary step of reviewing en banc an interlocutory stay decision. The answer to that question is plainly no. The best way for this Court to encourage "those who are watching this case unfold to retain faith in our judicial system," 2025 WL 2951371, at *35 (Graber, J., dissenting), is to evenhandedly apply its en banc rules and principles, not to grant further review of an interlocutory stay decision that plainly does not warrant en banc review under the normal criteria.

## CONCLUSION

The Court should decline to review the panel's decision en banc.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7517*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-7203*
   *andrew.bernie@usdoj.gov*

October 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit set by this Court's October 20, 2025 order because it contains 9,973 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE