No. 25-6268
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

STATE OF OREGON; CITY OF PORTLAND,

     Plaintiffs-Appellees,

        v.

DONALD J. TRUMP, In his official capacity as President of the United States; et al,

     Defendants-Appellants.
_____

APPELLEES' SUPPLEMENTAL BRIEF
_____

Appeal from the United States District Court
for the District of Oregon
_____

DENIS M. VANNIER  #044406
Senior Deputy City Attorney
Office of City Attorney
  1221 SW 4th Ave., Ste. 430
  Portland, Oregon 97204
  Telephone:  (503) 823-4047
  denis.vannier@portlandoregon.gov

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General
DUSTIN E. BUEHLER  #152024
Special Counsel
JONA J. MAUKONEN  # 043540
Assistant Attorney-In-Charge
Civil Appeals
PEENESH SHAH  #112131
Assistant Attorney General
STACY M. CHAFFIN  #205782
Assistant Attorney General
  1162 Court St.
  Salem, Oregon 97301
  Telephone:  (503) 378-4402
  stacy.chaffin@doj.oregon.gov

Attorney for Appellee
City of Portland

Attorneys for Appellee
State of Oregon
_____

## TABLE OF CONTENTS

INTRODUCTION AND RULE 40(B)(2) STATEMENT ...................................1

STATEMENT.......................................................................................4

    A.    The President directs the deployment of the military to Portland, Oregon. ...........................................................................4

    B.    The district court temporarily enjoins the deployment of the federalized Oregon National Guard to Portland. .............................7

    C.    A sharply divided 2-1 panel stayed the district court's TRO. .......12

        1.    The panel majority held that defendants have shown a likelihood of success on the merits and that the other stay factors weigh in their favor. ........................................ 12

        2.    Dissenting, Judge Graber focused on the district court's unchallenged findings, the lack of evidence to support the government's contentions about significant ongoing violence and disruption, and the absence of any true emergency in Portland. ........................ 16

REASONS FOR GRANTING EN BANC REVIEW ........................................22

    A.    This case presents questions of exceptional importance. ..............24

    B.    The panel's decision conflicts with precedent on those matters of exceptional importance. .................................................27

        1.    The panel majority renders judicial review illusory, contravening *Newsom*. ........................................................ 27

        2.    The panel majority misconstrues the plain text of § 12406(3), in conflict with *Newsom*.................................. 32

CONCLUSION...................................................................................37

EXCERPT OF RECORD

# TABLE OF AUTHORITIES

## Cases Cited

*Anderson v. City of Bessemer City, N. C.*,
   470 U.S. 564 (1985) ........................................................................ 30, 31

*Illinois v. Trump*,
   2025 WL 2937065 (7th Cir. Oct. 16, 2025) .......................... 27, 29, 31, 34

*Martin v. Mott*,
   25 U.S. 19 (1827) ....................................................................................29

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025)................................ 2, 3, 4, 5, 8, 11, 15, 16,
   18, 22, 27, 28, 29, 31, 32, 34, 35

*Newsom v. Trump*,
   2025 WL 2501619 (N.D. Cal. Sept. 2, 2025)...........................................26

*Newsom v. Trump*,
   786 F. Supp. 3d 1235 (N.D. Cal. 2025) ...................................................11

*Oregon v. Trump*,
   2025 WL 2817646 (D. Or. Oct. 4, 2025) ............................ 7, 9, 10, 15, 30

*Protectmarriage.com-Yes on 8 v. Bowen*,
   752 F.3d 827 (9th Cir. 2014)....................................................................37

*Pub. Utilities Comm'n of State of Cal. v. FERC*,
   100 F.3d 1451 (9th Cir. 1996)..................................................................37

*Reid v. Covert*,
   354 U.S. 1 (1957) ....................................................................................27

*S.E.C. v. Rogers*,
   790 F.2d 1450 (9th Cir. 1986)..................................................................30

*Sterling v. Constantin*,
   287 U.S. 378 (1932) ..................................................................... 9, 22, 35

*United States v. Jackson*,
   480 F.3d 1014 (9th Cir. 2007)..................................................................32

*United States v. Lopez*,
   514 U.S. 549 (1995) .................................................................................22

*United States v. Payton*,
    593 F.3d 881  (9th Cir. 2010) ...................................................37

*United States v. Wilson*,
    503 U.S. 329 (1992) ................................................................32

*Widakuswara v. Lake*,
    2025 WL 1521355 (D.C. Cir. May 28, 2025) ..........................37

*Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure)*,
    343 U.S. 579 (1952) ................................................................36

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ................................................................31

## Constitutional and Statutory Provisions

10 U.S.C. § 12406 ......................... 3, 5, 6, 7, 8, 11, 15, 18, 22, 24, 25, 27, 28, 29,
    31, 33, 35, 36

10 U.S.C. § 12406(2) ................................................... 6, 9, 11, 14, 19

10 U.S.C. § 12406(3) ................................... 6, 9, 10, 14, 17, 19, 32, 34

U.S. Const., Amend. I .................................................... 20, 23, 34, 36

U.S. Const., Amend. X ............................................................ 6, 7, 22

U.S. Const., Art. I § 8 ...................................................................22

## Other Authorities

Brief for Professor Martin J. Lederman as Amicus Curiae 1,
    *Trump et al. v. Illinois et al.*, 25-2798 .....................................34

Fed. R. Civ. P. 52(a) ...........................................................................30

Stephen I. Vladeck, Note,
    *Emergency Power and the Militia Acts*, 114 Yale L.J. 149 (2004) .. 35, 36

## APPELLEES' SUPPLEMENTAL BRIEF
_____

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

This case raises fundamental questions that lie at the heart of—and threaten—our constitutional design.  As the district court cogently identified, the case interweaves questions about the sovereignty and dignity of states, the role of our military in domestic law enforcement, and the function that the judiciary plays as a coequal branch of government in safeguarding those separations of power.

On September 27, 2025, the President of the United States ordered the deployment of military forces to Portland, Oregon.  In particular, he directed the Secretary of Defense "to provide all necessary Troops to protect War ravaged Portland," without the consent and over the objection of state and local leaders, "authorizing Full Force, if necessary."  (Dkt 9-12).  His stated purpose was to protect "our ICE Facilities under siege from attack by Antifa, and other domestic terrorists."  (*Id.*) The next day, Defense Secretary Pete Hegseth federalized 200 members of the Oregon National Guard.  (Dkt 1-2 at 2).  Within hours, the State of Oregon and the City of Portland sued for declaratory and injunctive relief.

The district court granted a TRO, enjoining the federalization and deployment in a 31-page opinion that made extensive findings of fact—findings

2

that the federal government expressly disavowed challenging on appeal. In brief, the court found that, in the two months preceding the President's directive, protests at Portland's ICE facility "were small and uneventful"; incidents identified by the federal government to justify the order were "handled by regular law enforcement forces"; and the federal government did not identify *any* violent or disruptive incidents in the two weeks preceding the directive. (Dkt 46-19). The court thus concluded that, despite the substantial deference afforded to the President in such a scenario, "[t]he President's determination was simply untethered to the facts," which failed the test for domestic deployment of military troops, as identified by this Court in *Newsom v. Trump*, 141 F.4th 1032, 1048 (9th Cir. 2025). (Dkt 46-23).

In a sharply divided 2-1 decision, a motions panel granted the federal government's request for a stay pending appeal of the district court's order. (Slip Op. at 36). The majority faulted the district court for not giving greater weight to protests in Portland that had occurred *three months* before the President's directive, while further framing the relevant context as including recent incidents at ICE facilities in Dallas, Texas, and Chicago, Illinois. (*Id.* at 4–5, 23–24). The majority also held that the district court should have deferred to "the executive's internal assessment of its ability to enforce the laws," the

3

specificity and factual basis of which appears nowhere in the record.  (*Id.* at 26–31).

Dissenting, Judge Graber explained how the majority panel's decision squarely conflicts with *Newsom*.  There, this Court examined the factual record of "the events *immediately* preceding the invocation" of 10 U.S.C. § 12406 by the President in and around Los Angeles to determine whether there was "an extreme and *ongoing* exigency"; in doing so, the Court made clear that "'minimal interference' with the execution of the laws does not suffice," as a matter of law, to justify the extraordinary measure of invoking § 12406.  (Diss. Op. at 11, 15 (emphasis in original) (quoting *Newsom*, 141 F.4th at 1051)).

Rehearing en banc is required for all the reasons identified by Judge Graber in her forceful dissent, which urges swift action "to vacate the majority's order before the illegal deployment of troops under false pretenses can occur."  (Diss. Op. at 36).  By the constitutional design of the Founders, the police power is reserved for the states, and by the statutory dictates of Congress, a President may federalize a state's National Guard only during actual emergencies.  By greenlighting the federalization of Oregon's National Guard for reasons divorced from space, time, or facts in Portland, the panel majority affronts Oregon's sovereignty and erodes the rule of law.  In short, this case presents questions of exceptional importance, and the majority's decision

4

gravely errs in answering them in direct conflict with the Court's published

opinion in *Newsom*.

## STATEMENT

**A.    The President directs the deployment of the military to Portland, Oregon.**

On September 27, 2025, the President of the United States ordered the

deployment of federal military forces to Portland, Oregon:



Donald J. Trump
@realDonaldTrump

At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

**12.8k** ReTruths  **53.1k** Likes                    9/27/25, 7:19 AM

(Dkt. 9-12).  The President directed Secretary Hegseth "to provide all necessary

Troops to protected War ravaged Portland," even "authorizing Full Force, if

necessary."  (*Id.*) The President's stated purpose was to protect "our ICE

Facilities under siege from attack by Antifa, and other domestic terrorists."

(*Id.*) The President issued the directive without the request or consent, and

indeed over the objection, of state and local leaders.

The next day, Secretary Hegseth federalized 200 members of the Oregon

National Guard.  (Dkt. 1-2 at 2).  On September 28, 2025, Secretary Hegseth

issued a memorandum calling 200 members of the Oregon National Guard into

5

federal service for 60 days. (*Id.*) The Hegseth memorandum was issued without the request or consent, and over the objection, of state and local leaders.

The Hegseth memorandum cited, as additional authority, a presidential memorandum dated June 7, 2025, that the President had issued in response to protests in and around Los Angeles, California. (*Id.*); *see Newsom*, 141 F.4th at 1041 (describing the June 7 memorandum). In that June 7 memorandum, the President purported to invoke 10 U.S.C. § 12406 to federalize state National Guards. (Dkt. 1-2 at 3). The June 7 memorandum stated:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws.

(*Id.*). It directed National Guard troops to "where protests * * * are occurring or are likely to occur based on current threat assessments and planned operations." (*Id.*) And it further declared that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." (*Id.*) Notably, the June 7 memorandum did not reference, relate to, or mention Portland. Indeed, it did not identify any protest, or any state National Guard, with any specificity whatsoever.

6

Within hours of Secretary Hegseth's federalization memorandum on September 28, 2025, the State of Oregon and the City of Portland filed suit and a concomitant motion for a temporary restraining order against the attempted federalization and deployment of the Oregon National Guard to Portland, against the wishes of both Oregon and Portland. (Dkt. 1; Dkt. 6). As pertinent here, Oregon and Portland argued that the federal defendants had exceeded the President's authority under 10 U.S.C. § 12406 and violated the Tenth Amendment to the U.S. Constitution. (Dkt. 6-20–24, 26–30). In brief, plaintiffs argued that Portland was not, in fact, war ravaged; that protests at the singular ICE facility in Portland were actively monitored and controlled by the Portland Police Bureau (PPB); and that, instead, the President was seeking to punish Oregon and Portland due to local policy choices with which he disagreed. (*Id.*)

In response, the federal defendants first argued that the President's directive was simply not reviewable. (Dkt. 35-18–19). Defendants also argued that, based on the facts on the ground in Portland, protests at Portland's ICE facility satisfied the requisite statutory preconditions under both § 12406(3) and § 12406(2). (Dkt. 35-20–24). Defendants submitted a declaration broadly asserting "coordinated assault by violent groups." (Dkt. 35-20 (quoting Dkt. 37-5)). As factual support, the declaration attached a DHS memorandum dated

7

September 26, 2025, that summarily stated that protestors were "actively aligned with domestic terror organizations." (Dkt. 37-11). Defendants also submitted two declarations that identified individual incidents at the ICE facility in Portland between June 2025 and September 2025. (Dkt. 35-20 (citing Dkt. 38-4–16; Dkt. 40-2–6)).

**B.    The district court temporarily enjoins the deployment of the federalized Oregon National Guard to Portland.**

After briefing and argument, the district court granted plaintiffs' motion for a temporary restraining order. *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646 (D. Or. Oct. 4, 2025). The court thereby enjoined for 14 days the federalization and deployment of the National Guard to Portland pursuant to Secretary Hegseth's September 28 federalization memorandum. (Dkt. 56-1). The court also scheduled a merits trial to begin October 29, 2025. (*Id.*)

The court first ruled that plaintiffs were likely to succeed on the merits of their claims that a forced federalization and deployment would be unlawful under 10 U.S.C. § 12406 and would violate the Tenth Amendment, given the record in the case. *Oregon*, 2025 WL 2817664, at *8–14. After weighing the evidence, the court found that plaintiffs would suffer irreparable harm absent an injunction, between the constitutional and sovereign interests at stake, as well as the resulting diversion of the state's National Guard from state availability and

8

control. *Id.* at *14. And the court ruled that the balance of the equities and the

public interest weighed in plaintiffs' favor, where a forced federalization would

violate state sovereignty and "risk blurring the line between civil and military

federal power—to the detriment of this nation," due to the longstanding history

and tradition in the country against military intrusion into civilian affairs. *Id.* at

*15. At the same time, the record reflected "that any threats to federal agents

and property are readily remedied—as they have been—by federal civilian law

enforcement, with the support of State and local law enforcement." *Id.* at 15,

n.4.

As a threshold matter, the district court ruled that the federalization order

was reviewable, as this Court squarely held much in *Newsom. Id.* at *9;

*Newsom*, 141 F.4th at 1047 (the President is not "the sole judge" of whether one

of the "three predicate conditions" in 10 U.S.C. § 12406 exists). In that case,

the State of California had challenged the President's federalization of the

California National Guard in response to ongoing protests. This Court held that

such an order was judicially reviewable but that courts "must give a great level

of deference to the President's determination that a predicate condition exists."

141 F.4th at 1048. In doing so, courts "review the President's determination to

ensure that it reflects a colorable assessment of the facts and law within a 'range

of honest judgment,'" as the statute provides Presidents with a "'permitted

9

range of honest judgment" that must be "'conceived in good faith,'" as well as "'directly related to the quelling of the disorder or the prevention of its continuance.'" *Id.* at 1050–51 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)); *see Oregon*, 2025 WL 2817646, at * 9 (so summarizing).

On the merits, the district court explained that defendants had invoked both 10 U.S.C. § 12406(3) and 10 U.S.C. § 12406(2) as statutory bases for the forced federalization. The former provides for calling up a state National Guard when "the President is unable with the regular forces to execute the laws of the United States," § 12406(3), while the latter authorizes doing so when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," § 12406(2). The court held that the record belied either basis. That is, the court made extensive factual findings that, rather than reflecting a colorable assessment of the facts within a range of honest judgment, the President's directive "was simply untethered to the facts." *Oregon*, 2025 WL 2817646, at *11.

Before proceeding further with a distillation of the district court's factual findings, plaintiffs pause to note that, before this Court, defendants have *expressly disavowed challenging* the district court's factual findings, as clearly erroneous or otherwise. (Oral arg., 10/09/2025, at 14:55–15:12). That is, defendants do not dispute the following facts found by the district court about

10

the actual protests in Portland and the actual concomitant impact of those protests on safety and security in Oregon.

As to the ability to execute the laws under § 12406(3), the district court found that, in the two months preceding the President's directive, the incidents identified by the federal government to justify the order at the ICE facility in Portland were "handled by regular law enforcement forces," and the federal government did not identify *any* violent or disruptive incidents in the two weeks preceding the directive. *Oregon*, 2025 WL 2817646, at *10. Rather, disruptions at the facility peaked in June 2025 and, in the months since, "there were sporadic events requiring either PPB monitoring or federal law enforcement intervention, but overall, the protests were small and uneventful." (*Id.*). Indeed, since July 2025, PPB had "'carried out routine monitoring of the ICE-Facility protests without serious incident.'" *Id.* at *4 (quoting Dkt. 7-7). PPB call logs also showed that PPB closely coordinated with federal law enforcement and regularly checked on the status of the ICE facility. (Dkt. 56-20). Moreover, although defendants had averred transferring 115 federal officers to Portland from other regions between June 2025 and September 2025 to help with staffing, the court explained that cross-office support "is a routine aspect of law enforcement activity" and that the staffing levels had both quelled

11

the violence in June and prevented it through September, "unaided by military forces." *Id.* at *10–11.[1]

As to the question of rebellion, the court construed the term "rebellion" consistently with the district court in *Newsom*, which had conducted a survey of dictionary definitions from the first predecessor statute to § 12406, the Militia Act of 1903. *Id.* at *12–13. The district court here thus identified four "key characteristics" for what constitutes a "rebellion" under § 12406(2):

> First, a rebellion must not only be violent but also be armed. Second, a rebellion must be organized. Third, a rebellion must be open and avowed. Fourth, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue.

*Id.* at *13 (quoting *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1253 (N.D. Cal. 2025). And the court held that the record refuted the charge of a rebellion or a danger of rebellion in Portland. To the contrary, defendants had only "presented evidence of sporadic violence against federal officers and property damage to a federal building." *Id.*

After the district court issued the TRO, defendants immediately appealed and sought an emergency stay of that order pending appeal. (C.A. Dkt. 11.1).

---

[1] Additional details about the nature of the protests at the ICE facility between June and through September 2025 are provided in the record at Dkt. 12, 33, 38, 40, and 46. *See also* E.R.-3 (Dkt 46-29 (table summarizing protest activity in September 2025).

12

That same night, defendants began efforts to deploy members of the California and Texas National Guards to Portland in direct contravention of the district court's TRO. The State of California joined this action, and all plaintiffs requested a second TRO to prevent the attempted deployment. (Dkt. 58; Dkt. 59). After a hearing, the district court entered a second TRO enjoining the deployment of all federalized National Guard members to Oregon. (Dkt. 68). This Court then granted an administrative stay of the first TRO to maintain the status quo of Oregon National Guard members being "federalized but not deployed" while a motions panel could decide the merits of defendants' stay motion. (C.A. Dkt. 53.1 at 7).[2]

**C.    A sharply divided 2-1 panel stayed the district court's TRO.**

**1.    The panel majority held that defendants have shown a likelihood of success on the merits and that the other stay factors weigh in their favor.**

The panel majority held that the district court erred in concluding that defendants had not shown a likelihood of success on the merits, because the district court purportedly had "substituted its own assessment of the facts for

---

[2]    To this day, defendants have not appealed the second TRO. Instead, they moved to dissolve the TRO following the motion panel's Stay Order discussed below. (Dkt. 97). Plaintiffs filed an opposition. (Dkt. 100). And defendants' reply brief is due to the district court by 12:00 p.m. on October 23, 2025. (Dkt. 102). The court set a hearing for 10:00 a.m. on October 24, 2025. (Dkt. 105). As of the time of this filing, Oregon National Guard members remain federalized in Oregon but not deployed to Portland.

13

the President's assessment of the facts." (Slip Op. at 23). First, the panel

majority held that "the district court erred by determining that the President's

'colorable assessment of the facts' is limited by undefined temporal restrictions

and by the district court's own evaluation of the level of violence necessary to

impact the execution of federal laws." (*Id.* at 23–24). In doing so, the panel

majority concluded that the district court "discounted most of the evidence of

events in Portland from June through September." (*Id.* at 24).

As noted previously, although defendants asserted multiple times during

oral argument that they were *not* challenging any of the district court's factual

findings, the panel majority concluded that the "district court also clearly erred

in characterizing the events in September leading up to and preceding the

federalization order." (*Id.* at 24, n.10). In doing so, the panel majority

referenced: criminal activity on September 1 that resulted in arrest; that Federal

Protective Service (FPS) "push[ed] out" protesters on September 6; on

September 12, "a large quantity of sticks and bats" was delivered outside the

facility but never used; on September 19, an unknown person called in a bomb

threat that did not occur; conflicts occurred between protesters and counter

protesters; and, *after* the President's social media post directing the military to

Portland, there was an increase in protest activity. (*Id.* at 24–25, fn 10). The

panel majority held that, "[c]onsidering the totality of the circumstances, there

14

is a colorable basis for the President's determination that he is unable with regular forces to execute the laws of the United States." (*Id.* at 26).

The panel majority also held that "the district court erred by placing too much weight on statements the President made on social media" for two reasons. (*Id.*). First, "[e]ven if the President may exaggerate the extent of the problem on social media, this does not change that other facts provide a colorable basis to support the statutory requirements." (*Id.* at 26–27). Second, "the President's social media post characterizing Portland as 'War ravaged' may reasonably be viewed as part of his assessment under § 12406(2)'s 'rebellion' prong, which we do not reach." (*Id.* at 27).

Finally, the panel majority held that "the district court erred by concluding that the surge deployment of FPS officers and [Homeland Security Investigations Special Response Team] officers from around the country to respond to the months of violence at the ICE Facility established that 'the regular forces,' i.e. FPS and additional federal law enforcement, *were able* to execute the laws of the United States." (*Id.* at 28) (emphasis in original). The majority reasoned: "By interpreting the modest improvements created by the surge as demonstrating that the President did not have a colorable basis for invoking § 12406(3), and discounting that the surge of FPS officers was inherently irregular, the district court accorded no deference to the President's

15

determination that he could not execute federal laws with regular forces."  (*Id.* at 30).

The panel majority also concluded that "[b]oth irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property and the faithful execution of law."  (*Id.* at 33 (citing *Newsom*, 141 F.4th at 1054)).  As a result, contrary to the district court's factual findings—and without concluding that those findings were clearly erroneous—the panel majority found that "state and local law enforcement have been unable or unwilling to assist the government's efforts to protect federal personnel and property at the ICE facility[.]"  (*Id.* at 35); *see Oregon*, 2025 WL 2817646 at *14–16.

Judge Nelson, in a separate concurrence, would have gone further.  In his view, contrary to *Newsom*, the President's § 12406 determinations are not judicially reviewable.  (Conc. Op. at 1–7).  He questioned whether plaintiffs' interests in maintaining their state sovereignty are enough to confer standing to challenge the forced federalization and deployment of Oregon's National Guard to Portland.  (*Id.* at 8–9).  He suggested that "historically the solution to presidential overreach" in using the military to quell domestic unrest "was the political process."  (*Id.* at 13–14).  And he determined that, under his view of the facts, the forced deployment of 200 Oregon National Guard members for 60

16

days "is well within a deferential proportional response" under the statute. (*Id.* at 20–21).

> **2.    Dissenting, Judge Graber focused on the district court's unchallenged findings, the lack of evidence to support the government's contentions about significant ongoing violence and disruption, and the absence of any true emergency in Portland.**

Judge Graber determined that the federal government failed to carry its burden to justify a stay pending appeal. (Diss. Op. at 2). On the likelihood of success on the merits, in stark contrast to the majority, Judge Graber determined that under the highly deferential standard set forth in *Newsom*, the President had exceeded the authority Congress provided for calling up the National Guard because his determination did not reflect "a colorable assessment of the facts and law within a range of honest judgment." (*Id.* at 1, 4–5, 7 (quoting *Newsom*, 141 F.4th at 1051)). Indeed, she explained that the majority's legal conclusions "cannot be squared with the record in this case and cannot be reconciled with *Newsom*." (*Id.* at 7).

Principally, Judge Graber faulted the majority for recasting the record in the face of undisputed factual findings by the district court. Judge Graber emphasized that the Court must defer to a district court's factual findings unless they are clearly erroneous, and the federal government had not challenged those findings on appeal. (*Id.* at 2, 7). In her view, the majority thus contravened the

17

deference owed to the district court's findings here by simply accepting the federal government's characterization of the level of violence in Portland. (*Id.* at 1–2). Judge Graber explained that the majority's decision "combines scattered incidents across four months" around the ICE building in Portland and "stretches the facts to suggest a level of continuing violence that the record does not reflect." (*Id*. at 15–16).

With respect to § 12406(3), Judge Graber agreed with the district court that the proper focus was whether, at the time the President decided to federalize the National Guard, the government was presently unable to execute the laws in Portland. (*Id.* at 7–9). She explained that the plain text of the statute speaks only in the present tense and, thus, it would make no sense "for this narrow statute, which focuses on extreme and unusual occurrences, to allow the President to call up the National Guard to address an exigency that no longer exists. (*Id.* at 9). Judge Graber therefore disagreed with the majority and the federal government that it was proper to look back months in time and at happenings around the country in making that assessment. (*Id.* at 8–11). Importantly here, in the two weeks leading up to the President's decision, there were only "tiny protest[s] causing no disruptions" to ICE operations in Portland. (*Id.* at 7) (emphasis in original).

18

Even if events in the months leading up to the decision to federalize are considered, Judge Graber determined that they were legally insufficient. (*Id.* at 12-16). The government's "declarants describe only four incidents of protestors clashing with federal officers in the month of September," and the incidents "are nowhere near the type of incidents that cannot be handled by regular law enforcement forces." (*Id.* at 12) (quoting district court order). Police reports from that time reflect that little was happening around the ICE building. (*Id.* at 13). Looking back further, there was a single relatively minor incident in August and little happening from mid-July onward. (*Id.* at 13–14). Judge Graber described that "[a]t no point during these two-plus months is there even a colorable assertion that the President was unable to execute the laws without more than a truly 'minimal interference' which as a matter of law does not justify invoking subsection three of the statute." (*Id.* at 14 (quoting *Newsom*, 141 F.4th at 1051)).

Looking back further still to June 2025, when "the more serious protests" happened outside the ICE building, those events also "likely did not result in an inability to execute the laws." (*Id.*). But even if the situation in June could constitute the type of exigency required by § 12406, it had dissipated well before September. (*Id.* at 15). Judge Graber concluded that whether "we consider only the days and weeks leading up to September 27 or the full four

19

months beforehand, no colorable assessment of the facts and law can justify a conclusion that an emergency existed on September 27." (*Id.* at 16).

Judge Graber also rejected that purported staffing difficulties, including the federal government having reallocated FPS officers to Portland, was sufficient to trigger federalizing the National Guard. (*Id.* at 16–17). As a legal matter, she questioned whether staffing difficulties alone could ever satisfy the text of the statute; in any event, she explained that the record here fell far short of demonstrating any inability to execute the laws of the United States. (*Id.* at 17). Moreover, she further explained that the panel majority had recast the record to say things that it did not say, to make an argument that the federal government had not made, based on a "vague, carefully worded" declaration from the federal government on general staffing numbers. (*Id.* at 17–19). Judge Graber reasoned that "the government is the only party with access to the pertinent information" and that it "cannot rely on factual ambiguities of its own making to meet its burden." (*Id.* at 19–21). Ultimately, Judge Graber stated that "the present record provides no support for the proposition that a staffing challenge amounted to an inability to execute the law" as required to invoke § 12406(3). (*Id.* at 21).

As for a "rebellion or danger of a rebellion" under § 12406(2), Judge Graber also found that defendants were unlikely to succeed. (*Id.* at 21-27). She

20

explained that while there was some dispute about the meaning of "rebellion," "the activity in Portland came nowhere close to constituting a rebellion." (*Id.* at 22). There was no "evidence that the sporadic violent events occurring over a handful of days during four months of otherwise peaceful protests were in any way organized," and the events did not rise to the level of exigency required for a rebellion. (*Id.* at 22–23). Rather, "the record discloses ordinary political protests" for most of the four months at issue, which are "quintessential First Amendment activity" and sporadic "violence committed by rogue participants" that was handled by law enforcement. (*Id.* at 23–24). That was not, as the majority concluded, similar to historic rebellions like the Whisky Rebellion, Shays's Rebellion, and Fries's Rebellion which each involved "a sizeable percentage of the population at the time—openly attacking federal officials and properties in clearly organized fashion across a wide geographic area." (*Id.* at 24–25). Rather, in Oregon, "there is no evidence of organization or leadership, widespread use of arms, ferocity, or difficulty exerting control by ordinary means" related to the tiny percentage of Portland's population (at most, 0.008%) participating in the protests on a single block of the city. (*Id.* at 25–26).

Moving to the other factors, Judge Graber concluded that they supported denying a stay. (*Id.* at 27–33). The federal government would not be harmed

21

absent a stay because the President acted without legal authority, the protests could be managed without the National Guard, and a second TRO—which the federal government has not appealed—precludes deployment of National Guard in Portland. (*Id.* at 27–30). Judge Graber rejected the majority and government's assertion that the second TRO would swiftly be dissolved based on the stay order of the first TRO, noting that dissolution was not a foregone conclusion because the second TRO raised additional issues not involved in this order. (*Id.* at 30–31). Because the federal government would not be harmed, the public likewise would not be harmed. (*Id.* at 32–33, n.13). And plaintiffs would suffer substantial harm from a stay. (*Id.* at 31–32). The "illegal deployment of Oregon National Guard members is a direct affront to Oregon's sovereignty" and will deprive Oregon of "more than half its reserves who are trained to respond quickly to emergencies, including natural disasters." (*Id.* at 32). The City of Portland "has a strong interest in preserving the peace" and deployment is likely to "aggravate the situation at the ICE building." (*Id.*).

In conclusion, Judge Graber emphasized the importance of the issues at play in this case including the inherent dangers of using military intervention into civilian matters absent a true emergency and foundational interests in separation of powers. (*Id.* at 33-36) (noting that although the political branches may expect "a measure of bending—sometimes breaking—the truth", the

22

judicial branch "rule[s] on facts, not on supposition or conjecture, and certainly not on fabrication or propaganda.").

## REASONS FOR GRANTING EN BANC REVIEW

Under our Constitution, the general police power is reserved to the states. U.S. Const., amend. X. There is no federal "plenary police power." *United States v. Lopez*, 514 U.S. 549, 566 (1995). Congress, however, is given the power to call forth a military, including state milias, in defense of the country. U.S. Const., art. I, § 8, cls. 15–16. And Congress has delegated the authority to "call[] forth the Militia" the President in three circumstances specified by statute. 10 U.S.C. § 12406. When so invoked, this Court "give[s] a great level of deference to the President's determination that a predicate condition exists." *Newsom*, 141 F.4th at 1048. Specifically, the Court "review[s] the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling*, 287 U.S. at 399).

This case presents exceptionally important structural questions regarding this country's continued status as a constitutional—not martial—republic, as well as exceptionally important and pressing practical questions regarding the extent to which local authorities around the nation must accept federal military encroachment on local law-enforcement functions.

23

Those questions cut to the heart of this nation's longstanding history and tradition that the federal military has no role in domestic law-enforcement, a task that the Constitution expressly reserved to the states when declining to create a general federal police power.  Under those rules and traditions, Congress has expressly prohibited the use of the military for civilian law enforcement and delimited when the President can deploy the military on United States soil.  That is what, in part, makes the United States the United States.

This case is the ideal vehicle to address those extraordinarily important questions and resolve the current intra-circuit conflict *en banc*.  The stark factual findings of the district court, which defendants have disclaimed challenging, conclusively establish that there was no need for military assistance at the time of the federalization order.  At most there was small, First Amendment-protected protest activity and sporadic, minor unlawful conduct that is appropriately handled by ordinary law enforcement.  If that justifies federalizing the National Guard, then almost anything would.  This case thus presents an opportunity for the *en banc* Court to resolve lingering conflicts of law in this area and decide whether a federalization order can ever be subject to meaningful judicial review.

24

**A.    This case presents questions of exceptional importance.**

The central issue in this case is the scope of executive authority to

federalize the National Guard in response to invasion, rebellion, or inability to

execute federal law with regular forces, as provided in 10 U.S.C. § 12406.  That

statute provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

Here, the panel's decision allows the executive remarkable deference to

invoke § 12406 as authority to take control of a state's National Guard over that

state's objection and task it with an entirely domestic law-enforcement mission,

even—as here—in response to temporary periods of disruptive but

25

unremarkable political protest.  That is, it provides any President with an unchecked tool for retaliation against those who speak out against his policies.

The effects of that rule will be felt in real terms throughout the country. That is why a total of 43 States and the District of Columbia—nearly every sovereign with a National Guard that could suffer the same injuries as Oregon has here under § 12406—have filed *amicus* appearances on one of the sides in this case.  (C.A. Dkt. 36.2, 38.2).  And that is why dozens of cities and local leaders from across the country—many of the possible locations for future deployments across the country, who could suffer the same injuries as Portland has here—have done the same.  (C.A. Dkt. 17.1 at 25–32).

Those *amici* know that the issues decided in this case will affect them directly because Portland and Oregon are not the only places where National Guard federalizations and deployments have already occurred or are impending. In an undated memorandum, Secretary Hegseth authorized the mobilization of "up to 400 members of the Texas National Guard" in response to purported threats "in Illinois" and "other locations throughout the United States," as "determined" by the President on October 4.  (Dkt. 65-1).  The president has also "deployed or approved National Guard in Title 32 status to Washington, D.C. and Memphis, Tennessee."  (C.A. Dkt. 37.2 at 28) (*Amicus* brief of Vet Voice Foundation et al.).  In other words, he has "deployed the National Guard

26

as domestic law enforcement *four times* in as many months—in California, the District of Columbia, Illinois, and Oregon." (C.A. Dkt. 36.2 at 15) (multi-state *amicus* brief opposing administrative stay). And all of that is entirely consistent with his openly stated intent to "get rid of" the "problems" in specific cities around the country. (Dkt. 56 at 13).

The question here is of heightened importance because once the National Guard is deployed, even if only for the stated purpose of protecting federal facilities and personnel, their mission may creep into domestic law enforcement—as it did when defendants deployed the National Guard in Los Angeles. *See Newsom v. Trump*, 25-CV-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025) (describing impermissible military participation in activities such as "traffic blockades on roads at a residential enforcement operation," and an incident where they "used riot shields and military vehicles to establish a perimeter at the DEA enforcement operation"). That mission creep was not accidental; it was the product of a "top-down, systemic effort by Defendants to use military troops to execute various sectors of federal law." *Id.*

And although this Court's decision will formally affect only those States and localities within the Ninth Circuit, its practical impact on those outside the circuit cannot be ignored. Once this Court has ratified the President's authority to federalize and employ the military in domestic law enforcement, the

27

President is more likely to exercise—and perhaps even test—that unrestrained authority throughout the nation. *See Reid v. Covert*, 354 U.S. 1, 23–24 (1957) ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds. Their fears were rooted in history. They knew that ancient republics had been overthrown by their military leaders.").

In short, because this issue is one of immediate and nationwide importance, the stakes here are high indeed, with no margin for error on the "thorny and complex issues of statutory interpretation" presented by this case. *See Illinois v. Trump*, 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025). *En banc* review is necessary to minimize the risk of committing such consequential error.

## B.    The panel's decision conflicts with precedent on those matters of exceptional importance.

Yet when presented with such high stakes, the panel majority committed multiple legal errors.

### 1.    The panel majority renders judicial review illusory, contravening *Newsom*.

The panel majority's most fundamental error is one that reflects a brewing controversy on the central legal question presented by this case: May courts review a President's determination that the facts meet § 12406's statutory

28

criteria?  A three-judge panel of this Court has held that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'"  *Newsom*, 141 F.4th at 1051.  The panel majority's analysis cannot be reconciled with that conclusion.

Under the standard announced in *Newsom*, deference to the executive does not mean that the President can circumvent constitutional and statutory limits on his authority with a patently false assertion of domestic "War," untethered from a showing of actual facts of actual violence against federal assets close in time to the attempted deployment.  The record here is devoid of such facts, just as the district court carefully and correctly found—factual findings that the federal government expressly disclaimed they were challenging at argument.

Yet the panel majority makes judicial review an empty exercise, consistent with Judge Nelson's absolutist view that "when the President invokes the 1795 Militia Act or its eventual successor § 12406, that decision is unreviewable by the federal courts."  (Conc. Op. at 5).  Worse still, the majority expressly declines to consider the patently false circumstances that the President identified as the reason that the Oregon National Guarded needed to be federalized—namely, that Portland was "War ravaged".  (Slip Op. at 26).

29

Instead, the majority criticizes the district court for relying too heavily on the President's own words, because "the President may exaggerate the extent of the problem on social media[.]" *Id.* But when federalizing a state's National Guard—over the state's objection—there can be nothing more important than the President's understanding and description of the circumstances that formed the basis of his decision.

Although the majority purported to conduct meaningful judicial review under *Newsom*'s standard, it functionally adopted Judge Nelson's absolutist view.[3] As the dissent aptly puts it, the panel majority's ruling simply "accepts the government's characterization of Portland as a war zone." (Diss. Op. at 1). Meaningful judicial review, by contrast, would require accepting the district court's factual findings, which "the government does not challenge on appeal," "are not clearly erroneous in any event," and "cannot be squared" with the majority opinion. (Diss. Op. at 7).

Here, the district court's factual findings, which are not clearly erroneous, "fully resolve this issue." (*Id.*). The district court found that

---

[3]    As the Seventh Circuit correctly explained, that absolutist view finds no support in *Martin v. Mott*, 25 U.S. 19 (1827), the primary authority cited by Judge Nelson. *See Illinois v. Trump*, 2025 WL 2937065, at *5 (explaining that *Martin* held only that "subordinate militiamen" have no authority to "review the President's determination under § 12406," not whether *courts* may do so).

30

"federal law enforcement officers, unaided by any military forces, were capable of not only quelling the violence in June but also preventi[ng] it through September." *Oregon*, 2025 WL 2817646, at \*10 (internal quotations omitted). In the two weeks leading up to the President's September 27 social media post, there was not a single incident of protesters disrupting the execution of law. *Id*. From Monday, September 22, 2025, through Friday, September 26, 2025, the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. *Id.* at \*5. PPB reported no incidents or disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. *Id.* "On September 26, the eve of the President's directive, law enforcement 'observed approximately 9-15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity.'" *Id.* at \*10.

The panel majority rejected this Court's role in deferring to the district court's factual findings and instead engaged in a fact finding mission to support the President's unsupportable determination. *See Anderson v. City of Bessemer City, N. C.*, 470 U.S. 564, 573 (1985) ("The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court."); *see also S.E.C. v. Rogers*, 790 F.2d 1450, 1458 (9th Cir. 1986) (noting that "as a court of limited review" the Ninth Circuit "must abide by the

31

clearly erroneous rule when reviewing a district court's findings."). "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123 (1969). The Supreme Court has counseled:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson*, 470 U.S. at 573-74.

In short, the majority opinion turns normal appellate-review standards on their head and makes the colorable-assessment standard an empty exercise, marking a departure from the holding of *Newsom*. What is worse, it risks a potential intra-circuit split through Judge Nelson's suggestion that *Newsom* is not binding. (Conc. Op. at 2).

In addition to the intra-circuit split, the panel's decision risks a circuit split with the Seventh Circuit, too, because that court has following *Newsom* and has held that "[n]othing in the text of § 12406 makes the President the sole judge of whether" its statutory "preconditions exist," and that those questions are "reviewable" by courts. *Illinois v. Trump*, 25-2798, 2025 WL 2937065, at *5. In addition to conflicting with that substantive rule, the panel majority's

32

willingness to accept the government's characterization of the facts over the district court's factual findings also conflicts with the Seventh Circuit's procedural approach. *Id*. (rejecting "the administration's" factual "determinations" in favor of "the district court's contrary factual findings").

### 2. The panel majority misconstrues the plain text of § 12406(3), in conflict with *Newsom*.

Leaving aside its abdication of judicial review, the panel majority also misinterpreted the key statutory criterion in this case: the requirement in § 12406(3) that "the President is unable with the regular forces to execute the laws of the United States."

The text of § 12406(3) makes clear that the President may federalize the National Guard only if he is unable at the present moment to execute the laws. By using the present tense—"is unable"—Congress clearly conveyed "that the present state of affairs is the relevant time." (Diss. Op. at 9). *See United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."); *United States v. Jackson*, 480 F.3d 1014, 1019 (9th Cir. 2007) (holding that Congress' use of "the present tense verb 'travels,' most sensibly read, does not refer to travel that occurred in the past"). Because Congress phrased § 12406(3) in the present tense, the statute requires that the President call forth the militia based on a contemporaneous assessment

33

and determination that he "is unable with the regular forces to execute the laws of the United States." That did not happen here.

Unlike the other subsections of § 12406—which contemplate not just present invasion and rebellion, but also a "danger" of those events—subsection (3)'s text cannot be satisfied based on the President's "predictive judgment about the possibility" of "imminent" events, and it must instead be based on the present facts *at the time* the President invokes that authority. (Diss. Op. at 8– 10). The panel majority was thus wrong to hold that "unable" in this context allows "past events" to permit a predictive gloss on facts that do not meet the text of subsection (3) at the time it is invoked. (Slip Op. at 25–26). Past events are relevant to the extent they show current circumstances, but they cannot justify federalization when the federal government is presently able to execute the laws with regular forces.

The panel majority was likewise incorrect to hold that subsection (3)'s stringent requirement can be met when the President has thus far been successful in executing the law but asserts that doing so has "strained resources" in an unsustainable manner. (Slip Op. at 27–30). As the dissent correctly explained, "[t]he trigger for federalizing the National Guard is an inability to execute the laws, not staffing difficulties that fall short of demonstrably resulting in an inability to execute the laws," especially when the

34

only evidence of those difficulties are the government's own ambiguous declarations, which contain facts insufficient to assess the nature of those difficulties. (Diss. Op. at 16–20).[4] The plain text of the statute requires a current inability to execute the laws, and the evidence here fails to meet that standard.

Finally, the panel majority "combines scattered incidents across four months when concluding that an exigency existed on September 27" and "stretches the facts to suggest a level of continuing violence that the record does not reflect." (Diss. Op. at 15). In doing so, the panel majority relied on circumstances that did not even occur in Portland, on situations that did not include a threat to federal property or persons, and on protesters' lawful exercise of their First Amendment rights to justify the federalization of the National Guard in Portland. (Slip Op. at 4-5, 9, 11-13).

---

[4] Also lurking in this case is a further question of statutory interpretation not expressly resolved by the panel majority: whether "regular forces" means any "federal officers" as this Court held in *Newsom*, or whether it means the soldiers and officers serving in the regular armed forces, as the Seventh Circuit has recognized may be more correct. *See Illinois v. Trump*, 25-2798, 2025 WL 2937065, at *7; *see also* Brief for Professor Martin J. Lederman as Amicus Curiae 1, *Trump et al. v. Illinois et al.*, 25-2798 (developing historical and statutory support for concluding that "'the regular forces' to which § 12406(3) refers are the regular, or 'standing' *military* personnel serving in the United States Armed Services").

35

None of the above can be reconciled with *Newsom*. According to *Newsom*, the § 12406 determination must be "in the face of the emergency and directly related to the quelling of the disorder[.]" 141 F.4th at 1051 (citing *Sterling*, 287 U.S. at 399-400). And as Judge Graber explained, *Newsom* held that the "'minimal interference' with the execution of the laws does not suffice," as a matter of law, to justify the extraordinary measure of invoking § 12406, and the Court thereby examined "the events *immediately* preceding the invocation" of § 12406 there to determine whether there was "an extreme and *ongoing* exigency." (Diss. Op. at 11, 15 (emphasis in original) (quoting *Newsom*, 141 F.4th at 1051)). The panel majority's reasoning—if allowed to stand—would provide any President with unlimited power to reference any circumstance, in any location, at any time as justification for militarizing the cities of this Nation, in conflict with *Newsom*.

Correctly interpreting and strictly applying Congress's intent in this context is no small matter. By enacting § 12406, Congress removed this form of presidential authority from the "zone of twilight" that normally attends congressional silence on a matter, where presidential power is perhaps concurrent with that of Congress or at worst uncertain. *See* Stephen I. Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 191-92 (2004) (discussing *Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure)*, 343 U.S.

36

579, 637 (1952) (Jackson, J., concurring). Instead, when "presidential emergency actions involving the military at home" are outside the scope of "express congressional authorization" under § 12406, they "are a usurpation of Congress's emergency power" and reflect the "lowest ebb" of presidential authority. Vladeck, 114 Yale L.J. at 192. The panel majority was thus mistaken to adopt such an atextual and elastic approach to interpreting § 12406's proper scope.

The stakes could not be graver. If the panel majority's ruling stands, almost anything—First Amendment-protected speech, low-level property offenses, nonviolent trespasses—could justify the President federalizing a State's National Guard and deploying them to the streets of our cities. Because the facts are so stark here, this case presents the ideal vehicle for the *en banc* Court to resolve what § 12406 means and how its use is subject to judicial review. And this Court should do so swiftly: The status quo still holds in Portland, and by immediately vacating the panel's order this Court will ensure that it remains so while it considers the important questions presented here.[5]

---

[5]    This case will not be rendered moot even if the TRO on appeal expires or is dissolved by the district court in response to the panel's decision. Defendants rely on the panel's decision to support a motion to dissolve a second TRO that is otherwise maintaining the status quo in Portland by preventing the deployment of any federalized National Guard members. (See Dkt. 68 (second TRO); Dkt. 97 (motion to dissolve second TRO)). Litigation over the second

*Footnote continued...*

37

## CONCLUSION

This Court should allow *en banc* review and vacate the panel's order on the motion for a stay pending appeal. *Cf. Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (*en banc*) (granting similar relief).

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General

/s/  Denis M. Vannier

DENIS M. VANNIER  #044406
Senior Deputy City Attorney
denis.vannier@portlandoregon.gov

Attorney for Appellee
City of Portland

/s/  Stacy M. Chaffin

STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov

Attorneys for Appellee
State of Oregon

---

TRO establishes a collateral consequence resulting from the panel's decision, creating an exception to the normal mootness rules that would otherwise preclude further review of that decision. *See generally Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996) (describing collateral consequences "exception to the mootness doctrine). At a minimum, the Court should grant en banc review to vacate the panel decision. *See United States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010) (noting "the opportunity to seek an en banc rehearing for the purpose of vacating our decision").

Even if the district court dissolves the second TRO, absent en banc review, the district court is likely to follow the panel decision as persuasive guidance. It will therefore have collateral consequences in the trial on the merits of plaintiffs' claims at the district court. Further, the exceptionally important issues in this case require timely resolution, and this case is an ideal candidate for ensuring those likely-to-recur issues do not escape review. See generally, e.g., *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (explaining mootness exception for cases that are capable of repetition while evading review).

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, and this

Court's order directing supplemental briefing, I certify that the Appellees'

Supplemental Brief is proportionately spaced, has a typeface of 14 points or

more and contains 8,596 words.

DATED:  October 22, 2025

/s/  Stacy M. Chaffin
STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov

Attorney for Plaintiff-Appellee
State of Oregon

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General
DUSTIN E. BUEHLER  #152024
Special Counsel
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil Appeals
PEENESH SHAH  #112131
Assistant Attorney General
STACY M. CHAFFIN  #205782
Assistant Attorney General
 1162 Court St.
 Salem, Oregon 97301
 Telephone: (503) 378-4402

Counsel for Appellee State of Oregon

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF OREGON; CITY OF PORTLAND, | |
| Plaintiffs-Appellees, | U.S.C.A. No. 25-6268 |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; et al, | STATEMENT OF RELATED CASES |
| Defendants-Appellants. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of

Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellees,

/ / /

/ / /

/ / /

certifies that she has no knowledge of any related cases pending in this court.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Interim Deputy Attorney General

/s/  Stacy M. Chaffin
STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov
DUSTIN E. BUEHLER  #152024
Special Counsel
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil Appeals
PEENESH SHAH  #112131
Assistant Attorney General

Attorneys for Plaintiff-Appellee
State of Oregon

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2025, I directed the Appellees'

Supplemental Brief to be electronically filed with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

/s/  Stacy M. Chaffin
STACY M. CHAFFIN  #205782
Assistant Attorney General
stacy.chaffin@doj.oregon.gov

Attorney for Plaintiff-Appellee
State of Oregon

SC3:kw5/1002547956