No. 25-6268

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

STATE OF OREGON, *et al.*,

> *Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

> *Defendants-Appellants*.

———————————

## On Appeal from the United States District Court
## for the District of Oregon
No. 3:25-cv-01756-IM
The Honorable Karin J. Immergut

———————————

## STATE OF CALIFORNIA'S MOTION TO INTERVENE AND
## SUGGESTION FOR REHEARING EN BANC

———————————

ROB BONTA
 *Attorney General of California*
SAMUEL T. HARBOURT
 *Solicitor General*
HELEN H. HONG
 *Principal Deputy*
 *Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
 *Senior Assistant*
 *Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
 *Supervising Deputy*
 *Attorneys General*

October 22, 2025

CHRISTOPHER D. HU
AARON D. PENNEKAMP*
 *Deputy Solicitors General*
BARBARA HORNE-PETERSDORF
JANE REILLEY
 *Deputy Attorneys General*
HALEY L. AMSTER
 *Associate Deputy*
 *Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6661
Aaron.Pennekamp@doj.ca.gov

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement ..................................................................................... 4

    A.   Deployment of California's National Guard in the
Los Angeles area .................................................... 4

    B.   Deployment of California's National Guard in
Oregon ...................................................................... 6

Argument ...................................................................................... 8

    I.   The Court should allow the State of California to intervene
as a party to this proceeding .................................................... 8

    II.   The Court should grant en banc review ................................. 13

Conclusion .................................................................................. 23

# TABLE OF AUTHORITIES

**Page**

CASES

*Bates v. Jones*
127 F.3d 870 (9th Cir. 1997) .................................................... 1, 9

*Cameron v. EMW Women's Surgical Ctr.*
595 U.S. 267 (2022) ..................................................................... 10

*Day v. Apoliona*
505 F.3d 963 (9th Cir. 2007) ............................................. 9, 10, 11

*Illinois v. Trump*
2025 WL 2937065 (7th Cir. 2025) ....................................... 10, 14

*Laird v. Tatum*
408 U.S. 1 (1972) .................................................................... 3, 19

*New York v. United States*
505 U.S. 144 (1992) ....................................................................... 18

*Newsom v. Trump*
141 F.4th 1032 (9th Cir. 2025) ............................................. *passim*

*W. Watershed Proj. v. Haaland*
22 F.4th 828 (9th Cir. 2022) .............................................. 11, 12

*Widakuswara v. Lake*
2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ............................. 3

STATUTES

10 U.S.C. § 12406 ................................................................. *passim*

Pub. L. No. 119-21, § 100052 (2025) ............................................. 17

# TABLE OF AUTHORITIES
## (continued)

Page

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
§ 8, cls. 15-16 .............................................................20
§ 9, cl. 7 ....................................................................17

U.S. Const. art. II
§ 2, cl. 1 ....................................................................20

**COURT RULES**

9th Cir. R. 29-2 ...............................................................2

Fed. R. App. P. 29 .............................................................2

Fed. R. App. P. 40(b)(2)(A) ..................................................14

Fed. R. Civ. P. 24(a)(2) ......................................................9

**OTHER AUTHORITIES**

*California to Deploy National Guard to Support Food Banks*,
Gov. Gavin Newson (Oct. 22, 2025),
https://tinyurl.com/3pr9yam3 ...............................................21

Coakley, *The Role of Federal Military Forces in Domestic
Disorders, 1789-1878* (1988), https://tinyurl.com/566cb2cm..............19, 20

The Federalist No. 29 (Alexander Hamilton) .................................21

Leider, *The Modern Militia*, 2023 Mich. St. L. Rev. 893 (2023)....................20

iii

## INTRODUCTION

California became a plaintiff in this case through an amended complaint that was filed after the notice of appeal in these appellate proceedings, and California now seeks leave to intervene in this Court, to join its co-plaintiffs in requesting rehearing en banc. Although intervention at the appellate stage is ordinarily "unusual," *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997), the circumstances underlying this litigation have been anything but ordinary. The federal government has drawn the State of California into this dispute: first by transporting 200 federalized members of California's National Guard from Los Angeles to Oregon, just hours after the district court's order prohibiting defendants from deploying members of *Oregon's* National Guard; and second, by issuing an order a few days ago, extending federalization of 200 California Guardsmen in Oregon to February 2026—specifically for the purpose of protecting "Federal functions, personnel, and property in *Oregon*."

California is now a plaintiff in the proceedings below, and defendants' recent actions have directly implicated California's sovereign interests in this appeal. The question whether the circumstances in Portland supply a "colorable basis for the President's determination that he is unable with [the] regular forces to execute the laws of the United States," Stay Order 26, is directly relevant to the status of the 200 California Guardsmen in Oregon now. The Court should therefore allow

California to intervene as a party to these appellate proceedings—just as it has already become a party to the district court proceedings.[1]

The Court should also grant en banc review and vacate the panel's published stay order pending en banc proceedings.[2]  The panel's order purports to apply this Court's prior decision in *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), but its reasoning "cannot be reconciled with *Newsom*" in several ways, Dissent 7 (Graber, J.).  For instance, while *Newsom* limited the circumstances that would justify a President's invocation of 10 U.S.C. § 12406 to "unusual" and "extreme" exigencies, 141 F.4th at 1051, the panel's order extends the statute to situations "far divorced" from any extreme or ongoing emergency, Dissent 34.  And the panel's application of the "highly deferential standard of review" discussed in *Newsom*, 141 F.4th at 1052, dilutes that deference standard to effectively insulate the President's decisions from all review, *see* Dissent 5 (deference "is not

---

[1] The State of Oregon and the City of Portland do not oppose California's motion.  The federal government has provided the following statement about its position:  "The federal government opposes this motion because the injunction on appeal does not apply to the California National Guard, any interest that California has is adequately represented by the present parties, California may participate as an amicus, and this case does not warrant en banc review for the same reasons articulated in the federal government's separately filed brief.  The federal government does not intend to file a separate response to this motion."

[2] If the Court does not approve the State's intervention request, the State respectfully requests that the Court construe this motion as an amicus brief filed in support of en banc review.  *See generally* Fed. R. App. P. 29; 9th Cir. R. 29-2.

2

unlimited").  In short, if even the "'largely sedate,'" *id.* at 13, conditions in Portland in September 2025 could justify federalizing and deploying the National Guard, then there are no circumstances in which the President would be limited from deploying military forces to the streets of an American city.

Defendants' unprecedented actions upset our Nation's longstanding tradition against "military intrusion into civilian affairs," *Laird v. Tatum*, 408 U.S. 1, 15 (1972), and threaten to alter the proper balance of power between Congress, the President, and the sovereign States.  In June, the President took the extraordinary step of invoking Section 12406 to federalize California's National Guard over the Governor's objection.  Since then, the President has repeated the experiment in places like Portland and Chicago—and has threatened to do the same in several other cities across the Nation, including most recently in San Francisco.  The Court should grant rehearing en banc and vacate the stay order to prevent the current President—and any future President—from using the military to expand federal power in ways that defy our longstanding democratic traditions.  *Cf. Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (granting similar relief).

3

## STATEMENT

### A.  Deployment of California's National Guard in the Los Angeles Area

In June 2025, President Trump issued a memorandum invoking Section 12406 and authorizing Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days" or longer.  C.A. Dkt. 57.1 at ER-190.[3]  On June 7 and 9, Secretary Hegseth issued orders to federalize 4,000 members of the California National Guard to provide protective services for federal buildings and federal agents within the Los Angeles region.  C.A. Dkt. 57.1 at ER-6-7.

The State of California filed a lawsuit challenging the President's federalization and obtained a temporary restraining order prohibiting defendants "from deploying members of the California National Guard" and directing defendants "to return control of the California National Guard to Governor Newsom."  C.A. Dkt. 57.1 at ER-37.  In an appeal separate from the present litigation, 9th Cir. No. 25-3727, this Court granted a stay pending appeal, concluding that defendants had presented facts about circumstances in early June

---

[3] Unless otherwise noted, "C.A. Dkt." refers to the docket in *Newsom v. Trump*, No. 25-3727 (9th Cir.).  "D.Ct. Dkt." refers to the docket in *Oregon v. Trump*, No. 25-cv-1756 (D. Or. Sept. 28, 2025).

in Los Angeles that established a "colorable basis for invoking" Section 12406(3). *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025).

Since then, the circumstances on the ground in Los Angeles have changed in material ways. The federal government has conceded that the risk to federal personnel and property has subsided. *See, e.g.*, C.A. Dkt. 126.1 at A-214. In recognition of that reality, defendants reduced the number of federalized National Guard units. By August 5, the number had fallen to 300. C.A. Dkt. 126.1 at A-2-3. Defendants nonetheless issued an order extending their deployment for a period of 90 days, through early November 2025. *See id.* at A-3.

In light of those changed circumstances (and others described in the next section), California filed a motion asking a panel of this Court to vacate its stay and issue an order to return the remaining 300 federalized members of the California National Guard to state control. *See generally* C.A. Dkt. 126.1. California explained that even under the "highly deferential standard of review" applied by this Court, which allows for actions "within a 'range of honest judgment,'" *Newsom*, 141 F.4th at 1050, 1052, defendants' efforts to extend the federalization of California's National Guard falls short. California's motion to vacate the stay remains pending before the panel of this Court considering the appeal in 9th Cir. No. 25-3727.

**B.    Deployment of California's National Guard in Oregon**

Meanwhile, on September 28, 2025, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 members of Oregon's National Guard.  D.Ct. Dkt. 56 at 3.  The State of Oregon and the City of Portland filed a lawsuit in the District of Oregon challenging the federalization order; they also filed a motion requesting a temporary restraining order.  *See* D.Ct. Dkt. 1, 6.  The district court granted the requested relief on October 4 in an order that is the subject of this appeal, enjoining defendants "from implementing Defendants' September 28, 2025 Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland."  D.Ct. Dkt. 56-1 at 1.

Hours later, the U.S. Army Northern Command communicated to California military leaders that it planned to send 200 federalized California National Guard personnel to Portland.  D.Ct. Dkt. 60 at 3.  By 6:30 a.m. the next day, approximately 100 of those Guard members had departed Los Angeles for Portland, and additional transport was scheduled for later in the day.  *See id.*  California also learned that defendants planned to send all 300 federalized California National Guard personnel to Portland, and that an order extending their federalization through January 31, 2026, would soon be issued.  *See id.*  Additionally, Defense Secretary Hegseth ordered the federalization of 400

6

members of Texas's National Guard "to perform federal protection missions where needed, including the cities of Portland and Chicago." D.Ct. Dkt. 65-1 at 2.

On October 5, Oregon and the City of Portland filed an amended complaint, D.Ct. Dkt. 58, and a second motion for a temporary restraining order, D.Ct. Dkt. 59. In light of California's substantial sovereign injuries and other forms of irreparable harm, the State of California became a plaintiff in this case and joined Oregon and Portland in seeking a second temporary restraining order—this time, the requested order would prevent the deployment of *California* National Guard troops in Portland. *See, e.g.*, D.Ct. Dkt. 59 at 11-12. As a result, California is a party for all purposes in the proceedings below. The district court held an emergency telephonic hearing later that evening and granted the requested temporary restraining order, enjoining defendants "from deploying federalized members of the National Guard in Oregon." D.Ct. Dkt. 68 at 1.

On October 16, defendants issued a memorandum stating that Secretary Hegseth had "directed the extension of orders for all California (CA) National Guard (NG) units called into Federal service" from "November 4, 2025 to February 2, 2026." C.A. Dkt. 139.1 at A-455. The memorandum also reported that the Secretary had called 200 Texas National Guard members into federal service through December 4, 2025. *See id.* The memorandum explained that "[t]hese 200 CA NG and 200 TX NG personnel . . . will deploy to Oregon effective

immediately to protect Federal functions, personnel, and property," and that the "400 personnel[] is the minimum required to protect Federal functions, personnel, and property in Oregon under current circumstances." *Id.* This memorandum marked the first time that defendants had justified the deployment of the California National Guard to Portland based on the alleged circumstances on the ground in Portland. Previously, defendants' position was that they could deploy the California National Guard to *Portland* based on the June memorandum issued in response to conditions in *Los Angeles*. *See, e.g.*, C.A. Dkt. 126.1 at A-421-422; *supra* p. 4 (discussing June memorandum).

## ARGUMENT

### I. THE COURT SHOULD ALLOW THE STATE OF CALIFORNIA TO INTERVENE AS A PARTY TO THIS PROCEEDING

California's interests became directly implicated in this litigation when defendants transported approximately 200 members of California's National Guard to Oregon, just hours after the district court issued the order prohibiting "the federalization and deployment of Oregon National Guard service members to Portland." D.Ct. Dkt. 56-1 at 1; *see* D.Ct. Dkt. 60 at 4. In light of California's substantial sovereign interests harmed by the federal government's actions, California joined the State of Oregon and the City of Portland on October 5 in filing an amended complaint and a request for a second temporary restraining

order.  *See generally* D.Ct. Dkt. 58, 59.  Since then, California has been a party for all purposes in the proceedings below.

After joining the litigation in the district court, California's interest in the proceeding has only grown more immediate and substantial.  The federal government's October 16 order extends the federalization of the 200 members of California's Guard presently in Oregon for another 90 days through February 2, 2026, and orders their deployment "immediately" for the specific purpose of "protect[ing] Federal functions, personnel, and property in *Oregon*."  C.A. Dkt. 139.1 at A-455 (emphasis added).  The question of whether the circumstances in Portland supply a "colorable basis for the President's determination that he is unable with [the] regular forces to execute the laws of the United States," Stay Order 26, is thus directly relevant to the status of the 200 California Guardsmen in Oregon now.  Although California was not a party when the district court issued the first temporary restraining order, defendants' subsequent actions—particularly the October 16 order—have drawn California directly into this appellate dispute.

Given those circumstances, California readily satisfies the standard for appellate intervention in this case.  *See Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007); *see also* Fed. R. Civ. P. 24(a)(2).  While "intervention at the appellate stage is . . . unusual," it can be justified for "imperative reasons."  *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997).  And although no statute or rule provides a

9

governing standard for deciding whether intervention on appeal should be allowed, the policies underlying intervention under Federal Rule of Civil Procedure 24 "guid[e]" the analysis. *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 276-277 (2022). Under that rule, the Court considers several factors, including whether the movant "has a significant protectable interest relating to the . . . subject of the action;" whether "the disposition of the action may, as a practical matter, impair or impede . . . [the movant's] ability to protect its interest;" whether "the application is timely;" and whether "the existing parties may not adequately represent . . . [the movant's] interest." *Day*, 505 F.3d at 965 (internal quotation marks omitted). Each factor strongly favors intervention here.

California's "significant protectable interest" in these appellate proceedings is not debatable. With the October 16 order extending the federalization of California Guardsmen for purposes of a deployment in Oregon based on current conditions in Portland, the question of whether the conditions in Portland satisfy the requirements of Section 12406 squarely affects California's sovereign interests. *See, e.g.*, *Newsom*, 141 F.4th at 1055 (acknowledging the State's "significant interests"); *Illinois v. Trump*, 2025 WL 2937065, at *7 (7th Cir. 2025) (deploying Guard troops in the State over the State's objection "constitutes proof of an irreparable harm").

10

The federal government also disclosed for the first time during oral argument before this Court that it "did not appeal the second TRO" because it "concluded that the district court would be required to dissolve the second TRO if Defendants succeed on their motion for a stay pending appeal." Stay Order 19 n.8. Although the panel opinion correctly recognized that the question of "[w]hether the second TRO could be extended to preclude the deployment of members of the California National Guard is a separate issue," Stay Order 34, the federal government's position threatens to, "as a practical matter, impair or impede" California's ability to challenge the deployment of its National Guard in Oregon, *Day*, 505 F.3d at 965 (internal quotation marks omitted). And if there were any doubt, the October 16 order confirms California's interest in these appellate proceedings.

California also has an interest that is unique from Oregon's. Of course, Oregon and California "share the same ultimate objective" in this litigation. *W. Watershed Proj. v. Haaland*, 22 F.4th 828, 841 (9th Cir. 2022). Both States seek to enjoin defendants from improperly federalizing and deploying National Guard troops in violation of statutory and constitutional limits. *See* D.Ct. Dkt. 58 at 32-43. But Oregon has its Guard, and California is a separate sovereign with its own Guard. And the far-flung deployment of California's National Guard threatens distinct harms. Indeed, the district court relied on these California-specific harms

11

when it granted the second temporary restraining order.  *See* C.A. Dkt. 126.1 at A-438; *see also id.* at A-430-431.

California is also uniquely positioned to offer this Court arguments related to the real-world consequences of the federal government's expansive view of presidential authority.  *See W. Watershed Proj.*, 22 F.4th at 842 (allowing intervention when a party brings "unique perspective to this litigation").  On June 7, for the first time in our Nation's history, the President invoked 10 U.S.C. § 12406 to federalize a State's National Guard over the objections of the State's Governor.  Nearly five months later, federalized members of California's Guard remain deployed in and around Los Angeles (and Portland and Chicago), and the federal government has now extended that deployment for some 200 members of the Guard to February 2026—more than eight months after the June events that initially prompted the federalization.  *See* C.A. Dkt. 139.1 at A-455.  The federal government's recent actions concerning California's National Guard illustrate a nearly limitless conception of presidential authority under Section 12406, and California should have the opportunity to present its "unique perspective" in this ongoing appeal.  *W. Watershed Proj.*, 22 F.4th at 842; *see also* Br. of the State of California and its Governor as Amici Curiae in Support of Respondents 7-12, *Illinois v. Trump*, No. 25A443 (U.S. Oct. 20, 2025) (documenting California's

experience since June with the federal government's unlawful National Guard deployment in Southern California), https://tinyurl.com/2apxrnrb.

## II. THE COURT SHOULD GRANT EN BANC REVIEW

California agrees with the State of Oregon and the City of Portland that the panel's stay order warrants en banc review and that the Court should vacate the stay order pending further en banc proceedings. As Judge Graber explains, the panel's order "cannot be reconciled with *Newsom*" (Dissent 7): it allows the "President to invoke emergency authority in a situation far divorced from an enumerated emergency," *id.* at 34; it dilutes the deference standard described in *Newsom* into an effectively toothless form of judicial review, *see id.* at 5; and it remarkably concludes that a State "suffer[s] *no injury* from federalization," Stay Order 33 n.16 (emphasis added).

The decision also presents issues of exceptional importance. The proper construction of Section 12406—and how courts should review invocations of that authority—have far-reaching consequences for our democracy and the proper balance of power between the President, Congress, and the States. Earlier this year, California predicted that the "highly deferential standard of review" adopted in *Newsom* would invite President Trump to repeat his dangerous experiment with the unlawful deployment of troops to cities and States throughout the Ninth Circuit and beyond. *See* C.A. Dkt. 48.1 at 11. Regrettably, that has proven true, and the

13

President has threatened yet further deployments of the National Guard within this Circuit based on nothing more than unfounded assertions of general lawlessness. This Court's en banc review is warranted to make clear that the proper standard of review "is not unlimited." Dissent 5.

1. The panel's order "cannot be reconciled" with the published decision in *Newsom.* Dissent 7.[4] Although the panel stated that its analysis "is circumscribed by [the] legal conclusions on the same issues in *Newsom*," Stay Order 19, the reasoning in the panel's order hardly resembles *Newsom*'s reasoning in several fundamental respects. *See* Fed. R. App. P. 40(b)(2)(A).

a. As Judge Graber observed, *Newsom* held that the proper interpretation of Section 12406(3) limits its invocation to "an extreme and *ongoing* exigency." Dissent 11. The statute allows federalization if "the President *is* unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3) (emphasis added). The Court in *Newsom* declined to adopt a construction of the statute that would require "as a prerequisite that the President be completely

---

[4] The panel's order views the Seventh Circuit's decision in *Illinois v. Trump*, 2025 WL 2937065 (7th Cir. Oct. 16, 2025), to involve facts that are "not analogous to the facts" in this case. Stay Order 31 n.15; *see also id.* (contending that "the situation in Portland . . . is distinguishable from the events in Chicago"). The federal government does not share that view. It recently explained its position in ongoing proceedings before the Supreme Court that there is a "stark conflict between the Ninth and Seventh Circuits." Reply 3, *Illinois v. Trump*, No. 25A443 (U.S. Oct. 21, 2025); *see also id.* at 12-13 (arguing that "there is a circuit split").

precluded" from executing the laws, or a reading that would "suggest that activation is inappropriate so long as any continued execution of the laws is feasible." 141 F.4th at 1051. At the same time, however, the Court rejected the federal government's argument that "any minimal interference with the execution of the laws is, by itself," adequate "to justify invoking" Section 12406(3). *Id.* Rather, the Court held that the statute requires the President to identify an "unusual," "extreme" exigency similar in kind to the "invasions" or "rebellions" mentioned in "[s]ubsections one and two of the statute." *Id.*

The panel's stay order in this case, by contrast, "permit[s] the President to invoke emergency authority in a situation far divorced from an enumerated emergency." Dissent 34; *see* Stay Order 23-31. The panel's decision failed to focus on whether there is a "present exigency," Dissent 8, examining instead whether "scattered incidents across four months" offer a colorable basis to federalize the Guard, *id.* at 15. But as Judge Graber explained, both the statute and *Newsom* require an "*ongoing* exigency." *Id.* at 10, 11 (citing *Newsom*, 141 F.4th at 1041-1042). "It is illogical to assert that, because an emergency existed three months ago, the same emergency exists today." *Id.* at 15; *see also id.* ("A pot of tepid water is not a pot of boiling water, and it cannot hurt you, even if it was boiling water three hours earlier.").

15

Judge Graber also properly faulted the majority for concluding that the President was "unable with the regular forces to execute the laws," even though the federal government acknowledged that it could "surge" Federal Protective Service officers to Portland to "'quell[]'" any violence. Stay Order 28-30. As Judge Graber explained, under a proper reading of *Newsom*, the "trigger for federalizing the National Guard is an inability to execute the laws, not staffing difficulties that fall short of demonstrably resulting in an inability to execute the laws." Dissent 17. "The most that can be said is that, because FPS officers were stretched thin, *if* protests were to flare up in the future and *if* staffing woes were to lead to insufficient staffing, then an inability to execute the laws *might arise* at some hypothetical future time." *Id.* But "fear of a future inability is not enough." *Id.*; *see also id.* ("Nor could staffing difficulties *alone*" support invocation of Section 12406(3), "otherwise, the President could direct scores of FPS officers to a location with minimal security issues and then claim authority to call up the National Guard because those officers are needed elsewhere.").

The majority's approach would transform Section 12406 into a mechanism for the Executive Branch to circumvent our ordinary constitutional processes. In our democratic system, the appropriate answer to the types of long-term budgetary and staffing concerns identified by the majority is for the President to ask *Congress* to expand those agencies' budgets, not to commandeer a State's National Guard for

federal service.  *See* U.S. Const. art. I, § 9, cl. 7.  For example, the President

recently prevailed upon Congress to triple the size of ICE's budget.  *See* Pub. L.

No. 119-21, § 100052 (2025).  Federalizing the National Guard under Section

12406(3) is a temporary solution to "unusual and extreme exigencies," *Newsom*,

141 F.4th at 1051, not a means to circumvent our ordinary democratic process.

    b.  The panel's order also applied a standard of deference that is effectively

"unlimited," Dissent 5—nothing like the "highly deferential," but not toothless,

standard of review applied in *Newsom*, 141 F.4th at 1052.  While the majority

purported to evaluate whether the President's invocation of Section 12406(3)

"reflects a colorable assessment of the facts and law within a range of honest

judgment," Stay Order 23 (internal quotation marks omitted), it diluted that review

in ways that *Newsom* plainly did not contemplate.  For example, the majority

emphasized that "the inherently subjective nature" of evaluating whether the

preconditions of Section 12406(3) are met "demonstrates that *the President* has the

authority to identify and weigh the relevant facts," *id.* at 25 (emphasis added).  But

this Court previously explained that "the text of the statute does not make the

President the sole judge of whether one or more of the statutory preconditions

exist." *Newsom*, 141 F.4th at 1047.

    And as Judge Graber explained, the "facts of this case come nowhere near

justifying the conclusion that the President was unable on September 27 to execute

the laws." Dissent 12. "[T]here had not been a single incident of protesters' disrupting the execution of the laws" in the two weeks leading up to the President's order calling up Oregon's Guard. *Id.* at 7. And looking more broadly at the four months prior to the invocation of Section 12406, including protest activity in June, "civilian authorities were able to restore order and resume regular operations." *Id.* at 15. The "present record" therefore "provides no support for the proposition that a staffing challenge amounted to an inability to execute the law." *Id.* at 21.

c. Finally, the majority's assessment of Oregon's claims of sovereign injury is flatly inconsistent with the treatment of the same type of harm in *Newsom*. While the panel's order acknowledges that *Newsom* held that States have "significant interests" at stake, Stay Order 35, the majority elsewhere offered its startling view that the State "suffer[s] no injury from federalization," *id.* at 33, n.16. As the majority sees things, the federalization of the Guard is "inherent to a system where National Guard units may temporarily be federalized pursuant to a federal statute." *Id.* But that devalues the State's significant interest in the "constitutional balance of power between federal and state government." *Newsom*, 141 F.4th at 1055. Indeed, it rests on the inexplicable premise that States suffer no cognizable injury when the federal government unlawfully commandeers their National Guard personnel for federal service. It is well-settled that States suffer injury in those circumstances. *See generally New York v. United States*, 505 U.S.

18

144, 166 (1992).  Although States may anticipate that their National Guard forces will be *lawfully* "federalized pursuant to a federal statute," Stay Order 33 n.16, they do not assume the risk that the federal government will abuse its limited federalization authority.

2.  The panel's order unquestionably implicates issues of exceptional importance.  Since the President federalized thousands of National Guard troops over the opposition of California's Governor in June, he has federalized troops in Washington D.C., Portland, and Chicago—and he has threatened to send the Guard into many other American communities, including imminently in San Francisco. Questions of how to interpret Section 12406—and how courts should review invocations of that authority—have important consequences for our democracy.  It is a "bedrock principle of American democracy" that "our military is apolitical." Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals as Amici Curiae, C.A. Dkt. 17.1 at 12.  By unilaterally seizing control of state National Guard units in service of the President's efforts to ramp up federal immigration enforcement, defendants risk "politicization of the military, which inevitably erodes public trust, impacts recruitment, and undermines troop morale." *Id.* at 7.  And every day that military troops patrol the streets of American cities, our Nation's longstanding norm against "military intrusion into civilian affairs" is further eroded.  *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* Coakley, *The Role*

*of Federal Military Forces in Domestic Disorders, 1789-1878*, at 3 (1988),

https://tinyurl.com/566cb2cm ("Opposition to the use of military force in the

enforcement of civil law is deeply embedded in American tradition.").

 This case also implicates the proper balance of power between the President,

Congress, and the States.  The Militia Clauses of the Constitution vest authority to

call forth the militia—in modern terms, the National Guard—"in the Congress, not

the president."  Coakley, *supra*, at 14.  And the Militia Clauses and the Tenth

Amendment reflect the Framers' intent to preserve state authority over the militia

and dual sovereignty.  *See, e.g.*, Leider, *The Modern Militia*, 2023 Mich. St. L.

Rev. 893, 915-918 (2023).  James Madison "advocated for full national control of

the militia."  *Id.* at 916.  "Other delegates, however, fought Madison by stressing

the importance" of state control.  *Id.* at 917.  Under the prevailing compromise,

States retain control absent a valid federalization pursuant to a statute enacted by

Congress.  *See* U.S. Const. art. I, § 8, cls. 15-16; *see also id.* art. II, § 2, cl. 1.

 That compromise continues to serve important purposes today.  The National

Guard performs vital state functions, including disaster response and drug

interdiction.  *See, e.g.*, C.A. Dkt. 5.1 at A190-195, A262.  Most recently, the

California National Guard has been deployed to support food banks in distributions

of food for individuals harmed by the loss of life-sustaining nutrition benefits

during the federal government shutdown.[5]  When the President federalizes the Guard in ways that exceed the limited authority granted to him by Congress—and when courts do not appropriately police the boundaries of executive authority—it intrudes on Congress's Article I prerogatives and on the State's sovereign right to deploy its Guard.  Those harms are only exacerbated when the President sends troops from one State to another, over the Governor's objection.  *Cf.* The Federalist No. 29 (Alexander Hamilton) (arguing Antifederalists were "absurd" to suggest the calling forth power could allow the "militia of Virginia" to "be dragged from their homes five or six hundred miles, to tame the republican contumacy of Massachusetts").

Other troubling consequences flow from defendants' expansive understanding of their legal authority—and the panel's decision to accord extraordinary (in effect, boundless) deference in this area.  As Judge Graber observed, the panel's order appeared to accept defendants' argument that "a staffing challenge" would suffice to allow the President to federalize the National Guard under Section 12406. Dissent 21.  On that view, defendants could always use Guard troops to augment federal law enforcement resources without having to go through the trouble of seeking a congressional appropriation.  *Supra* pp. 16-17.  And according to the

---

[5] *California to Deploy National Guard to Support Food Banks*, Gov. Gavin Newson (Oct. 22, 2025), https://tinyurl.com/3pr9yam3.

majority, any minimal or sporadic acts of unrest and violence can suffice to authorize federalization.  Giving the President authority to federalize the Guard in those circumstances would make it all too easy to deploy thousands of military troops to American communities—not just where civilians are protesting immigration enforcement, but also where they are protesting other policies, or protesting in advance of a federal election.  En banc review is warranted to prevent that untenable and dangerous scenario from materializing.

## CONCLUSION

The Court should allow the State of California to proceed as a party in this appeal, grant en banc review, and vacate the stay order pending en banc proceedings.


Dated:  October 22, 2025                    Respectfully submitted,

                                            *s/ Aaron D. Pennekamp*

                                            ROB BONTA
                                              *Attorney General of California*
                                            SAMUEL T. HARBOURT
                                              *Solicitor General*
                                            HELEN H. HONG
                                              *Principal Deputy Solicitor General*
                                            THOMAS S. PATTERSON
                                            MICHAEL L. NEWMAN
                                              *Senior Assistant Attorneys General*
                                            CHRISTOPHER D. HU
                                            AARON D. PENNEKAMP
                                              *Deputy Solicitors General*
                                            ANYA BINSACCA
                                            MARISSA MALOUFF
                                            JAMES E. STANLEY
                                              *Supervising Deputy Attorneys General*
                                            BARBARA HORNE-PETERSDORF
                                            JANE REILLEY
                                              *Deputy Attorneys General*
                                            HALEY L. AMSTER
                                              *Associate Deputy Solicitor General*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(1) and Local Rules 27-1(d) and 32-3 because it contains 5,024 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.