**Case No. 25-6268**

---

**THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

STATE OF OREGON; et al.,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, In his official capacity as President of the United States; et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Oregon

No. 3:25-cv-01756-IM

---

**SUPPLEMENTAL AMICUS CURIAE BRIEF OF NINTH CIRCUIT
STATES IN SUPPORT OF REHEARING EN BANC**

---

Joshua D. Bendor (AZ Bar No. 031908)
Joshua.Bendor@azag.gov
Emma H. Mark (AZ Bar No. 032249)
Emma.Mark@azag.gov
ACL@azag.gov

OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333

*Counsel for the State of Arizona*

*(Additional Amici on Signature Page)*

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................... 1

INTERESTS OF AMICI CURIAE ............................................................ 1

ARGUMENT ........................................................................................... 2

I.    The Order conflicts with *Newsom*, history, and the text of
§ 12406 by permitting the President to federalize the National
Guard without exigent circumstances ........................................ 2

II.    The Order's definition of "regular forces" conflicts with
*Newsom*. ..................................................................................... 9

CONCLUSION ...................................................................................... 11

CERTIFICATE OF COMPLIANCE ........................................................ 13

CERTIFICATE OF SERVICE ................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex parte Milligan*,
    71 U.S. (4 Wall.) 2 (1866) ...............................................................................8

*Illinois v. Trump*,
    No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025).........................10

*Martin v. Mott*,
    25 U.S. (12 Wheat.) 19 (1827) .....................................................................5

*Mincey v. Arizona*,
    437 U.S. 385 (1978) .......................................................................................8

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) .............................................. 2, 3, 5, 6, 7, 10

*Oregon v. Trump*,
    No. 3:25-cv-1756-IM, 2025 WL 2817646 (D. Or. Oct. 4, 2025) .............7, 9

*United States v. Johnson*,
    256 F.3d 895 (9th Cir. 2001)..........................................................................8

**Statutes**

10 U.S.C. § 12406...........................................................................................passim

**Other Authorities**

Donald J. Trump, President of the United States, Remarks to the
    Department of War (Sept. 30, 2025) ........................................................11

Joseph Nunn & Elizabeth Goitein, Guide to Invocations of the
    Insurrection Act, Brennan Center for Justice (Apr. 25, 2022)................4

Leslie Berger, *A City in Crisis: Days of Devastation in the City*, L.A.
    Times (May 3, 1992).......................................................................................4

Mary C. Lawton, Memorandum from Antonin Scalia, Assistant
          Att'y Gen., Off. of Legal Couns., to the Deputy Att'y Gen. Re:
          L. Relating to Civ. Disturbances (Jan. 6, 1975)..........................................3

## INTRODUCTION

The Panel's Order grants the President sweeping authority to mobilize and deploy the National Guard in situations that go far beyond our Nation's history and tradition and the text of 10 U.S.C. § 12406 itself. Under the reasoning of the Order, the President could justify deployment of the National Guard whenever there is even a possibility that federal law enforcement resources may be strained or used in an "irregular" location. That low threshold demeans traditional notions of state sovereignty and the founding American principle that the use of the military for ordinary domestic law enforcement is a threat to liberty. The Order is at odds with this Court's precedent, as well as the text of § 12406, which provide for federal deployment of the National Guard in defined, exigent circumstances. The Order allows federalization of the National Guard to become routine. This case should be reheard en banc.

## INTERESTS OF AMICI CURIAE

Because this case presents issues of grave importance to the States within the Ninth Circuit—the largest judicial circuit in the United States, encompassing nine states and three territories with a combined population of over 68 million people—the States of Arizona, Hawai'i, Nevada, and

1

Washington file this brief under Federal Rule of Appellate Procedure 29(b)(2) to supplement an amicus that they and other States filed earlier in this case. *See* Dkt. 36. The previously filed amicus brief in opposition to Defendants' Motion for Stay explained how the President's federalization and deployment of National Guard troops in Oregon, over the objection of Oregon's governor, conflicted with America's history and tradition of eschewing military intrusion into civilian affairs and undermined state sovereignty. *See id.* The Amici States now file this supplemental brief because the Order is in significant tension with a recently published decision on the same issue—*Newsom v. Trump*—creating real uncertainty about the law in this Circuit and threatening both the sovereignty of our states and the liberty of our citizens.

## ARGUMENT

**I. The Order conflicts with *Newsom*, history, and the text of § 12406 by permitting the President to federalize the National Guard without exigent circumstances.**

The Order erodes the judicial guardrails that this Court just recognized in *Newsom*. As *Newsom* explained, although "the President's determination that an exigency exists [should] be given significant deference," the Court must nonetheless "review the President's determination to ensure that it

2

reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Newsom v. Trump*, 141 F.4th 1032, 1050–51 (9th Cir. 2025) (citation omitted). The Order retreats from even that modest and deferential standard and creates a license for the President to federalize the National Guard at his pleasure. Neither our history nor the statutory text permit that wide-ranging authority.

Federalizing the National Guard to execute the laws is saved for only the rarest circumstances. As detailed in the States' previous amicus brief, this restraint reflects enduring American principles that the military must be kept strictly subordinate to civil authority and that states' control of their National Guards is a core element of state sovereignty. Since 1792, the President has used federalized militia in domestic law enforcement only as "a last resort" when needed to quell an insurrection, when necessary to enforce a federal court order, or when state and local law enforcement are unable to enforce the law.[1] The federalized militia or National Guard was called to respond to armed, violent uprisings like the Whiskey Rebellion in

---

[1] Mary C. Lawton, Memorandum from Antonin Scalia, Assistant Att'y Gen., Off. of Legal Couns., to the Deputy Att'y Gen. Re: L. Relating to Civ. Disturbances, at 9 (Jan. 6, 1975), https://perma.cc/B628-5ANM.

1794, the refusal to comply with desegregation orders in Little Rock in 1957, and the Los Angeles riots in 1992 following mob violence that ultimately "left at least 45 people dead, about 2,000 injured and caused more than $550 million in property damage in the city of Los Angeles alone."[2]   All told, between 1792 and June 6, 2025, Presidents relied on the Calling Forth and Insurrection Acts approximately thirty times to engage National Guards in domestic law enforcement.[3]  Yet President Trump has deployed the National Guard as domestic law enforcement four times in as many months—in California, the District of Columbia, Oregon, and Illinois.

Section 12406 incorporates traditional restraints on the domestic use of the National Guard.  It permits federal activation of the National Guard only in response to an "invasion," "rebellion," or the President's inability to execute federal law.  In other words, it can only be invoked in response to an

---

[2] Leslie Berger, *A City in Crisis: Days of Devastation in the City*, L.A. Times (May 3, 1992), https://tinyurl.com/yc6ykpf3.

[3] *See generally* Joseph Nunn & Elizabeth Goitein, Guide to Invocations of the Insurrection Act, Brennan Center for Justice (Apr. 25, 2022), https://www.brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act.

ongoing emergency, and the President's invocation of § 12406(3) requires a "determination that an exigency exists." *Newsom*, 141 F.4th at 1050.

As this Court recognized in *Newsom*, that determination, while entitled to "a great level of deference," is not a blank check for federalizing the National Guard. *Id.* at 1048. Instead, deference flows from the nature of the exigency itself: "because the power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union, … every delay, and every obstacle to an efficient and immediate compliance, necessarily tends to jeopardize the public interests." *Id.* (cleaned up) (quoting *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827)).

Yet the Order concluded that civil unrest at a single federal building that had been contained by local and federal law enforcement can be the basis for later federalizing the National Guard. *See* Order 24 (citing "disruptive events that occurred in June, July, and August" and treating that as "most of the evidence" that an emergency existed); Dissent 7, 12–14 (describing the events in August and September 2025); *see also* Dissent 8–11 (explaining how the Order's reasoning departed from the statutory text and

5

historical tradition).[4]   This distortion of what constitutes an exigency sufficient to domestically deploy the National Guard against a State's wishes fundamentally upsets the balance of power between States and the federal government and jeopardizes our citizens' most fundamental liberties.

To be sure, "[t]he President can, and should, consider the totality of the circumstances when determining whether he 'is unable with the regular forces to execute the laws of the United States.'"  Order 25.   But under § 12406(3), even assuming for the sake of argument that the President may not have been able to execute federal law at some point previously, he is not authorized to federalize and deploy the National Guard without a *present* inability to execute federal law.  A past problem does not satisfy the statute's demand for an exigency.

In *Newsom*, this Court recognized its role in reviewing "the President's determination that an exigency exists" requiring the National Guard to enforce the law.  *Newsom*, 141 F.4th at 1050.  The Order (at 23) recites this standard but abandons it by concluding that § 12406(3) "contains no

---

[4] Citations to "Order" refer to the Panel's published per curiam order. Citations to "Dissent" refer to Judge Graber's dissent.

6

[temporal] limitations." Order 25. This is plainly wrong. For the President to have made a "colorable assessment of the facts," *Newsom*, 141 F.4th at 1051, there must be an exigency at the time the President calls the National Guard into service, *see also id*. at 1052 (holding there was likely a colorable basis for invoking § 12406(3) in Los Angeles on June 7 because "*the day before*," several documented incidents "significantly impeded the ability of federal officers to execute the laws" (emphasis added)); 10 U.S.C. § 12406(3) (requiring that the "President *is* unable with the regular forces to execute the laws of the United States" (emphasis added)).

The district court carefully analyzed that question and found that there was "substantial evidence that the protests at the Portland ICE facility were not significantly violent or disruptive in the days—or even weeks—leading up to the President's directive on September 27, 2025." *Oregon v. Trump*, No. 3:25-cv-1756-IM, 2025 WL 2817646, at *10 (D. Or. Oct. 4, 2025). In other words, the President was not unable to execute the laws at the time he called the National Guard into service. The Order largely ignored the district court's factual findings, which are entitled to deference, and instead reweighed the evidence while faulting the district court for considering the very question that the statute demands—did the facts support the

7

President's determination that, at the time of his directive, he was unable with regular forces to execute the laws of the United States?

The existence of exigency is, by definition, a time-based inquiry. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866) ("As necessity creates the rule, so it limits its duration ...."). The Order characterized the district court's inquiry as an "undefined temporal restriction[ ]"on the President's authority, Order 23, but it is often a district court's job to assess the relevant time period when considering the existence of an exigency.

These questions commonly arise when applying the Fourth Amendment's requirement that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (citation omitted). In this context, courts universally understand that exigency is a time-based inquiry, and assess the facts, based on the totality of the circumstances, at a particular moment in time—"the moment the officer makes the warrantless entry." *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001).

Although the President certainly may "identify and weigh the relevant facts under § 12406(3)," Order 25, applying the appropriate amount of

8

deference, the district court may ensure the facts colorably support the conclusion that the President is *currently* unable to execute federal law.

## II.    The Order's definition of "regular forces" conflicts with *Newsom*.

The Order further conflicts with *Newsom* by employing a definition of "regular forces" that permits the President to commandeer a State's National Guard merely because of alleged staffing constraints.  As the district court aptly put it, "[i]f the President could equate diversion of federal resources with his inability to execute federal law, then the President could send military troops virtually anywhere at any time." *Oregon*, 2025 WL 2817646, at *11.  But the Order suggests the President has authority to do just that.

Section 12406(3) permits the President to federalize the National Guard over a governor's objection only where he is "unable with the regular forces to execute the laws of the United States."  The Order, however, suggests that the President can call out the National Guard any time he has diverted federal law enforcement resources to support law enforcement activity in another "irregular" jurisdiction—a seemingly routine exercise. But even if a deployment of Federal Protective Service officers is "irregular and unsustainable," Order 28, this Court has already determined that those officers still count as "regular forces" who can "execute the laws of the

9

United States." *See Newsom*, 141 F.4th at 1051–52 (noting that "FPS officers defending federal property" are "federal officers [who] execute the laws").[5]

Section 12406(3) requires more than that the President reallocate officers to areas requiring heightened security. Otherwise, the test would allow what this Court has already rejected—that "any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." *See Newsom*, 141 F.4th at 1051. If the President faces staffing difficulties with the current number of federal law enforcement officers at his disposal, he should ask Congress for more funding, not deploy the National Guard.

In effect, the Order changed the statutory requirement of "unusual and extreme exigencies," *id.*, to a determination of whether deployment of officers "was inherently irregular," Order 30. Although the place that an officer is stationed might be "irregular," in the sense that she does not

---

[5] How to define "regular forces" is an unsettled question that the en banc Court need not reach. *See Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025) (noting that "regular forces" could mean "the soldiers and officers serving in the regular armed forces").

usually work there, that does not authorize the President to call the National Guard into service under § 12406(3).

The danger to the Amici States is clear. President Trump made plain his desire to "use some of these dangerous cities," namely "the ones that are run by the radical left Democrats," as "training grounds for our military National Guard."[6] If allowed to stand, the Order will sanction federalized National Guard units as a routine sight in the cities of the Ninth Circuit. That is contrary to the text of § 12406 and our Nation's history and tradition.

## CONCLUSION

The Court should rehear the case en banc.

---

[6] Donald J. Trump, President of the United States, Remarks to the Department of War (Sept. 30, 2025), https://tinyurl.com/bddkuc5c.

11

Respectfully submitted this 22nd day of October, 2025.

KRISTIN K. MAYES
  ARIZONA ATTORNEY GENERAL

By */s/ Joshua D. Bendor*
Joshua D. Bendor
Emma H. Mark
OFFICE OF THE ARIZONA
  ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Emma.Mark@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

AARON D. FORD
  *Attorney General*
  *of Nevada*
100 North Carson Street
Carson City, NV 89701

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

12

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 29-2(c) because it contains 2,163 words according to the word-processing system used to prepare the brief.

2.  This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 22nd day of October, 2025.


By */s/ Joshua D. Bendor*

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 22nd day of October, 2025.

*/s/ Joshua D. Bendor*