FILED

DEC 8 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF OREGON; CITY OF PORTLAND,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DONALD J. TRUMP, In his official capacity as President of the United States; PETER HEGSETH, In his official capacity as Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; KRISTI NOEM, In her official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants - Appellants,<br><br>---------------------------------------<br><br>STATE OF CALIFORNIA,<br><br>Intervenor - Pending. | No. 25-6268<br><br>D.C. No. 3:25-cv-01756-IM District of Oregon, Portland<br><br>**AMENDED ORDER** |

**MURGUIA**, Chief Judge:
(Statement by Judge Bybee, Statement by Judge Tung)

The order filed on October 28, 2025, Dkt. No. 89, taking this case en banc is amended as follows to append Judge Bybee's statement in support of en banc review and Judge Tung's statement respecting the grant of rehearing en banc:

Upon the vote of a majority of nonrecused active judges, it is ordered that this case be reheard en banc pursuant to Federal Rule of Appellate Procedure 40(c) and Circuit Rule 40-3. The order published at 157 F.4th 1013 (9th Cir. 2025), is vacated.

FILED

DEC 8 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*State of Oregon v. Trump*, No. 25-6268

BYBEE, J., Senior Circuit Judge, statement in support of en banc review:

I have issued this statement in support of en banc review—a statement that is unusual, but not unprecedented[1]—because I believe that the parties have overlooked a clause in the Constitution that is of great relevance to the resolution of this case: the Domestic Violence Clause. U.S. Const. art. IV, § 4. As I have documented below, the Domestic Violence Clause was interwoven with the Militia Clause in the debates framing the Constitution, the ratification debates and early commentary, and throughout the history of the President's use of the Militia. In issuing this statement, I take no position on the ultimate merits of this case. But I do introduce critical historical context that I hope provides a new lens through which to analyze the constitutional limitations on the President's militia powers. In particular, I urge the en banc panel to rethink the standard we adopted in *Newsom v. Trump*: that we defer to the President's determination to send the National Guard into a state over its objection so long as that determination "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" 141 F.4th 1032, 1051 (9th Cir. 2025)

[1] *See*, *e.g.*, *United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) (VanDyke, J., dissenting from the grant of rehearing en banc); *Feldman v. Ariz. Sec'y of State's Off.*, 841 F.3d 791 (9th Cir. 2016) (Reinhardt, J., concurring in the grant of rehearing en banc); *Henry v. Ryan*, 766 F.3d 1059, 1060 (9th Cir. 2014) (W. Fletcher, J., concurring in the grant of rehearing en banc); *id.* at 1067 (Tallman, J., dissenting from the grant of rehearing en banc); *United States v. Bowen*, 485 F.2d 1388 (9th Cir. 1973) (Chambers, J., dissenting from the grant of rehearing en banc).

(quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)). I do not believe that standard reflects the Constitution's allocation of authority over domestic violence between the states and the United States. To that end, I have offered some thoughts as to what the appropriate standard of review might be.

## I. INTRODUCTION

The Framers of the Constitution were deeply concerned with two issues. First, they were concerned that the United States have sufficient authority to defend the nation and its own laws. Second, they were concerned that the conferral of such power not usurp the states' primary responsibility for addressing crime, riots, and other lawless actions. "It is no easy thing to establish a republican military powerful enough to protect against foreign enemies and domestic insurrections, without creating the danger to which all too many republics have succumbed: that the man on the white horse will seize the reins of power." Michael W. McConnell, *The President Who Would Not Be King* 205 (2020). These were among "the central concerns of the Anti-Federalists about the new national government in general and the presidency in particular." *Id.*

The solution to the first issue was found in the Militia Clause, which is the source of authority for 10 U.S.C. § 12406, the statute at issue in this case.[2] Article I, Section 8, Clause 15 provides:

> [Congress shall have Power] . . . [t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.

But that grant of power raised an important question: "[W]hat will be a reasonable guard" against "the national, . . . swallow[ing] up the State[?]" 1 *The Records of the Federal Convention of 1787* at 60 (Max Farrand ed., 1911) [hereinafter *Farrand's Records*] (statement of George Mason). As George Mason warned at the Virginia Ratifying Convention, "[t]he meeting of three or four persons might be called an insurrection; and the militia might be called out to disperse them." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 415 (Jonathan Elliot ed., 2d ed., 1996) (1836) [hereinafter *Elliot's Debates*].

[2] While I refer only to the first of the two Militia Clauses throughout this statement, the second of the Militia Clauses, Article I, Section 8, Clause 16, also underscores the federalist structure of the Militia, empowering the federal legislature "[t]o provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States," while expressly "reserving [power] to the States" for the "Appointment of the Officers" and the "training [of] the Militia according to the discipline prescribed by Congress." *See also Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 16–17 (1820) ("But as State militia, the power of the State governments to legislate on the same subjects, having existed prior to the formation of the constitution, and not having been prohibited by that instrument, it remains with the States, subordinate nevertheless to the paramount law of the general government, operating upon the same subject.").

The solution to the second issue and to George Mason's question was the Domestic Violence Clause in Article IV, Section 4, which provides:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

The Clause's phrasing directly inverts the Declaration of Independence's grievance that the King "kept among us . . . Standing Armies *without the Consent* of our legislatures." The Declaration of Independence ¶ 13 (emphasis added).

The Militia and Domestic Violence Clauses were to be read together to keep the federal government and the states in their respective lanes. As St. George Tucker explained, "every pretext for intermeddling with the domestic concerns of any state, under colour of protecting it against domestic violence is taken away, by that part of the provision which renders an application from the legislative, or executive authority of the state endangered, necessary to be made to the federal government, before [its] interference can be at all proper." St. George Tucker, 1 *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia* App. at 366–67 (1803); *see* Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1819 (1833) (adopting Tucker's formulation).

This case is not about whether the United States has the power to enforce its own laws. It surely does. It is about the circumstances under which the United

States can do so by calling forth the Militia, whether the President has the authority to deploy troops into states against their wishes, and whether the judiciary can determine if the President is "intermeddling" on pretext.

## II. THE DOMESTIC VIOLENCE CLAUSE AS A LIMITATION ON THE MILITIA CLAUSE

The Framers divided the duty to secure the peace between the federal government and the states. As Justice Kennedy memorably put it, "[t]he Framers split the atom of sovereignty." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). The federal government was given the duty to protect us from foreign threats, while the states retained the primary duty to protect us from internal threats, such as crime and riots. The Preamble reflects this allocation. The Constitution was established to "insure Domestic Tranquility, provide for the common defense, [and] promote the general welfare." U.S. Const. pmbl. The verbs "insure," "provide," and "promote" are not mere elegant variation, but concise descriptions of the respective roles of the states and the federal government. The word "insure" makes the federal government the *guarantor* of domestic tranquility, not its primary provider or a concurrent promoter. "Insure," in this context, is the language of suretyship; it is a pledge of support, not a grant of agency.

The Preamble's promise to "insure Domestic Tranquility" thus reflects a careful delineation of permissible federal military intervention in domestic affairs:

States are not only owed protection *by* the federal government, they are owed protection *from* it. Although long overlooked, the Domestic Violence Clause plays a central role in constraining the federal government's power under the Militia Clause. That balance must inform our interpretation of § 12406.

A. *Section 12406 and the Militia and Domestic Violence Clauses*

Section 12406 provides:

> Whenever—
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
> (3) the President is unable with the regular forces to execute the laws of the United States;
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States . . . .

10 U.S.C. § 12406. Section 12406 is simply a delegation of Congress's enumerated powers over the Militia, as it lists, in reverse order, Congress's power "[t]o provide for calling forth the Militia to [1] execute the Laws of the Union, [2] suppress Insurrections and [3] repel Invasions." U.S. Const. art. I, § 8, cl. 15.

Section 12406 is constrained by the Domestic Violence Clause. Again, Article IV, Section 4 reads: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the

Legislature cannot be convened) against domestic Violence." In addition to the republican guarantee, this provision enumerates two protections. The first is protection "against Invasion" from another state or nation, which is required because the Constitution simultaneously forbids the states from "engag[ing] in War unless actually invaded, or in such imminent Danger as will not admit of delay." *Id.* art. I, § 10, cl. 3. The second is protection "against domestic Violence." But unlike the Republican Guarantee Clause and the Invasion Clause, the Domestic Violence Clause does not impose a free-standing obligation on the United States. Rather, it is a conditional obligation, one that turns on a request from the state.

Though the phrase "domestic Violence" is neither defined nor a term of art, it can be understood from the broader context of the Constitution. The Constitution uses five other terms to express resistance to or disregard for law: crime, insurrection, rebellion, invasion, and war. *See*, *e.g.*, U.S. Const. art. I, § 8, cl. 15 ("Insurrections" and "Invasions"); art. I, § 8, cl. 11 ("War"); amend. XIV, § 2 ("rebellion" and "crime"). As the Constitution expressly denies to the states the right to engage in war or repel invasion, art. I, § 10, cl. 3, "domestic Violence" refers to matters *within a state*, including crime, riot, and insurrection or rebellion *against the state.* Congress may respond directly to any *external* threat to a state, but Congress has limited power to respond to an *internal* threat to a state.

The Constitution has reserved to the states the right to manage their own internal affairs, including the power to punish crime, suppress insurrections, and stifle rebellions. Except in unusual circumstances, discussed below, the United States may intervene to quell domestic violence within a state only when it is invited by the state's legislature or the governor. In Hohfeldian terms, the Domestic Violence Clause is both a *privilege* of the states to call upon the resources of the United States, and an *immunity* from federal interference in state matters touching on "domestic Violence." Stated differently, the Militia Clause is the Constitution's grant of authority to Congress to use the Militia in response to a request for assistance under the Domestic Violence Clause. The Militia Clause *facilitates* the use of the Militia; the Domestic Violence Clause *conditions* its use. The Domestic Violence Clause thus preserves a vertical separation of powers when dealing with domestic disturbances.

To understand the limitations on the federal government's engagement with the sovereign states through military force, we must turn our attention to the original understanding of the Domestic Violence Clause and its dialogue with the Militia Clause.[3]

---

[3] The literature on the constitutional place of the Domestic Violence Clause is surprisingly thin. Principal sources include William M. Wiecek, *The Guarantee Clause of the U.S. Constitution* (1972); and Jay S. Bybee, *Insuring Domestic Tranquility:* Lopez*, Federalization of Crime, and the Forgotten Role of the Domestic Violence Clause*, 66 Geo. Wash. L. Rev. 1 (1997). For historical accounts of the

B. *The Framers' Concerns*

1. The Philadelphia Convention

Through vigorous debate and compromise, the delegates to the Philadelphia Convention ensured that the federal government would have enough military power to protect the states when necessary, but not so much that it could override the states' primary responsibility for handling civil disorder. Luther Martin set the tone for this delicate balance by acknowledging that the "general government ought to protect and secure the state governments." 1 *Farrand's Records* 439. But he also assured that "[s]tates will take care of their internal police and local concerns. The general government has no interest, but the protection of the whole." *Id.*

From the outset, the Convention treated what would become the Domestic Violence and Militia Clauses as closely linked. Charles Pinckney's original proposal ensured protection to states from "domestic insurrection" and "rebellion" "on application of the legislature of a state," while also granting the national legislature the power to arm and organize the Militia. 5 *Elliot's Debates* 130–32. Early drafts

---

invocation of the Domestic Violence Clause, see Frederick T. Wilson, U.S. Army, *Federal Aid in Domestic Disturbances 1787–1903*, S. Doc. No. 57-209 (1903); Office of the Judge Advocate Gen., *Federal Aid in Domestic Disturbances 1903–1922*, S. Doc. No. 67-263 (1922); Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789–1878* (1988); Clayton D. Laurie & Ronald H. Cole, *The Role of Federal Military Forces in Domestic Disorders 1877–1945* (1997); Paul J. Scheips, *The Role of Federal Military Forces in Domestic Disorders 1945–1992* (2005).

of the Constitution authorized Congress "[t]o subdue a rebellion in any particular state, on the application of the legislature thereof" and "[t]o make Laws for calling forth the Aid of the Militia, to execute the Laws of the Union[,] to repel Invasion[,] to inforce Treaties[,] [and to] suppress internal [Commotions]." 2 *Farrand's Records* 144; *see also* 2 *id.* 168 (similar). As concerns grew about federal overreach in the states' internal affairs, James Wilson emphasized that the "object" of the guarantee of protection was "merely to secure the States [against] Dangerous commotions, insurrections and rebellions." 2 *id.* 47. The delegates then voted, on Madison's suggestion, to limit the protection to "domestic as well as foreign violence." 2 *id.* 47–49.

The Committee of Detail's early-August draft further refined the arrangement: Congress would be granted general militia powers and the power "[t]o subdue a rebellion in any State, on the application of its legislature," while the Domestic Violence Clause added the condition "on application of its legislature" before "domestic violence," which the new draft distinguished from "foreign invasion." *See* 2 *id.* 159, 182. Once that condition was added, Congress's power to subdue rebellions upon a state's application became redundant and was eliminated by mid-August. *See* 2 *id.* 317–20. Edmund Randolph's handwritten notes position the Domestic Violence Clause's purpose as "protect[ing] each state against *internal*

*commotion* . . . [b]ut . . . not . . . without an application from the legislature of a state." 2 *id.* 148 (emphasis added).

The guardrail of a state's request figured prominently at the Convention. When South Carolina's Thomas Pinckney moved to eliminate "on the Application of its legislature," his motion immediately spurred objections from several delegates. 2 *Farrand's Records* 316–18. Luther Martin insisted that "[t]he consent of the State ought to precede the introduction of any extraneous force whatever." 2 *id.* 317. Oliver Ellsworth agreed that "[i]n many cases," the federal government "ought not to be able to interpose unless called upon." *Id.* Elbridge Gerry, who had witnessed the turmoil of Shays's Rebellion in his home state, was particularly opposed to "letting loose the myrmidons of the U[nited] States on a State without its own consent." *Id.* He emphasized the "[s]tates will be the best Judges in such cases" and, referring to Shays's Rebellion, suggested that "[m]ore blood would have been spilt . . . if the [federal government] had intermeddled" in the state's affairs without its request for assistance. 2 *id.* 317.

In late August 1787, Delaware's John Dickinson, repeating earlier objections, made one last attempt to delete the requirement that a state's legislature must request federal intervention. 2 *id.* 467. By a vote of eight to three, the delegates refused to drop the condition. *Id.* Dickinson then proposed a more moderate expansion: allow the request to come from the state's "Executive" because "[t]he occasion itself . . .

might hinder the Legislature from meeting." 2 *id*. 467. It passed overwhelmingly (8 yes, 2 no, 1 divided). *Id.* After the Committee of Style presented the penultimate draft, the delegates, in the final days of the convention, slightly reverted on this expansion by narrowing when the Executive could make the request to "when the Legislature cannot be Convened." 2 *id.* 621.

Thus, consistent with the Framers' concern of ensuring protection while also preventing unwanted federal military intervention in domestic affairs, the Domestic Violence Clause authorizes federal aid only "on Application of the Legislature, or of the Executive (when the Legislature cannot be convened)." U.S. Const. art. IV, § 4. This textual guardrail was born of the Framers' fear of an unbounded national army and unwarranted federal intervention. The Framers' unwillingness to omit it speaks to their intent to ensure the national government does not intervene militarily absent a state's request.

2. The Ratification Debates

The Framers' concerns about federal overreach into state affairs similarly took center stage during the ratifying conventions, with the Virginia debates exemplifying common anxieties that the Militia Clause would give Congress a cudgel against the states and their people. Representing the Anti-Federalists, Patrick Henry remarked that he was "still persuaded that the power of calling forth the militia, to execute the laws of the Union" was "dangerous." 3 *Elliot's Debates* 411.

Having requested that James Madison clarify "the cases where the militia would be wanting to execute the laws," Henry emphasized the risk of pretextual justifications: "[Madison] told us the militia may be called out to quell riots. . . . Who are to determine whether it be a riot or not? Those who are to execute the laws of the Union? If they have power to execute their laws in this manner, in what situation are we placed!" *Id.* at 411–12. Henry further underscored the dangers of granting the national government such a sweeping permit to mobilize the Militia, noting the "unprecedented" nature of "calling the militia to enforce every execution indiscriminately." *Id.* at 412.

In response, Madison contended that the Militia represented a "more proper way" to manage external invasions and internal insurrections and to execute the laws, as compared to a standing army. *Id.* at 413–14. But Madison's defense of the Militia Clause also demonstrated his grasp of its limits. Specifically, Madison argued that "[t]here is a great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance; which is a construction *not warranted by the clause*." *Id.* at 415 (emphasis added).

To expound on the constrained set of circumstances justifying Militia federalization to execute the laws of the Union, Madison proffered examples where the unlawful actors "were too formidable for the civil power to overcome." *Id.* at

414. And when Henry Clay expressed fears that the Militia Clause might enable the Kentucky Militia to "be sent to the Mississippi" and "would lead to the establishment of a military government, as the militia were to be called forth to put the laws into execution," Madison answered that the power may be resorted to only "[i]f the posse of one county were insufficient to overcome the resistance to the execution of the laws." *Id.* at 384. But it was "obvious" to Madison that "when the civil power was sufficient, this mode would never be put in practice." *Id.*

Madison's delineation of acceptable and unacceptable applications of the Militia Clause supports two principles that should guide our understanding of its scope. First, as Congress's power over the Militia was thought of as a less dangerous alternative to using a standing army to enforce the laws, deployment of the National Guard should be limited to scenarios akin to those where armed forces are warranted. Second, the Militia should be called forth by the federal government only as a last resort when the civil force is unable to quell resistance to the laws, rather than as a supplemental or substitute source of ordinary law enforcement and crime control.

This understanding also has roots in the Framers' concerns about pretext. After Madison disavowed the notion that the Militia could be used to enforce laws in the first instance, George Mason raised a related objection that "too much power was given to Congress,—power that would finally destroy the state governments, more effectually by insidious, underhanded means, than such as could be openly

practised." *Id.* at 415. In Mason's view, "because the state governments could call forth the militia when necessary, so as to compel a submission to the laws; and as they were competent to it, Congress ought not to have the power." *Id.* Otherwise, he argued, "[t]he meeting of three or four persons might be called an insurrection; and the militia might be called out to disperse them." *Id.*

The debate then transitioned from the Militia Clause to the Domestic Violence Clause, with Patrick Henry again expressing concern that the combined authority of the Domestic Violence Clause and the Militia Clause gave Congress exclusive control of the Militia. But Madison argued that the states had concurrent authority to call forth their own militias, instead characterizing the Domestic Violence Clause as providing states, upon their request, with "supplemental security to suppress insurrections and domestic violence." *Id.* at 425. Edmund Pendleton, President of the Virginia Ratifying Convention, supported Madison's interpretation by similarly describing the Domestic Violence Clause as a restricted grant of power to Congress: "This is a restraint on the general government *not* to interpose. The state is in full possession of the power of using its own militia to protect itself against domestic violence; and the power in the general government cannot be exercised, or interposed, without the application of the state itself." *Id.* at 441 (emphasis added). The same understanding was present during other state ratifying debates, such as those in Massachusetts, where James Bowdoin listed the Domestic Violence Clause

as one of several "checks" should the "great power" of Congress "be abused, and, instead of protecting, . . . be employed by Congress in oppressing, their constituents." 2 *Elliot's Debates* 85–86.

The Framers' understanding of this interplay between the Militia Clause and the Domestic Violence Clause reveals the constitutional principles that should circumscribe their operation. Congress may deploy the Militia to execute federal laws, but only as a last resort when civil forces prove inadequate, and—with limited exceptions implicating individual rights, as discussed below—only upon a state's request.[4]

[4] Congress has codified similar limiting principles in its various invocations of the Militia Clause. The Militia Act of 1792 allowed the President to call forth the Militia only when execution of the laws was obstructed by "combinations too powerful to be suppressed by the ordinary course of judicial proceedings." Act of May 8, 1792, 1 Stat. 271. The Insurrection Act includes near-identical language. *See* 10 U.S.C. § 252 (allowing the President to activate the Militia when it becomes "impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings"). And just as the Framers understood the Domestic Violence Clause to constrain Congress's militia power, the Militia Act echoed the Clause's language in granting the President *qualified* control over the Militia in cases of insurrection. Act of May 8, 1792, 1 Stat. 271. ("[I]n case of an insurrection in any state, against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such state, or of the executive (when the legislature cannot be convened) to call forth such number of the militia . . . .").

3. The Federalist Papers

The Federalist Papers furnish further evidence regarding the Framers' restrictions on federal deployment of the Militia into the states. In Federalist 29, Alexander Hamilton answered a claim from the Anti-Federalists that the states ought "to apprehend danger from the militia itself in the hands of the federal government." The Federalist No. 29, at 133 (Terence Ball, ed., 2003). To Hamilton, such a claim was "so far fetched and so extravagant . . . that one is at a loss whether to treat it with gravity or with raillery." *Id.* at 135.

Hamilton then turned to what he considered to be "exaggerated suggestions" that the Militia of New Hampshire would "be marched to Georgia, of Georgia to New-Hampshire, of New-York to Kentucke and of Kentucke to Lake Champlain." *Id*. He discounted the notion that the federal government would use the Militia in this manner "to lay prostrate the liberties of the people" as rhetorical "conceits" and "absurdities," utterly detached from the text of the Constitution. *Id.* at 136. There may be occasions, he added, when "it would be natural and proper that the militia of a neighbouring state should be marched into another," but these would be "[i]n times of insurrection or invasion." *Id*. For Hamilton, Anti-Federalist fears that the federal government would abuse the power to call forth the Militia, overriding the will of the states, were so far removed from the meaning of this text that they were irrational. *Id.* at 135.

In Federalist 21, Hamilton further detailed the *guarantee* of sovereignty that a federalized military could provide to the states, citing Shays's Rebellion as evidence of this guarantee's importance "in repelling . . . domestic dangers." The Federalist No. 21, at 95. Shays's Rebellion proved the "dangers" of a constitution that withholds power from the federal government to aid a state suffering the threats of a "successful faction." *Id*. During this rebellion, in which thousands of former Revolutionary War soldiers organized in an armed revolt in Massachusetts, Governor Bowdoin had sought assistance from the Continental Congress, but to no meaningful avail. *See* Leonard Richards, *Shays's Rebellion: The American Revolution's Final Battle* (2002). As Hamilton noted in Federalist 26, the governor was thus "compelled to raise troops" himself, turning to a private army to quell the disturbance. The Federalist No. 26, at 118. The Constitution, Hamilton emphasized, would rightfully allow the federal government to respond to a state's requests for aid.

The Federalist Papers also spotlight concerns about the potential pretextual use of federal power. Madison, in Federalist 43, responded to Anti-Federalist fears that federal authority would "become a pretext for alterations in the State governments, without the concurrence of the States themselves" by explaining that the Constitution expressly safeguarded against unwarranted interference. The Federalist No. 43, at 212. In Federalist 21, Hamilton rejected concerns of "officious

interference in the domestic concerns" of the States by emphasizing the exceptional nature of federal intervention. The Federalist No. 21, at 95. So long as a state maintains its republican political processes, the federal government has "less pretense" to impose "violent remedies in partial or occasional distempers of the State." *Id*. Those disturbances are for the states to address. Collectively, these essays foreclosed the idea that the Constitution could authorize federal military intervention based on fabricated justifications that ignore carefully constructed vertical separation of powers limitations.

C. *The Historical Practice*

The decades following the Constitution's ratification tested its limits on the federal government's ability to deploy troops to respond to domestic challenges. In particular, four events in those early years establish the precedent for future presidents, furnishing us with a historical "gloss" on the words of the Constitution. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring). The proximity of the Whiskey Rebellion, the Trans-Oconee Republic, Fries's Rebellion, and the Baltimore riots of 1812 to the Constitution's ratification—and the fact that the presidents responding to these crises were George Washington, John Adams, and James Madison—is powerful evidence of, in Madison's striking phrase, a "liquidation" of Constitutional meaning. The Federalist No. 37, at 172; *see NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[W]e put significant weight upon

historical practice.") (emphasis omitted); *id.* at 572 (Scalia, J., concurring in the judgment) ("[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision."). Such "early history" gives us insight into how "the Framers themselves . . . read the Constitution." *Mistretta v. United States*, 488 U.S. 361, 398 (1989); *see also* Akhil Reed Amar, *America's Unwritten Constitution: The Precedents and Principles We Live By* 309 (2012); William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019).

To clarify how history and tradition have aligned with that original understanding, I will then consider the pre-Civil War and post-Civil War periods. *See Noel Canning*, 573 U.S. at 584–93, 602–13 (Scalia, J., concurring in the judgment) (reviewing various historical periods). Though these examples implicate various statutes—many of which were predecessors to the modern-day Insurrection Act and § 12406—they illustrate the constitutional constraints that apply regardless of the purported statutory basis for a president's domestic deployment of the Militia. These examples are not comprehensive and include two outlier cases that are not consistent with the early practice. But collectively, they illustrate that presidents have consistently understood the militia power to be constrained by the Domestic Violence Clause. Finally, I will address how we should consider the Fourteenth Amendment in conjunction with the Domestic Violence Clause.

### 1. The Early Period, 1789–1812

#### a. The Whiskey Rebellion (Washington)

The government's handling of the Whiskey Rebellion demonstrates careful negotiation between federal and state authorities, not unfettered presidential discretion to use the Militia against a state's wishes—even when federal interests are at stake. From 1791 to 1794, western Pennsylvanians formed an organized resistance preventing the collection of federal whiskey taxes. Thousands of Pennsylvanians "resisted by brutalizing and terrorizing federal tax collectors and their local supporters with tar and feathers, torches, whips, guns, and more." Akhil Reed Amar, *The Words That Made Us* 382 (2021). This three-year revolt was "[t]he single largest example of armed resistance to a law of the United States between the ratification of the Constitution and the Civil War." Thomas P. Slaughter, *The Whiskey Rebellion* 5 (1986).

Understanding the threat posed not only by the armed resistance but also by unwanted federal intervention, President Washington dutifully followed the federalism limitations imposed by the Constitution. During more than three years of escalating violence, he urged Pennsylvania to lead the response while he negotiated with state officials, according respect to their belief that federal intervention was not needed. 4 Pennsylvania Archives 70, 123, 293–302 (John B. Linn & William Henry Egle eds., 2d ser. 1896) [hereinafter Pa. Archives]. Tracking

the requirements of the Domestic Violence Clause, an executive conference recognized that if the President were to "draft[] the militia," the "Governor w[ould] be under the necessity of convening the Legislature." Pa. Archives 70. Indeed, as Governor Mifflin expressed to Secretary Randolph, "[h]ad the riot been unconnected with the system of federal policy, the vindication of our laws would be left to the ordinary course of justice; and only in the last resort, at the requisition, and as an auxiliary of the civil authority, would the military force of the State be called forth." *Id.* at 88. President Washington also solicited an independent judicial review, which certified that "the execution" of the laws of the United States was "obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings." *See id.* at 70, 107, 123.

Acknowledging the stakes of using military force domestically over a state's objection, the President waited to deploy the Militia until he had Pennsylvania's approval. In Governor Mifflin's final letter to President Washington before federal troops were authorized, the Governor offered the President his "full and unequivocal assurance that whatever requisition [he] may make" would be "promptly undertaken and faithfully discharged," leaving it "implicitly to [Washington's] judgment" to choose "the measures for discharging . . . the laws of [the] Union." 4 Pa. Archives 93. Even after securing consent, President Washington asked to meet with state officials to craft a joint plan, emphasizing "respectful attention" to the Governor and

a "united and comprehensive view" for their "co-operation" during this "important and delicate . . . conjuncture." *Id.* at 96. The same day the President issued his proclamation, Governor Mifflin issued his own, calling up the Pennsylvania Militia and pledging full support for the federal military effort. *Id.* at 108–10.

b. The Trans-Oconee Republic (Washington)

A domestic uprising in the fall of 1794 provides additional precedent illustrating the limits of federal intervention when organized domestic unrest obstructs federal law. In 1794, Elijah Clarke and Georgia frontiersmen declared a separate "Trans-Oconee Republic" on Creek lands in direct defiance of President Washington's painstakingly negotiated 1790 Treaty of New York. *See generally* Watson W. Jennison, *The Trans-Oconee Republic, 1794* (2012); E. Merton Coulter, *Elijah Clarke's Foreign Intrigues and the "Trans-Oconee Republic"* (1921). An armed group of hundreds of disaffected Revolutionary War veterans—supported by thousands of others—maintained their illegal occupation for months despite attempts by Georgia's Governor Mathews to put it to an end. Jennison, *The Trans-Oconee Republic*, at 109.

Secretary of State Edmund Randolph—who served on the Committee of Detail—described this turmoil to President Washington as "domestic violence" and identified the Domestic Violence Clause as the operative authority for calling forth the Militia in response. 16 The Papers of George Washington 316–18 (David R.

Hoth & Carol S. Ebel eds., 2011). Secretary Randolph reminded President Washington that in such cases of domestic unrest, "unless the State chooses to resort to the general government for aid in subduing it, the general government cannot of its own accord interfere." *Id.* The Constitution, Randolph emphasized, authorizes interference only "on application of the legislature or of the executive (when the legislature cannot be convened)." *Id.* (quoting U.S. Const. art. IV, § 4). Underscoring the gravity of the threat, he suggested the President inform the Governor that he would "give aid to the State, against those, who attempt a new government, *if applied for*, according to the constitution or law." *Id.* (emphasis added).

The President adopted this position. The Secretary of War informed Governor Mathews that "upon application of the Legislature, or of the Executive of a State, when its Legislature cannot be convened," the United States "are bound to protect it against domestic violence." 1 American State Papers: Indian Affairs 501–02 [hereinafter Am. State Papers]. Because the rebels were violating Georgia's criminal laws, the Secretary observed that the disturbance may have been "proper to leave" to Georgia's own management. *Id.* Yet the Secretary pointed out that the unrest also violated a host of federal laws, including federal laws requiring the removal of citizens from Indian lands, the Constitutional requirements for a new state, and the Indian treaty. The President thus urged the Governor to "take the most energetic and

decisive measures within [his] power for suppressing the said design," including using local militia. *Id.* President Washington added that he would "rely on [Governor Mathews'] exertions to repel the mischief arising from this quarter." *Id.*

After two months, Georgia's efforts had yet to resolve the uprising and its mounting threat to federal law. President Washington—this time through acting Secretary of War Hamilton—again expressed to Governor Mathews the urgency of bringing a swift end to the uprising, reminding the Governor that "upon [his] application," militias from neighboring states could help suppress the rebellion. Am. State Papers at 502–03. In doing so, the President invoked and upheld his constitutionally rooted promise to withhold federal troops until the State requested them. Shortly thereafter, Georgia managed to suppress the uprising without federal aid. Coulter, *Elijah Clarke's Foreign Intrigues*, at 18.

This episode further indicates that the Domestic Violence Clause governs use of the Militia when both federal and state interests are at stake. It suggests that the President may not unilaterally deploy the Militia to a state absent that state's consent—even where unrest obstructs federal statutes and policies. Such cases are instead governed by the Constitution's promise to make federal intervention contingent "on application" of the state. President Washington, though eager to end the disturbance, maintained that federal force could be deployed only upon a request by Georgia's legislature (or governor if the legislature could not meet).

c. Fries's Rebellion (Adams)

The episode known as Fries's Rebellion confirms the primacy of state response and federal-state cooperation. As in the Whiskey Rebellion, Pennsylvania farmers organized in opposition to a federal property tax. Following the example of President Washington before him, President Adams did not march in troops over the objections of state officials. Instead, the President avoided intervening until the state agreed to help quell the rebels. After determining that troops were necessary, President Adams "directed James Henry, Secretary of War to *request* Pennsylvania's governor, Thomas Mifflin, to dispatch militia." Jane Shaffer Elsmere, *The Trials of John Fries* 435 (1979) (emphasis added). Secretary Henry then wrote to the Governor that "the President thought it best to employ a military force." W.W.H. Davis, *The Fries Rebellion* 75 (1899). Governor Mifflin agreed with Secretary Henry that military force was necessary "in suppressing the insurrection now existing" and ordered the Brigadier-General to comply with the federal government's request. *Id.* at 76. In short, although the United States ultimately intervened in Fries's Rebellion, the decision to do so was not made unilaterally by the President. Rather, it was the result of careful coordination between the federal and state governments.

d. Baltimore Riots of 1812 (Madison)

President Madison, the original drafter of the Domestic Violence Clause, followed this pattern when America's declaration of war against Great Britain in June 1812 ignited a summer of partisan violence in Baltimore. In "probably the most terrifying and brutal riot in the young nation's history up to that time," mobs of several hundred heavily armed men filled the streets. Frank A. Cassell, *The Great Baltimore Riot of 1812*, 70 Md. Hist. Mag. 241, 241 (1975). Despite the uncontrollable violence, "city officials . . . were reluctant to intervene," and the Mayor was "reluctant to call out the Militia." *Id.* at 258.

The mob violence came to a flashpoint on August 3 when a Federalist newspaper owner planned to distribute an incendiary anti-war newspaper at the federal post office. A mob gathered and "threatened to pull the building down." Donald R. Hickey, *The War of 1812: A Forgotten Conflict* 61 (2012). Secretary of State James Monroe wrote to President Madison the next day to stress the urgency of the situation, warning that "[m]obs must be prevented" and unless "some distinguished effort is . . . made," there "is danger of a civil war." Letter from James Monroe to James Madison (Aug. 4, 1812). But a few days later, Attorney General William Pinkney, reporting to the President from Baltimore, concluded: "I do not perceive that the General Government could well interfere . . . *even if it were desirable that it should*" because order can be maintained by the local "Majistracy .

. . aided by . . . the Militia." Letter from William Pinkney to James Madison (Aug. 7, 1812) (emphasis added).

Despite the threat to federal property and lackadaisical response by local authorities, President Madison refused to deploy federal force even after mob violence took place at a federal building, taking the view that the response properly belonged to local authorities. While President Madison expressed dismay at the situation and acknowledged that the post office was "under the sanction of the U.S.," he stated that he "was not aware, that any defensive measures were within the Executive sphere." Letter from James Madison to John Montgomery (Aug. 13, 1812). And ultimately, it was the local forces that quelled the disorder: A local commander called out the city brigade to scatter the rioters and protect the post office. Cassell, *The Great Baltimore Riot*, at 258.

* * *

Taken together, the Whiskey Rebellion, the Trans-Oconee Republic, Fries's Rebellion, and the 1812 Baltimore riots underscore that federal military intervention must be informed by the Constitution's federalism limitations, which expressly require a state request in cases of domestic violence to place the Militia under shared federal-state control. In the Whiskey Rebellion of 1791, President Washington spent years engaging with and deferring to Governor Mifflin before sending in troops to Pennsylvania—and he did so only after the Governor gave his consent. In 1794, he

held back on deploying troops in response to the Trans-Oconee Republic on the precise basis of the Domestic Violence Clause, while also reminding Governor Mathews that the state could request federal assistance if necessary. During Fries's Rebellion of 1799, President Adams likewise awaited Governor Mifflin's approval before deploying troops into Pennsylvania to suppress the insurrection. And in the Baltimore riots of 1812, President Madison made clear that even when federal property was threatened, he had to wait for a request from the state. In these instances, all which took place within the first few decades of the Constitution's ratification, Presidents Washington, Adams, and Madison understood that their power to deploy troops to handle domestic disturbances was constrained by the consent of the states.

2. The Early Republic to the Civil War, 1813–1865

The presidents who followed Presidents Washington, Adams, and Madison honored the practice of withholding federal troops until the state—through the legislature or the governor—requested federal intervention. In doing so, they regularly cited the Domestic Violence Clause as the basis for their restraint.

a. Williamsport Canal Riots (Jackson)

In January 1834, violent labor disputes threatened the Chesapeake and Ohio Canal, a major Jacksonian-era domestic infrastructure project jointly sponsored by the federal and state governments. Coakley, *The Role of Federal Military, 1789–*

*1878*, at 103. On January 16, 1834, deadly clashes between rival labor factions halted construction and overwhelmed local authorities. *Id.* On January 28, 1834, after almost two weeks during which state and local authorities failed to restore order, the Maryland General Assembly formally resolved that the "civil authority is incompetent to quell" such "riotous assemblages" and requested "the President of the United States . . . order on to Williamsport such portion of the military of the general government as in his opinion may be necessary to protect our citizens, and prevent any injury to the public works." Maryland H.D., J. Proc., Dec. Sess., at 166 (Jan. 28, 1834). Consistent with the Domestic Violence Clause, only after the state's formal request and finding that the civil authority had been exhausted did President Jackson direct the Secretary of War to "order such military as will be able to aid the civil authority of Maryland to put down the riotous assembly." Robert B. Morris, *Andrew Jackson, Strikebreaker*, 55 Am. Hist. Rev. 54, 61 (1949). Federal troops managed to quell the uprising, allowing construction to resume.

b. The Dorr Rebellion (Tyler)

The Dorr Rebellion of 1841–1842 provides another example of a president refusing to interfere in the domestic concerns of a state without a request. During that incident, residents of Rhode Island held an unauthorized convention to frame a state constitution, declared it the paramount law of Rhode Island, and ordered popular elections to organize a new state government. *Luther v. Borden*, 48 U.S. (7

How.) 1, 35–37 (1849). The movement elected Thomas Wilson Dorr to be the new governor of Rhode Island, but Samuel Ward King, the governor under Rhode Island's existing charter government, denied the validity of the proceedings. *Id.* After Dorr's followers took up arms against the charter government, Governor King declared martial law and called out the Rhode Island Militia. *Id.*

Governor King also wrote a letter to President John Tyler informing him that 500 to 1,000 armed insurgents had gathered and requesting that the federal government send military aid. U.S. House of Representatives Select Committee on Rhode Island, *Interference of the Executive in the Affairs of June 7, 1844* at 688–90. President Tyler refused, expressly referencing the Domestic Violence Clause and responding that "the United States [has] no power to summon to the aid of the State the military force of the United States, unless an application shall be made by the *legislature*" because "the State executive cannot make such" a request "except when the legislature cannot be convened." *Id.* The President did not call out the Militia; instead, he issued a declaration "recogniz[ing] [King] as the executive power of the State, and took measures to call out the militia to support his authority if it should be found necessary for the general government to interfere." *Luther*, 48 U.S. at 44. No such federal intervention turned out to be necessary because the armed opposition surrendered shortly after President Tyler's declaration. *Id.*

The incident resulted in the Supreme Court deciding *Luther v. Borden*, in which the Court shed some light on the limits of federal intervention. In that case, plaintiff Martin Luther, one of Dorr's supporters, brought a trespass action to recover damages caused when officers of the Rhode Island Militia broke into his house on Governor King's orders. *Id.* at 34. Luther argued that because Dorr's new government had "displaced and annulled" the old one, the officers' trespass constituted unlawful military action *against* the official government. *Id.* at 34–35. The Supreme Court concluded that the issue was non-justiciable because the political branches possess exclusive authority "to decide what government is the established one in a State," and "certainly no court of the United States . . . would have been justified in recognizing the opposing party as the lawful government."[5] *Id.* at 44. In so holding, the Court also acknowledged the constraints of the Domestic Violence Clause, distinguishing between the ability of the President to call out the Militia to repel *invasions* and to suppress *insurrections* against a state government:

[5] The Supreme Court has characterized *Luther*'s holding as being limited to this Republican Guarantee context and the question of which of two competing governments should be recognized by the United States. *E.g.*, *Baker v.* Carr, 369 U.S. 186, 223 (1962) ("[T]he only significance that *Luther* could have for our immediate purposes is in its holding that the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government."); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 590 (2004) (Thomas, J., dissenting) (characterizing *Luther* as holding "that courts could not review the President's decision to recognize one of the competing legislatures or executives").

"The power given to the President in each case is the same,—with this difference only, that it cannot be exercised by him in the latter case, *except upon the application of the legislature or executive of the State*." *Id.* at 44–45 (emphasis added).

c. Guerilla Warfare in Missouri (Lincoln)

Even during the Civil War, President Abraham Lincoln adhered to the Domestic Violence Clause's limits on federal intervention. In October 1863, Missouri, under a provisional Unionist government, was riven by guerrilla warfare and infighting among Union loyalists. Amid this factional unrest, Missouri Governor Hamilton Gamble requested federal aid. President Lincoln declined, explaining that "it did not appear to me that the domestic violence you apprehend, was very imminent" and that "[i]n the absence of such violence, or imminent danger thereof, it is not proper for the national executive to interfere." Letter from Abraham Lincoln to Hamilton R. Gamble (Oct. 19, 1863). President Lincoln noted that he would leave suppression of the disturbances to Missouri officials, while underscoring that "on a proper case made," he would "give the State the constitutional protection against invasion and domestic violence." *Id.*

3. The Post-Civil War Period, 1866–Present

In the period following the Civil War, the constitutional constraints of the Militia and Domestic Violence Clauses governed in the same way they did previously, except when the state itself was violating federal law—a new and notable

exception tied to the Fourteenth Amendment (discussed in Part II.C.4, *infra*). With the exception of one president noted below, presidents have consistently respected these constitutional restraints, following the examples of Presidents Washington, Adams, and Madison in the earliest years of the republic.

a. The Brooks-Baxter Dispute (Grant)

In 1874, following a month-long armed conflict in Arkansas driven by supporters of Joseph Brooks, who had lost the gubernatorial race but refused to concede, President Ulysses S. Grant called out federal aid and directed all Arkansas troops to recognize Elisha Baxter as the rightful governor. In doing so, President Grant noted that "under section 4 of Article IV of the Constitution," the Governor "has heretofore made application to me to protect said State and the citizens thereof against domestic violence," and "both houses [of the State's legislature] have passed a joint resolution also applying to me to protect the State against domestic violence." Wilson, *Federal Aid*, at 151; Proclamation No. 218 (May 15, 1874).

b. The Great Railroad Strike of 1877 (Hayes)

During the Great Railroad Strike of 1877, President Rutherford B. Hayes *prepared* to render federal military aid prior to a state's request but still waited for a formal request do so. Even though the strike had caused widespread violence in West Virginia and paralyzed commerce in several states, President Hayes ordered a federal response only after West Virginia Governor Henry Mathews reported that

"domestic violence exist[ed]" that "his State [was] unable to suppress." Proclamation No. 236 (July 18, 1877). Referencing the Domestic Violence Clause, President Hayes observed that the governor "made due application" "under section 4 of Article IV of the Constitution" and "the legislature of said State . . . c[ould] not be convened in time to meet the present emergency." *Id.* When the strikes spilled over to Maryland, Governor John Carroll likewise requested federal aid, writing that "it [was] impossible with the force at [his] command to disperse the rioters" and "called upon" the President "to furnish the force necessary to protect the State against domestic violence," again noting that the "legislature can not be convened in time to meet the emergency." Wilson, *Federal Aid*, at 165.

After the epicenter of the violence shifted to Pennsylvania, Philadelphia's mayor requested federal troops, and President Hayes, recognizing that the Constitution required a request from the state legislature or governor, first made "every effort . . . to reach Governor Hartranft." *Id.* at 167. After unsuccessful attempts to reach the governor, who was on the Pacific coast, the Adjutant General informed the traveling troops that although "[t]he governor of Pennsylvania has not yet made a formal call for troops, . . . the President wishes to prepare in season for emergencies." *Id.* at 274. Shortly after midnight the next day, Governor Hartranft officially requested the President's "assist[ance] in quelling mobs within the borders of the State of Pennsylvania." *Id.* at 167. Upon receiving the request, President

Hayes issued a proclamation, again invoking the Domestic Violence Clause and noting that "the governor . . . has represented that domestic violence exists in [Pennsylvania] which the authorities of said State are unable to suppress." *Id.* at 168.

As the strike spread westward, the federal troops were directed to stand ready but hold off unless and until a state made a formal request. The governors of Illinois and Indiana each formally requested aid, expressly referring to "domestic violence." *Id.* at 171–72. In Ohio, even though local authorities in Toledo "implored" the federal commander to "render assistance," he refused, concluding that "he should take no part in suppressing the rioters, inasmuch as the governor had not called for assistance." *Id.* at 170; *see also id.* at 173–74 (similar response to the riots in St. Louis, Missouri).

c. The Pullman Strike (Cleveland)

In dealing with the Pullman Strike of 1894, President Grover Cleveland aberrated significantly from the precedent set by prior Presidents. President Cleveland sent federal troops into Chicago to enforce an injunction issued by a federal court barring railroad strikers from "interfering with, hindering, obstructing, or stopping any mail trains, express trains, or other trains, whether freight or passenger, engaged in interstate commerce." *In re Debs*, 158 U.S. 564, 568 (1895), *disapproved of by Bloom v. Illinois*, 391 U.S. 194 (1968). In his proclamation, the

President characterized the strikers as a "riotous mob" and stated that "by reason of unlawful obstructions, combinations, and assemblages of persons," it had become "impracticable" to "enforce by the ordinary course of judicial proceedings the laws of the United States." Proclamation No. 366 (July 8, 1894).

The President's deployment of federal troops prompted a strenuous response from Illinois Governor John Altgeld, who informed President Cleveland that Illinois was "able to take care of itself." Letter from John Altgeld to Grover Cleveland (July 5, 1894). Governor Altgeld further implied that the administration was relying on pretextual justifications, noting that "very little actual violence has been committed" and "[t]here have been a few local disturbances, but nothing that seriously interfered with the administration of justice, or that could not be easily controlled by the local or State authorities." *Id.*

Invoking principles of federalism, Governor Altgeld stressed that "federal supremacy and local self-government must go hand in hand, and to ignore the latter is to do violence to the Constitution." *Id.* As such, the governor argued, "the statute authorizing the President to send troops into States must be construed" in line with the "fundamental principle" that "[e]ach community shall govern itself so long as it can and is ready and able to enforce the law." *Id.* "Especially," he emphasized, "in matters relating to the exercise of the police power and the preservation of law and order." *Id.*

President Cleveland's short reply engaged little with Governor Altgeld's concerns, averring only that "there has been no intention of thereby interfering with the plain duty of the local authorities to preserve the peace of the city." *Id.* His decision to send in federal troops and ignore the state's objections is a marked departure from the approach taken by virtually every president who deployed troops domestically, except when states stood in opposition to federal law.[6]

d. The Mining Strikes (T. Roosevelt, Wilson, and Harding)

In 1902, faced with a coal strike that threatened widespread hardship for Eastern and Midwestern states, various officials urged President Theodore Roosevelt to invoke the precedent of the Pullman strike and intervene with federal troops. President Roosevelt declined until the Pennsylvania Governor made a formal request. Laurie & Cole, *The Role of the Federal Military, 1877–1945*, at 184–85. The strike ultimately settled without the need for federal military intervention. Similarly, after the Nevada Governor requested federal assistance in response to

[6] There is language in the Supreme Court's decision in *In re Debs* that appears at first blush to support President Cleveland's decision to send in the Militia. In broad dicta, the Court stated that "[t]he strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the nation, and all its militia, are at the service of the nation, to compel obedience to its laws." *In re Debs*, 158 U.S. at 582. The *Debs* Court, however, never held that President Cleveland had the authority to send in the National Guard. The only issue before the Court was whether to grant habeas relief to a defendant jailed for violating the injunction against the strikers.

strikes that erupted in Goldfield, Nevada, President Roosevelt directed the California National Guard to Nevada but instructed them "not [to] act" until he received confirmation from the state's legislature in accordance with the Domestic Violence Clause. Wilson, *Federal Aid*, at 310–11. The legislature was quickly convened and issued a formal resolution requesting federal military aid. *Id.* at 31.

President Woodrow Wilson's response to striking coal miners in 1913–1914 is largely in line with the traditional practice of respecting state sovereignty. Even when the strikers mounted an armed resistance to Colorado's state-controlled National Guard, President Wilson expressly withheld intervention under the constraints of the Domestic Violence Clause and responded only after the Colorado Governor sought federal assistance. Proclamation No. 1265 (Apr. 28, 1914). In July 1914, however, President Wilson sent federal troops into Arkansas to protect federal property from violent labor riots at coal companies under a federal receivership. Wilson, *Federal Aid*, at 321; Laurie & Cole, *The Role of the Federal Military, 1877–1945*, at 219–21. President Wilson did so without awaiting a request from the state, but state officials expressed their acquiescence to the federal intervention. *Id.*

Finally, in 1921, after a similar conflict involving armed, striking coal miners arose in West Virginia, the state sought assistance from President Warren G. Harding. President Harding's proclamation calling forth the Militia likewise quoted the

Domestic Violence Clause and noted the Governor's request for intervention. Proclamation No. 1606 (Aug. 30, 1921).

e. The Detroit Riots (F. Roosevelt and L. Johnson)

Presidents continued to await the States' requests throughout the rest of the twentieth century. In responding to riots in Detroit in 1943, President Franklin D. Roosevelt called forth the Militia because "the Governor of the State of Michigan ha[d] represented that domestic violence exist[ed] in said State which the authorities of said State [were] unable to suppress" and because, "it is provided in the Constitution of the United States that the United States shall protect each State in this Union, on application of the Legislature, or of the Executive, when the Legislature cannot be convened, against domestic violence." Proclamation No. 2588 (June 21, 1943). During the 1967 riots in Detroit and the 1968 unrest following Dr. Martin Luther King Jr.'s assassination, President Lyndon B. Johnson similarly deployed the National Guard in response to requests by Michigan Governor Romney, Illinois Governor Shapiro, and Maryland Governor Agnew. Telegram from Lyndon B. Johnson to George W. Romney (July 24, 1967); Proclamation No. 3841, 33 F.R. 5497 (April 9, 1968); Proclamation No. 3842, 33 F.R. 5499 (Apr. 9, 1968).

f. The Postal Strike (Nixon)

We have at least one additional instance in which federal troops were called to enforce federal law without seeking state consent, but the case is unusual because the problem was not related to domestic violence. In response to the 1970 postal worker strike, President Nixon sent thousands of National Guard members to New York City—not to quell any domestic unrest, but to deliver the mail. James B. Jacobs, *The Role of Military Forces in Public Sector Labor Relations*, 35 Indus. & Lab. Rels. Rev. 163, 167 (1982). I have noted the case here out of completeness, but it is not even clear that the Domestic Violence Clause had any applicability.

During the strike, the Department of Justice's Office of Legal Counsel (OLC) issued a memorandum supporting President Nixon's use of the troops. *See* Memorandum from Off. of Legal Couns. to Gen. Couns., Dep't of the Army, *Re: Authority to Use Troops to Execute the Laws of the United States* (Mar. 27, 1970). In it, the OLC broadly stated that the president has "inherent authority" to use troops to "take care that the laws be faithfully executed." *Id.* (citing U.S. Const. art. II, § 3).[7] While noting that the authority had historically "been utilized in the context

[7] Although other OLC memos have touched on the President's authority to use troops to protect federal property and functions, most of these memos relate to activity in Washington D.C., which is a *federal* enclave. *See*, *e.g.*, William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Statutory Authority to Use Federal Troops to Assist in the Protection of the President* (Nov. 12, 1969) (discussing the stationing of troops in the vicinity of the White House); William H. Rehnquist, *Re: Authority to Use Troops to Prevent Interference With Federal*

of enforcing laws against violent obstruction," the OLC found that it was not "limited to enforcement but encompasses the 'execution,' i.e., the completion, effectuation, performance, of the laws." *Id.* Perhaps not surprisingly, OLC did not refer to either the Militia or Domestic Violence Clauses.

g. The Rodney King Riots (G.H.W. Bush)

During the 1992 Los Angeles riots following the beating of Rodney King, President George H.W. Bush deployed National Guardsman "at the request of the Governor" of California, Pete Wilson. President Bush, Address to the Nation on the Civil Disturbances in Los Angeles, California (May 1, 1992). Like Presidents Washington, Adams, Madison, Jackson, Tyler, Lincoln, Grant, Hayes, T. Roosevelt, Wilson, Harding, F. Roosevelt and L. Johnson, President Bush respected the sovereignty of the states in deciding whether to deploy the Militia—complying with the constraints imposed by the Domestic Violence Clause.

4. The Domestic Violence Clause and the Fourteenth Amendment

The Fourteenth Amendment introduced a new dimension to the constitutional dialogue between the Militia and Domestic Violence Clauses by establishing a

---

*Employees by Mayday Demonstrations and Consequent Impairment of Government Functions* (Apr. 29, 1971) (discussing "Mayday Movement" protests in D.C.); William H. Rehnquist, *Re: Authority to Use Troops to Protect Federal Functions, Including the Safeguarding of Foreign Embassies in the United States* (May 11, 1970) (discussing the protection of foreign embassies "through the use of federal, rather than D.C. police officers").

limited set of circumstances where the federal government may deploy troops over a state's objections. *See* Ilan Wurman, *The Second Founding: An Introduction to the Fourteenth Amendment* 102–03 (2020). Section 5 of the Fourteenth Amendment granted Congress "the power to enforce, by appropriate legislation" the protections of the Amendment's other sections, including the Privileges or Immunities, Due Process, and Equal Protection Clauses in Section 1. Section 5 was Congress's response to the southern states' continued resistance after the Civil War to granting full freedoms to formerly enslaved people—a resistance notably embodied in the so-called Black Codes. It permitted Congress to address a circumstance not anticipated in the founding debates: *state* violations of the Constitution and federal statutes. [8]

In 1871, three years after the Fourteenth Amendment's ratification, Congress adopted the so-called Ku Klux Klan Act, entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." Ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. §§ 1983, 1985–1986). In this Act, Congress authorized the President to employ the Militia in "all cases where insurrection, domestic violence, unlawful combinations, or conspiracies in any State shall so obstruct or hinder the execution of the laws thereof . . . as to deprive . . . the people of such States any of the rights, privileges, or protection

[8] The Domestic Violence Clause figured prominently in the civil rights enforcement debates during Reconstruction. *See* Bybee, *Insuring Domestic Tranquility*, 66 Geo. Wash. L. Rev. at 67–71. Those debates are not relevant for my present purposes.

named in the constitution and secured by this act." *Id.*; *see also* 10 U.S.C. § 253. The Supreme Court held that the Act was unconstitutional insofar as it applied to private actors. *United States v. Harris*, 106 U.S. 629, 639 (1883). But the Court also recognized that the Act was constitutional insofar as it "protect[ed] against *the acts of the state government itself*." *Id*. at 608 (quoting *United States v. Cruikshank*, 25 F. Cas. 707, 710 (C.C.D. La. 1874), *aff'd*, 92 U.S. 542 (1875)) (emphasis added).

During Reconstruction, and again during the Civil Rights Era in the mid-twentieth century, presidents have exercised Congress's delegation of its Fourteenth Amendment enforcement power when states have refused to protect the rights conferred by Section 1.

b. The Ku Klux Klan (A. Johnson and Grant)

In 1868, state officials asked President Andrew Johnson for federal assistance in enforcing their laws against the Ku Klux Klan. President Johnson deployed federal troops once the Tennessee General Assembly made a formal request. Coakley, *The Role of Federal Military, 1789–1878*, at 301–02. In 1872, President Grant employed troops against the Ku Klux Klan in South Carolina. The record is not clear whether the state either formally requested federal assistance or objected to the federal presence, but it is likely that the governor either requested assistance or willingly accepted it because the governor was actively arming Black militia to combat the Ku Klux Klan. *See id.* at 310–13. But President Grant understood that

he could not intervene without state consent when states were not participating in or acquiescing to infringements on individual rights. In 1875, President Grant deployed the Militia to Louisiana to deal with "the White Leagues, armed and ready for conflict." Letter from Ulysses S. Grant to the Senate of the United States (Jan. 13, 1875). He emphasized that the governor had "made a formal requisition" before sending in troops, in compliance with "section 4, Article IV, of the Constitution." *Id*.

c. The Desegregation Cases (Eisenhower, Kennedy, and L. Johnson)

The civil rights enforcement acts came to the fore in the desegregation cases. In 1957, Arkansas Governor Orval Faubus and other state officials engaged in a multi-pronged campaign to prevent a court-ordered desegregation plan. *See Cooper v. Aaron*, 358 U.S 1, 8–10 (1958). Acting under the Governor's orders, the Arkansas National Guard "stood shoulder to shoulder" and "forcibly prevented" Black students from entering a school. *Aaron v. Cooper*, 156 F. Supp. 220, 225–26 (E.D. Ark. 1957). To protect the students, President Eisenhower deployed regular army troops and federalized the Arkansas National Guard.

In defending the deployment, the Attorney General stressed that the Governor had made "no effort whatever" to "uphold the jurisdiction of the Federal court" and instead "clearly directed" his powers to "nullif[y] . . . the court's mandate." *Id.* Even so, the Attorney General emphasized that states still bear the "*primary and mandatory duty*" to suppress "domestic violence" even where "the domestic

violence is interposed *in opposition to the enforcement of Federal law* rather than to the local law of the State." *Id.* at 321–23 (emphasis added). Only when a state shirks that duty by itself subverting federal law may the federal government federalize the Militia to ensure enforcement. *Id.* at 324; *see also Cooper*, 358 U.S. at 15, 18–19 (1958) (finding that the turmoil in Arkansas was "directly traceable to the actions of legislators and executive officials of the State of Arkansas, taken in their official capacities").

Between 1962 and 1963, President John F. Kennedy similarly federalized and deployed the National Guard three times to overcome "open and active resistance" by state officials to federal court desegregation orders at public schools. In September 1962, the Governor of Mississippi, in defiance of federal court orders, incited a mob of white students to block the enrollment of the first African American student admitted to the University of Mississippi. President Kennedy first sought state compliance but federalized the National Guard when the state refused, declaring that the Mississippi Governor and other state officials were "willfully opposing and obstructing the enforcement of [federal court] orders." Proclamation No. 3497 (Sept. 30, 1962). Then, in June 1963, President Kennedy federalized the Alabama National Guard to protect two African American students after Governor Wallace, with an escort of state police, physically "stood in the schoolhouse door" to block their enrollment at the University of Alabama. *See* Proclamation No. 3542

(June 11, 1963). Later that same year, after Alabama's governor used the National Guard to block African American students from attending desegregated public schools in defiance of federal court orders, President Kennedy again federalized the Guard to enforce those orders. *See* Proclamation No. 3554 (Sept. 10, 1963).

All three episodes featured *state* officials' "direct and active resistance" to federal law in defying federal desegregation orders at public schools. Notably, despite President Kennedy's efforts in each case to first secure the cooperation of the state, the governors refused to provide assurances that they would respect the supremacy of federal law.

In a similar episode in 1965, President Lyndon B. Johnson federalized the Alabama National Guard, directing it to protect the civil rights marchers from Selma to Montgomery after Governor Wallace actively subverted federal law by defying a federal injunction barring state officials from interfering with the march. *See Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965). In his proclamation, President Johnson found that the Governor's express "refus[al] to provide for the safety and welfare" of the marchers was "obstructing the execution and enforcement of the laws of the United States," including the court's order. Proclamation No. 3645 (March 20, 1965).

Because the desegregation cases involved state governors and officials who openly subverted federal law, no state request was constitutionally required under

the Domestic Violence Clause because the source of the domestic violence was the state itself.

* * *

We can quibble around the edges of these examples, and it is possible that I have missed other examples or even counterexamples, but the historical record—from George Washington to George H.W. Bush—is, in the main, consistent: federal use of the Militia is constrained by the Domestic Violence Clause. Nor is this historical pattern confined to domestic unrest involving only state law or interests: in most episodes, federal interests, laws, and policies were the primary target of the unrest. From the earliest examples of presidential practice to modern day deployments, presidents have understood that state governments must first request assistance as a necessary condition for the federalized deployment of the Militia in response to domestic disturbances.

An important exception to this rule comes out of the Fourteenth Amendment: If states actively oppose or resist the enforcement of the laws in violation of the Privileges or Immunities, Due Process, or Equal Protection Clauses, the federal government may deploy troops to execute the laws of the United States. In such cases, the Domestic Violence Clause provides no basis for objection when the states themselves are the source of or have acquiesced in the unrest. But otherwise, the President may not deploy the Militia without state consent.

## III. JUDICIAL REVIEW OF PRESIDENTIAL ACTIONS

In *Newsom*, we concluded that we had the power to review the President's decision to deploy troops to enforce federal law in Los Angeles. 141 F.4th at 1045–47. What standard of review do we use? We concluded that courts must defer to the President's determination that a statutory precondition for federalizing the National Guard has been met so long as that determination "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (citing *Sterling*, 287 U.S. at 399). Although we did not "further specify the precise standard that governs our review," *id.*, we described the standard as one that is "especially deferential," *id.* at 1047.

I am concerned that such deference—sounding in horizontal separation of powers concerns—cannot be reconciled with *vertical* separation of powers principles found in the Domestic Violence Clause. And no matter the appropriate standard of review, one thing is clear: It does not require courts to turn a blind eye to pretext. Courts are "not at liberty to shut [their] eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared." *Baker v. Carr*, 369 U.S. 186, 214 (1962) (citation omitted); *cf. Trump v. United States*, 603 U.S. 593, 608 (2024) ("If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring))). I discuss below why I do

not think "special deference" is the appropriate standard of review.[9] I then offer a suggestion for a burden-shifting framework that affords deference to both the President and the states. Finally, I address why, at a minimum, we should allow the states the opportunity to demonstrate that the President's stated reasons are pretextual.

A. *Special Deference Is Not the Proper Standard of Review*

Determining how to account for the Domestic Violence Clause in our review of the President's actions does not admit of easy or traditional principles. We surely owe deference to the President's determination of *how* force should be employed in defense of the enforcement of federal law. *See* 10 U.S.C. § 12406 ("[T]he President may call into Federal service members and units of the National Guard of any State *in such numbers as he considers necessary* to . . . execute those laws." (emphasis added)). We also surely owe *some* deference to presidential determinations of the need for such actions. But the contexts for those determinations are not the same. The question in this case is not *how* the President directs the National Guard, but *whether* the National Guard may be deployed to Oregon against the wishes of the state in the first place. The President has made certain statements in support of his

[9] In her dissent from the denial of rehearing en banc in *Newsom*, Judge Berzon provided a thoughtful analysis explaining why exceptional deference to the President's determinations is not appropriate in this context. *See Newsom v. Trump*, --- F.4th ----, 2025 WL 2977104, at *3–10 (9th Cir. Oct. 22, 2025) (Berzon, J., dissenting from the denial of rehearing en banc).

proposed course of action. The issue for us is how much deference do we owe to those justifications?

There are, of course, circumstances where the judiciary, as a coordinate branch of government, must accord great respect to Presidential determinations of fact. But the cases in which we have been "especially deferential" are largely limited to national security and foreign affairs. Neither context is implicated here.

For example, we have long recognized that "the Executive's evaluation of the underlying facts is entitled to" additional deference "in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" *Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010)). This deference is due in part because we assume that the President has superior access to information, including information for which we have few tools for assessing. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Thus, "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Holder*, 561 U.S. at 34 (citation omitted). As a result, if the Executive is "seeking to prevent imminent harms in the context of international affairs and national security," the Executive "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* at 35.

If this case involved a foreign police action, an action to repel foreign invasion, or a declared war, we would have little basis for second-guessing the President's determination that an exigency exists. But that is not this case. Those are *external* actions for which we have recognized "a standard [of review] far more general than that which has always been considered requisite with regard to domestic affairs." *Curtiss-Wright*, 299 U.S. at 324. With respect to the quelling of an *internal* uprising or the purported need to execute laws domestically, the judiciary is fully capable of making findings regarding the need for action.

The upshot of all this is that although there are certainly circumstances where the President's findings deserve substantial deference, in the context of the interpretation and invocation of the constitutional terms at issue, the President's findings cannot be the last word. Absolute fealty is not required here. We have the capacity both to define constitutional terms and to make findings as to whether the President's asserted basis for action comes within that definition. Just as we would not entrust the President to judge for himself whether a tax was proportional, art. I, § 8, cl. 1, whether a regulation gave preference to one port over another, art. I, § 9, cl. 6, or whether a rule was properly within the scope of the Commerce Clause, art. I, § 8, cl. 3, there is no reason for the judiciary to accept at face value the President's determination that a condition of insurrection or rebellion exists within a state or that he is unable to execute the law through ordinary means.

It bears repeating that Oregon is not challenging in this suit *how* the President is using the National Guard, but *whether* he may use the National Guard at all. Whether the President can lawfully intervene in the first place to exercise an enumerated power is not a question beyond the ken of the judiciary. *See Newsom*, 141 F.4th at 1046. Judicial review means determining "whether the Executive branch has correctly applied [a] statute that establishes its authority," *Chadha v. Immigr. & Naturalization Serv.*, 634 F.2d 408, 430 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983), and "whether he has acted within the law," *Clinton v. Jones*, 520 U.S. 681, 703 (1997). In doing so, "[j]udges have always been expected to apply their 'judgment' *independent* of the political branches when interpreting the laws those branches enact." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (citing The Federalist No. 78). Although the "views of the Executive Branch [may] inform the judgment of the Judiciary," they may "not supersede it." *Id.* at 370.

B. *A Proposal for a Burden-Shifting Standard*

So how do we determine whether the federal government may call forth the Militia in the first instance, and over the objections of a state? This is a challenging question. With respect to the Tenth Amendment (and outside the context of the anti-commandeering principle), the Court has said that such decisions should largely be left to the political processes. *See South Carolina v. Baker*, 485 U.S. 505, 572 (1988); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552 (1985). I do

not believe that the same can be said for the states' privilege and immunity embedded in the Domestic Violence Clause. That Clause is a far more particular declaration of states' rights than the tautologous Tenth Amendment. The Domestic Violence Clause is the rare provision in the Constitution that secures an "attribute[] of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner." *Nat'l League of Cities v. Usery*, 426 U.S. 833, 845 (1976), *overruled on other grounds by*, *Garcia*, 469 U.S. 528; *see also New York v. United States*, 505 U.S. 144, 156–57 (1992).

Because the President's exercise of authority under § 12406 is only as broad as Congress's authority under the Militia Clause, we may treat the Executive's justification for sending federal troops to enforce federal law as it were Congress's own set of findings. *Cf. Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 131–32 (2015) (Thomas, J., concurring) ("[T]he Constitution does not empower Congress to issue a judicially binding interpretation of the Constitution or its laws. Lacking the power itself, it cannot delegate that power to an agency."). And the Court has never obligated itself to accept whatever findings Congress makes. For example, although Congress has broad authority under the Commerce Clause, the Court has said there

are limits to that authority. With respect to Congress's findings linking gun possession in school zones with crime affecting the economy, the Court wrote:

> [U]nder the Government's . . . reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens . . . . Under the theories that the Government presents . . ., it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign.

*United States v. Lopez*, 514 U.S. 549, 558–59 (1995). And in *Gonzales v. Carhart*, 550 U.S. 124 (2007), although the Court ultimately upheld the Partial–Birth Abortion Ban Act of 2003, it rejected the Attorney General's argument "to uphold the Act on the basis of the congressional findings alone." *Id.* at 165. "Although we review congressional factfinding under a deferential standard, we do not in the circumstances here place dispositive weight on Congress' findings. The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Id.*

Even in the context of military action, the Supreme Court has likewise held that "[i]t does not follow from the fact that the executive has [a] range of discretion" in responding to certain exigencies "that every sort of action the [Executive] may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat." *Sterling*, 287 U.S. at 400. "It is the emergency that gives the right,

[but] the emergency must be *shown* to exist before the [action] can be justified." *Mitchell v. Harmony*, 54 U.S. 115, 134 (1851) (emphasis added).

So here, in an attempt to "further specify the precise standard that governs our review" of a state's challenge to the basis of the President's decision to deploy the Militia to the states, *Newsom*, 141 F.4th at 1051, I offer one possible solution: a three-step burden-shifting scheme informed by the structure, history, and tradition of the Constitution.[10] At the first step, we expect the President to state which § 12406 precondition for the federalization and deployment of the National Guard is being invoked—e.g., to combat an invasion, to suppress a rebellion, or to execute specified federal laws—and the factual circumstances the President believes satisfy that precondition. In so doing, the President must articulate a rational connection between the factual finding and the need to invoke § 12406. *Cf. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43, (1983) (requiring a "reasoned analysis" of the facts). This is not a particularly difficult burden, and following *Newsom*, so long as the President's

---

[10] The Supreme Court has adopted burden-shifting frameworks in a variety of contexts. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018) (applying a "three-step, burden-shifting framework" to the rule of reason in antitrust); *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986) (establishing a three-step burden-shifting analysis for peremptory strikes of jurors); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (establishing a three-part burden-shifting test for proving racial discrimination under Title VII).

articulation "reflects a colorable assessment of the facts and law within a 'range of honest judgment,'" the President's determination is due *prima facie* deference. *Newsom*, 141 F.4th at 1051 (quoting *Sterling*, 287 U.S. at 399).

But when it comes to the findings of fact supporting the President's declaration, we need not accept the President's telling of the story as the last word, particularly in the face of contrary evidence. *See Sterling*, 287 U.S. at 401 ("What are the allowable limits of military discretion, *and whether or not they have been overstepped in a particular case*, are judicial questions." (emphasis added)); *cf. Crowell v. Benson,* 285 U.S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the *independent determination of all questions, both of fact and law*, necessary to the performance of that supreme function." (emphasis added)). In *Martin v. Mott*, the Court noted that a "public officer is presumed to act in obedience to his duty" only "until the contrary *is shown*."[11] 25 U.S. (12 Wheat.) 19, 33 (1827) (emphasis

[11] Although *Martin v. Mott* contained dicta ostensibly pertaining to presidential deference, Justice Story was addressing only the deference *militiamen* within the President's chain of command owe to the President's determinations. *See* 25 U.S. at 29–30 ("Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President?"). That case was not about—and did not establish a rule regarding—the *courts'* ability to review presidential determinations. Moreover, *Martin* occurred in the context of *invasion* during the War of 1812, not domestic violence. Although it may contain language that could be construed overly broadly if taken out of context,

added). As such, something akin to a burden-shifting framework is more appropriate to evaluate the President's factual findings.

To raise a challenge to a Presidential determination "conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance," a state must be permitted to show, by the preponderance of the evidence, that the invoked statutory factual precondition is *not* met. *See Sterling*, 287 U.S. at 399–400. In the case of § 12406(3), a state can meet its burden by showing that ordinary civil processes were sufficient to enforce federal law. At this stage, history implores consideration of factors such as whether state officials were willing to cooperate and assist or if state officials actively obstructed federal enforcement; whether federal civilian tools remained available; and whether the deployment infringes on countervailing state interests, including by intruding in matters traditionally left to states, such as crime or riot. By placing the burden on the state to demonstrate that the President's articulation of the facts is incorrect, we have given the President his due deference.

Only if the state successfully makes such a showing does the burden then shift back to the President to provide evidence supporting his initial articulation. He may do so by producing facts demonstrating that the deployment was within the

"general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).

permissible bounds of the President's statutory and constitutional power to call forth the Militia to execute federal laws. The court can consider the geographic and temporal proximity of the evidence; whether state officials openly refused or obstructed federal officials or a federal court order; and whether Fourteenth Amendment individual rights were implicated.

If the President is able to do so, then the state must be afforded a final opportunity to demonstrate that the President's proposed justification was a pretext for an unlawful purpose. It might do so by showing reliance on post hoc rationales, departures from established criteria or procedures, or a mismatch between stated justifications and impermissible objectives. Throughout, the ultimate burden of persuasion rests with the state; courts should accord respectful deference to executive judgments of exigency and refrain from second-guessing military tactics or strategies, but they should also require a rationale grounded in evidence rather than ipse dixit.

*C. Consideration of Presidential Pretext*

Whether or not the court accepts my prior suggestion, we should, at a minimum, give the state the opportunity to prove whether the political branches are abusing "constitutional powers" by assuming authorization "as the pretext for the usurpation of powers not belonging" to them. *M'Culloch v. Maryland*, 17 U.S. 316, 359 (1819); *see also Youngstown*, 343 U.S. at 650 (Jackson, J., concurring) (noting

the risk that a president may use apparently authorizing language as "a ready pretext for usurpation" of power).

Recently, in *Department of Commerce v. New York*, 588 U.S. 752 (2019), the Court addressed an instance that called for the judicial accounting of executive pretext. In that high-profile case, Secretary of Commerce Wilbur Ross had sought to reinstate a question about citizenship on the 2020 census questionnaire. The Supreme Court affirmed the district court's "determination that the Secretary's decision must be set aside because it rested on a pretextual basis." *Id*. at 780. The Court found a "significant mismatch between the decision the Secretary made and the rationale he provided," which the Court characterized as "contrived." *Id*. at 783–84. Even where "review is deferential," the Court wrote, the judiciary ought not "exhibit a naiveté from which ordinary citizens are free," or else "judicial review" would be "an empty ritual." *Id.* at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

As for the case at hand, President Trump has made several statements that the court can and should consider to determine whether his purported legal basis for calling forth the National Guard to Portland is pretextual. For example, in the Truth Social post that served as the President's order authorizing the deployment of the Guard, the President declared that he was deploying the troops "to protect War ravaged Portland, *and* any of our ICE Facilities under siege." Dist. Ct. Dkt. 146 at

14 (emphasis added). The President has made other similar statements identifying local crime and disorder as justification for his decision to activate the Guard:

- "There's a huge problem in Portland. I'll tell you what the problem is crime, OK? Crime." *Remarks: Donald Trump Signs an Executive Order on Alaskan Energy and Minerals*, Roll Call (Oct. 6, 2025), https://perma.cc/TAG8-XNGK.
- "Portland is—is on fire. Portland's been on fire for years and not so much saving it. We have to save something else because I think that's all insurrection. I really think that's really criminal insurrection." *Id.*
- "I believe that the Portland people are scared. You look at what's happened with Portland over the years. It's—it's a burning hell hole." *Id.*

The President himself appears to have questioned whether the reality in Portland diverged from his understanding. Following a conversation with Oregon Governor Tina Kotek, the President recounted asking the governor: "'Well wait a minute, am I watching things on television that are different from what's happening? My people tell me different.' They are literally attacking and there are fires all over the place . . . it looks like terrible." Evan Watson, *Trump Questioned Perception of Portland Before Approving Military Plan: 'Am I Watching Things on Television That Are Different from What's Happening?'*, KGW8 (Sept. 28, 2025), https://perma.cc/T88B-VMDA. During that same conversation, Governor Kotek said she made it "abundantly clear" that the situation in Portland was under control: "Portland and the State of Oregon believe in the rule of law and can manage our own local public safety needs." Tina Kotek, (GovTinaKotek), X (Sept. 27, 2025, at 1:09 PM), https://perma.cc/TZ6T-S8TK.

On another occasion, the President stated that the activities warranting the mobilization of the National Guard "are not occurring in isolation," but are instead "similar to other ongoing efforts in multiple States and cities around the country to disrupt the faithful enforcement of Federal law." Donald J. Trump, *Department of War Security for the Protection of Federal Personnel and Property in Illinois*, The White House (Oct. 4, 2025), https://perma.cc/MP4M-WK3J. Accordingly, the court should not consider the President's statements about Portland in isolation. In his speech to senior military leadership in September 2025, the President remarked that "the Democrats run most of the cities that are in bad shape" and declared that his administration would "straighten them out one by one." *Speech: Donald Trump Addresses Military Leadership in Quantico, Virginia*, Roll Call (Sept. 30, 2025), https://perma.cc/4EUD-86TV (emphasis added). He then told the audience that "we should use some of these *dangerous cities as training grounds for our military, National Guard*." *Id.* (emphasis added).

Statements the President has made about other cities are therefore relevant to the question of whether ordinary crime control is the animating force behind the National Guard deployments, as opposed to a genuine inability to enforce federal law:

- "[W]e're going to make Chicago really great again. And we're going to stop this crime. Then we're going to go to another one. And we're going to go city by city. We're going to have safe cities." *Remarks: Donald Trump Signs an Executive Order on Alaskan*

*Energy and Minerals*, Roll Call (Oct. 6, 2025), https://perma.cc/TAG8-XNGK.

- "We have to make sure that our cities are safe. And it's turning out—and—and we started with DC. It's been so successful." *Id.*

And as for Memphis, the White House's official memorandum on the mobilization of the National Guard claims only that the city "is suffering from tremendous levels of violent crime" and states that the National Guard will "support public safety and law enforcement operations" in their mission to "end street and violent crime." Donald J. Trump, *Restoring Law and Order in Memphis*, The White House (Sept. 15, 2025), https://perma.cc/F23U-BGCU.

Whatever conclusions may be drawn from the consideration of such statements is for the court to decide, but the court *should* consider them. And if, after considering these statements and all other relevant facts, the court determines that the President's "course of action was not supported by the evidence before him, and his stated rationale was pretextual," then his order may not stand. *Dep't of Com.*, 588 U.S. at 773–74.

## IV. CONCLUSION

I respectfully urge the en banc panel to take account of the role of the Domestic Violence Clause in this case and to fix a standard of review that will respect its guarantee of state primacy over "domestic Violence," U.S. Const. art. IV, § 4, and the surety role of the United States in securing "domestic Tranquility," U.S. Const. pmbl. The Domestic Violence Clause captured the Framers' carefully crafted

balance of interests between the states and the federal government. Because "the state has no more important interest than the maintenance of law and order," *Sterling*, 287 U.S. at 399, there is no greater threat to the sovereignty of the states than an assertion of federal control over their domestic affairs.

FILED

DEC 8 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*State of Oregon v. Trump*, No. 25-6268
TUNG, Circuit Judge, statement respecting the grant of rehearing en banc:

I write in response to Judge Bybee's statement. Judge Bybee makes two claims—first, that a judge can review a President's determination that an exigency exists to call forth the National Guard to execute the federal laws; and second, that the President must receive consent from a State before he can call forth the National Guard of that State. Respectfully, Judge Bybee is wrong on both points. Our Constitution, the statute at issue, and Supreme Court precedent confirm that judicial interference in a matter assigned to the political branches would be improper, and that a State need not consent before the President can call forth the National Guard.

**I.**

The Constitution gives Congress the power to "provide for calling forth the militia" (today's National Guard). Art. I, § 8, cl. 15. And in exercising that power, Congress authorized the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . execute [the federal] laws" "[w]henever . . . the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406.

**A.**

Who is to decide when that condition pertains? Read most naturally, the statute assigns to the President the task of determining when he "is unable" to execute the laws in the manner described. Indeed, it would be anomalous for

Congress or judges to make that determination; they do not execute the federal laws and hence could not adequately assess whether "the President is unable with regular forces to execute" those laws. The President is entrusted with the power and duty to "take Care that the Laws be faithfully executed" (Art. II, § 3), and he serves as the "Commander in Chief" of "the Militia of the several States, when called into actual Service of the United States" (Art. II, § 2).

Accordingly, while Congress supplies the conditions for when a militia can be called forth to execute the federal laws (here, whether the President is unable to execute the laws), it would appear most natural for Congress to assign to the person vested with the power to execute the laws the power also to determine when he is unable to execute those laws. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31 (1827) ("The power itself is confided to the Executive of the Union, to him who is, by the constitution, 'the commander in chief of the militia, when called into the actual service of the United States,' whose duty it is to 'take care that the laws be faithfully executed,' and whose responsibility for an honest discharge of his official obligations is secured by the highest sanctions. He is necessarily constituted the judge of the existence of the exigency in the first instance[.]"); *see also* R. Epstein, *Executive Power, the Commander in Chief, and the Militia Clause*, 34 Hofstra L. Rev. 317, 321–22 (2005) ("The use of the indirect verb construction ('provide for the calling forth') makes it clear that Congress itself does not have the power to call forth the

militia, but in fact must pass some statute which will decide how and when the militia shall be called into the United States. . . . [T]he clear implication is that it can set by rules and regulations the conditions under which the President may, as commander in chief, call the militia into actual service."). Congress made that assignment here. Not to itself, not to the courts.

Pursuant to its militia-clause power, Congress could have assigned to the judiciary some role in determining exigency, despite the anomaly that would create. But it did not do that here. In the past, Congress did require a judicial notice of exigency before the President could summon the militia. Under the 1792 Militia Act, the President first had to obtain a notice from "an associate justice or the district judge"—finding that the "execution" of the federal laws was "obstructed" by "combinations too powerful to be suppressed by the ordinary course of judicial proceedings." Act of May 2, 1792, ch. 28, § 2, 1 Stat. 264. But just three years later, Congress removed that requirement after President Washington put down the Whiskey Rebellion. Act of February 28, 1795, ch. 36, § 2, 1 Stat. 424; *see also* R. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789–1878*, at 67–68 (1988) ("The new act of 28 February 1795 deleted the requirement that the president obtain a judicial certificate before using the militia . . . . By his actions in the Whiskey Rebellion, Washington had apparently dissipated the fears expressed in

1792 that these powers 'could not with safety be entrusted to the President of the United States.'").[1]

No such judicial-certification requirement has been reinstated since. The import of that history is clear: whereas Congress had previously experimented with requiring a judge to certify the existence of an exigency to enable the President to call forth the militia, Congress now vests the President with exclusive discretion in determining whether that exigency exists.

Supreme Court precedent affirms the President's exclusive discretion in this area. In *Martin v. Mott*, the Court held, in interpreting the Militia Act of 1795 (a precursor to the statute here), that the "authority to decide whether the exigency has arisen, belongs exclusively to the President" and "his decision is conclusive upon all other persons." 25 U.S. at 30. No ifs, ands, or buts. The Court reasoned that "this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of Congress." *Id.* That "power," Justice Story wrote, "is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union,"

[1] Even Judge Bybee (before becoming a judge) recognized that this deletion was a "significant change" making clear that "[t]he need to intervene was left entirely to the President's judgment." J.S. Bybee, *Insuring Domestic Tranquility:* Lopez*, Federalization of Crime, and the Forgotten Role of the Domestic Violence Clause*, 66 Geo. Wash. L. Rev. 1, 43 n.270 (1997).

and a "prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object." *Id.*

The prospect of a judicial countermand inverts this scheme. Allowing a judge to second-guess a presidential determination of exigency—while superimposing an entire fact-finding and adjudicatory process—would undermine the "nature of the power" to meet the exigency and eviscerate the "prompt[ness]" with which Congress authorized the President to act in calling forth the militia. Nothing in our constitutional order requires that result. Indeed, the wide discrepancies among judges as to the facts, the inferences to be drawn from the facts, and whether those facts and inferences give rise to an exigency (*compare, e.g.*, *Oregon v. Trump*, 157 F.4th 1013, 1019–24, 1029–31 (9th Cir. 2025) (per curiam), *with id.* at 1044–45, 1047–53 (Graber, J., dissenting)), only vindicate *Martin*'s holding that the President's determination is (and ought to be) conclusive.

The absence of a judicial countermand does not mean that there would be no check on purported abuses of executive power. *Congress* could reinsert a judicial-notification requirement or a variant thereof anytime it wishes, or impose other restrictions concerning the grounds on which the militia could be called. *See* 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 426 (J. Elliot ed., 2d ed., 1996) [hereinafter *Elliot's Debates*] (when responding to an opponent who "disapprove[d] of [the Militia Clause] because it

does not say in what particular instances the militia shall be called out to execute the laws," George Nicholas (a Virginia delegate) explained that "particular instances must be defined by the legislature"). The Framers designed our constitutional scheme to reserve the power to call forth the militia to the *political* branches (the Legislature and Executive) and to divide it between them to avoid abuse by a single branch. *See* Art. I, § 8, cl. 15; *see also Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.").

Put simply, intervention by a non-political, unelected branch (the Judiciary) was not contemplated, unless Congress expressly authorized such intervention. Congress did not do so here.

Other features of our constitutional order would serve to curb executive excess. If executive action as authorized by Congress becomes too unpopular, the people would be free to remove their elected officials (the President included) through the franchise. *See* 3 *Elliot's Debates* 421 (Marshall) ("[A]s the government was drawn from the people, the feelings and interests of the people would be attended to, and that we should be safe in granting them power to regulate the militia.").[2] Importantly, too, the militia itself was viewed by the founding generation as a *check against* (and not as a means of enabling) federal abuse. *See* 3 *Elliot's Debates* 400 (Randolph) ("Shall we be afraid that the people [referring to the militia], this bulwark of freedom, will turn instruments of slavery?").[3] After all, the

[2] *See also* 3 *Elliot's Debates* 381–82 (Madison) ( "[A] government of a federal nature . . . ha[s] no temptation whatever to abuse this power; such abuse could only answer the purpose of exciting the universal indignation of the people, and drawing on themselves the general hatred and detestation of their country."); 4 *Elliot's Debates* 64 (Maclaine) ("It cannot be supposed that the representatives of our general government will be worse men than the members of our state government."); 4 *Elliot's Debates* 209 (Spaight) ("The power of calling forth the militia is given for the common defence; and can we suppose that our own representatives, chosen for so short a period, will dare to pervert [this] power . . . ?"); The Federalist No. 29, at 183 (C. Kesler ed., 2003) ("If we were even to suppose the national rulers actuated by the most ungovernable ambition, it is impossible to believe that they would employ such preposterous means to accomplish their designs."); 3 The Records of the Federal Convention of 1787 at 319 (M. Farrand ed., 1911) [hereinafter *Farrand's Records*] (Randolph) ("The president, who commands [the militia] when in the actual service of the union, is appointed secondarily by the people. — This is a further security.").

[3] *See also* 3 *Elliot's Debates* 401 (Randolph) ("Is it not incredible that men who are interested in the happiness of their country—whose friends, relations, and

militia was composed of everyday citizens (not professional soldiers), the officers of which were (and still are) appointed by the State, not the federal government.[4] St. George Tucker, 1 *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia*, app. 274 (1803) ("We have seen that the appointment of the officers of the militia, and the authority of training them, are expressly reserved to the states, by this article: this was considered as a most important check to any possible abuse of power in the federal government[.]").[5]

---

connections, must be involved in the fate of their country — should turn against their country?"); 4 *Elliot's Debates* 64 (Maclaine) ("Will the militia be called out by the general government to enslave the people — to enslave their friends, their families, themselves?"); 3 *Farrand's Records* 318–19 (Randolph again making the same point); The Federalist No. 29, at 181 ("There is something so far-fetched and so extravagant in the idea of danger to liberty from the militia . . . . What shadow of danger can there be from men who are daily mingling with the rest of their countrymen and who participate with them in the same feelings, sentiments, habits and interests?").

[4] While modern Militia Acts have given the National Guard a split federal and state role, the core of the National Guard remains true to the militia of the Founders. When not activated, they hold civilian jobs and live locally in their communities. *See Perpich v. Dep't of Def.*, 496 U.S. 334, 348 (1990).

[5] *See also* 3 *Elliot's Debates* 400–01 (Randolph) ("The state governments, having the power of appointing them, may elect men who are the most remarkable for their virtue of attachment to their country."); 3 *Farrand's Records* 318–19 (Randolph) ("In order to produce greater security, the state governments are to appoint the officers."); The Federalist No. 29, at 181–82 ("What reasonable cause of apprehension can be inferred from a power in the Union to prescribe regulations for the militia, and to command its services when necessary, while the particular States are to have the *sole and exclusive appointment of the officers*?"); The Federalist No. 46, at 296 ("[T]he existence of subordinate governments, to which the people

To be sure, our constitutional design recognized that "no precise bounds could be set to the national exigencies[.]" The Federalist Papers No. 26, at 165 (C. Kesler ed., 2003). But our Framers entrusted the "exercise of that power" to "the legislature and executive" to work out. *Id.* at 166, 168. It is the product of our court-centric minds that judges *must* be able to redress any claim that such inherently imprecise bounds were transgressed—or else the sky would fall. But our Constitution does not reflect that view.

**B.**

Judge Bybee has suggested that *Martin v. Mott* stands for the proposition that the "conclusiveness" of the President's determination applies only to militiamen in the President's chain of command. ***See* Op. at 57 n.11**. But that is not a credible reading. In no uncertain terms, the Court held that "the authority to decide whether the exigency has arisen, belongs exclusively to the President" and "his decision is conclusive *upon all other persons*." *Martin*, 25 U.S. at 30 (emphasis added); *see also Luther v. Borden*, 48 U.S. (7 How.) 1, 45 (1849) ("Undoubtedly, if the President in exercising this power shall fall into error, or invade the rights of the people of the State, it would be in the power of Congress to apply the proper remedy. But the

are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition . . . ."); R. Delahunty, *Structuralism and the War Powers: The Army, Navy, and Militia Clauses*, 19 Ga. St. U. L. Rev. 1021, 1053–54 (2003).

courts must administer the law as they find it."); *The Orono*, 18 F. Cas. 830, 830 (C.C.D. Mass. 1812) (No. 10,585) (Story, Circuit Justice) ("It does not belong to the court to superintend the acts of the executive, nor to decide on circumstances left to his sole discretion."). "All other persons" clearly includes judges. To read *Martin* as excluding judges amounts to nothing more than an Article III power grab, inviting judicial intrusions into executive determinations that Congress has plainly vested in the President.[6]

Nor has *Sterling v. Constantin*, 287 U.S. 378 (1932), supposedly clarified *Martin* to mean that, while a President's determination of exigency to call forth the militia is accorded a great deference, judges can nevertheless review that determination. Rather, it repeatedly reaffirmed *Martin*'s ruling that the President's determination was conclusive. *See Sterling*, 287 U.S. at 399 ("[T]he Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive.").

---

[6] Dictum in *Martin*—that "[e]very public officer is presumed to act in obedience to his duty, until the contrary is shown"—does not somehow greenlight judicial review. 25 U.S. at 33. Indeed, in the next few sentences, the Court makes clear (again) that the President's judgment was conclusive and not subject to review: "It is not necessary to aver [or plead], that the act which he may rightfully do, was so done," because "[i]f the fact of the existence of the exigency were averred, it would be traversable [or denied], and of course might be passed upon by a jury; and thus the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury." *Id.*

*Sterling* did not question whether the executive (there, the Texas governor) validly determined an exigency to call forth the state militia. *See id.* at 401. Rather, *Sterling* addressed whether executive action—*subsequent to* and *separate from* the calling forth of the militia—could be reviewed for its constitutionality (*i.e.*, action in which the executive used the militia to enforce orders restricting the production of oil from private wells). *See id.* at 388, 401–02 ("Fundamentally, the question here is not of the power of the Governor to proclaim that . . . it is necessary to call military force to the aid of the civil power. . . . The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil.").

Not surprisingly, the Court in *Sterling* held that such alleged violations of private-property rights were reviewable in court, though the executive's actions were still given deference. *See id.* at 399 ("[T]here is a permitted range of honest judgment *as to the measures* to be taken in meeting force with force, in suppressing violence and restoring order . . . ." (emphasis added)); *id.* at 400 ("*Such measures*, conceived in good faith, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the Executive in the exercise of his authority to maintain peace." (emphasis added)).

Plaintiffs are not alleging the invasion of any private-property rights here. Plaintiffs challenge only the President's determination to call forth and deploy the militia (or to "federalize" Oregon's National Guard)—not any separate or subsequent invasion of individual rights that the militia may have caused. And *that* determination, *Martin* and *Sterling* hold, is conclusive.

## II.

Our constitutional history also makes clear that the President need not obtain consent from States before he calls forth the militia to execute the federal laws. Judge Bybee writes that the Domestic Violence Clause imposes such a requirement. It does not.

### A.

Article IV, § 4 states that "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or the Executive (when the Legislature cannot be convened) against domestic Violence." Contrary to Judge Bybee's claim, the Domestic Violence Clause's text and history prove that no State-consent requirement exists.

On its face, the text of Article IV obligates the federal government to "protect" a State if certain conditions are met. Nothing in the text limits Congress's ability to assign to the President the power to call forth the militia—let alone *require* that the

President obtain approval from a State before it can call forth the militia to execute federal law.

The power to call forth the militia is addressed in an entirely different constitutional article (*see* Art. I, § 8, cl. 15). If there were a requirement of State consent—limiting Congress's authority to provide for calling forth the militia (and the President's power to call it forth)—one would have expected to find such a requirement in the Militia Clause or a surrounding provision.[7] But it is not there. Indeed, the Constitution already expressly "reserv[es]" certain powers to the States with respect to the militia—the power to "[a]ppoint[]" the militia's "[o]fficers" and to "train[]" the militia "according to the discipline prescribed by Congress[.]" Art. I, § 8, cl. 16. That the Constitution did not require that Congress or the President obtain consent from a State before calling forth the militia strongly suggests that no such requirement exists.[8]

---

[7] *See, e.g.*, Art. I, § 8, cl. 17 ("To exercise exclusive Legislation in all Cases whatsoever, over . . . all Places purchased *by the Consent of the Legislature of the State* in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings" (emphasis added)).

[8] Judge Bybee discusses two delegates from the state ratification debates (Edmund Pendleton and James Bowdoin) to suggest that it was widely understood that the Domestic Violence Clause required State consent to call forth the militia. **Op. at 15–16**. That suggestion is incorrect. In fact, when considering the interaction of the Militia Clause and the Domestic Violence Clause, the delegates were primarily concerned about whether the clauses limited the power of the *States* to call forth their own militia "without an application to Congress." *See, e.g.,* 3 *Elliot's Debates* 416–17 (Henry), 417 (Corbin), 417–19 (Grayson), 419–20 (Marshall), 421 (Marshall),

The history of the Militia and Domestic Violence clauses reinforces that conclusion. The federal and state ratifying conventions had considered multiple proposals that would have given the States a veto power with respect to calling forth the militia by the federal government. *See* 2 *Elliot's Debates* 546 ("[N]or shall the militia of any state be continued in actual service longer than two months . . . without the consent of the legislature of such state[.]").[9] But all those proposals were rejected. *Cf.* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1197 (1833) ("[T]hat the militia under the command of the national government might be dangerous to the public liberty . . . produced some propositions of amendment in the state conventions, which, however, were never duly ratified, and have long since ceased to be felt, as matters of general concern."). And those

422–24 (Henry), 424–25 (Madison). The debate thus focused on giving reassurance that the States retained the authority to call up their own militia. *E.g.*, *id.* at 419 (Marshall) ("To me it appears, then, unquestionable that the state governments can call forth the militia[.]"); *see also* **Op. at 15** (quoting Madison). In any event, neither Pendleton nor Bowdoin expressed the view that the Domestic Violence Clause restrained the President in calling forth the militia to execute *federal* laws. *See* 3 *Elliot's Debates* 441; 2 *Elliot's Debates* 85–86.

[9] *See also* 2 *Elliot's Debates* 406 ("That the militia of any state shall not be marched out of such state without the consent of the executive thereof[.]"); *id.* at 552 ("The following amendments were . . . negatived . . . 1. That the militia . . . shall not be marched, beyond the limits of an adjoining state, without the consent of their legislature or executive."); 3 *Elliot's Debates* 378–79 (Mason) ("I wish such an amendment as this—that the militia of any state should not be marched beyond the limits of the adjoining state; . . . I wish such a check, as the consent of the state legislature, to be provided.").

proposals were rejected because the ratifiers believed that Congress provided a sufficient check against any abuse by the President in calling forth the militia, and that "requiring [State] consent" would "destroy the general government," deprive it of the ability to swiftly counteract invasions, rebellions, or obstructions in the execution of federal laws, and undermine the security of the Union. 3 *Elliot's Debates* 383 (Madison).[10]

To read the Domestic Violence Clause as requiring the President to obtain State consent here, as Judge Bybee would, is thus wrong. To be sure, the Clause appears to require that the federal government receive an "Application" from the State for assistance before the federal government can "protect" the State against "domestic Violence." Art. IV, § 4. And that would make sense: what business would the federal government have to interfere in matters purely "domestic"—that is, involving disturbances that implicate violations of state law—unless the State

[10] *See also* 3 *Elliot's Debates* 390 (Nicholas) (noting that such an amendment would "put an obstacle in the way of the general government, and put it in the power of the state governments to take away the aid of the militia."); *id*. at 421 (Marshall) ("No state will spare to another its militia, which it conceives necessary for itself. It requires a superintending power, in order to call forth the resources of all to protect all."); *id.* at 424 (Madison) ("If ever America should be attacked, the states would fall successively. . . . [A]s each state will expect to be attacked, and wish to guard against it, each will retain its own militia for its own defence."); 1 *Elliot's Debates* 372 (Martin) ("They said that . . . if the militia was under the control and the authority of the respective states, it would enable them to thwart and oppose the general government.").

requested help? But "violence" in a State is no longer "domestic" when *federal* laws are thwarted, as even Judge Bybee appears to recognize. **Op. at 7** ("As the Constitution expressly denies to the states the right to engage in war or repel invasion, art. I. § 10, cl. 3, 'domestic Violence' refers to matters *within a state*, including crime, riot, and insurrection or rebellion *against the state*." (emphasis in original)).[11]

When federal laws are thwarted, the Militia Clause provides that Congress can provide for calling forth the militia to execute those laws. If it wanted, Congress could have required the President to obtain State consent (***cf. supra* at 3**). But Congress did not do so here. That is enough to refute Judge Bybee's thesis.

To add error upon error, Judge Bybee asserts that judicial review is necessary to address violations of the Domestic Violence Clause. **Op. at 49–54.** The Supreme Court already rejected that view: any purported violation of that Clause, as with any

---

[11] *See also* The Federalist No. 21 at 135 ("Without a guaranty the assistance to be derived from the Union in repelling those domestic dangers which may sometimes threaten *the existence of the State constitutions*, must be renounced." (emphasis added)). Judge Bybee quotes St. George Tucker—"every pretext for intermeddling with the domestic concerns of any state, under colour of protecting it against domestic violence is taken away, by that part of the provision which renders an application from the legislative, or executive authority of the state endangered, necessary to be made to the federal government, before [its] interference can be at all proper." **Op. at 4**. But this quotation says nothing about requiring an "application" from a State before the President can call forth the militia to execute *federal* law.

supposed violation of the Guaranty Clause, is simply not justiciable. *E.g., Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118, 147–48 (1912) (noting that "if the question of what was the rightful government within the intendment of § 4 of article 4 was a judicial one, the duty to afford protections from invasion and to suppress domestic violence would be also judicial" and rejecting the notion that either the Guaranty Clause or the Domestic Violence Clause was justiciable (citing *Luther*, 48 U.S. at 43)). Rather, Congress is the branch entrusted with determining "the means proper" "to fulfil this guarantee" against "domestic violence," and Congress resolved that "the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President." *Luther*, 48 U.S. at 43. The Court explained that Congress "wisely" "thought otherwise" about "plac[ing] it in the power of a court to decide when the contingency had happened," as "[t]he ordinary course of proceedings in courts of justice would be utterly unfit" given that "the interposition of the United States must be prompt." *Id*. at 43–44.

So it is that both the text and history of the Domestic Violence Clause conspire to preclude Judge Bybee's claim that State consent is required before the President can call forth the militia to execute federal law.

**B.**

Despite what the text and history show, Judge Bybee contends that past practice of federal-state cooperation prove that the Domestic Violence Clause required the President to obtain State consent to call forth the militia to enforce federal law. Judge Bybee marshals a slew of historical examples that supposedly make the point. But *none* of his examples, in fact, do so. Rather, they prove the opposite—that the President had the power, without State consent, to call forth the militia to execute federal law, and that any "cooperation" between the President and a State was a matter of prudence and policy, not legal necessity.

Judge Bybee's principal example of a President supposedly needing consent from a State is from the Whiskey Rebellion. But the historical record on which Judge Bybee relies debunks his thesis. Contrary to Judge Bybee's claim (*see* **Op. at 22**), President Washington did *not* acknowledge that consent from Pennsylvania's governor was needed to call forth the militia to enforce the federal tax laws in that State. Indeed, the governor himself expressed that the President had the authority to call forth the militia *without* the State's consent. Letter from Thomas Mifflin to George Washington (Aug. 5, 1794), *in* 4 *Pennsylvania Archives* 93 (J.B. Linn & W.H. Egle eds., 2d ser. 1896). The governor disagreed with the President's decision to summon the militia, stressing to the President that the militia "ought *not* to be employed" and reasoning that "on the principles of policy as well as of law, it would

be *improper* in me to employ the military power of the State while its Judiciary authority is competent to punish the offenders" (*id*. at 89, 92 (emphasis added))—even though, by this point, President Washington had already obtained notification from a federal judge (required under the Militia Act of 1792) that "judicial proceedings" were not sufficient. Letter from James Wilson to George Washington (Aug. 4, 1794), *in* 4 *Pennsylvania Archives* 70. *Nevertheless*, the governor stated that, when it came to enforcing federal law, the President had conclusive authority to call forth the militia in his "judgment" and "on such evidence as you approve." Letter from Thomas Mifflin to George Washington (Aug. 5, 1794), *in* 4 *Pennsylvania Archives* 93.

The governor's statement is worth quoting here in full, because his acknowledgment of the President's conclusive authority could not be any clearer and so eviscerates Judge Bybee's theory: "I have hitherto, indeed, only spoken as the Executive Magistrate of Pennsylvania, charged with a general superintendence and care that the laws of the Commonwealth be faithfully executed, *leaving it, as I ought, implicitly to your judgment, to choose, on such evidence as you approve, the measures for discharging the analogous trust which is confided to you, in relation to the laws of the Union*." *Id*. at 93 (emphasis added).

The response the governor received is equally explicit. In a letter, the Secretary of State (directed by the President) addressed the governor's "impl[ied] []

virtual disapprobation of that plan of conduct on the part of the General Government." Letter from Edmund Randolph to Thomas Mifflin (Aug. 7, 1794), *in* 4 *Pennsylvania Archives* 97. The Secretary stated plainly that the governor could not "fail to acquiesce" nor "refuse [his] concurrence in the Opinion which the President entertains." *Id.* at 101. The reason, the Secretary stated, was fundamental to our federal system: "The people of the United States have established a Government," "[t]hey have instituted Executive Organs for administering that government," and "their Representatives have established the rules by which those organs are to act." *Id.* at 102. Accordingly, the people "could never be expected to approve that the care of vindicating their authority, of enforcing their laws"—when that "authority" is "attacked"—"should be transferred from the officers of their own government to those of a State[.]" *Id.*

The next example that Judge Bybee invokes also proves the opposite of his claim. As Judge Bybee tells it (*see* **Op. at 23–25**), the federal government's handling of the creation of the Trans-Oconee Republic—a short-lived but disruptive settlement within Georgia—shows that the President needed State consent before calling forth the militia to execute federal law. But that is just not true. Judge Bybee quotes a letter from Secretary of State Edmund Randolph to President Washington in which he acknowledged that "the general government cannot of its own accord interfere in a case of domestic violence" without an application from the State for

aid. *See* Letter from Edmund Randolph to George Washington (July 17, 1794), *in* 16 *The Papers of George Washington, Presidential Series* 368 (D.R. Hoth & C.S. Ebel eds., 2011). But by "domestic violence," Randolph meant just that: violence that was purely domestic to the State, implicating only violations of state law (such as insurrection against the state government), not violations of federal law. *See id.* By contrast, if *federal* law were at stake ("something else being done against the United States"), Randolph advised, "so far as mere power is concerned, it is presumed that the President may call forth the militia of Georgia or of any other State[.]" *Id.* at 369.

In this affair, federal law was at stake, because the agitators for independence from Georgia occupied tribal land and the President had the statutory authority to "remove" them from that land. *See id.* (referencing Act of Mar. 1, 1793, § 5, 1 Stat. 329–32). Thus, in his letter to the governor of Georgia, the Secretary of War Henry Knox wrote that the President had the authority to call up federal forces: "it might, perhaps, be proper to leave this attempt, under its present circumstances, to the management of your own State, *if it were not that the laws of the United States are infringed thereby*." *See* Letter from Henry Knox to George Mathews (July 28, 1794), *in American State Papers: Indian Affairs* 501 (1998) (emphasis added). As a prudential matter, however, the President did not intervene, instead "entertain[ing] the most perfect reliance on [the governor's] exertions, to repel the mischief arising

from this quarter." *Id.* This example proves, contrary to Judge Bybee's contention, that exercising prudential judgment in withholding the militia does not negate the President's *power* to call it forth.

Judge Bybee's example from the Fries Rebellion does not help him either. Judge Bybee concludes (*see* **Op. at 26**) that a "request" from President Adams to Pennsylvania's governor to dispatch militia to quash rioting against a federal tax on land amounted to the President's acknowledgment that obtaining the governor's consent was *required*. Not so. Once again, the inference that Judge Bybee seeks to draw is contradicted by the historical record. The President's "request" was in fact an order, and not merely seeking consent. On behalf of the President, the Secretary of War "request[ed] your Excellency *will order* to hold [certain "troops of cavalry"] in readiness to march[.]" Letter from James McHenry to Thomas Mifflin (Mar. 20, 1799), *in* W.W.H. Davis, *The Fries Rebellion* 75 (1899) (emphasis added). And "request" here was used as shorthand for "*requisition*, on [the] [g]overnor [], for militia." *Id*. (ed. note) (emphasis added). In other words, an *order*. And the governor construed the President's "request" as such, immediately directing his adjutant general to comply. Letter from Thomas Mifflin to Peter Baynton (Mar. 20, 1799), *in* Davis, *The Fries Rebellion* 76. To be sure, "request" in other contexts can mean the mere "asking for permission." But in this context, a "request" does not

mean "asking for permission," any more than a father "requesting" his son to do homework is asking for his son's permission.

Judge Bybee's last example from the Founding Era fares no better. Judge Bybee suggests that, during the Baltimore riots of 1812, President Madison acknowledged the constraints supposedly imposed by the Domestic Violence Clause on his constitutional authority to call forth the militia, when he "refused to deploy federal force even after mob violence took place at a federal building, taking the view that the response properly belonged to local authorities." *See* **Op. at 27–28**. But Judge Bybee gets the history all wrong. Rather than refusing to use federal force in the face of "mob violence . . . at a federal building" (as Judge Bybee asserts), President Madison observed from reports that there was no violence there at all: "I never considered an assault by the mob on the post office as probable, nor allowed myself to doubt that, if made, the local authority was both able and willing to crush it." Letter from James Madison to John Montgomery (Aug. 13, 1812), *in* 5 *The Papers of James Madison, Presidential Series* 150 (J.C.A. Stagg et al. eds., 2004).

So much for Judge Bybee's historical examples from our early Republic. Those examples offer zero support for his claim that the President was required to obtain State consent before calling forth the militia to execute *federal* law. At most, the examples confirm the point that if the violence were purely "domestic"—that is, involving a violation of state law or insurrection against the government of the

State—then the federal government likely has no authority to send troops into that State unless the State's legislature (or executive, if the legislature cannot convene) applies for federal support. And in fact, as explained, the historical examples offered by Judge Bybee only *affirm* the President's power to call forth the militia to execute federal law without State consent.

Judge Bybee's more modern examples stray even further afield from his thesis. His examples either are irrelevant to our question or prove the point that the President had the power to call forth the militia to execute federal laws without State consent. For instance, Judge Bybee discusses a litany of instances involving violations of state law or insurrections against state government—the Williamsport Canal riots, the Dorr Rebellion, guerilla warfare in Missouri in 1863, the Brooks-Baxter dispute, the 1877 railroad strike, the 1902 mining strike, the Detroit riots, and the Rodney King riots. *See* **Op. at 29–42**. But none of these examples answers the question here: whether the President must obtain consent from a State before he can summon the militia to execute *federal* law.

Judge Bybee's other modern examples undercut the very proposition he seeks to prove. Judge Bybee addresses the Pullman Strike of 1894. But there (as he acknowledges), President Cleveland deployed federal forces into Chicago to enforce a federal injunction over the objection of the governor. *See* **Op. at 36–37.** Judge Bybee calls this action a "marked departure" from past practice. ***Id.*** **at 38.** But it is

not. History—properly construed (and not as Judge Bybee has revised it)—validates the President's power to call forth the militia to execute *federal* law without State consent. President Cleveland's actions are entirely consistent with that history.

Similarly, Judge Bybee recounts examples in which various Presidents deployed federal forces "without state consent" to enforce the promises of equal protection and due process under the Fourteenth Amendment. *See* **Op. at 42–48**. All these examples are of a piece with earlier events: they show that the President need not procure State approval before using the militia to enforce federal law. Judge Bybee describes the Fourteenth-Amendment cases as "[a]n important exception" to the requirement of obtaining State consent—an "exception" supposedly rooted in Section 5 of the Fourteenth Amendment. ***Id.* at 48**. But as explained, these cases are no exception at all. They are wholly aligned with past practice.[12] Nor does Judge Bybee explain why Section 5 of the Fourteenth Amendment (that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article") dispenses with the so-called requirement to secure State consent, while the Militia Clause (that "Congress shall have Power . . . [t]o provide for calling forth the Militia to execute the Laws of the Union") retains that requirement. He cannot.

[12] Judge Bybee also briefly discusses how President Nixon summoned the National Guard to enforce federal law in response a postal worker strike in 1970. But Judge Bybee concedes that this example does not support his claim, simply "not[ing] the case here out of completeness." **Op. at 41**.

**III.**

Even if one were to overlook Judge Bybee's historical revisionism, the final stake through his theory is this: his failure to propose a principled alternative. Judge Bybee proposes a test to assess the validity of the President's determination to call forth the militia. While Judge Bybee disagrees with the substantial deference that the panel in *Newsom v. Trump*, 141 F.4th 1032, 1051 (9th Cir. 2025), gives the President, he does not believe that the President should receive no deference at all. Instead, Judge Bybee offers "a three-step burden-shifting scheme" purportedly "informed by the structure, history, and tradition of the Constitution." **Op. at 56**.

Truth be told, Judge Bybee's "solution" is as hopelessly complicated as it is concocted. Where exactly does this test come from? Why three steps; why any steps? If Judge Bybee is borrowing his test from employment law—*see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)—what makes employment relations comparable to exercises of presidential power? *See* **Op. at 56 n.10.** Under one of Judge Bybee's "steps," a State can rebut the "prima facie deference" given to a President's determination by "consider[ing]" a multitude of "factors"—such as "whether state officials were willing to cooperate"; "whether federal civilian tools remained available"; and "whether the deployment infringes on countervailing state interests." **Op. at 57–58.** Of course, none of these factors is dispositive, nor does Judge Bybee's list appear exhaustive. And how to apply any of those factors—*e.g.*,

what "civilian tools" are "available"; what counts as an "infring[ement] of a "countervailing" interest—appears beyond the judicial ken.

*   *   *

Rather than invent a makeshift framework, let us return to what our Constitution provides. Pursuant to it, Congress assigned to the President the power to call forth the militia when he determines he is unable to execute the federal laws. Judge Bybee's work (mountainous as it is) does nothing to refute that principle—his is, in the end, a great labor producing a mouse. I respectfully register my disagreement with his statement in support of en banc review.